# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

HCB FINANCIAL CORP.,

    Plaintiff,

v.

LEE K. MCPHERSON, A/K/A LEE KENNEDY,
A/K/A LEE F. KENNEDY, A/K/A LEE KAREN
FREYER, A/K/A LEE K. FREYER, IN HER
INDIVIDUAL CAPACITY; LEE K.
MCPHERSON A/K/A LEE F. KENNEDY, IN
HER CAPACITY AS TRUSTEE OF THE TRUST
U/W/O BABETTE L. WIENER DATED
10/30/1984; BRENDA L. ADKINSON, IN HER
CAPACITY AS TRUSTEE OF THE TRUST
U/W/O BABETTE L. WIENER DATED
10/30/1984; HARRY RAUCH FREYER, IN HIS
INDIVIDUAL CAPACITY; HARRY RAUCH
FREYER, IN HIS CAPACITY AS TRUSTEE OF
THE TRUST U/W/O BABETTE L. WIENER
DATED 10/30/1984; EMMANUEL
KNIAHYNYCKY; JANET KNIAHYNYCKY;
NEIL MCPHERSON; SAMUEL REYNOLDS;
ANITA L. WILLIAMS; 5950 STATE BRIDGE
ROAD, LLC; BK PROPERTIES II, LLC;
CANNDESCENT JV, LLC; COMPASSIONATE
USE, LLC; COMPASSIONATE USE II, LLC;
FOUNTAIN SQUARE FWB HOLDINGS, LLC;
FREYER INVESTMENTS, LP; HUNGRY
OTTER HOLDINGS, LLC; HYPERION GP,
LLC; HYPERION GULF COAST VENTURES,
LTD.; HYPERION MANAGEMENT, LLC; KWF
GROUP, LLC; LEE KENNEDY
INVESTMENTS, L.P.; LFK GP, LLC; LKF
INVESTMENTS-TEXAS, LLC; LK FREYER
INVESTMENTS, LLC; MEDICUS ARKANSAS,
LLC; MEDICUS ARKANSAS II, LLC;
MEDICUS ARKANSAS III, LLC; ORGANIC
HEALTH SCIENCES, LLC; PALMS DESTIN
HOLDINGS, LLC; ROCKCLIFF HOLDINGS-
GP, LLC; ROCKCLIFF HOLDINGS, LP; AND
SUMMER WINDS GEORGIA, LLC;

**CASE NO.:**   18-1120

Defendants.

# COMPLAINT

For its Complaint against **LEE K. MCPHERSON**, a/k/a Lee Kennedy, a/k/a Lee F. Kennedy, a/k/a Lee Karen Freyer, a/k/a Lee K. Freyer ("**Kennedy**"), and each of the other named Defendants, Plaintiff **HCB FINANCIAL CORP.** ("**HCB**") states as follows:

# INTRODUCTION

1.     Kennedy owes HCB more than $2,000,000.00 pursuant to the Amended Final Judgment (the "**HCB Judgment**" or the "**Amended Final Judgment**") entered in *HCB Financial Corp. v. Mississippi Investors VI, LLC, et al.*, United States District Court for the Southern District of Mississippi, Case No. 1:10cv559 (the "**District Court Case**"), on July 11, 2013. A true and correct copy of the Amended Final Judgment is attached to this Complaint as **Exhibit 1**.

2.     The HCB Judgment remains outstanding and unpaid because Kennedy – a highly sophisticated businessperson – has intentionally avoided payment of her lawful obligations to HCB. Utilizing her business acumen and her extensive personal and professional connections, Kennedy has actively undermined HCB's collection efforts, which Kennedy once referred to as a "joke."

3.     Kennedy and her co-defendants have interfered with HCB's post-judgment discovery efforts, as well. Kennedy's discovery abuses have been so extensive that United States

Magistrate Judge John Gargiulo *sua sponte* threatened Kennedy with incarceration if she failed to participate in HCB's post-judgment discovery efforts.[1]

4. While pursuing post-judgment collection efforts against Kennedy, HCB has discovered that Kennedy and the other named Defendants, including Kennedy's family members, accountants, engineers, real estate brokers, bankers, and business partners (the "**Kennedy Enterprise**") have engaged in a criminal enterprise through a pattern of racketeering activities that includes bank fraud, mail fraud and wire fraud, racketeering, money laundering, and engaging in monetary transactions in property derived from specified unlawful activity. Over the past eight years, the Kennedy Enterprise has embarked on an ambitious course to defraud banks, title insurance companies, courts, and Kennedy's legitimate creditors, including HCB.

5. The Kennedy Enterprise functioned as a continuing unit or organization for the purpose of carrying out the Kennedy Enterprise's unlawful schemes.

6. The Kennedy Enterprise devised multiple schemes comprised of components intertwined with Kennedy's and other defendants' legitimate business interests. The Kennedy Enterprise deliberately defrauded lenders, title agencies, title underwriters, buyers, and/or sellers of various kinds of property for purposes of conveying assets or acquiring assets free and clear of the HCB Judgment. To close deals that would not otherwise close because of the HCB Judgment, the Kennedy Enterprise at times denied the existence of the Amended Final Judgment or misrepresented HCB's collection efforts. When it came to closing deals, the ends justified the means.

---

[1] In the Florida Charging Order Case, *infra* Part I.E.3., the Florida Court recently held Kennedy, in her individual capacity, in contempt for failing to ensure entities she controlled observed the requirements of the Florida Charging Orders.

7.     The Kennedy Enterprise devised a scheme to transfer Kennedy's assets, which were rightfully owed to third parties such as HCB, to Kennedy's insiders and affiliates to avoid collection efforts by her creditors, including HCB. In that way, Kennedy could continue to control her substantial wealth, collect hundreds of thousands of dollars of annual rent revenues, and preserve Kennedy's investment and equity cushion in her assets, to the detriment of HCB.

8.     After Kennedy and her affiliates defaulted on more than $15,000,000 in commercial debt, the Kennedy Enterprise executed its scheme to transfer Kennedy's personal assets beyond her creditors' reach. The Kennedy Enterprise transferred millions of dollars of liquid assets into limited partnerships, limited liability companies, and trusts to fend off Kennedy's creditors, including HCB.

9.     To that end, the Kennedy Enterprise defrauded Well Fargo Bank, National Association ("**Wells Fargo**") by staging a default on a $1,500,000 loan and then executing a classic short sale fraud scheme. Knowing her wealth would disqualify her from favorable loan accommodations from Wells Fargo, Kennedy triggered an intentional, strategic default. Then, the Kennedy Enterprise executed a *sub rosa* scheme by which Kennedy Enterprise funded a discounted payoff to Wells Fargo through a straw buyer. The Kennedy Enterprise ultimately succeeded in its fraud on Wells Fargo, committing bank fraud, mail fraud, wire fraud, and money laundering in the process. By consummating the fraudulent short sale before HCB had an opportunity to record the Amended Final Judgment, the Kennedy Enterprise endeavored to transfer beachfront property in Destin, Florida, beyond HCB's reach.

10.     The Kennedy Enterprise also devised a scheme to liquidate or otherwise cash-out its real estate assets to shield the equity in those assets from collection by Kennedy's collecting creditors, such as HCB, or otherwise reinvest the enterprise's equity in those assets.

11.     The Kennedy Enterprise targeted other banks, too. The Kennedy Enterprise tricked Thomasville National Bank ("**Thomasville**") into making a loan to a non-existent company. Grossly misrepresenting Kennedy's assets and liabilities, and manipulating the ownership of numerous entities, the Kennedy Enterprise borrowed more than $1,000,000 from Thomasville and directed those loan proceeds into its other operations.  The Kennedy Enterprise committed numerous instances of mail and wire fraud and bank fraud in its efforts to obtain loans from Thomasville.

12.     In addition, the Kennedy Enterprise executed a scheme to borrow money from smaller banks anxious to make commercial loans to people as wealthy as Kennedy. The Kennedy Enterprise borrowed $600,000 from First Florida Bank ("**First Florida**"), in Destin, Florida, by misrepresenting the value of Kennedy's assets and concealing litigation pending against Kennedy in Florida, Mississippi, Louisiana, and Texas. The Kennedy Enterprise submitted tax returns that were knowingly false and misrepresented creditors' collection efforts to obtain the loan from First Florida. In so doing, the Kennedy Enterprise committed bank fraud, mail fraud, and wire fraud.

13.     HCB's Amended Final Judgment, though, has been a continuing impediment to the Kennedy Enterprise's borrowing efforts because it negatively affects Kennedy's personal net worth and liquidity. To keep up appearances, the Kennedy Enterprise repeatedly has misrepresented the extent of HCB's collection activities so the enterprise could minimize the negative effects of Kennedy's failure to pay the HCB Judgment.

14.     Beyond its bank fraud schemes, the Kennedy Enterprise committed fraud against numerous other companies, courts in Texas and Florida, courts in Canada, and the State of

Arkansas Medical Marijuana Commission, all in efforts to preserve or enhance its financial condition.

15. At times, the Kennedy Enterprise endeavored to liquidate certain assets, particularly those Kennedy owned in her individual capacity, such as Kennedy's vacation home fronting the Gulf of Mexico in Destin, Florida, and a townhouse near the beach in Walton County, Florida.

16. From 2013 through 2018, Kennedy would say or do anything to consummate a transaction, and Kennedy and her co-conspirators signed countless affidavits, certificates, and other documents they knew to be false to defraud banks, title companies, courts, and other stakeholders.

17. In sum, Kennedy and her co-defendants conducted a criminal enterprise through a pattern of racketeering activities that was intended to harm HCB and deprive it of the proceeds of its judgment – a liability that remains unpaid despite Kennedy's obvious ability to pay. The Kennedy Enterprise has committed numerous instances of mail fraud, wire fraud, racketeering, and money laundering in its efforts to transfer assets beyond the reach of HCB's collection efforts.

18. The Kennedy Enterprise even engaged in frauds on the courts of Texas and Florida in its efforts to prevent HCB from discovering and executing against Kennedy's assets. The Kennedy Enterprise masked Kennedy's control of a series of limited partnerships, inter vivos trusts, testamentary trusts, and limited liability companies to prevent disclosure of Kennedy's control over such entities from the Florida and Texas courts to impede HCB's collection efforts.

19.     Moreover, the Kennedy Enterprise utilized fraudulent or undisclosed strawman transactions to consummate deals that conceal Kennedy's direct control over the disposition of assets that otherwise would be used to pay Kennedy's legitimate creditors, such as Wells Fargo and HCB. The Kennedy Enterprise funnels money through electronic transactions among major investment banks, law firms, title companies, and real estate brokers to disguise the source and ultimate disposition of the proceeds of the Kennedy Enterprise. Despite the web of limited partnerships, limited liability companies, and trusts spun by the Kennedy Enterprise, Kennedy is very much in control of The Kennedy entities, which are her alter egos.

20.     The Kennedy Enterprise has existed and operated since at least 2010 and continues to this day.

21.     The Kennedy Enterprise operates in interstate commerce and its activities substantially affect interstate commerce.

22.     Since 2010, the Kennedy Enterprise has committed the following crimes:

    a.      Mail fraud under 18 U.S.C. § 1341;

    b.      Wire fraud under 18 U.S.C. § 1343;

    c.      Financial institution fraud under 18 U.S.C. § 1344;

    d.      Racketeering under 18 U.S.C. § 1952; and

    e.      Witness tampering under 18 U.S.C. § 1512.

23.     Through its pattern of racketeering activities, the Kennedy Enterprise has derived substantial and unlawful economic benefits, which it has reinvested in other aspects of its criminal enterprise.

24.     HCB has been damaged by the Kennedy Enterprise because it has been unable to collect its judgment. The Kennedy Enterprise's unlawful conduct has deprived HCB of monetary

proceeds in excess of $15,000,000.00, attorney's fees, and expenses. The Kennedy Enterprise has unlawfully imposed on HCB opportunity costs resulting directly from the enterprise's criminal activity because the Kennedy Enterprise deprived HCB of the opportunity to access and utilize the proceeds of the HCB Judgment and the deficiency Kennedy owes under the HCB Judgment.

25.     In addition, the Kennedy Enterprise conspired, acted, and engaged in ongoing and systematic efforts to transfer Kennedy's assets with the actual intent to hinder, delay, and defraud her creditors, including HCB, in violation of Texas' Uniform Fraudulent Transfer Act ("**TUFTA**"), Tex. Bus. & Com. Code Ann. § 24.001, the Florida Uniform Fraudulent Transfer Act ("**FUFTA**"), Fla. Stat. § 726.101, and the Louisiana Trust Code, La. Rev. Stat. § 9:1721.

## JURISDICTION AND VENUE

26.     This case arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("**Civil RICO**"), as well as under the laws of the State of Texas and the State of Florida.

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367(a) and 18 U.S.C. § 1964(c).

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because (a) a substantial part of the events or omissions giving rise to HCB's claims occurred in this district, or (b) a substantial part of property that is the subject of the action is situated in this district. In addition, venue is proper in this district pursuant to 18 U.S.C. § 1965(a)-(b) because each defendant resides, is found, has an agent, or transacts her or his or its affairs in this district, and because the ends of justice so require.

## PARTIES

29.     HCB is a corporation incorporated under the laws of the State of Florida, and its principal place of business is in Miramar Beach, Walton County, Florida. HCB is a "person" as defined in 18 U.S.C. § 1961(3) and 1964(c).

30.     Kennedy is a citizen of the State of Texas. She resides in Austin, Travis County, Texas.

31.     Defendant BRENDA L. ADKINSON ("**Adkinson**") is a citizen of the State of Texas. She resides in Austin, Travis County, Texas.

32.     Defendant HARRY RAUCH FREYER ("**Harry Freyer**") is a citizen of the State of Colorado. He resides in Aurora, Arapahoe County, Colorado.

33.     Defendant EMMANUEL "MANNY" KNIAHYNYCKY ("**Kniahynycky**") is a citizen of the State of Michigan. He resides in Rochester Hills, Oakland County, Michigan.

34.     Defendant JANET KNIAHYNYCKY ("**Janet Kniahynycky**") is a citizen of the State of Michigan. She resides in Rochester Hills, Oakland County, Michigan.

35.     Defendant NEIL MCPHERSON ("**Neil McPherson**") is a Canadian citizen, and he resides in Houston, Harris County, Texas.

36.     Defendant SAMUEL "SAM" REYNOLDS ("**Reynolds**") is a citizen of the State of Texas. He resides in Austin, Travis County, Texas.

37.     Defendant ANITA L. WILLIAMS ("**Anita Williams**") is a citizen of the State of Florida. She resides in Santa Rosa Beach, Walton County, Florida.

38.     Defendant 5950 STATE BRIDGE ROAD, LLC, f/k/a 5950 STATE BRIDGE ROAD, INC. ("**5950 State Bridge**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

39.     Defendant BK PROPERTIES II, LLC ("**BK II**") is a limited liability company organized under the laws of the State of Florida. BK II's principal place of business is in Destin, Okaloosa County, Florida.

40.     Defendant CANNDESCENT JV, LLC ("**Canndescent JV**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

41.     Defendant COMPASSIONATE USE, LLC ("**Compassionate Use**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

42.     Defendant COMPASSIONATE USE II, LLC ("**Compassionate Use II**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

43.     Defendant FOUNTAIN SQUARE FWB HOLDINGS, LLC ("**Fountain Square**"), is a limited liability company organized under the laws State of Texas. Its principal place of business is in Austin, Travis County, Texas.

44.     Defendant FREYER INVESTMENTS, LTD. ("**Freyer Investments**"), is a Texas limited partnership. Its principal place of business is in Cherry Hills Village, Arapahoe County, Colorado.

45.     Defendant HUNGRY OTTER HOLDINGS, LLC ("**Hungry Otter**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

46.     Defendant HYPERION GP, LLC ("**Hyperion GP**"), is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Houston, Harris County, Texas.

47.     Defendant HYPERION GULF COAST VENTURES, LTD. ("**Hyperion**"), is a Texas limited partnership. Its principal place of business is in Austin, Travis County, Texas.

48.     Defendant HYPERION MANAGEMENT, LLC ("**Hyperion Management**"), is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

49.     Defendant KWF GROUP, LLC ("**KWF Group**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Taxes.

50.     Defendant LEE KENNEDY INVESTMENTS, L.P. ("**Lee Kennedy Investments**") is a Texas limited partnership. Its principal place of business is in Austin, Travis County, Texas.

51.     Defendant LFK GP, LLC ("**LFK GP**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

52.     Defendant LKF INVESTMENTS-TEXAS, LLC ("**LKF Investments-Texas**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

53.     Defendant LK FREYER INVESTMENTS, LLC ("**LK Freyer Investments**"), is a limited liability company organized under the laws of the State of Louisiana. Its principal place of business is in Austin, Travis County, Texas.

54.     Defendant MEDICUS ARKANSAS, LLC ("**Medicus Arkansas**"), is a limited liability company organized under the laws of the State of Arkansas. Its principal place of business is in Austin, Travis County, Texas.

55.     Defendant MEDICUS ARKANSAS II, LLC ("**Medicus II**"), is a limited liability company organized under the laws of the State of Arkansas. Its principal place of business is in Austin, Travis County, Texas.

56.     Defendant MEDICUS ARKANSAS III, LLC ("**Medicus III**"), is a limited liability company organized under the laws of the State of Arkansas. Its principal place of business is in Austin, Travis County, Texas.

57.     Defendant ORGANIC HEALTH SCIENCES, LLC ("**Organic Health**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

58.     Defendant PALMS DESTIN HOLDINGS, LLC ("**Palms Destin Holdings**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

59.     Defendant ROCKCLIFF HOLDINGS-GP, LLC ("**Rockcliff GP**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

60.     Defendant ROCKCLIFF HOLDINGS, LP ("**Rockcliff Holdings**") is a Texas limited partnership. Its principal place of business is in Austin, Travis County, Texas.

61.     Defendant SUMMER WINDS GEORGIA, LLC ("**Summer Winds Georgia**") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Austin, Travis County, Texas.

## FACTS COMMON TO ALL COUNTS

I.     *Background and nature of HCB's claims against Kennedy.*

    A.     *Kennedy has an extensive background in banking and finance.*

62.     Kennedy is well-educated. In 1991, she was graduated from American University with an M.B.A. with a concentration in finance. She holds bachelor's degrees in political science and economics from Washington University in St. Louis, Missouri. She also attended the University of London.

63.     Kennedy has invested successfully in diverse businesses throughout the United States. She is an accomplished real estate investor and developer and has been the managing member of McPherson Development since 2003. Prior to becoming a successful real estate entrepreneur, Kennedy accumulated more than 10 years of experience in private wealth management, investor relations, and institutional investment, working for financial giants Morgan Stanley; G.A. Kraut, and Spears; and Leeds & Kellogg, which is now a wholly-owned subsidiary of Goldman Sachs. In April 2016, Kennedy testified that she has been a real estate developer for 15 years and she is very experienced in banking and borrowing money. *See Biel REO, LLC v. Lee Freyer Kennedy Crestview, LLC*, 242 So. 3d 833, 844 (Miss. 2018), *reh'g denied* 2018 Miss. LEXIS 246 (Miss., May 31, 2018).

64.     As an investor, Kennedy trades heavily in equities markets. For example, in 2012, Kennedy and entities she owned or controlled bought and sold $200,000,000 of publicly traded securities.

65.     Most recently, Kennedy has invested in marijuana cultivation businesses in California, Texas, and Arkansas. In 2016, Kennedy led a $6,500,000.00 equity transaction for Canndescent MBC, a California mutual benefit corporation, one of the leading cannabis cultivators in California. Canndescent "cultivates ultra premium cannabis flower and curates it

for the adult-use California market"[2] and contends that it "produces over 10,000 pounds of cannabis each year and is often described as the inventor of luxury cannabis."[3] Demonstrating her business acumen, Kennedy recently explained, "At this moment in history, cannabis is an execution play requiring a blend of six sigma operations and state-of-the-art marketing. Canndescent was the first company of the 50-plus I reviewed that possessed the vision, passion, expertise and focus to build something extraordinary."[4]

66.     Throughout post-judgment discovery and in testimony in related cases, Kennedy has feigned ignorance or lack of understanding of her own finances, businesses, and entity structure. Kennedy has done so in a deliberate attempt to manipulate HCB's collection efforts.

67.     Kennedy boasts personal wealth in excess of $13,000,000, including cash in banks, life insurance with a cash surrender value of $6,000,000.00, an annual salary of $150,000.00 (paid by an entity she alone manages), "lots of" mineral and royalty interests, and a home worth more than $2,000,000.00. Kennedy owns numerous interests in limited liability companies, limited partnerships, joint ventures, and other business organizations.

### B.     Kennedy guaranteed nearly $17,500,000 of debt for Mississippi Investors VI, LLC, and defaulted on her guaranty obligations.

68.     In 2006, Kennedy was heavily invested in real estate development projects along the Gulf Coast from Texas to Florida. Among her investments was Mississippi Investors VI, LLC ("**Mississippi Investors**"), a Mississippi limited liability company, which was developing a large-scale, master-planned community in Stone County, Mississippi, known as "Horizons."

---

[2] https://www.canndescent.com/our-process
[3]     https://www.newcannabisventures.com/california-premium-cannabis-grower-canndescent-named-to-exclusive-startup-list/
[4] https://www.prweb.com/releases/2016/08/prweb13647644.htm

69.     In connection with the Horizons project, Kennedy guaranteed loans from Double A Firewood, Inc. ("**Double A Firewood**") and Central Progressive Bank ("**Central Progressive**"), in Lacombe, Louisiana, totaling nearly $17,500,000.

70.     Ultimately, Mississippi Investors and Kennedy defaulted on their obligations to Double A Firewood and Central Progressive.

### 1.     The Double A Firewood Loan

71.     On September 29, 2006, Mississippi Investors executed a promissory note in favor of Double A Firewood in the original principal amount of $7,438,400.00 (the "**Double A Firewood Loan**"). At the time Mississippi Investors signed the promissory note, Kennedy was a member of Mississippi Investors.

72.     Kennedy and her then partners in Mississippi Investors each executed a continuing personal guaranty agreement, unconditionally guaranteeing the full and prompt payment of all liabilities, indebtedness, and obligations of every kind and character, owed by Mississippi Investors to Double A Firewood.

73.     Mississippi Investors simultaneously delivered a Deed of Trust conveying certain real property commonly referred to as Villages C and D to Double A Firewood as additional collateral for the Double A Firewood Loan.

74.     Mississippi Investors and its guarantors, including Kennedy, defaulted on the Double A Firewood Loan, and Double A Firewood initiated foreclosure efforts on its collateral.

75.     Central Progressive, another of Mississippi Investors' lenders, purchased the Double A Firewood Loan in an effort to protect its junior lien in the collateral.

76.     As Double A Firewood's assignee and successor, Central Progressive completed the foreclosure efforts previously initiated by Double A Firewood under the Double A Firewood Loan.

77.     Because the sale price at the foreclosure sale of the real property collateral was inadequate to pay the Double A Firewood Loan in full, Central Progressive sued Kennedy, among others, for a deficiency judgment.

78.     On December 9, 2010, Central Progressive filed the original Complaint in the District Court Case.[5]

79.     On August 24, 2011, Central Progressive served Kennedy with its First Amended Complaint in the District Court Case.

**2.     Loan No. 2252139**

80.     In a separate loan transaction, Mississippi Investors borrowed $10,000,000 from Central Progressive under Loan No. 2252139.

81.     On August 23, 2006, Mississippi Investors executed a Promissory Note (the "**CPB Promissory Note**") in favor of Central Progressive in the original principal amount of $10,000,000.00, evidencing Loan No. 2252139.

82.     On or about August 23, 2006, Kennedy executed a Commercial Guaranty (the "**CPB Guaranty**") in which she agreed to pay all sums due Central Progressive from Mississippi Investors under the CPB Promissory Note and any modifications thereto, including principal, interest, attorney's fees, and costs of collection.

83.     The CPB Promissory Note matured on March 23, 2008, and all amounts outstanding under Loan No. 2252139 became due and payable.

---

[5] *See supra* para. 1. The District Court Case originally was styled *Central Progressive Bank v. Mississippi Investors VI, LLC, et al.*, United States District Court for the Southern District of Mississippi, Case No. 1:10cv559HSO-JMR.

84.     Mississippi Investors defaulted under the CPB Promissory Note when it failed to pay on maturity the amounts due under Loan No. 2252139. Kennedy, in turn, defaulted under the CPB Guaranty when she failed to pay the amounts due under Loan No. 2252139.

85.     On June 18, 2008, Central Progressive filed its Original Petition in that certain civil action styled *Central Progressive Bank v. David E. Fleisher, Mike Adkinson a/k/a William Michael Adkinson, Robert T. Windham a/k/a Robert T. Windham, Sr., and Lee Freyer Kennedy*, 22nd Judicial District Court for St. Tammany Parish, Louisiana, Case No. 2008-13320 (the "**St. Tammany Parish Case**") seeking enforcement of Loan No. 2252139.

86.     On February 2, 2010, Central Progressive sent letters to Mississippi Investors and its guarantors, including Kennedy, demanding payment in full in the amount of $7,198,345.73. A true and correct copy of Central Progressive's February 2, 2010, letter to Kennedy is attached to this Complaint as **Exhibit 2**.

87.     Central Progressive filed supplemental and amending petitions on June 25, 2008, and June 7, 2010, in the St. Tammany Parish Case.

88.     On June 15, 2015, HCB filed a Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment in the St. Tammany Case. The court in the Tammany Parish Case denied HCB's Motion for Summary Judgment on September 9, 2015.

89.     The St. Tammany Parish Case is pending and awaiting trial.

**C.      *Central Progressive failed, and HCB ultimately acquired the Double A Firewood Loan <u>and</u> Loan No. 2252139.***

90.     As a result of the real estate market crash and recession of December 2007 through June 2009, and the resulting defaults and loss of capital, Central Progressive failed on November 11, 2011.

91.     After Central Progressive failed, the 22nd Judicial District Court for St. Tammany Parish, Louisiana, appointed the Federal Deposit Insurance Corporation ("**FDIC**") as Receiver of Central Progressive.[6] FDIC immediately assigned the Double A Firewood Loan and Loan No. 2252139 to First NBC Bank in New Orleans, Louisiana. On May 4, 2012, First NBC Bank assigned the Double A Firewood Loan and Loan No. 2252139 to HCB.

92.     On May 11, 2012, HCB moved the District Court to be substituted for Central Progressive as the party plaintiff in the District Court Case, and on May 21, 2012, the District Court granted HCB's motion to substitute.

93.     On October 10, 2012, less than five months later, HCB filed a Motion for Summary Judgment in the District Court Case. Kennedy responded to HCB's Motion for Summary Judgment on October 24, 2012, and on October 25, 2012, Kennedy supplemented her Response to HCB's Motion for Summary Judgment. On October 31, 2012, HCB filed its Reply to Kennedy's Response to HCB's Motion for Summary Judgment. At that time, the District Court took HCB's Motion for Summary Judgment under consideration.

94.     On March 14, 2013, the District Court entered that certain Memorandum Opinion and Order Granting Plaintiff's Motion for Summary Judgment (the "**Memorandum Opinion**") in the District Court Case. A true and correct copy of the Memorandum Opinion is attached to this Complaint as **Exhibit 3**. Immediately thereafter, the District Court entered that certain Final Judgment in the District Court Case. A true and correct copy of the Final Judgment is attached to this Complaint as **Exhibit 4.** On April 11, 2013, HCB filed a Motion to Alter or Amend the Final Judgment. A true and correct copy of HCB's Motion to Alter or Amend is attached to this

---

[6] *In the Matter of Central Progressive Bank, Lacombe, LA, a Louisiana banking corporation*, Docket No. 2011-16562, Div. D, 22nd Judicial District Court, St. Tammany Parish, Louisiana.

Complaint as **Exhibit 5**. On July 11, 2013, the District Court entered the Amended Final Judgment in the District Court Case. **Ex. 1**. The Amended Final Judgment provided that "Judgment is rendered in favor of [HCB] against [Kennedy], for the sum of $2,019,495.82." *Ibid*.

95.     Kennedy subsequently appealed the Amended Final Judgment to the United States Court of Appeals for the Fifth Circuit (the "**Fifth Circuit**") in that certain case styled *Lee Kennedy v. HCB Financial Corp.*, United States Court of Appeals for the Fifth Circuit, No. 13-60560. On June 4, 2014, the Fifth Circuit entered its Judgment affirming the HCB Judgment. A true and correct copy of the Fifth's Circuit Judgment is attached to this Complaint as **Exhibit 6**.

96.     The Amended Final Judgment is final and has been affirmed on appeal. Kennedy has no defenses to the Amended Final Judgment.

97.     As of the filing of this Complaint, Kennedy owes HCB **$2,037,062.30** under the Amended Final Judgment, exclusive of post-judgment costs, interest, and attorney's fees.

98.     As of the date of this Complaint, Kennedy owes HCB **$13,251,402.37** in connection with Loan No. 2252139, as follows:

|  |  |
|---|---:|
| Principal Balance: | $7,061,536.00 |
| Accrued Interest as of 06/10/15: | $4,134,824.77 |
| Accrued Interest since 06/10/15: | $1,905,255.63 |
| Appraisal Fee: | $7,000.00 |
| Attorney's Fees: | $1,057,273.31 |
| Costs: | $32,705.76 |
| Late Fees: | $16,744.97 |
| **Total** | **$14,215,340.44** |

99.     Combined with the HCB Judgment, as of December 21, 2018, **Kennedy owes HCB $16,252,402.74**.

**D.      Kennedy sued Bryan Nelson and Hall.**

100.     On October 9, 2015, Kennedy sued Hall and Bryan Nelson, PA (the "**BN Law Firm**"), her counsel in the District Court Case, in that certain civil action styled *Lee F. Kennedy*

*v. Jeffrey L. Hall*, United States District Court, Southern District of Mississippi, Case No. 2:15cv135-KS-JCG (the "**Kennedy/Hall Case**"). A true and correct copy of Kennedy's complaint in the Kennedy/Hall Case is attached to this Complaint as **Exhibit 7**.

101. Kennedy alleged that Hall and Bryan Nelson committed legal malpractice by, among other things, failing to conduct discovery, obtain appraisals, or raise certain arguments Kennedy hoped would have prevented entry of the HCB Judgment. **Ex. 7**. Kennedy attached to her complaint email communications from September 1, 2011, and September 2, 2011, between her and Ralph N. "Sandy" Menetre ("**Menetre**"), then the Executive Vice President of Central Progressive.

102. On September 1, 2011, Kennedy sent an email to Menetre in which Kennedy wrote:

> Sandy, I just received the documents pertaining to the suit CPB filed against me. I spoke to your attorney, I just want to bring to your attention that not only have I been out of the partnership for 5 years (which you knew) but there is a ruling on the valuation of property adjacent, that is of lesser value, of north of $4000.00 per acre. ***I am not responsible for this debt***, but based on the appraisal and the ruling this put the collateral in access of what is owed. The opinion I have gotten from appraisals is north of $5000.00 per acre. This is more than double the value of what is owed.
>
> This lawsuit is frivolous and waste of money on both sides. I understand CPB is in serious trouble and I find it extravagant that you'd be reaching for ridiculous straws at this point. Your lawyers are happy to pursue this in light of the fee's [sic] they will obtain.
>
> Think about this continous [sic] waste of share holders money and reckless spending of shareholder money. Lee Kennedy

**Ex. 7** (emphasis added).

103. On September 2, 2011, Menetre replied to Kennedy's September 1, 2011, email. Menetre responded, "See your continuing guarantee [sic] the Bank is having issues as a result of individuals not living up to their obligation as agreed[.]" *Ibid*.

104.    Minutes later, Kennedy forwarded Menetre's email to Hall, and she wrote, "I wanted that email in the file so when it goes into receivership .... call me[.]" *Ibid*.

105.    On June 3, 2016, Hall and Bryan Nelson filed a Motion for Summary Judgment, supporting exhibits, and a Memorandum in Support of Motion for Summary Judgment in The Kennedy/Hall Case.

106.    Kennedy opposed Hall and Bryan Nelson's Motion for Summary on June 28, 2016, when she filed her Opposition to Motion for Summary Judgment with supporting exhibits. Kennedy attached to her opposition the Affidavit of William Christopher Beary (the "**Beary Affidavit**"). A true and correct copy of the Beary Affidavit is attached to this Complaint as **Exhibit 8**.

107.    In the Beary Affidavit, Beary attested that, at that time, he was defending Kennedy in the St. Tammany Parish Case. **Ex. 8**, ¶ 2. Beary explained that he participated in several conference calls with Hall in 2011 and 2012. *Id*., ¶ 5. More specifically, Beary provided in his affidavit as follows:

> I participated in several conference calls with Jeff Hall in 2011 and 2012 in which he was instructed to: (1) retain a real estate appraiser to value the collateral at issue in HCB's lawsuit against Kennedy in Mississippi; (2) file a Motion to Abstain based on the Colorado River abstention doctrine and/or otherwise adjoin and/or stay the Mississippi Action; (3) assert as a defense the fact that HCB held four parcels of real estate as collateral and that the fair market value of all four parcels should be utilized in calculating any deficiency judgment owed by Kennedy; and (4) contest the deficiency amount sought by HCB in the Mississippi Action.

*Id*.

108.    Beary also attested, under oath, as follows:

> I participated in several phone calls where it was discussed by Jeff Hall in providing legal advice to Lee Kennedy that she was entitled in the Mississippi Action to an offset for the value of the underlying collateral and that being the fair market value of the underlying collateral at the time the collateral was taken by the lender. At no time did Jeff Hall indicate any legal deficiency in the argument

of such an offset and, in fact, provided Lee Kennedy the advice that proof of the fair market value would relieve her on the sued upon obligation up to the extent of the value of the collateral. It was discussed numerous times that the value of the collateral exceeded the underlying value of the debt and that Lee Kennedy, according to Jeff Hall, should not have to be liable for any of the sued upon obligation.

*Id.*, ¶ 11.

109.    On August 9, 2016, The Kennedy/Hall Court granted Hall and Bryan Nelson's Motion for Summary Judgment and entered judgment in favor of Hall and Bryan Nelson. True and correct copies of The Kennedy/Hall Court's Order and Final Judgment are attached to this Complaint as **Exhibit 9**.

110.    On August 25, 2016, Kennedy filed a Notice of Appeal to the United States Court of Appeal for the Fifth Circuit.

111.    After making himself a fact witness in the underlying case, Beary represented Kennedy on appeal in that certain case styled *Lee Kennedy v. Jeffrey Hall and Bryan Nelson, PA*, United States Court of Appeals for the Fifth Circuit, No. 16-60569.

112.    Kennedy, as Appellant, and Hall and Bryan Nelson, as Appellees, filed their respective appellate briefs as follows:

        a.      Brief of Appellant Lee F. Kennedy, filed on October 25, 2016;

        b.      Brief of Defendants-Appellees Jeffrey Hall and Bryan Nelson PA, filed on November 23, 2016; and

        c.      Reply Brief of Appellant Lee F. Kennedy, filed on December 7, 2016.

113.    On December 14, 2016, Hall and Bryan Nelson moved to strike portions of Kennedy's Appellant's Reply Brief because, according to Hall and Bryan Nelson, Kennedy raised arguments in her reply brief she previously had not raised before the trial court or in the

Brief of Appellant. A true and correct copy of the Motion to Strike is attached to this Complaint as **Exhibit 10**.

114.    On December 22, 2016, Kennedy opposed Hall and Bryan Nelson's Motion to Strike Portion of Reply Brief. In her Memorandum in Opposition to Motion to Strike Portion of Reply Brief, a true and correct copy of which is attached to this Complaint as **Exhibit 11**, Kennedy cited directly to the Beary Affidavit to rebut Hall and Bryan Nelson's Motion to Strike. **Ex. 11** at 1-2. Beary signed Kennedy's Memorandum in Opposition to Motion to Strike Portion of Reply Brief. In that memorandum, Kennedy quoted Paragraph 11 of the Beary Affidavit in its entirety, even attributing the testimony to Beary. *Id*.

115.    Beary not only was a fact witness in the Kennedy/Hall Case, but also signed the papers that cited to his own testimony as a fact witness, as shown in the following table:

| Paper/Pleading | Citations to Testimony | Signatures |
|---|---|---|
| Appellant's Brief | pp. 16, 37-38, 40<br>n. 38 at 16<br>nn. 91-93 at 37<br>nn.94-97 at 38<br>n.110 at 40 | pp. 11, 44, 46-47 |
| Appellant's Reply Brief | p. 8<br>nn. 29-30 at 8 | pp. 13-15 |
| Opposition to Motion to Strike | pp. 1-2<br>n.3 at 1<br>n.4 at 2 | pp. ii, 9-11 |

116.    On February 17, 2017, the Fifth Circuit affirmed the judgment of court in the the Kennedy/Hall Case.

**E.    Kennedy has fraudulently obstructed HCB's discovery and collection efforts.**

117.    Immediately before and after HCB obtained the Amended Final Judgment, Kennedy began (a) transferring assets to insiders and affiliates; (b) causing those insiders either to extend credit or obtain credit under the guise of arm's-length transactions; (c) encumbering assets not previously encumbered; and (d) misrepresenting the nature and existence of other

assets, all of which Kennedy accomplished with the knowledge, agreement, and assistance of one or more of the other Defendants.

118.    On July 22, 2013, HCB served on Kennedy post-judgment interrogatories, requests for production, and requests for admission. The same day, HCB also served a notice of deposition on Kennedy.

119.    On November 27, 2013, HCB filed a motion to compel Kennedy to respond to HCB's discovery requests. Even then, Kennedy provided no discovery responses until December 18, 2013, just one day before her first post-judgment deposition. Those responses, served four months after their due date, were woefully incomplete and inadequate. Kennedy failed until May 13, 2016, to provide complete discovery responses. That day, Kennedy served her Supplemental Responses to Plaintiff's Interrogatories and Requests for Production, a true and correct copy of which is attached hereto as **Exhibit 12**.[7]

120.    HCB has deposed Kennedy twice since the entry of the Amended Final Judgment. Kennedy's first post-judgment deposition occurred on December 19, 2013. The second post-judgment deposition occurred on May 1, 2014. Relevant excerpts from the transcripts of Kennedy's December 19, 2013, and May 1, 2014, post-judgment depositions are attached to this Complaint as **Exhibits 13** and **14**, respectively.[8]

121.    Since that time, Kennedy repeatedly has interfered with HCB's third-party discovery efforts.

---

[7] Kennedy served discovery responses on December 18, 2013, February 5, 2014, May 13, 2016, and December 16, 2016.

[8] References to the transcript of Kennedy's first post-judgment deposition will appear as "*Kennedy, Vol. I*, page:line." References to the transcript of Kennedy's second post-judgment deposition will appear as "*Kennedy, Vol. II*, page:line."

1.   **HCB has domesticated the Amended Final Judgment and perfected its judgment lien in numerous jurisdictions.**

122.   On January 4, 2014, HCB recorded the HCB Judgment in Official Records Book 2940, Page 2353, of the Public Records of Walton County, Florida.

123.   On January 17, 2014, HCB recorded the HCB Judgment in Official Records Book 3133, Page 1260, of the Public Records of Okaloosa County, Florida.

124.   On May 9, 2014, HCB filed an Electronic Judgment Lien Certificate with the Florida's Central Judgement Lien Registry, as Instrument No. J14000561984.

125.   On September 8, 2014, HCB domesticated the HCB Judgment in the State of Texas in that certain civil action styled *HCB Financial Corp. v. Lee F. Kennedy*, District Court, Travis County, Texas (the "**Travis County Court**"), Cause No. D-1-GN-14-003506 (the "**Travis County Case**").

126.   HCB has registered the HCB Judgment in numerous United States District Courts, as shown on the following table:

| Date Filed | Style | Court | Case Number |
|---|---|---|---|
| 01/06/15 | HCB Financial Corp. v. Kennedy | U.S.D.C., S.D.N.Y. | 1:2015mc00002 |
| 08/21/15 | HCB Financial Corp. v. Kennedy | U.S.D.C., W.D. La. | 5:2015mc00024 |
| 04/06/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., N.D. Tex. | 1:2016mc00003 |
| 04/07/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., S.D. Tex. | 4:2016mc00776 |
| 04/08/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., W.D. Tex. | 1:2016mc00450 |
| 04/14/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., E.D. Tex. | 1:2016mc00003 |
| 04/19/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., D. Colo. | 1:2016rj00006 |
| 10/07/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., M.D. Ga. | 1:2016mc00002 |
| 11/03/16 | HCB Financial Corp. v. Kennedy | U.S.D.C., N.D Ga | 1:2016mi00090 |

2.   **HCB obtained charging orders against Kennedy's companies in Texas.**

127.   On November 7, 2014, HCB filed a Petition/Application for Charging Orders in the Travis County Case.

128.   Neither Kennedy nor any of the entities identified in HCB's Petition/Application for Charging Orders answered HCB's petition. On December 3, 2014, the Travis County Court

conducted a hearing on HCB's Petition for Charging Orders at which Kennedy appeared through her counsel, Mr. Eric Taube ("**Mr. Taube**").

129.    On December 16, 2014, the Travis County Court entered its Order Granting in Part and Denying, in Part, Motion for Charging Order (the "**Texas Charging Order**"), a true and correct copy of which is attached to this Complaint as **Exhibit 15**, charging the following companies (the "**Texas Charged Entities**"):

- Lee Kennedy Investments
- LFK GP
- Rockcliff Holdings
- Rockcliff GP
- Hungry Otter
- Rivercrest Lot, LLC
- FH Aspen, LLC
- LKF Investments-Texas
- KWF Group
- Chesapeake Kennedy, LLC
- BCL Kennedy

130.    None of the Texas Charged Entities has made any payment under the Texas Charging Order.

### 3.    HCB successfully obtained charging orders against several Kennedy entities in Florida.

131.    In Florida, HCB has obtained Charging Orders against other entities Kennedy owns and/or controls.

132.    On February 4, 2014, HCB filed an action in the Circuit Court of Okaloosa County, Florida, styled *HCB Financial Corp. v. Lee F. Kennedy*, Circuit Court of Okaloosa County, Florida (the "**Florida Court**"), Case No. 2014CA000372F (the "**Florida Charging Order Case**") to domesticate the HCB Judgment in Florida.

133.    On March 7, 2014, the HCB Judgment was domesticated and filed for record in Official Records Book 3138, Page 4687, in the Public Records of Okaloosa County, Florida.

134.    On September 17, 2014, HCB filed a Motion for Charging Order in the Florida Charging Order Case.

135.    On November 10, 2014, and December 2, 2014, the Florida Court granted HCB's motion and entered Charging Orders (the "**Florida Charging Orders**"), true and correct copies of which are attached to this Complaint as **Exhibit 16**, against the following entities owned and/or controlled by Kennedy (the "**Florida Charged Entities**" and each a "**Florida Charged Entity**"):

| Issue Date | Charged Entity | Recording Date | County, State | Book | Page |
|---|---|---|---|---|---|
| 11/10/2014 | BK Properties II, LLC | 11/14/14 | Okaloosa County, FL | 3172 | 2995 |
| 11/10/2014 | Iron Glades Slope, LLC | 11/14/14 | Okaloosa County, FL | 3172 | 3000 |
| 12/02/2014 | Lee Freyer Kennedy Crestview, LLC | 12/09/14 | Okaloosa County, FL | 3175 | 2777 |
| 12/02/2014 | Lee Freyer Kennedy Crestview II, LLC | 12/09/14 | Okaloosa County, FL | 3175 | 2781 |
| 12/02/2014 | Lagniappe Funding, LLC | 12/09/14 | Okaloosa County, FL | 3175 | 2785 |
| 12/02/2014 | Kennedy Five Acres Crestview, LLC | 12/09/14 | Okaloosa County, FL | 3175 | 2789 |
| 12/02/2014 | Holiday Isle LFK Investments, LLC | 12/09/14 | Okaloosa County, FL | 3175 | 2793 |

136.    The Florida Charging Orders required each Florida Charged Entity (a) within thirty (30) days after service, to "file with the Clerk of Court a sworn answer reporting any amounts distributable or payable to Kennedy at the time of service" and at all subsequent times; (b) required to "state the value, at the time of service of this Charging Order and at all subsequent times, of both the capital and the income accounts attributable to the interests of Kennedy in that limited liability company;" and (c) annually, on the last business day of September to "file with the Clerk of Court and [HCB]'s counsel a sworn answer reporting any amounts distributable or payable to Kennedy for the preceding year." **Ex. 16**, ¶¶ D-F.

137.    HCB timely and properly served each Florida Charged Entity with a certified copy of the applicable Florida Charging Order.

138.    On July 17, 2017, HCB filed a Motion for Contempt Order against Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC, because

those entities failed to fulfill their obligations under the Florida Charging Orders. A true and correct copy of HCB's Motion for Contempt Order is attached to this Complaint as **Exhibit 17**.

139.   Specifically, HCB sought contempt orders against those entities because they failed to file the sworn answers required under the Florida Charging Orders. **Ex. 17**.

140.   On August 18, 2017, just minutes before the hearing on HCB's Motion for Contempt Orders, Kennedy filed the Affidavit of Lee McPherson (the "**Contempt Affidavit**"). A true and correct copy of the Contempt Affidavit is attached to this Complaint as **Exhibit 18**. In the Contempt Affidavit, Kennedy attested under oath that none of Lee Freyer Kennedy Crestview, Lee Freyer Kennedy Crestview II, Lagniappe Funding, Kennedy Five Acres Crestview, or Holiday Island LFK Investments made any distributions to her after December 3, 2014. **Ex. 18.** The Contempt Affidavit made no reference to BK II or Iron Glades Slope.

141.   On August 18, 2017, the Florida Court held a hearing on HCB's Motion for Contempt Order at which Kennedy appeared in person, with Defendant Mead, Kennedy's counsel, at her side. A true and correct copy of the transcript of the Florida Court's August 18, 2017, hearing is attached to this Complaint as **Exhibit 19**.[9]

142.   On September 7, 2017, the Florida Court granted HCB's Motion for Contempt Order. A true and correct copy of the Florida Court's September 7, 2017, Order Granting Motion for Contempt Order (the "**Contempt Order**") is attached to this Complaint as **Exhibit 20**. The Florida Court concluded that the Florida Charged Entities[10] were in contempt for failing to comply with the terms of the Florida Charging Orders applicable to them. **Ex. 20**. The Florida

---

[9] References to the transcript of the August 18, 2017, hearing will be referenced in this Complaint as "*2017 Contempt Trans.*, page:line."

[10] Specifically, Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC.

Court ordered each of the entities to comply with the Florida Charging Orders within 30 days after entry of the order – that is, no later than October 7, 2017. *Id.*

143.    The Florida Court also imposed civil fines associated with the Florida Charged Entities' continued failure to comply with Florida Charging Orders. *Id.* First, the Florida Court imposed a fine of $5,000.00 if the Florida Charged Entities failed to comply with the Florida Charging Orders on or before October 7, 2017. *Id.* Second, the Florida Court imposed a fine of $2,500.00 for each 30-day period after October 7, 2017, in which the Florida Charged Entities continue in contempt. *Id.*

144.    At the time the Florida Court entered the Contempt Order, Kennedy was the manager or managing member of each of the Florida Charged Entities. Accordingly, Kennedy controls the actions of the Florida Charged Entities.

145.    Because Kennedy and the Florida Charged Entities still had not complied with the Florida Charging Orders or the Florida Court's Order Granting Motion for Contempt Order, on June 12, 2018, HCB filed a Motion for Further Contempt Orders, to Foreclose Interests, to Appoint Receiver, and to Reduce Civil Fines to Judgment (the "**Motion for Further Contempt**"), a true and correct copy of which is attached to this Complaint as **Exhibit 21**.

146.    On September 12, 2018, the Florida Court held a hearing on HCB's Motion for Further Contempt. True and correct copies of excerpts from the transcript of the September 12, 2018, hearing are attached to this Complaint as **Exhibit 22**.[11] Kennedy appeared in person with her counsel, Mr. Rick Petermann.

---

[11] References to the transcript of the September 12, 2018, hearing will be referenced in this Complaint as "*2018 Contempt Trans.*, page:line."

147.    At the September 12, 2018, hearing, Kennedy testified that she resigned as the manager of the Florida Charged Entities in July 2017:

Q.    So as of March 30, 2018, you were the manager of Kennedy Five Acres Crestview, LLC, correct?

A.    No. I mean, I resigned from all these LLCs. . . .

Q.    But you would agree with me, Ms. Kennedy, that at the bottom here, this is your electronic signature that says Lee McPherson?

A.    It says Lee McPherson.

Q.    And you are certifying, under oath, that you're the manager of that LLC, correct?

A.    Like I told you, I resigned. And I don't know how this got filed. I can only assume Anica [sic] did it, because she's been doing it for years.

*        *        *

Q.    So as of April 5th, 2017 the Division of Corporations has you listed as the manager at April 5, 2017?

A.    Yes. And I was the manager then.

Q.    Okay. When did you supposedly resign from –

A.    July of '17. And see – because I actually cannot be the manager, because this is –

Q    Ms. Kennedy, you've already affirmed your signature appears, under oath –

A    Right; it does.

*2018 Contempt Trans.*, 14:10-25; 15:12-25.

148.    Kennedy testified also that none of the Florida Charged Entities complied with the Florida Charging Orders. In Kennedy's words, "I did not see this document. And I was not instructed to do so by my counsel. And there was nothing to provide, because it doesn't have a bank account. Doesn't own any real property or assets. It's just a shell." *Id.*, 31:6-10. In short, Kennedy did nothing.

30

149.    Kennedy testified that she took no action because she followed Mead's "exact advice" and "did everything that he asked me to do." *Id.*, 35:14; 40:18-20.

150.    On October 25, 2018, the Florida Court entered an Order Granting [HCB's] Motion for Further Contempt Orders. A true and correct copy of the Order Granting Motion for Further Contempt (the "**Further Contempt Order**") is attached to this Complaint as **Exhibit 23**.

151.    In the Further Contempt Order, the Florida Court entered judgment against each of Lee Freyer Kennedy Crestview; Lee Freyer Kennedy Crestview II; Holiday Isle LFK Investments; Kennedy Five Acres Crestview; and Lagniappe Funding in the amount of $35,000.00 each, for a total of $175,000.00. The Florida Court ordered each entity to make payment of the judgment amount within 30 days after entry of the order. The court imposed additional fines against the entities in the event they failed to comply with its orders. It ordered a receiver to take control of each of the entities. Finally, and most importantly, the Court held Kennedy, individually, in contempt because she and she alone controlled each of the entities.

152.    As of the date of this Complaint, the Florida Charged Entities continue in their contempt of court and have failed to comply with the Florida Charging Orders. According to the Contempt Order and the Further Contempt Order, the Florida Charged Entities each owe $40,000 in civil fines and $200,000.00 in the aggregate.

**4.       HCB obtained a charging order against LK Freyer Investments.**

153.    On August 21, 2015, HCB registered its judgment against Kennedy in the United States District for the Western District of Louisiana (the "**USDC Shreveport Division**") when it filed that certain miscellaneous action styled *HCB Financial Corp. v. Lee. F. Kennedy*, United States District Court, Western District of Louisiana, Case No. 5:2015-mc-00024 (the "**Shreveport Division Case**").

154.    On October 20, 2016, HCB filed its Ex parte Motion for Charging Order for LK Freyer Investments, L.L.C. in the Shreveport Division Case.

155.    On October 25, 2016, the USDC Shreveport Division entered an Order granting HCB's Ex parte Motion for Charging Order for LK Freyer Investments, L.L.C. (the "**Louisiana Charging Order**"), a true and correct copy of which is attached to this Complaint as **Exhibit 24.**

156.    The Louisiana Charging Order charged Kennedy's interest in LK Freyer Investments and required that "LK Freyer Investments, L.L.C. and all of its members shall pay any money or property due or to become due to judgment debtor Lee F. Kennedy directly to HCB until the amount remaining on the Judgment, plus all accrued interest is paid in full." **Ex. 24**, ¶ (2).

157.    The Louisiana Charging Order also required Kennedy and LK Freyer Investments to provide to HCB complete copies of all of Kennedy's financial statements, Schedule K-1s, and tax returns immediately upon, but in no event later than 15 days after, receipt of the same. *Id.*, ¶ (3).

158.    Neither Kennedy nor LK Freyer Investments has fulfilled her or its obligations under the Louisiana Charging Order.

## II.    *After Kennedy defaulted on loans from Wells Fargo, Whitney National Bank, and Central Progressive, the Kennedy Enterprise implemented a sophisticated divestment strategy.*

159.    In preparation for the inevitable collection efforts, Kennedy transferred nearly all of her personal assets to a series of limited partnerships and limited liabilities companies, including Lee Kennedy Investments, LKF Investments-Texas, LK Freyer Investments, and Rockcliff Holdings. Each of those companies, and others, were formed, organized, or operated specifically to shelter Kennedy's substantial wealth **after** Kennedy's several loan defaults, including the Double A Firewood Loan and Loan No. 2252139.

160.     Not surprisingly, the Kennedy Enterprise operates those entities for Kennedy's personal benefit. Kennedy pays for her personal credit cards and legal fees from the accounts owned or controlled by the foregoing entities. She has paid for day spa visits and the condominium association dues for her home.

### A.     *Funding the Babette Trust was a key component of the Kennedy Enterprise's divestment strategy because the Babette Trust was a spendthrift trust that provided significant creditor protection.*

161.     Babette L. Wiener ("**Babette**") was Kennedy's maternal grandmother. Babette had only two children – William J. Wiener, Jr. ("**Bill Jr.**") and Kay (Kennedy's mother).

162.     On or about October 30, 1984, Babette executed her Last Will and Testament. A true and correct copy of Babette's Last Will and Testament is attached to this Complaint as **Exhibit 25**.

163.     Babette's Last Will and Testament contained provisions establishing, upon Babette's death, testamentary trusts for Babette's children, Bill Jr. and Kay, and their lineal descendants.

164.     Babette bequeathed the bulk of her estate to her children, Bill Jr. and Kay. She left to Bill Jr. one-half of the residuum of her estate. *Id.*, Art. III. Regarding the remainder of her estate, Babette instructed as follows:

> I leave the rest and residuum of my estate in trust for Kay and her direct lineal descendants, one fourth (1/4th) for Kay, and three-fourths (3/4ths), per stirpes, for those of Kay's direct lineal descendants who are living at my death, with Kay's share to be held in a separate and distinct trust for her benefit, and with each of her direct living descendant's share to be held in a separate and distinct trust (Kay and each such descendant hereinafter referred to as the "Beneficiary").

**Ex. 25**, Art. III.

165.     Babette's Last Will and Testament vested in the trustee of each testamentary trust the power to terminate such trust in the trustee's discretion. *Id.*, ¶ III.D. at 5.

166.    The trusts created under Babette's Last Will and Testament contained conventional "spendthrift provisions," which sought to restrain the transfer of any interest in the principal or income of such trusts. *Id.*, ¶ IV.E. at 6.

167.    Babette also included in her Last Will and Testament limitations on who was eligible to serve as trustee or successor trustee, and she provided a mechanism for a trustee's resignation. *Id.*, ¶¶ IV.D. at 6, IX.B. at 15.

168.    Babette died on October 28, 1985, at her home in Shreveport, Louisiana.

169.    Babette's Last Will and Testament was filed for probate on November 4, 1985, in the First Judicial District Court, Caddo Parish, Louisiana (the "**Probate Court**"), in that certain civil action styled *In re: Succession of Babette L. Wiener*, First Judicial District Court, Caddo Parish, Louisiana, Suit No. 318037 (the "**Succession Case**").

170.    At the time of Babette's death, Kay had three lineal descendants: Aimee Freyer Valls ("**Aimee**"); Carol Paige Freyer ("**Carol**"); and Kennedy. Accordingly, Babette's Last Will and Testament created four (4) distinct trusts for the benefit of Kay, Aimee, Carol, and Kennedy (the separate trust created for Kennedy's benefit is referenced in this Complaint as the "**Babette Trust**"), respectively.

171.    From the time of Babette's death in 1985 through the present, Kennedy has been the sole beneficiary of the Babette Trust. Kennedy's two minor children, CWK and BFK, are potential substitute principal beneficiaries under La. Rev. Stat. 9:1973. Neither CWK nor BFK has any rights to the trust principal or income. The Babette Trust exists solely for Kennedy's benefit.[12]

---

[12] Kennedy's two minor children, CWK and BFK, are her children from her marriage to Everett Kennedy. Kennedy and Everett Kennedy were divorced on February 17, 2006, by a Final

172.     Since 2010, the Kennedy Enterprise has shielded Kennedy behind the spendthrift provisions of the Babette Trust. To take advantage of spendthrift protections, the Kennedy Enterprise has transferred assets into the Babette Trust and utilized the Babette Trust as a mere conduit for Kennedy's benefit, making the Babette Trust a critical component of the Kennedy Enterprise.

173.     Prior to 2010, the Babette Trust owned few assets and realized very little income. Indeed, in 2009, the Babette Trust realized gross income of only $22,861. The Babette Trust's income grew substantially over the next several years, with its gross income peaking in 2014 at $625,956.00, as shown in the following table:

| Tax Year | Source | Total Income |
| --- | --- | --- |
| 2009 | Federal Form 1041 | $22,861 |
| 2010 | Federal Form 1041 | $200,638 |
| 2011 | Federal Form 1041 | $237,363 |
| 2012 | Federal Form 1041 | $195,068 |
| 2013 | Federal Form 1041 | $270,594 |
| 2014 | Federal Form 1041 | $625,956 |
| 2015 | Federal Form 1041 | $504,126 |
| 2016 | Federal Form 1041 | $101,264 |
| **Total** | | **$2,157,870** |

174.     As the Kennedy Enterprise embarked on its course of asset sheltering, the Babette Trust became an increasingly important cog in the Kennedy Enterprise.

**B.     The Kennedy Enterprise enlisted existing companies, such as Lee Kennedy Investments and LK Freyer Investments, to create the appearance of operating in the ordinary course of business.**

**1.     Lee Kennedy Investments and LFK GP**

175.     In addition to the Babette Trust, the Kennedy Enterprise has employed Lee Kennedy Investments as a significant investment vehicle to shelter Kennedy's assets.

---

Judgment of Dissolution of Marriage entered in that certain civil action styled *Lee Freyer Kennedy v. Everett J. Kennedy*, Circuit Court of Okaloosa County, Florida, Case No. 2005 DR 000721. On information and belief, Everett Kennedy died in Coatzacoalcos, Coatzacoalcos Municipality, Veracruz de Ignacio de la Llave, Mexico, on or about August 29, 2013.

176.     Lee Kennedy Investments is a Texas limited partnership that Kennedy formed on April 3, 2008, by filing its Certificate of Formation of Limited Partnership, Filing No. 800960470, Document No. 210883930002. A true and correct copy of the Certificate of Formation of Lee Kennedy Investments is attached to this Complaint as **Exhibit 26**. Kennedy signed the Certificate of Formation on April 2, 2008.

177.     From August 16, 2010, until **February 2, 2016**, Lee Kennedy Investments filed no Public Information Reports as required by Tex. Tax Code § 171.252. Then, on February 2, 2016, Lee Kennedy Investments filed its 2016 Public Information Report. In the 2016 Public Information Report, Kennedy reported that she was the manager of Lee Kennedy Investments. Kennedy signed Lee Kennedy Investments' 2016 Public Information Report, a true and correct copy of which is attached to this Complaint as **Exhibit 27**.

178.     LFK GP is the general partner of Lee Kennedy Investments. **Ex. 26**. LFK GP is a Texas limited liability company. It was formed on April 3, 2008, by the filing of a Certificate of Formation with the Secretary of the State of Texas, Filing No. 800960467, Document No. 210883. A true and correct copy of the Certificate of Formation of LFK GP is attached to this Complaint as **Exhibit 28**. Kennedy is (and always has been) the manager of LFK GP. **Ex. 28**.

### 2.     LK Freyer Investments

179.     The Kennedy Enterprise relies also on LK Freyer Investments to generate income and to shield that income for Kennedy's benefit.

180.     LK Freyer Investments is a Louisiana limited liability company. Kennedy organized LK Freyer Investments on July 13, 1999. A true and correct copy of the Articles of Organization of LK Freyer Investments is attached to this Complaint as **Exhibit 29**. With its Articles of Organization, LK Freyer Investments filed its Initial Report, in which LK Freyer Investments identified Kennedy as the company's manager. **Ex. 29**.

181.    On October 15, 2005, the Louisiana Secretary of State revoked LK Freyer Investments' Articles of Organization because LK Freyer Investments failed to file its annual reports for 3 consecutive years. *Id.*

182.    On or about February 7, 2006, LK Freyer Investments filed its Annual Report and Reinstatement for the period ending July 13, 2005. LK Freyer Investments' February 7, 2006, Annual Report and Reinstatement listed the company's mailing address as 444 Madison Ave., 28th Floor, New York, New York 10022, which is the address of Lachman & Lachman, Kennedy's prior accountants. Kennedy signed the February 7, 2006, Annual Report and Reinstatement as the Manager of LK Freyer Investments. *Id.*

183.    On or about March 6, 2009, Kennedy, individually and as Custodian for CWK under the Mississippi UTMA,[13] as the natural parent of CWK and as the sole Managing Conservator for CWK ("**Kennedy-Custodian**"), entered into that certain Operating Agreement of LK Freyer Investments, LLC, dated as of January 1, 2009. A true and correct copy of the Operating Agreement of LK Freyer Investments, LLC, is attached to this Complaint as **Exhibit 30**. The Operating Agreement of LK Freyer Investments provided that Kennedy owned 99.999% and Kennedy-Custodian owned .001% of the membership interests of LK Freyer Investments. **Ex. 30**.

C.    ***The Kennedy Enterprise formed LKF Investments-Texas to further its fraudulent divestment scheme.***

184.    In 2010 Kennedy formed LKF Investments-Texas as a manager-managed Texas limited liability company. Texas attorney Thomas D. Solomon formed LKF Investments-Texas on July 26, 2010, by filing its Certificate of Formation with the Secretary of the State of Texas, Filing No. 801297974, Document No. 317496540002. A true and correct copy of the Certificate

---

[13] Mississippi Uniform Transfers to Minor Act, Miss. Code Ann. §§ 91-20-1 to -49.

of Formation of LKF Investments-Texas is attached to this Complaint as **Exhibit 31**. Kennedy is (and always has been) the Manager of LKF Investments-Texas.

185.    According to Kennedy's counsel at the time, attorney Thomas D. Solomon ("**Mr. Solomon**"), LKF Investments-Texas was formed "to own the 59.9991% Membership Interest owned by Lee Kennedy and 10% Membership Interest owned by Lee Kennedy Investments, LP in LK Freyer Investments, L.L.C., a Louisiana limited liability company."

>    **D.**    ***Kennedy transferred most of her intangible assets into LK Freyer Investments, LKF Investments-Texas, and Rockcliff Holdings as an unlawful asset protection tactic.***

186.    After organizing the Kennedy Enterprise's sheltering scheme, during 2010, Kennedy transferred nearly all of her intangible assets, such as ownership in limited liability companies and limited partnerships, to entities Kennedy controlled.

187.    From an asset protection perspective, limited partnerships and limited liability companies are desirable entity selections because those entity types insulate a debtor from some creditor collection actions. For example, a debtor's ownership interest in a limited liability company generally is exempt from execution under both Texas and Florida law – that is, a creditor typically cannot compel a debtor to convey its interests in a limited liability company to satisfy its indebtedness. *See* Tex. Bus. Org. § 101.112. The same usually is true of a debtor's interests in a limited partnership. *See* Tex. Bus. Org. § 152.308.

188.    A debtor's interest in a corporation, however, is subject to seizure and execution in both Texas and Florida.

189.    By transferring her assets to limited liability companies and limited partnerships, Kennedy could significantly impair her creditors' collection and enforcement activities while protecting her substantial assets from execution.

**1.      Kennedy and Lee Kennedy Investments transferred all of their interests in LK Freyer Investments.**

190.    In 2010, Kennedy and Lee Kennedy Investment assigned all of their respective interests in LK Freyer Investments to LKF Investments-Texas and the Babette Trust. The Kennedy Enterprise manipulated the ownership of those membership interests in an inexplicable manner.

191.    As of January 1, 2009, Kennedy owned 99.999% of the membership interests of LK Freyer Investments. Kennedy-Custodian owned the remaining .001% of the membership interests. **Ex. 30**.

192.    According to LK Freyer Investments' 2009 Form 1065 tax return, at the beginning and end of tax year 2009, Kennedy, Kennedy-Custodian, and Lee Kennedy Investments owned 89.90%, .10%, and 10.00%, respectively, of the membership interests of LK Freyer Investments.

193.    At the end of 2009, the Babette Trust had no ownership interest in LK Freyer Investments; however, at the beginning of the 2010 tax year, the Babette Trust owned 30% of the membership interests in LK Freyer Investments.

194.    Unless the Babette Trust owned interests at the end of 2009, it could not have owned interests at the beginning of 2010. Instead, the Babette Trust would have owned no interests at the beginning of 2010, and it would have acquired ownership during the tax year.

195.    At some point during 2010, Kennedy and Lee Kennedy Investments transferred all of their membership interests in LK Freyer Investments to LKF Investments-Texas.

196.    According to LK Freyer Investments' 2010 Form 1065, by the end of the 2010 tax year, LK Freyer Investments' ownership had changed dramatically, as shown in the following table:

| Tax Year | 2009 | | 2010 | |
|---|---|---|---|---|
| Ownership | 01/01/09 | 12/31/09 | 01/01/10 | 12/31/10 |
| Kennedy | 89.90% | 89.90% | 59.91% | 0.00% |
| Kennedy-Custodian | 0.10% | 0.10% | 0.09% | 0.09% |
| Lee Kennedy Investments | 10.00% | 10.00% | 10.00% | 0.00% |
| LKF Investments-Texas | 0.00% | 0.00% | 0.00% | 69.91% |
| Babette Trust | 0.00% | 0.00% | 30.00% | 30.00% |

197.     Ordinarily, ownership at the beginning of the tax year should be the same as ownership at the end of the immediately preceding year. Then, as ownership changes (even on the first day of the tax year), those changes are reflected as of the end of the following tax year. Thus, if Kennedy owned 89.90% of LK Freyer Investments at the end of 2009, then she necessarily owned 89.90% of LK Freyer Investments at the beginning of 2010. As shown below, that is not how Kennedy's interests changed hands:



198.     The Kennedy Enterprise did not operate in an ordinary manner, as reflected in the manipulation of the ownership of LK Freyer Investments.

       **E.**     ***In addition, the Kennedy Enterprise capitalized Rockcliff Holdings with nearly $3,000,000 in contributions previously owned by Kennedy individually.***

199.     Kennedy transferred personal assets not only to the Babette Trust and LKF Investments-Texas, but also to Rockcliff Holdings.

200.     On July 19, 2010, Kennedy, with assistance from attorney Thomas D. Solomon, formed Rockcliff Holdings as a Texas limited partnership, by filing Rockcliff Holdings' Certificate of Formation of Limited Partnership with the Secretary of the State of Texas, Filing No. 801294984, Document No. 316147970002. A true and correct copy of the Certificate of Formation of Rockcliff Holdings is attached to this Complaint as **Exhibit 32**.

201.     In 2012, Kennedy executed that certain Limited Partnership Agreement of Rockcliff Holdings, LP, dated as of July 19, 2010. A true and correct copy of Rockcliff Holdings' Limited Partnership Agreement is attached to this Complaint as **Exhibit 33**. The Limited Partnership Agreement specified that Kennedy was the sole limited partner of Rockcliff Holdings, and Rockcliff GP was Rockcliff Holdings' general partner. **Ex. 33** at 57. As of July 19, 2010, Kennedy owned 98.88889% of the total partnership interests in Rockcliff Holdings. Rockcliff GP owned the remaining 1.11111% of the partnership interests of Rockcliff Holdings. *Id*.

202.     Rockcliff GP is a manager-managed Texas limited liability company. It was formed on July 15, 2010, by the filing of a Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 801293878, Document No. 315747890002. A true and correct copy of the Certificate of Formation of Rockcliff GP is attached to this Complaint as **Exhibit 34**. Kennedy is (and always has been) the manager of Rockcliff GP. **Ex. 34**.

203.     Even though Rockcliff Holdings was formed in 2010, Rockcliff Holdings was not capitalized until at least 2012, long after the District Court Case had been filed, and while the District Court Case was still pending.

204.    To capitalize Rockcliff Holdings, Kennedy contributed personal assets totaling $1,669,615.00 in value, comprised of the assets held in Kennedy's securities and deposit accounts at MorganStanley SmithBarney ("**Morgan Stanley**") and Kennedy's membership interests in BCL Kennedy.

205.    The Kennedy Enterprise memorialized Rockcliff Holdings' capitalization (the "**Capitalization Transaction**") through a complicated funding scenario unlike any other transaction among Kennedy and the various companies and trusts she controls.

206.    In March 2012, the Kennedy Enterprise executed the following (the "**Capitalization Documents**"), true and correct copies of which are attached to this Complaint as **Composite Exhibit 35**:

        a.        Contribution and Funding Agreement (**Ex. 35-1**);

        b.        Assignment (**Ex. 35-2**);

        c.        Limited Partnership Interest Sales Agreement (**Ex. 35-3**);

        d.        Promissory Notes (**Ex. 35-4**); and

        e.        First Amendment to Limited Partnership Agreement (**Ex. 35-5**).

207.    Kennedy, Rockcliff GP, and Rockcliff Holdings entered into that certain Contribution and Funding Agreement dated as of July 19, 2010. **Ex. 35-1**. The Contribution and Funding Agreement provided that Kennedy would:

> contribute, convey, transfer, and deliver directly to the Partnership . . . all of her right, title, and interest to the accounts owned by her and the Membership Interest owned by her in ***BCL Kennedy, LLC, a Texas limited liability company*** together with the assets more fully described on Exhibit "A" (collectively "Contributed Property") so that the Partnership shall be the sole owner of the Contributed Property . . .

*Id*., ¶ 1 (emphasis added).

208.    The Contribution and Funding Agreement defined the Contributed Property as follows:

| Contributed Property | |
|---|---|
| **Amount** | **Description** |
| $1,092,524.00 | Account held by Transferor having a value as of June 30, 2010, as set forth in [Morgan Stanley] client statement for the period June 1-30, 2010 for account styled Morgan Advisory Active Assets Account number XXX-XXXXX0-104, MSB FBO Lee Freyer Kennedy, 4720 Rockcliff Road, Apt 3, Austin, Texas, the most recent statement, subject to change on the books of the Partnership to reflect a more accurate value as of July 19, 2010, if such becomes available.[14] |
| $127,172.15 | Account held by Transferor having a value as of June 30, 2010, as set forth in [Morgan Stanley] client statement for the period June 1-30, 2010 for account number XXX-XXXXX-X4-495, the recent statement, Lee F. Kennedy, 4720 Rockcliff Road, Apt 3, Austin, Texas, the most recent statement, subject to change on the books of the Partnership to reflect a more accurate value as of July 19, 2010, if such becomes available. |
| $449,918.82 | All the Membership Interest owned by Transferor in BCL Kennedy a Texas limited liability company, with a value based on the account balance constituting the value of assets owned by such company as set forth in MorganStanley SmithBarney client statement for the period June 1-30, 2010 for Financial Management Account number XXX-XXXXX-XX XXX, BLC LLC [sic], 4720 Rockcliff Road, Apt 3, Austin, Texas, the most recent statement, subject to change on the books of the Partnership to reflect a more accurate value as of July 19, 2010, if such becomes available.[15] |
| $1,669,614.97 | **Total** subject to change on the books of the Partnership to reflect a more accurate value as of July 19, 2010, if such becomes available. |

**Ex. 35-1** at 5.

209.    The Contribution and Funding Agreement provided that Kennedy first would contribute property to Rockcliff GP in exchange for all of the membership interests in Rockcliff GP. Rockcliff GP then would transfer to Rockcliff Holdings the same property in exchange for the 1.11111% general partnership interests in Rockcliff Holdings. *Id.*, ¶ 1(a).

210.    Upon Kennedy's conveyance of the remaining portion of the Contributed Property to Rockcliff Holdings, Kennedy acquired all of the limited partnership interests in Rockcliff Holdings.

---

[14] On information and belief, Kennedy's account ending in 0104 was pledged as collateral to Morgan Stanley Bank, and Kennedy could borrow against the assets held in this account.

[15] According to the Limited Partnership Agreement, Kennedy's interests in BCL Kennedy had a value of $449,918.82.

211.    Instead of following the three-stage procedure outlined in the Contribution and Funding Agreement, Kennedy conveyed all of the Contributed Property directly to Rockcliff Holdings, entirely bypassing Rockcliff GP pursuant to that certain "Assignment" dated as of July 19, 2010. **Ex. 35-2**.

212.    Then, Kennedy executed that certain Limited Partnership Interest Sales Agreement among Rockcliff Holdings, the BFK Trust, and the CWK Trust (the "**Rockcliff Sale Agreement**"). **Ex. 35-3**. Pursuant to the Rockcliff Sale Agreement, Rockcliff Holdings agreed to sell 5% limited partnership interests to each of the BFK Trust and the CWK Trust for a price of $92,756.00, with $13,000.00 in cash payable upon the transfer and the remaining $79,756.00 payable pursuant to a promissory note secured by the partnership interests so purchased. *Id*.

213.    Kennedy signed the Rockcliff Sale Agreement as the President of Rockcliff GP, on behalf of Rockcliff Holdings. Kennedy also signed the agreement on behalf of Rockcliff GP, as the general partner of Rockcliff Holdings, and individually as the limited partner. *Id*.

214.    Although the Rockcliff Sale Agreement bears Harry Freyer's name as the Trustee of the BFK Trust and the CWK Trust, Harry Freyer did not sign the Rockcliff Sale Agreement. On information and belief, Kennedy signed Harry Freyer's name to the Rockcliff Sale Agreement. *Id*.

215.    As of July 19, 2010, the BFK Trust and the CWK Trust each delivered promissory notes to Rockcliff Holdings in the principal amount of $79,756.00. Although the promissory notes show Harry Freyer's name as the Trustee of the BFK Trust and the CWK Trust, Harry Freyer did not sign the promissory notes. On information and belief, Kennedy signed Harry Freyer's name to the promissory notes. **Ex. 35-4**.

216.    Then, Rockcliff GP, Rockcliff Holdings, Kennedy, the BFK Trust, and the CWK Trust entered into that certain First Amendment to Limited Partnership Agreement dated as of July 19, 2010. **Ex. 35-5**. Kennedy signed the First Amendment to Limited Partnership Agreement as the President of Rockcliff GP, Rockcliff Holdings' general partner. *Id*. She also signed the First Amendment to Limited Partnership Agreement in her individual capacity. *Id*. Harry Freyer signed the First Amendment to Limited Partnership Agreement as Trustee of the BFK Trust and as Trustee of the CWK Trust. **Ex. 35-5**.

217.    According to the First Amendment to Limited Partnership Agreement, Rockcliff Holdings issued 10 new partnership Units that it transferred to the CWK Trust and the BFK Trust in exchange for a combination of "cash and notes" contributed by the children's trusts. *Id*.

218.    Although the First Amendment to Limited Partnership Agreement recited that it was executed "as of" July 19, 2010, Kennedy and Harry Freyer did not execute the First Amendment to Limited Partnership Agreement until approximately March 7, 2012, after the filing of the District Court Case.

219.    After executing the First Amendment to Limited Partnership Agreement on or about March 7, 2012, Harry Freyer transmitted or caused the executed First Amendment to Limited Partnership Agreement to be transmitted from telephone/facsimile number (303) 287-1499 in Denver, Colorado, to telephone/facsimile number (512) 329-0048, in Austin, Texas.[16] *Id.* at 4.

---

[16] Telephone number (303) 287-1499 is associated with Vend-One, Inc., a Delaware corporation, which previously was registered to do business in Colorado. From 1991 to 2012, Harry Freyer was a director and the registered agent of Vend-One, Inc., in Colorado. Telephone number (512) 329-0048 is Kennedy's facsimile number.

220.    Pursuant to the First Amendment to Limited Partnership Agreement, the partnership interests of Rockcliff Holdings are owned as follows:



**Ex. 35-5** at 1-2.

221.    Neither Rockcliff GP nor Rockcliff Holdings filed any state or federal tax returns for tax years 2010 and 2011. On information and belief, neither Rockcliff GP nor Rockcliff Holdings generated income, incurred expenses, or owned assets until the Capitalization Transactions occurred in 2012.

222.    To disguise the fraudulent nature of Capitalization Transactions, Kennedy, in her various capacities, and Harry Freyer backdated the Capitalization Documents by approximately two years – the documents dated as of July 19, 2010, actually were executed in March 2012.

223.    Furthermore, according to Rockcliff Holdings' 2012 Form 1065 tax return, neither Kennedy nor the BFK Trust nor the CWK Trust nor Rockcliff GP contributed any capital prior to 2012. Their respective capital account balances were $0.00 as of January 1, 2012.

Rockcliff Holdings' 2012 Form 1065 reflects that Rockcliff Holdings' partners all contributed capital during 2012, but not before 2012.

224.   In 2012, Kennedy completed a series of account transfers from Morgan Stanley to Citi Private Bank:

a.   On February 3, 2012, Kennedy completed an Account Transfer Form and sent it to Citi Private Bank by facsimile transmission from facsimile number (512) 329-0048 for pirses of transferring her account ending in 0104 at Morgan Stanley to her account ending in 0597 at Citi Private Bank. **Ex. 35-6**.

b.   On or about April 4, 2012, Kennedy transferred her account ending in 4495 at Morgan Stanley to her account ending in 0597 at Citi Private Bank. **Ex. 35-7**.

c.   On or about August 1, 2012, Kennedy transferred Lee Kennedy Investments' account ending in 6424 at Morgan Stanley to its account ending in 8542 at Citi Private Bank. **Ex. 35-8**.

225.   On information and belief, Rockcliff Holldings had no accounts at Citi Private Bank (or anywhere, for that matter), until March 14, 2012, when it opened its account ending in 7949 at Citi Private Bank.

226.   After transferring her accounts from Morgan Stanley to Citi Private Bank, Kennedy transferred her personal accounts at Citi Private Bank to her business/entity accounts at Citi Private Bank:

a.   On or about March 28, 2012, Kennedy transferred "ALL Assets in Kind" from her account ending in 0597 to Rockcliff Holdings' account ending in 7949 at Citi Private Bank. **Ex. 35-7** (capitalization in original). Kennedy made the March 28, 2012, transfer by Letter of Authorization to Mr. Elliot Acoca ("**Mr. Acoco**") at Citi Private Bank. Kennedy sent the

March 28, 2012, Letter of Authorization by facsimile from her personal facsimile number, (512) 329-0048, in Austin, Texas, to Mr. Acoca in New York. **Ex. 35-9**.

        b.        On or about May 11, 2012, Kennedy sent another Letter of Authorization to Mr. Elliot Acoca at transferring again all assets from her account ending in 0597 to Rockcliff Holdings' account ending in 7949 at Citi Private Bank. **Ex. 35-10**.

> ### F.   *Kennedy exited Freyer Investments in 2010 to shelter her income from collection by her creditors.*

227.    In addition, with assistance from Harry Freyer and Freyer Investments, Kennedy sheltered her partnership interests in Freyer Investments.

228.    Freyer Investments is a Texas limited partnership. Harry Freyer formed Freyer Investments on or about April 3, 1981. Harry Freyer is the general partner of Freyer Investments.

229.    As of December 31, 2009, Kennedy **individually** owned 25% of the profit, loss, and capital of Freyer Investments.

230.    At the beginning of the 2010 tax year, Kennedy's capital account balance in Freyer Investments was $122,904. During the 2010 tax year, Freyer Investments distributed the balance of Kennedy's capital account to Kennedy.

231.    At the beginning of the 2010 tax year, LK Freyer Investments owned no interest in Freyer Investments. By the end of the 2010 tax year, LK Freyer Investments succeeded to Kennedy's 25% limited partnership interest in Freyer Investments. During 2010, LK Freyer Investments' capital account balance increased from $0.00 to $176,733. LK Freyer Investments contributed $136,479 to Freyer Investments.

232.    On information and belief, from 2009 until 2013, Freyer Investments continued making distributions directly to Kennedy, individually.

233.     **Within days after entry of the HCB Judgment**, Freyer Investments' books reflected a change in distributions to Kennedy. Instead of making distributions directly to Kennedy, Harry Freyer and Freyer Investments began making Kennedy's distributions to LK Freyer Investments.

234.     Freyer Investments' general ledger as of December 31, 2013, a true and correct copy of which is attached to this Complaint as **Exhibit 36**, reflected the change in distribution payments.

235.     According to Freyer Investments' general ledger, Freyer Investments made distributions directly to Kennedy on January 2, 2013; January 31, 2013; March 4, 2013; and March 29, 2013. Beginning on April 29, 2013, **the month after entry of the Final Judgment on March 14, 2013**, Freyer Investments began making distributions not to Kennedy, but to LK Freyer Investments, as shown below:

| 2013 DISTRIBUTIONS FROM FREYER INVESTMENTS | | |
|---|---|---|
| **Date** | **To** | **Amount** |
| 01/02/13 | Kennedy | $1,500.00 |
| 01/31/13 | Kennedy | $1,500.00 |
| 03/04/13 | Kennedy | $1,500.00 |
| 03/29/13 | Kennedy | $2,000.00 |
| 04/29/13 | LK Freyer Investments | $2,500.00 |
| 05/29/13 | LK Freyer Investments | $2,000.00 |
| 07/02/13 | LK Freyer Investments | $2,500.00 |
| 07/31/13 | LK Freyer Investments | $2,500.00 |
| 08/30/13 | LK Freyer Investments | $2,500.00 |
| 10/04/13 | LK Freyer Investments | $2,500.00 |
| 10/31/13 | LK Freyer Investments | $2,500.00 |
| 12/03/13 | LK Freyer Investments | $1,750.00 |
| **Total** | | **$25,250.00** |

**Ex. 36**.

236.     Each entry in Freyer Investments' general ledger above corresponds with a check issued by Freyer Investments to either Kennedy or LK Freyer Investments, as shown as **Exhibit 37** attached hereto, except one: On March 29, 2013, Freyer Investments issued check

number 652 to LK Freyer Investments. From all that appears, Kennedy deposited each check from Freyer Investments into LK Freyer Investments' accounts ending 2702 or 7565. **Ex. 37**.

237.   In a circular transaction, in March 2013, Freyer Investments distributed Kennedy's capital account balance to her. Kennedy, in turn, contributed her capital account balance in Freyer Investments to LK Freyer Investments. Then, LK Freyer Investments contributed that account balance back to Freyer Investments.

238.   The distribution and contributions among Freyer Investments, Kennedy, and LK Freyer Investments were made unlawfully to protect Kennedy's income stream from Freyer Investments and with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

239.   Thus, as can be seen in this Complaint, the Kennedy Enterprise deliberately and intentionally transferred Kennedy's personal property assets into entities removed from personal liability to shield those assets from Kennedy's creditors.

### III.     *The Kennedy Enterprise has abused the attorney-client relationship.*

240.   For years, the Kennedy Enterprise has employed lawyers and law firms not just for purposes of obtaining legal advice, but also for hiding assets, laundering money, and shielding Kennedy from legal process.

#### A.     *The Leighton/Adkinson Firm is an operational hub for the Kennedy Enterprise.*

241.   The Leighton/Adkinson Firm is one of the hubs around which the Kennedy Enterprise turns. Through the Leighton/Adkinson Firm and its "family" of lawyers and related firms, the Kennedy Enterprise has executed many of its fraudulent schemes.

242.   The Leighton/Adkinson Firm has prepared at least 95 state and federal tax returns for the Kennedy Enterprise, not including the Kennedy Enterprise's 2017 state and federal tax returns, all as shown on the attached **Exhibit 38**.

243.     The Leighton/Adkinson Firm actually is a conglomeration of several lawyers and law firms who have worked as an integrated unit for years.

244.     The lawyers who make up the Leighton/Adkinson Firm include Leighton, Adkinson, Mark Hopkins, M. Matthew Williams ("**Attorney Williams**"), Lisa Michaux, and Glenn Brown ("**Mr. Brown**").

245.     The law firms comprising the Leighton/Adkinson Firm include:

     a.     Leighton Law Firm, PLLC, f/k/a Law Office of William Leighton, PLLC;

     b.     Hopkins & Williams, PLLC, f/k/a Hopkins Law, PLLC;

     c.     Leighton, Hopkins & Williams, PLLC;

     d.     The Leighton/Adkinson Firm; and

     e.     Law Firm of M. Matthew Williams, PLLC.

246.     As early as January 27, 2009, Leighton, Mark Hopkins, and Attorney Williams began sharing office space in Austin, Texas.

247.     Since 2009, the law firms have shared offices, addresses, and registered agents, as shown below:

| Firm Name | Registered Agent | Registered Office Address |
| --- | --- | --- |
| William Leighton PLLC | William R. Leighton | 248 Addie Roy Rd., Ste. B-204, Austin, TX 78738 |
| Hopkins & Williams | Mark D. Hopkins | 12117 Bee Caves Rd., Ste. 360, Austin, TX 78738 |
| LH&W | William R. Leighton | 248 Addie Roy Rd., Ste. B-204, Austin, TX 78738 |
| LMAB | William R. Leighton | 248 Addie Roy Rd., Ste. B-204, Austin, TX 78738 |
| Attorney Williams PLLC | M. Matthew Attorney Williams | 248 Addie Roy Rd., Ste. B-204, Austin, TX 78738 |

**1.     Leighton Law Firm, PLLC, f/k/a Law Office of William Leighton, PLLC**

248.     On May 25, 2006, Leighton formed Leighton Law Firm, PLLC, f/k/a Law Office of William Leighton, PLLC ("**William Leighton PLLC**") by filing a Certificate of Formation of Professional Limited Liability Company with the Texas Secretary of State, Filing No. 800660619, Document No. 130830940002. According to the Certificate of Formation of William

Leighton PLLC, Leighton was the sole member of William Leighton PLLC, and William Leighton PLLC's registered office and principal office address was 3821 Juniper Trace, Suite 107, Austin, Texas 78738. Leighton is the sole member and manager of William Leighton PLLC.

249.     On April 27, 2009, William Leighton PLLC filed its 2008 Public Information Report, and it filed a Statement of Change of Registered Office/Agent. In its 2008 Public Information Report, William Leighton PLLC changed its principal office address to **from 3821 Juniper Trace, Suite 107**, Austin, Texas 78738, **to 3821 Juniper Trace, Suite 106**, Austin, Texas 78738. At that time, William Leighton PLLC **changed its registered office address from Suite 107 to Suite 106**.

250.     On January 19, 2010, William Leighton PLLC filed a Certificate of Amendment and changed its name to Leighton Law Firm, PLLC. William Leighton PLLC again reported that its principal office address was **Suite 107** at 3821 Juniper Trace; however, William Leighton PLLC changed its registered office address **from Suite 107 to Suite 106** at 3821 Juniper Trace.

251.     On October 26, 2010, William Leighton PLLC filed another Statement of Change of Registered Office/Agent in which it changed both its principal office address and registered office address to **12117 Bee Caves Road, Suite 260, Austin, Texas 78738**. From 2012 through 2016, William Leighton PLLC's address remained the same.

252.     On May 13, 2017, William Leighton PLLC filed its 2017 Public Information Report. In its 2017 Public Information Report, William Leighton PLLC's principal office and registered office addresses changed to 248 Addie Roy Road, Suite B-204, Austin, Texas 78746. True and correct copies of William Leighton PLLC's filings with the Texas Secretary of State are attached to this Complaint as **Composite Exhibit 39**.

### 2.     Hopkins & Williams, P.L.L.C., f/k/a Hopkins Law, PLLC

253.    Hopkins & Williams, P.L.L.C., f/k/a Hopkins Law, PLLC ("**Hopkins & Williams**"), was another one of the law firms employed by the Kennedy Enterprise.

254.    Hopkins & Williams is a Texas professional limited liability company. Mark Hopkins formed Hopkins Law, PLLC, on January 27, 2009, by filing a Certificate of Formation of Professional Limited Liability Company, Filing No. 801079500, Document No. 244296870002. When Mark Hopkins formed Hopkins & Williams, Hopkins & Williams' principal address was **3821 Juniper Trace, Suite 107**, Austin TX 78738, **the same address as William Leighton PLLC's principal office address in 2009 and 2010**.

255.    On September 15, 2010, Hopkins Law, PLLC, filed an Assumed Name Certificate under which it began doing business as Hopkins & Williams, PLLC. At that time, Hopkins & Williams' principal office address was **12117 Bee Caves Road, Suite 260**, Austin, Texas 78738, **the same address as William Leighton PLLC's address at the end of 2010**.

256.    On January 31, 2012, Hopkins Law, PLLC, changed its name to Hopkins & Williams, P.L.L.C., by filing a Certificate of Amendment with the Texas Secretary of State's office. Hopkins & Williams' Certificate of Amendment identified Mark Hopkins and Attorney Williams as the two members of Hopkins & Williams. From 2012 through 2017, Hopkins & Williams' Public Information Reports all identified Mark Hopkins and Attorney Williams as the two members or partners of Hopkins & Williams. True and correct copies of Hopkins & Williams' filings with the Texas Secretary of State are attached to this Complaint as **Composite Exhibit 40**.

### 3.     Leighton, Hopkins & Williams, PLLC

257.    On August 17, 20l0, Leighton organized Leighton, Hopkins & Williams, PLLC ("**LH&W**"), as a Texas professional limited liability company, by filing a Certificate of

Formation of Professional Limited Liability Company, Filing No. 801307230, Document No. 321380990002. In its Certificate of Formation, LH&W named Leighton, Mark Hopkins, and Attorney Williams as its only three members. **LH&W's registered office address was 3821 Juniper Trace, Suite 106, Austin, Texas 78738, the same address as William Leighton PLLC's address and Hopkins & Williams' address in 2010.** The following year, on May 10, 2011, LH&W filed its 2011 Public Information Report and identified its principal office address as 12117 FM 2244 Ste. 260, Bee Cave, Texas 78738, which is the same as 12117 Bee Caves Road, Suite 260, Austin, Texas 78738.

258.    On March 26, 2012, LH&W filed its 2012 Public Information Report in which LH&W **changed its principal office address from Suite 260 at 12117 Bee Caves Road to Suite 240 at 12117 Bee Caves Road**; however, the 2012 Public Information Report listed different addresses for the members.

259.    As of March 26, 2012, Leighton's address was 12117 Bee Caves Road, **Suite 240**. Mark Hopkins and Attorney Williams' addresses were 12117 Bee Caves Road, **Suite 260**. LH&W reported the same information in its 2013, 2014, and 2015 Public Information Reports.

260.    In its 2016 Public Information Report, LH&W reported a change in Mark Hopkins' address **from Suite 260 to Suite 240** at 12117 Bee Caves Road.

261.    According to LH&W's 2017 Public Information Report, Leighton, Mark Hopkins, and Attorney Williams all used **12117 Bee Caves Road, Suite 240**, as their mailing addresses, but the firm's principal office address changed to **248 Addie Roy Road, Suite B-204, Austin, Texas 78746**. True and correct copies of LH&W's filings with the Texas Secretary of State are attached to this Complaint as **Composite Exhibit 41**.

### 4.     The Leighton/Adkinson Firm

262.    Leighton, Michaux, Adkinson & Brown, PLLC, f/k/a Leighton, Magids, Adkinson & Brown, PLLC, f/k/a Leighton, Williams, Adkinson & Brown, PLLC (the "**Leighton/Adkinson Firm**") is a Texas professional limited liability company. It was formed on June 15, 2015, by the filing of a Certificate of Formation with the Secretary of the State of Texas, Filing No. 802235169, Document No. 611278990002.

263.    According to the Leighton/Adkinson Firm's Certificate of Formation, the Leighton/Adkinson Firm exists "for the practice of law and services ancillary to that professional service." In addition, the Leighton/Adkinson Firm "is a professional entity that performs professional legal services, as defined in Section 301.003 of the Texas Business Organizations Code, and the original members herein are each licensed lawyers and counselors at law and are authorized to practice law in the State of Texas." *Id.*

264.    In addition to providing professional legal services, the Leighton/Adkinson Firm also provides professional accounting services.

265.    Attorney Williams, a lawyer licensed under the laws of the State of Texas, organized the Leighton/Adkinson Firm. Leighton was (and is) the Leighton/Adkinson Firm's registered agent.

266.    According to the Leighton/Adkinson Firm's Certificate of Formation, the Leighton/Adkinson Firm's initial registered office was located at **12117 Bee Caves Road, Suite 3-240**, Austin, Texas 78738.

267.    The Leighton/Adkinson Firm's Certificate of Formation identified four members: (1) Leighton, (2) Attorney Williams; (3) Adkinson; and (4) Mr. Brown.[17]

---

[17] Leighton and Adkinson are brother and sister.

268.    On or about August 16, 2016, the Leighton/Adkinson Firm filed a Statement of Change of Registered Agent/Office, in which it changed its registered office from 12117 Bee Caves Road, Suite 3-240, Austin, Texas 78738, to 248 Addie Roy Rd, Suite B-204, Austin TX 78746. Leighton signed the Leighton/Adkinson Firm's August 16, 2016, Statement of Change of Registered Agent/Office.

269.    On December 31, 2016, the Leighton/Adkinson Firm filed its 2016 Public Information Report. Adkinson signed the Leighton/Adkinson Firm's 2016 Public Information Report as of May 10, 2016. The Leighton/Adkinson Firm's 2016 Public Information Report disclosed again that the Leighton/Adkinson Firm was comprised of four members: (1) Leighton; (2) Attorney Williams; (3); Adkinson, and (4) Brown.

270.    On or about May 15, 2017, the Leighton/Adkinson Firm filed its 2017 Public Information Report, which Adkinson signed. The Leighton/Adkinson Firm's 2017 Public Information Report again reported the names of the firm's members; however, Leighton and Attorney Williams **were not** identified as members in the Leighton/Adkinson Firm's 2017 Public Information Report. The 2017 report identified the Leighton/Adkinson Firm's members as Adkinson, Brown, and Lisa Magids.[18]

271.    On June 4, 2017, the Leighton/Adkinson Firm filed a Certificate of Amendment changing its name from Leighton, Williams, Adkinson & Brown, PLLC, to Leighton, Magids, Adkinson & Brown, PLLC. Adkinson signed the Leighton/Adkinson Firm's June 4, 2017, Certificate of Amendment. On July 27, 2017, the Leighton/Adkinson Firm filed a second

---

[18] At the time the Leighton/Adkinson Firm filed its 2017 Public Information Report, Mr. Brown was actively representing Kennedy in that certain civil action styled *Lee McPherson v. Angelique Ela McPherson Meyer*, United States District Court for the Western District of Texas, Case No. 1:17-cv-00431.

Certificate of Amendment changing its name to Leighton, Michaux, Adkinson & Brown, PLLC. Adkinson signed the Leighton/Adkinson Firm's July 27, 2017, Certificate of Amendment. The Leighton/Adkinson Firm's Certificate of Formation, 2016 Statement of Change of Registered Agent/Office, 2016 Public Information Report, 2017 Public Information Report, and Certificates of Amendment are attached to this Complaint as **Composite Exhibit 42**.

### 5.      Law Firm of M. Matthew Williams, PLLC

272.    On June 8, 2017, Attorney Williams formed the Law Firm of M. Matthew Williams, PLLC ("**Williams PLLC**"), by filing a Certificate of Formation of Professional Limited Liability Company with the Texas Secretary of State, Filing No. 802742217, Document No. 743447290002. A true and correct copy of copy of Williams PLLC's Certificate of Formation is attached to this Complaint as **Exhibit 43**.

273.    According to the Certificate of Formation of Williams PLLC, Attorney Williams is the sole member of Williams PLLC, and Williams PLLC's principal office address is 248 Addie Roy Road, Suite B204, Austin, TX 78746, where Attorney Williams shares office space with Leighton, Adkinson, and the Leighton/Adkinson Firm.

274.    The following diagram shows the commonality of ownership/membership among the law firms:



275.    Beyond the commonality of interests and ownership, even the Leighton/Adkinson Firm has used various identities over the years while representing the Kennedy Enterprise. For instance, when preparing the Kennedy Enterprise's tax returns, the Leighton/Adkinson Firm has used two different names in a single tax year. On some returns, the Leighton/Adkinson Firm might use one firm name, while using a different firm name on a different return for the same tax

year. In some instances, the Leighton/Adkinson Firm used two different firm names in a single return.

276. For example, in KWF Group's 2016 Arkansas tax return, the Leighton/Adkinson Firm identified itself as the preparer with two different names, as follows:

| Tax Year | Entity | Form | Firm Name |
|----------|--------|------|-----------|
| 2016 | KWF Group, LLC | AR1050 | Leighton Williams Adkinson & Brown |
| 2016 | KWF Group, LLC | AR8453-PE | Leighton Law Firm, PLLC |

277. In the same way, the Leighton/Adkinson Firm used the same Federal Employer Identification Number ("**EIN**") with different firm names. On information and belief, William Leighton PLLC's EIN ends in 1306, and the Leighton/Adkinson Firm's EIN ends in 0424.

278. In 2015, William Leighton PLLC and the Leighton/Adkinson Firm used EIN ending in 0424, as follows:

| Tax Year | Entity | Form | Firm Name | Firm EIN |
|----------|--------|------|-----------|----------|
| 2015 | 5950 State Bridge Road | 1120S | Leighton Law Firm, PLLC | 0424 |
| 2015 | 5950 State Bridge Road | GA 600S | Leighton Law Firm, PLLC | 0424 |
| 2015 | Babette Trust | 1041 | Leighton, Williams, Adkinson & Brown | 0424 |
| 2015 | Fountain Square | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | Hungry Otter | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | KWF Group | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | Kennedy | 1040 | Leighton Law Firm, PLLC | 0424 |
| 2015 | Lee Kennedy Investments | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | LK Freyer Investments | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | Rockcliff GP | 1065 | Leighton Law Firm, PLLC | 0424 |
| 2015 | Rockcliff Holdings | 1065 | Leighton Law Firm, PLLC | 0424 |

279. There is no distinction among the variations of the Leighton/Adkinson Firm. Firm addresses, agents, employees, names, and EINs have been interchangeable throughout the Leighton/Adkinson Firm's representation of the Kennedy Enterprise.

### B. *Adkinson is a key member of Leighton/Adkinson's Firm.*

280. Adkinson is a lawyer licensed under the laws of the State of Texas. Adkinson has been employed by the Leighton/Adkinson Firm since September 2011. On information and belief, Adkinson has been a partner/member in the Leighton/Adkinson Firm since 2015.

281.    Since 2013, Adkinson has performed substantial work for and on behalf of the Kennedy Enterprise. Adkinson has prepared no fewer than 85 tax returns for Kennedy and Kennedy-related entities since 2013.[19]

282.    Adkinson is the organizer of a number of Kennedy's business entities, including 5950 State Bridge Road, Canndescent JV, Compassionate Use II, Gonzales Holdings, Medicus, Medicus Arkansas, Medicus II, Medicus III, Organic Health, and Palms Destin Holdings.

283.    Adkinson has supervised or directed hundreds of thousands of dollars, if not millions of dollars, of interstate financial transactions for the Kennedy Enterprise, including the Kennedy Enterprise's investments in marijuana cultivation in violation of federal law.

284.    Adkinson represents Kennedy in litigation.

285.    Adkinson prepares the Kennedy Enterprise's financial statements.

286.    Adkinson represents Hyperion, which holds two judgments against Kennedy and several charging orders against numerous Kennedy affiliates.

287.    Adkinson represents Hyperion GP and Hyperion Management, the former and current General Partners of Hyperion.

**1.      As Kennedy's lieutenant, Adkinson steered Hyperion's litigation <u>against</u> Kennedy and <u>for</u> Kennedy.**

288.    In Cause No. 18-600,[20] in which Hyperion obtained new charging orders against several newly formed entities, in February and March 2018, Adkinson represented Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings as the Judgment Debtor and Defendants **against** Hyperion as the Judgment Creditor and Plaintiff, while simultaneously representing Hyperion.

---

[19] That is, of the 95 or more tax returns the Leighton/Adkinson Firm has prepared for the Kennedy Enterprise, Adkinson personally prepared at least 85 of those returns.
[20] *See infra* Part IV.D.3.

289.    Adkinson even instructed Hyperion's counsel, Mr. Ashley Callahan ("**Mr. Callahan**"), with respect to strategy, tactics, and timing of the litigation to hinder, delay, and defraud HCB with respect to its collection efforts against Kennedy.

290.    On paper, at least, Adkinson is the trustee of the Babette Trust. As the trustee of the Babette Trust, Adkinson controls assets intended to be managed for Kennedy's benefit, but she has secured from her own client a full release of her fiduciary obligations as trustee. Like Harry Freyer, Adkinson never petitioned the Probate Court in Babette's Succession Case in Louisiana to appoint her as the trustee of the Babette Trust. She simply accepted the appointment from Kennedy.

## 2.    Adkinson chose her son, Reynolds, to manage Hyperion Management.

291.    Beyond the simultaneous representation of numerous entities, and in the face of myriad conflicts of interest, Adkinson was instrumental in the appointment Reynolds as the manager of Hyperion Management.

292.    Reynolds is Adkinson's son.

293.    Hyperion Management is a Texas limited liability company. It was formed on November 7, 2017, by the filing of a Certificate of Formation with the Secretary of the State of Texas, Filing No. 802854801, Document No. 771839540003.   A true and correct copy of Hyperion Management's Certificate of Formation is attached to this Complaint as **Exhibit 44**.

294.    Reynolds is Hyperion Management's registered agent, manager, and organizer. **Ex. 44**.

295.    Hyperion Management's registered office is located at 106 Aria Ridge, Austin, TX 78738. *Id*.

296.    On November 7, 2017, Hyperion Management became the General Partner of Hyperion, replacing Hyperion GP. On November 8, 2017, Hyperion filed a Restated Certificate

of Formation, a true and correct copy of which is attached to this Complaint as **Exhibit 45**. In its

Restated Certificate of Formation, Hyperion changed its address from 4720 Rockcliff Road, #3,

Austin, Texas 78746 – Kennedy's home address – to 106 Aria Ridge, Austin, TX 78738. **Ex. 45**.

297.    Hyperion's Restated Certificate of Formation named Hyperion Management as

Hyperion's new General Partner. *Id*. Reynolds signed Hyperion's Restated Certificate of

Formation as the Manager of Hyperion Management, as the General Partner of Hyperion. *Id*.

298.    In Hyperion's Restated Certificate of Formation, Reynolds signed Restated

Certificate of Formation under penalty of perjury. *Id*.

299.    Reynolds transmitted or caused to be transmitted the Restated Certificate of

Formation to the Texas Secretary of State by facsimile transmission from the Leighton/Adkinson

Firm's telephone/facsimile number. *Id*.

300.    Reynolds has no substantial business experience. He was graduated from the

University of Texas at Austin on December 8, 2018, with a degree in Sport Management.

301.    Reynolds holds Sales Agent License number 695668 issued by the Texas Real

Estate Commission on or about October 31, 2017, one week before he organized Hyperion

Management.

302.    Even though Reynolds changed Hyperion's registered address from 4720

Rockcliff Road to 106 Aria Ridge, Adkinson owns the property at 106 Aria Ridge. Adkinson

purchased the property on May 14, 2015. A true and correct copy of the Warranty Deed is

attached to this Complaint as **Exhibit 46**.

303.    Adkinson has assumed management responsibility in the Kennedy Enterprise.

According to Reynolds' December 13, 2018, deposition testimony, **all of the information**

**Reynolds possesses regarding Hyperion or Kennedy was communicated to him by**

**Adkinson**. She is the Trustee of the Babette Trust, which Kennedy has used for years to defraud creditors. Leighton is or was a partner with Kennedy in her efforts to obtain marijuana cultivation licenses. Attorney Williams was responsible for obtaining Hyperion's judgments and charging orders against Kennedy's holdings. The Leighton/Adkinson Firm and its members have immersed themselves in the Kennedy Enterprise's operations.

### IV.    *The Kennedy Enterprise formed and operated Hyperion as a shell to defraud Kennedy's creditors.*

304.    Kennedy's real estate investment interests are obvious. She has been a successful real estate developer for more than 15 years.

305.    Initially, the Kennedy Enterprise created Hyperion to acquire Kennedy's liabilities to Whitney National Bank ("**Whitney**"), in Gulfport, Mississippi.[21]

306.    Ultimately, the Kennedy Enterprise employed Hyperion to shield its wealth behind a lengthy series of fraudulent court actions, judgments, and charging orders.

307.    The Kennedy Enterprise has utilized Hyperion to interfere with HCB's legitimate collection efforts by (a) obtaining fraudulent charging orders between 2013 and 2018; (b) intervening in the Florida Charging Order Case; (c) committing fraud on the Florida Court to protect BK II and Iron Glades Slope from HCB's collection efforts; (d) committing fraud on the Travis County Court to insulate Kennedy; and (e) commissioning Adkinson's 22 year old son, Reynolds, to "manage" Hyperion.

---

[21] At all relevant times, Whitney was a financial institution as defined by 18 U.S.C. § 20; an insured depository institution as defined by 18 U.S.C. § 20(1); and mortgage lending business as defined by 18 U.S.C. § 20(10). Whitney holds FDIC Certificate Number 18538, evidencing its insured status. Whitney is involved in interstate commerce.

A. **Kennedy is Hyperion's majority owner, and she controls Hyperion through direct and indirect ownership and management.**

308.   Hyperion is a Texas limited partnership. It was formed on August 20, 2012, by the filing of a Certificate of Formation of Limited Partnership with the Secretary of the State of Texas, Filing No. 801642641, Document No. 438119250004. A true and correct copy of Hyperion's Certificate of Formation is attached to this Complaint as **Exhibit 47**.

309.   At the time Hyperion was formed, Hyperion GP was Hyperion's general partner, and Neil McPherson was Hyperion GP's manager. **Ex. 47**. Neil McPherson also was Hyperion GP's sole member.

310.   Hyperion GP is a Texas limited liability company. Mr. Kevin Childs ("**Attorney Childs**") of the Dunagan Childs law firm in Austin, Texas, formed Hyperion GP by filing its Certificate of Formation of Limited Partnership with the Secretary of the State of Texas, Filing No. 801642635, Document No. 438119250002. A true and correct copy of Hyperion GP's Certificate of Formation is attached to this Complaint as **Exhibit 48**.

311.   The general partner and limited partners of Hyperion executed that certain Agreement of Limited Partnership of Hyperion Gulf Coast Ventures, Ltd., dated as of August 20, 2012. A true and correct copy of Hyperion's Agreement of Limited Partnership is attached to this Complaint as **Exhibit 49**.

312.   According to the Limited Partnership Agreement, the general partner of Hyperion was, as of August 20, 2012, Hyperion GP. **Ex. 49**. The limited partners of Hyperion were Rockcliff Holdings, Hungry Otter, Freyer Investments, David Porter, and Kniahynycky, as shown below:



313.    Neil McPherson signed the Limited Partnership Agreement as the Manager of Hyperion GP, the General Partner of Hyperion. *Id.* **Kennedy signed the Limited Partnership Agreement on behalf of Rockcliff Holdings, as the Manager of Rockcliff GP, the General Partner of Rockcliff Holdings.**[22] *Id.* Kennedy also signed the Limited Partnership Agreement as the Manager of Hungry Otter.[23] *Id.*

---

[22] Kennedy misrepresented Hyperion's ownership in her Supplemental Responses. **Ex. 12**.
[23] At that time, Kennedy was the sole member of Hungry Otter, but Kennedy and Neil McPherson were utilizing Hungry Otter for Neil McPherson's benefit and to defraud Neil McPherson's creditors, including his former wife, Angelique McPherson.

314.    Upon execution of its limited partnership agreement, Hyperion's organization appeared as follows:



315.    As of August 20, 2012, Hyperion's partners had the following capital account balances:

| Name | Capital Contribution |
|---|---|
| Hyperion GP | $100.00 |
| Rockcliff Holdings | $900,000.00 |
| David Porter | $100.00 |
| Emmanuel Kniahynycky | $100.00 |
| Freyer Investments | $200,000.00 |
| Hungry Otter Holdings | $1,000.00 |
| **Total** | **$1,101,300.00** |

*Id.* at 33.

316.    Even though the Limited Partnership Agreement was dated as of August 20, 2012, the partners do not appear to have executed the agreement until March 2013.

317.    On March 1, 2013, at 8:39 a.m., Harry Freyer sent an email with the subject line "Hyperion Group-Freyer Investments" to Attorney Childs. A true and correct copy of Harry Freyer's March 1, 2013, email to Attorney Childs is attached to this Complaint as **Exhibit 50**. In his March 1, 2013, email to Attorney Childs, Harry Freyer wrote, "PLEASE E EMAIL ME YOUR FAX # SO I CAN FAX YOU THE FREYER INVESTMENTS/HYPERION SIGNATURE PAGE." **Ex. 50**. Attorney Childs sent a reply email to Harry Freyer the same day at 11:45 a.m. transmitting his direct facsimile number. *Id*.

318.    On March 1, 2013, Harry Freyer transmitted the signature page bearing his signature on behalf of Freyer Investments on the Limited Partnership Agreement from telephone/facsimile number (720) 324-8698 in Colorado to Attorney Childs at telephone/facsimile number (512) 279-0806 in Texas. **Ex. 49** at 31.

319.    On March 4, 2013, Harry Freyer transmitted the signature page bearing his signature from telephone/facsimile number (720) 324-8698 in Colorado to Kennedy at telephone/facsimile number (512) 329-0048 in Texas. **Ex. 49** at 32.

320.    In reality, Hyperion's limited partners did not own any interests in Hyperion and did not make any capital contributions to Hyperion in 2012. Rockcliff Holdings' 2012 Form 1065 reflects no investment in Hyperion in 2012, and Hungry Otter did not file any 2012 state or federal tax returns, suggesting that, like Rockcliff Holdings, Hungry Otter made no investment in Hyperion in 2012.

321.    On or about February 21, 2014, the State of Texas revoked Hyperion's existence pursuant to Tex. Tax Code § 171.309 because Hyperion failed to file its annual Public Information Report and pay its annual franchise taxes.

322.    For ten months, Hyperion took no action to correct its forfeited status. Then, on September 22, 2014, Hyperion filed its 2013 and 2014 Public Information Reports, true and correct copies of which are attached to this Complaint as **Exhibit 51**.

323.    In its 2013 and 2014 Public Information Reports, Hyperion represented that (a) it had no revenues in either year; (b) Hyperion GP was its General Partner; and (c) Hyperion GP owned 100% of the partnership interests of Hyperion. *Id*.

324.    Neil McPherson filed Hyperion's 2013 and 2014 Public Information Reports online through the Texas Comptroller of Public Accounts TxComptroller eSystems webpage, https://mycpa.cpa.state.tx.us, and each report included the following Declaration:

> I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief and that a copy of this information has been mailed to each person named in the section who is a General Partner, Limited Partner or other member.

*Id*.

325.    Neil McPherson and Hyperion's representations in the 2013 and 2014 Public Information Reports were false, and Neil McPherson and Hyperion knew their representations were false.

326.    At the time Neil McPherson and Hyperion made their representations in the 2013 and 2014 Public Information Reports, Hyperion GP did not own 100% of the partnership interests of Hyperion.

327.    On December 8, 2014, Hyperion submitted a Tax Clearance Letter for Reinstatement, making Hyperion eligible for reinstatement through May 15, 2015. The next day,

on December 9, 2014, Hyperion filed an Application for Reinstatement and Request to Set Aside Revocation or Forfeiture. Neil McPherson signed the Application for Reinstatement on behalf of Hyperion GP, as the general partner of Hyperion. **Exhibit 52**.

328.     From its inception until November 2017, Hyperion had never opened a bank account. On information and belief, Hyperion has never filed a federal or state tax return.

> **B.     *Hyperion acquired Whitney National Bank's loans to Lee F. Kennedy Alabama and Factory Hill and used those loans to shelter Kennedy's assets from HCB's collection efforts.***

329.     Between February 2008 and August 2008, Kennedy and entities she owned and/or controlled borrowed money from Whitney National Bank ("**Whitney**") in Gulfport, Mississippi.

330.     On February 25, 2008, Lee F. Kennedy Alabama, L.L.C. ("**Lee F. Kennedy Alabama**") executed and delivered to Whitney that certain Promissory Note dated as of February 25, 2008, in the original principal amount of $1,763,000.00. Kennedy signed the Promissory Note as the managing member of Lee F. Kennedy Alabama.

331.     Lee F. Kennedy Alabama's obligations under the Promissory Note were further secured pursuant to that certain Mortgage dated as of February 25, 2008, and recorded in the Office of the Judge of Probate of Mobile County, Alabama, in Real Property Book 6337, Page 1781, encumbering certain real property situated in Mobile County, Alabama (the "**Mobile County Property**"). Kennedy signed the Mortgage encumbering the Mobile County Property as the managing member of Lee F. Kennedy Alabama.

332.     Kennedy also executed and delivered to Whitney that certain Commercial Guaranty dated as of February 25, 2008, pursuant to which Kennedy unconditionally guaranteed all of Lee F. Kennedy Alabama's obligations to Whitney in connection with the Promissory Note.

333.    After a series of other assignments, on or about March 9, 2012, Biel REO, LLC, accepted assignment of the Promissory Note and Mortgage by Lee F. Kennedy Alabama and Kennedy's Commercial Guaranty in favor of Whitney.

334.    Later in 2008, Factory Hill, L.L.C. ("**Factory Hill**"), borrowed more than $2,021,250.00 from Whitney. On August 4, 2008, Factory Hill executed and delivered to Whitney that certain Promissory Note dated as of August 4, 2008, in the original principal amount of $2,021,250.00. Kennedy signed the Promissory Note as the managing member of Factory Hill.

335.    Factory Hill's obligations under the Promissory Note were further secured pursuant to that certain Deed of Trust dated as of August 4, 2008, and recorded as Instrument No. 2008 11692 T-J1 in the office of the Chancery Clerk of the First Judicial District of Harrison County, Mississippi, encumbering certain real property situated in Harrison County, Mississippi (the "**Harrison County Property**").

336.    Also, Kennedy executed and delivered to Whitney that certain Commercial Guaranty dated as of August 4, 2008, pursuant to which Kennedy unconditionally guaranteed all of Factory Hill's obligations to Whitney in connection with the Promissory Note.

337.    After a series of other assignments, on or about February 28, 2012, Biel REO, LLC, accepted assignment of the Promissory Note, Deed of Trust, and Kennedy's Commercial Guaranty in favor of Whitney.

C.    *The Kennedy Enterprise funded Hyperion's purchase of the Whitney loans with money from the accounts of LK Freyer Investments and Lee Kennedy Investments.*

338.    Prior to July 2012, Hyperion had no assets, no bank accounts, no real estate, and no money with which it could conduct any business.

339.   To purchase the Whitney loans to Lee F. Kennedy Alabama and Factory Hill, the Kennedy Enterprise advanced $900,000.00 for Hyperion's benefit.

340.   From July 27, 2012, to August 8, 2012, the Kennedy Enterprise sent $150,000.00 from its accounts at JPMorgan Chase Bank ("**JPMC**")[24] to the Dunagan Childs law firm's escrow/trust account by interstate wire transfer. Each wire transfer to the Dunagan Childs law firm's referenced "EMD for Hyperion Capital," as follows:

| Date | From | To | Reference | Amount |
|------|------|-----|-----------|--------|
| 07/27/12 | LK Freyer Investments | Dunagan Childs | Emd For Hyperion Capital | $50,000.00 |
| 08/08/12 | LKF Investments-Texas | Dunagan Childs | Emd For Hyperion Capital | $50,000.00 |
| 08/08/12 | LK Freyer Investments | Dunagan Childs | Emd For Hyperion Capital | $50,000.00 |
| **Total funded from JPMC accounts** | | | | **$150,000.00** |

341.   On August 15, 2012, Kennedy sent an email, a true and correct copy of which is attached to this Complaint as **Exhibit 53**, to Mr. Elliot Acoca at Citi Private Bank as follows:

> Elliot, I need to wire $350,000 from LK Freyer Investments and $400,000 from Lee Kennedy Investments to the escrow account of Craig A Dunagane [sic] escrow. The instructions are contained in this email below. Please note on the wire it is a loan to Hyperion Capital deal. Please let me know if you need anything else.

**Ex. 53**.

342.   With her August 15, 2012, email to Elliot Acoca at Citi Private Bank,[25] Kennedy forwarded an email she received from Attorney Childs on July 27, 2012, that included wire transfer instructions for the Craig A. Dunagan, P.C. Escrow Account ending in 1251 at Texas Capital Bank, N.A. (ABA routing number 111017979) in Texas.

343.   On August 15, 2012, Citi Private Bank sent $750,000.00 to Craig A. Dunagan, P.C., and/or the Dunagan Childs law firm, by interstate wire transfer. Citi Private Bank

---

[24] On information and belief, JPMC's website, through which Kennedy accesses the Kennedy Enterprise's accounts at JPMC, is hosted on servers located in New York.

[25] Citi Private Bank is an affiliate of Citigroup, Inc., and Citibank, N.A.

transferred $350,000.00 from LK Freyer Investments' account ending in 7618 at Citi Private Bank (ABA routing number 021000089) in New York to Craig A. Dunagan, P.C.'s account ending in 1251 at Texas Capital Bank, N.A. (ABA routing number 111017979) in Texas. Citi Private Bank transferred $350,000.00 from Lee Kennedy Investments' account ending in 6542 at Citi Private Bank (ABA routing number 021000089) in New York to Craig A. Dunagan, P.C.'s account ending in 1251 at Texas Capital Bank, N.A. (ABA routing number 111017979) in Texas.

344.    On or about September 13, 2012, Biel REO, LLC, assigned the Lee F. Kennedy Alabama Mortgage to Hyperion pursuant to that certain Assignment and Assumption of Mortgage, Assignment of Leases and Rents and Loan Documents, dated as of September 13, 2012, and recorded on October 30, 2012, in the Office of the Judge of Probate of Mobile County, Alabama, in Real Property Book 6950, Page 1270.

345.    On the same day, on or about September 13, 2012, Biel REO, LLC, assigned the Factory Hill Deed of Trust to Hyperion pursuant to that certain Assignment and Assumption of Mortgage, Assignment of Leases and Rents and Loan Documents, dated as of September 13, 2012, and recorded on October 31, 2012, as Instrument No. 2012 10333 T-J1 in the office of the Chancery Clerk of the First Judicial District of Harrison County, Mississippi.

### D.    *After Biel REO assigned the loans to Hyperion, Hyperion foreclosed the Mobile County Property and Harrison County Property.*

346.    On or about January 11, 2013, while HCB's Motion for Summary Judgment was pending in the District Court Case, Hyperion foreclosed the Harrison County Property. Hyperion recorded its Substituted Trustee's Deed on January 18, 2013, as Instrument No. 2013 412 D-J1 in the office of the Chancery Clerk of the First Judicial District of Harrison County, Mississippi.

347.   According to the Substitute Trustee's Deed, Hyperion purchased the Harrison County property for $475,000.00, which was credited against Factory Hill's indebtedness under the Promissory Note.

348.   Hyperion still owns the Harrison County Property.

349.   On or about March 15, 2013, **one day after entry of the Original Judgment**, Hyperion foreclosed the Mobile County Property. Hyperion recorded its Foreclosure Deed on March 15, 2013, in the Office of the Judge of Probate of Mobile County, Alabama, in Real Property Book 7001, Page 1405.

350.   According to the Foreclosure Deed, Hyperion purchased the Mobile County property for $1,840,000.00, which was credited against Lee F. Kennedy Alabama's indebtedness under the Promissory Note.

351.   The Kennedy Enterprise fraudulently vaulted Hyperion in creditor priority by fast-tracking default judgments and charging orders.

352.   After foreclosing in Mississippi and Alabama, Hyperion pursued deficiency claims against Kennedy in Texas.

      **1.**   ***Hyperion Gulf Coast Ventures, Ltd., v. Factory Hill, L.L.C.*, District Court, Travis County, Texas, Cause No. D-1-GN-13-000625**

353.   On February 19, 2013, **while HCB's Motion for Summary Judgment was pending before the District Court**, Hyperion filed that certain civil action styled *Hyperion Gulf Coast Ventures, Ltd., v. Factory Hill, L.L.C., and Lee Freyer Kennedy a/k/a Lee F. Kennedy*, District Court, Travis County, Texas, Cause No. D-1-GN-13-000625 ("**Cause No. 13-625**").

354.   When it filed Cause No. 13-625 against Kennedy, Hyperion was represented by Attorney Williams.

73

355.    Neither Kennedy nor Factory Hill answered or otherwise defended Hyperion's Original Petition.

356.    On March 21, 2013, at 8:16 a.m., **one week after the District Court entered the Original Judgment against Kennedy**, Hyperion filed a Motion for No-Answer Default Judgment against Kennedy and Factory Hill. Just one hour and nine minutes later, at 9:25 a.m., the Travis County Court entered a Final Default Judgment against Kennedy and Factory Hill in the amount of $896,164.70.[26]

357.    On April 12, 2013, at 2:10 p.m., **one day after HCB filed its Motion to Alter or Amend**, Hyperion filed an Application for Charging Order against Kennedy seeking to charge Kennedy's interests in the following:

- Rivercrest Lot
- Iron Glades Slope
- FH Aspen
- LFK Investments-Texas
- LK Freyer Investments
- LK Freyer Shumaker
- BK Properties
- Rockcliff Holdings
- Lee Kennedy Investments

358.    **Seven minutes later**, the Travis County Court entered a Charging Order Against Lee Freyer Kennedy, charging Kennedy's interests exactly as Hyperion requested, while also imposing a lien against such interests, all in favor of Hyperion. A true and correct copy of the April 12, 2013, Charging Order is attached hereto as **Exhibit 54**.

359.    On April 29, 2013, at 1:42 p.m., **four days after the conclusion of briefing on HCB's and Kennedy's motions for new trial**, Hyperion filed a separate Application for Charging Order in which it sought a Charging Order against Hungry Otter. That same day, the Travis County Court entered its Charging Order Against Lee Freyer Kennedy. The April 29

---

[26] The same day, Hyperion GP paid Hopkins & Williams $3,500.00 by interstate wire transfer.

Charging Order not only charged Kennedy's interests in Hungry Otter, but also imposed a lien against Kennedy's membership interests in Hungry Otter. A true and correct copy of the April 29, 2013, Charging Order is attached hereto as **Exhibit 55**.

360.    On or about May 20, 2013, Attorney Williams executed that certain Foreign Judgment Affidavit, which was recorded on May 29, 2013, in Official Records Book 3097, Page 4175, of the Public Records of Okaloosa County, Florida. A true and correct copy of the Foreign Judgment Affidavit is attached to this Complaint as **Exhibit 56**. With the Foreign Judgment Affidavit, Attorney Williams recorded an exemplified copy of the Final Default Judgment in Cause No. 13-625.

361.    On December 10, 2013, at 5:24 p.m., Hyperion filed yet another Application for Charging Order. Hyperion's December 10, 2013, Application for Charging Order requested charging orders with respect to Kennedy's interests in KWF Group, LLC; Rockcliff Holdings-GP, LLC; and LFK GP, LLC.

362.    Hyperion filed its December 10, 2013, Application for Charging Order (a) just **two weeks after** HCB filed its November 27, 2013, Motion to Compel in the District Court; (b) only **four days after** HCB served its December 6, 2013, Notice of Deposition of Lee Kennedy; and (c) **nine days before** Kennedy's first post-judgment deposition, on December 19, 2013.

363.    On December 13, 2013, the Travis County Court granted Hyperion's December 10, 2013, Application for Charging Orders; charged Kennedy's interests in KWF Group, Rockcliff GP, and LFK GP; and imposed a lien against such interests, again all in favor of Hyperion. A true and correct copy of the December 13, 2013, Charging Order is attached to this Complaint as **Exhibit 57**.

364.    On September 25, 2014, at 1:46 a.m., Hyperion again filed an Application for Charging Order in Cause No. 13-625. In its September 2014 Application for Charging Order, Hyperion sought a charging order with respect to Kennedy's interests in BK II. Hyperion filed its September 25, 2014, Application for Charging Order just **eight days after** HCB filed the Florida Charging Order Motion on September 17, 2014,[27] **and two weeks after HCB domesticated the HCB Judgment in Texas.**

365.    At the time Hyperion filed its September 25, 2014, Application for Charging Order in Cause No. D-1-GN-18-000625, Hyperion's Certificate of Formation had been forfeited because of its failure to file its Public Information Reports and pay required franchise taxes under Texas law. As a result, Hyperion was prohibited from maintaining any civil action in Texas courts.

366.    At 1:34 p.m., less than 12 hours later, the Travis County Court granted Hyperion another Charging Order Against Lee Freyer Kennedy. A true and correct copy of the September 25, 2014, Charging Order is attached to this Complaint as **Exhibit 58**. The September 2014 Charging Order charged Kennedy's interests in BK II and imposed a lien against those interests.

367.    Kennedy never defended or appealed any of Hyperion's charging order applications in Cause No. 13-625.

368.    Through entry of the Amended Final Judgment, Hyperion's actions in Cause No. 13-625 were temporally connected to HCB's actions, as shown below:

---

[27] In the Florida Charging Order Case, HCB sought charging orders against Kennedy's interests in BK II and other entities. *See supra* paras. 138-163.



369.    For instance, in March 2013 Hyperion sought a default judgment against Kennedy in Cause No. 13-625 just **seven days after entry of the Original Judgment**, and Hyperion applied for its first charging order **one day after HCB filed its Motion to Alter or Amend**.

> **2.      Hyperion Gulf Coast Ventures, Ltd., v. Lee F. Kennedy Alabama, L.L.C., District Court of Travis County, Texas, Cause No. D-1-GN-13-001003**

370.    On March 25, 2013, 11 days after the District Court granted HCB's Motion for Summary Judgment and entered the Final Judgment, Hyperion filed that certain civil action styled *Hyperion Gulf Coast Ventures, Ltd., v. Lee F. Kennedy Alabama, L.L.C., and Lee Freyer Kennedy a/k/a Lee F. Kennedy*, District Court of Travis County, Texas, Cause No. D-1-GN-13-001003 ("**Cause No. 13-1003**"), seeking a deficiency judgment in the amount of $864,000.00, plus accrued interest, costs, and attorney's fees.

371.    Kennedy never answered or defended Hyperion's claims in Cause No. 13-1003.

372.    On April 29, 2013, at 10:32 a.m., Hyperion filed a Motion for No-Answer Default Judgment Against Lee Freyer Kennedy a/k/a Lee F. Kennedy. Attached to Hyperion's Motion for No-Answer Default Judgment was the Affidavit of Neil McPherson in Support of Plaintiff's Motion for Default Judgment dated as of April 26, 2013.

373.    The very same day, at 5:00 p.m., the Travis County Court entered a Final Default Judgment against Kennedy in the amount of $1,069,220.00, exclusive of attorney's fees, court costs, and private service fees.

374.    On July 19, 2013, at 1:22 p.m., **eight days after the District Court entered the Amended Final Judgment**, Hyperion filed an Application for Charging Order against Kennedy in Cause No. 13-1003, seeking to charge Kennedy's interests in the following entities:

- Rivercrest Lot
- Iron Glades Slope
- FH Aspen
- LKF Investments-Texas
- LK Freyer Investments
- LK Freyer Shumaker
- BK Properties
- Hungry Otter
- KWF Group
- Rockcliff GP
- LFK GP

375.    Hyperion's July 19, 2013, Application for Charging Order also sought to charge Kennedy's limited partnership interests in Rockcliff Holdings and Lee Kennedy Investments.

376.    One week later, on July 26, 2013, the Travis County Court entered a Charging Order Against Lee Freyer Kennedy, charging Kennedy's interests exactly as requested by Hyperion, while also imposing a lien in favor of Hyperion against such interests. A true and cotrect copy of the July 26, 2013, Charging Order is attached top this Complaint as **Exhibit 59**.

377.    Through entry of the Amended Final Judgment, Hyperion's actions in Cause No. 13-1003 were temporally related to HCB's actions, as shown below:



378.     Then, on September 25, 2014, at 1:34 p.m., **just eight days after HCB filed the Florida Charging Order Motion on September 17, 2014**, Hyperion filed another Application for Charging Order in Cause No. 13-1003 in which it sought a Charging Order against BK II. The Travis County Court **immediately** entered a second Charging Order Against Lee Freyer Kennedy. The September 25, 2014, Charging Order Against Lee Freyer Kennedy in Cause No. 13-1003 was entered at 1:34 p.m.[28] A true and correct copy of the September 25, 2014, Charging Order is attached to this Complaint as **Exhibit 60**.

379.     Kennedy never defended or appealed Hyperion's charging order applications in Cause No. 13-1003.

### 3.     *Hyperion Gulf Coast Ventures, Ltd., v. Lee Freyer Kennedy*, District Court of Travis County, Texas, Cause No. D-1-GN-18-000600

380.     In the later part of 2017, the Kennedy Enterprise caused Hyperion to assert additional collection efforts related to its judgments. The Kennedy Enterprise fraudulently obtained another charging order through Hyperion to prevent HCB from collecting the HCB Judgment.

381.     On February 5, 2018, Hyperion filed an new Application for Charging Orders in that certain civil action styled *Hyperion Gulf Coast Ventures, Ltd., v. Lee Freyer Kennedy a/k/a Lee F. Kennedy a/k/a Lee Freyer McPherson; 5950 State Bridge Road, LLC; Compassionate Use, LLC; Compassionate Use II, LLC; Organic Health, LLC; and Gonzales LA Holdings, LLC*, District Court, Travis County, Texas, Cause No. D-1-GN-18-000600 ("**Cause No. 18-600**").[29] A

---

[28] The September 25, 2014, Charging Orders Against Lee Freyer Kennedy in Cause No. 13-625 and Cause No. 13-1003 were entered at exactly the same time.
[29] Collectively, the Hyperion judgments and charging orders referenced in Part 4.D., are referred to *infra* as the "Hyperion Liens."

true and correct copy of Hyperion's Application for Charging Orders is attached to this Complaint as **Exhibit 61**.

382.     Hyperion requested charging orders against Kennedy's interests in 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings, none of which even existed at the time Hyperion last applied for charging orders from the Travis County Court. **Ex. 61**.

383.     This third case by Hyperion third case was filed at the instruction and behest of Kennedy so she could assert Hyperion's continued collection efforts as a defense in the Florida Charging Order Case in Okaloosa County, Florida.

384.     On February 28, 2018, Kennedy, along with 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings, filed their Original Answer in Cause No. 18-600. A true and correct copy of the Original Answer is attached to this Complaint as **Exhibit 62**.

385.     Adkinson signed and filed the Original Answer. **Ex. 62**. At the time she filed the Original Answer, Adkinson represented not only Kennedy, but also Reynolds, Hyperion Manegement, and Hyperion.

386.     The Original Answer was the first appearance Kennedy made in any of the cases filed by Hyperion.

387.     On March 8, 2018, at 9:04 a.m., Hyperion, Kennedy, and the entity respondents entered into Agreed Charging Orders, which were entered by the Travis County Court. A true and correct copy of the Agreed Charging Orders is attached to this Complaint as **Exhibit 63**. None of the party-litigants signed the Agreed Charging Orders.

388.    By entering into the Consent Charging Orders, the Kennedy Enterprise fraudulently elevated Hyperion's judgment liens over the claims of any and all other creditors, including HCB.

### E.     Hyperion had no cash assets to fund its operations, so the Kennedy Enterprise paid for everything.

389.    Hyperion had no financial means of obtaining its judgments on its own, so it relied entirely on the Kennedy Enterprise to fund its operations. Beginning in 2012, the Kennedy Enterprise funded all of Hyperion's activities.

390.    As described above, between July 27, 2012, and August 15, 2012, Lee Kennedy Investments, LK Freyer Investments, and LKF Investments-Texas transferred $900,000.00 to the Dunagan Childs law firm to purchase the Whitney loans from Biel REO.

391.    From March 12, 2013, to January 17, 2014, **after entry of the HCB Judgment**, the Kennedy Enterprise provided funds to Hyperion in the amount of $256,900 as set forth below:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 03/21/13 | Lee Kennedy Investments | 7472 | Hyperion GP, LLC | 5580 | $5,000.00 |
| 04/08/13 | LK Freyer Investments | 7565 | Hyperion GP, LLC | 5580 | $5,000.00 |
| 04/22/13 | LK Freyer Investments | 2702 | Hyperion GP, LLC | 5580 | $2,000.00 |
| 07/24/13 | LK Freyer Investments | 2702 | Hyperion GP, LLC | 5580 | $4,000.00 |
| 10/08/13 | LK Freyer Investments | 7565 | Hyperion GP, LLC | 5580 | $5,000.00 |
| 10/15/13 | Hungry Otter Holdings | 2835 | Hyperion GP, LLC | 5580 | $500.00 |
| 12/17/13 | Lee Freyer Kennedy | 9320 | Hyperion GP, LLC | 5580 | $36,400.00 |
| 01/17/14 | Hungry Otter Holdings | 2835 | Hyperion GP, LLC | 5580 | $199,000.00 |
| **Total** | | | | | **$256,900.00** |

392.    On March 21, 2013, Hyperion GP sent $3,500.00 to Hopkins & Williams by interstate wire transfer. Hyperion GP made the transfer from its account ending in 5580 at JPMC (ABA routing number 114000776) in New York to Hopkins & Williams by book transfer debit.

393.    On April 1, 2013, Hyperion GP sent $4,502.60 by interstate wire transfer to Fernandez & Combs, LLC, a law firm in Mobile, Alabama, for the foreclosure of the Mobile

County Property. Hyperion GP made the transfer from its account ending in 5580 at JPMC (ABA routing number 114000776) in New York to Fernandez & Combs, LLC's account at Regions Bank (ABA routing number 062005690) in Alabama.

394.    In the days and weeks prior to making payments to Hopkins & Williams and Fernandez & Combs, Hyperion GP did not have money to pay those firms.

395.    As of March 7, 2013, Hyperion GP had on deposit only $3,384.20. On March 21, 2013, Lee Kennedy Investments transferred $5,000.00 to Hyperion GP by intrabank transfer. Lee Kennedy Investments' March 21, 2013, transfer to Hyperion GP increased Hyperion GP's bank balance from $3,384.20 to $8,384.20. From the $8,384.20 on deposit in Hyperion GP's account ending in 5580, Hyperion GP paid Hopkins & Williams $3,500.00 and Fernandez & Combs $4,502.60. **Hyperion GP could not have made either of those payments but for the March 21, 2013, transfer from Lee Kennedy Investments.**

396.    On May 8, 2013, Hyperion GP paid Hopkins & Williams another $6,000.00 by interstate wire transfer from its account ending in 5580 at JPMC (ABA routing number 114000776) to Hopkins & Williams' account at Broadway National Bank (ABA routing number 114021933) in Austin, Texas.

397.    Hyperion GP had only $935.05 on deposit on May 8, 2013, and could not have made its payment to Hopkins & Williams without a $6,000.00 deposit from the Kennedy Enterprise.

398.    Then, on July 24, 2013, Hyperion GP paid $3,500.00 to Hopkins & Williams by interstate wire transfer from its account ending in 5580 at JPMC (ABA routing number 114000776) to Hopkins & Williams' account at Broadway National Bank (ABA routing number 114021933) in Austin, Texas.

399.     On July 24, 2013, Hyperion GP had only $910.05 on deposit. To fund Hyperion GP's payment to Hopkins & Williams, on July 24, 2013, LK Freyer Investments transferred $4,000.00 from its account ending in 2702 at JPMC to Hyperion GP's account ending in 5580 at JPMC. **LK Freyer Investments made the foregoing transfer only two weeks after entry of the HCB Judgment.**

400.     Hyperion GP could not have made its May 8, 2013, or July 24, 2013, payments to Hopkins & Williams, without deposits from the Kennedy Enterprise, as shown below:

| Date | To | From | Amount | Balance |
|------|----|------|--------|---------|
| **Balance as of 03/07/13** | | | | **$3,384.20** |
| 03/21/13 | Hyperion GP, LLC | Lee Kennedy Investments, LP | $5,000.00 | $8,384.20 |
| 03/21/13 | Hopkins Law PLLC | Hyperion GP, LLC | ($3,500.00) | $4,884.20 |
| 03/21/13 | Wire Online Domestic Fee | Hyperion GP, LLC | ($25.00) | $4,859.20 |
| 04/01/13 | Fernandez & Combs, LLC | Hyperion GP, LLC | ($4,502.60) | $356.60 |
| 04/01/13 | Wire Online Domestic Fee | Hyperion GP, LLC | ($25.00) | $331.60 |
| | | | | |
| | | | | |
| **Balance as of April 26, 2013** | | | | **$935.05** |
| 05/08/13 | Deposit 112185122 | Hyperion GP, LLC | $6,000.00 | $6,935.05 |
| 05/08/13 | Hyperion GP, LLC | Wire Online Domestic Fee | ($25.00) | $6,910.05 |
| 05/08/13 | Hyperion GP, LLC | Hopkins Law, PLLC | ($6,000.00) | $910.05 |
| 07/24/13 | LK Freyer Investments, LLC | Hyperion GP, LLC | $4,000.00 | $4,910.05 |
| 07/24/13 | Hyperion GP, LLC | Wire Online Domestic Fee | ($25.00) | $4,885.05 |
| 07/24/13 | Hyperion GP, LLC | Hopkins Law, PLLC | ($3,500.00) | $1,385.05 |

401.     After making its July 24, 2013, payment to Hopkins & Williams, Hyperion HP had remaining on deposit only $1,385.05. Hyperion GP did not make any other payments or deposits until September 19, 2013, when it transferred $516.00 directly to Kennedy's account ending in 9320 at JPMC.

402.     As of September 19, 2013, Hyperion GP's cash balance was only $869.05.

403.     On October 25, 2013, Hyperion GP paid Hopkins & Williams $5,000.00 by interstate wire transfer from its account ending in 5580 at JPMC (ABA routing number 114000776) to Hopkins & Williams' account at Broadway National Bank (ABA routing number 114021933) in Austin, Texas.

404. Hyperion GP could not have made its October 25, 2013, payment to Hopkins & Williams without assistance from the Kennedy Enterprise. On October 8, 2013, LK Freyer Investments transferred $5,000.00 from its account ending in 7565 at JPMC to Hyperion GP's account ending in 5580 at JPMC. LK Freyer Investments' October 8, 2013, transfer to Hyperion GP increased Hyperion GP's bank balance to $5,869.05, which enabled Hyperion GP to make its $5000.00 payment to Hopkins & Williams on October 8, 2013.

405. On January 23, 2014, Hungry Otter paid Hopkins & Williams $2,571.00 from Hungry Otter's account ending in 2835 at JPMC. Hungry Otter's January 23, 2014, payment to Hopkins & Williams referenced "Payment for Lee McPherson." At the time of such payment, Kennedy owned no less than 90% of the membership interests in Hungry Otter.

406. On February 25, 2015, Hungry Otter made a $1,000.00 payment to Hopkins & Williams by interstate wire transfer. Hungry Otter made the payment from its account ending in 2835 at JPMC (ABA routing number 114000776) to Hopkins & Williams' account at Broadway National Bank (ABA routing number 114021933) in Austin, Texas. Hungry Otter's February 25, 2015, payment referenced, "Payment For Hyperion."

407. In addition to the foregoing legal fees, the Kennedy Enterprise has paid for insurance for Hyperion. On November 24, 2015, Rockcliff Holdings paid BancorpSouth Insurance Services, Inc., $1,984.00, by check number 5061 from its account ending in 7373 at JPMC for Hyperion's insurance coverage. On November 22, 2016, Lee Kennedy Investments paid BancorpSouth Insurance Services, Inc., $1,816.00, by check number 1034 from its account ending in 7472 at JPMC for Hyperion's insurance coverage. True and correct copies of check numbers 5061 and 7472 are attached to this Complaint as **Exhibit 65**.

408.    Even though LK Freyer Investments owns no interest in Hyperion, on March 15, 2015, LK Freyer Investments issued check number 1077 in the amount of $200.00 from its account ending in 2702 at JPMC to the Texas State Comptroller for Hyperion. A true and correct copy of check number 1077 is attached to this Complaint as **Exhibit 66**.

409.    Hyperion's judgments have continued accruing interest, and Kennedy has made no payments to Hyperion to reduce her alleged judgment obligations. Instead, the Kennedy Enterprise has actively funded Hyperion's operations and obstruction of HCB's collection efforts, and Hyperion has distributed to the Kennedy Enterprise the bulk of its income.

410.    Each of the transfers to and from Hyperion was made with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

### F.    *All of Hyperion's judgments and charging orders were obtained fraudulently.*

411.    Since 2012, Hyperion has played an important role in the Kennedy Enterprise by purchasing loans Kennedy guaranteed and fraudulently obtaining judgments and charging orders against Kennedy's interests.

412.    In some instances, the Kennedy Enterprise intentionally misrepresented facts and circumstances to the courts in Texas and Florida.

413.    Despite Hyperion's direct and very close association with Kennedy, **neither Kennedy nor Hyperion ever disclosed, among other things, the extent to which Kennedy controls Hyperion**, the extensive conflicts of interest among Kennedy's counsel, or the circular ownership relationships among the charged entities and Hyperion. Because of The Kennedy's Enterprise's fraudulent conduct, Hyperion holds charging orders against some of the very entities that own Hyperion.

414.    When HCB sought charging orders in Texas and Florida, Kennedy and Hyperion defended against those actions, but when Hyperion – controlled by Kennedy – applied for charging orders or other relief, Kennedy appeared and defended only once – in 2018 – specifically to acquiesce to Hyperion.

### 1.    The Kennedy Enterprise employed counsel to conceal Kennedy's involvement and enhance Hyperion's credibility.

415.    The Kennedy Enterprise intentionally concealed Kennedy's involvement in the Hyperion cases.

416.    When Hyperion filed its Original Petitions in Cause No. 13-625 on February 19, 2013, and Cause No. 13-1003 on March 25, 2013, Attorney Williams and Hopkins & Williams represented Hyperion. Attorney Williams, Mark Hopkins, Brantley Boyett, and Glenn Brown appeared on the pleadings for Hyperion.

417.    On February 19, 2013, Attorney Williams and Mark Hopkins were the members of Hopkins & Williams, and Mr. Brown was an attorney at Hopkins & Williams.

418.    At the same time, Attorney Williams and Mark Hopkins were partners with Leighton in LH&W. **Ex. 43**.

419.    At the same time, Leighton was the sole member of William Leighton PLLC, where Adkinson was an attorney. **Ex. 41**.

420.    From February 19, 2013, through September 25, 2014, when Hyperion obtained its last charging orders in Cause No. 13-625 and Cause No. 13-1003 in Travis County, Texas, Attorney Williams, Mark Hopkins, and Leighton remained partners in LH&W. **Ex. 43**.

421.    During that same period of time, Attorney Williams and Mark Hopkins were representing Hyperion in its claims against Kennedy.

422.    During that same period of time, Leighton and Adkinson were preparing the Kennedy Enterprise's tax returns.

423.    None of the foregoing relationships were disclosed to the Travis County Court in any of Hyperion's lawsuits.

424.    When Hyperion filed its Motion for Charging Orders in Case No. 18-600 in February 2018, five years after filing its first petition, the Leighton/Adkinson Firm still represented the Kennedy Enterprise in litigation and in preparation of its tax returns. At the time, Leighton, Adkinson, and Mr. Brown were members of the Leighton/Adkinson Firm.

425.    In fact, since 2013, Leighton, Attorney Williams, Adkinson, Mr. Brown, and their affiliated law firms have continuously represented Kennedy while also continuously representing Hyperion.

> **2.      The Kennedy Enterprise devised an illegal scheme to recirculate Kennedy's income.**

426.    As previously stated in this Complaint, the Travis County Court and the Florida Court have entered a number of charging orders with respect to Kennedy's interests in the entities she controls. The various charging orders all impose similar requirements on the charged entities – if and when those entities make distributions (mandatory or discretionary) to their constituent members or partners, the entities must pay Kennedy's share of distributions to the parties holding the charging orders.

427.    Thus, if one of the entities (e.g., Rockcliff Holdings) distributes income to its partners, then Rockcliff Holdings must pay Kennedy's share to Hyperion or HCB, as the case may be.

428.    The distribution scheme contemplated by the Hyperion Liens fails when examined in light of the Kennedy Enterprise's utilization of Hyperion.

429.    As set forth above, Kennedy is a limited partner in Rockcliff Holdings. Typically, if Rockcliff Holdings elects to distribute cash to its constituent partners, it would distribute cash to Kennedy and the other limited partners, the children's trusts. The charging orders prevent any distribution to Kennedy. The charging orders require that any distribution to which Kennedy is entitled must be made instead to Kennedy's judgment creditors, Hyperion and HCB.

430.    Under the circumstances of this case, enforcement of Hyperion's charging orders is effectively null and void. Because of the interconnectedness among the owners of Hyperion, any distributions captured by Hyperion flow back to Kennedy.

431.    The logical fallacy of Hyperion's charging orders is *reductio ad absurdum*, as shown as follows:



432.    The distribution/collection cycle would necessarily repeat into infinity, a result the Texas, Louisiana, and Florida legislatures never intended.

433.    The Kennedy Enterprise has employed such a scheme to prevent HCB and Kennedy's other creditors from enforcing their claims against Kennedy.

### 3.   The Kennedy Enterprise committed fraud on the Florida Court to block HCB's collection efforts.

434.   After HCB filed its Florida Charging Order Motion, Hyperion filed a Motion to Intervene in the Florida Charging Order Case on October 16, 2014. A true and correct copy of Hyperion's Motion to Intervene is attached to this Complaint as **Exhibit 67**. Hyperion was represented by Florida attorney John Dowd and the Dowd Law Firm. **Ex. 67**.

435.   In its Motion to Intervene, Hyperion committed fraud on the Florida Court.

436.   Hyperion represented to the Florida Court that it had "proceeded with its own collection efforts, to include a demand upon some of the same assets upon which HCB now seeks relief from this Court and has determined that a number of the LLC's [sic] listed by HCB are inactive and have no assets." *Id.*, ¶ 5.

437.   Hyperion alleged also that it was "unable to determine which, if any, of the LLC's [sic] listed may be a single member LLC." *Id.*, ¶ 5.

438.   Hyperion's representations were false, and Hyperion knew those representations were false.

439.   Other than obtaining fraudulent charging orders, Hyperion has never proceeded with any legitimate collection efforts against Kennedy.

440.   Moreover, at the time Hyperion moved to intervene in the Florida Charging Order Case, Neil McPherson was the manager of Hyperion GP, the General Partner of Hyperion. Pursuant to applicable law, Hyperion is charged with Neil McPherson's knowledge of the assets of the various entities named in the Florida Charging Order Case. Moreover, Kennedy and Neil McPherson directly controlled Hyperion at that time. Through its principals Kennedy and Neil McPherson, Hyperion was well aware of all of Kennedy's assets.

441.     In addition, the Leighton/Adkinson Firm represented the Kennedy Enterprise in Hyperion litigation in Texas and had just finishing preparing and filing the Kennedy Enterprise's 2013 state and federal tax returns.

442.     During that same time period, Hyperion's existence had been revoked by the State of Texas. Hyperion could not have pursued its purported collection activities at that time because it was prohibited from asserting any claims against any party in the Texas courts.

443.     The Florida Court entered the Florida Charging Orders as discussed, *supra*, and, with respect to BK II and Iron Glades Slope, subordinated HCB's charging orders to the Hyperion Liens, just as the Travis County Court concluded. The Florida Court, like the Travis County Court, premised its determination on Hyperion's fraudulent representations to the court.

### G.     The Kennedy Enterprise fraudulently manufactured litigation and discovery to maintain its scheme against HCB.

#### 1.     Kennedy and Adkinson schemed to impede HCB's legitimate collections efforts by fabricating discovery to commit a fraud on the Florida court.

444.     On July 17, 2017, HCB filed a Motion for Contempt Order in the Charging Order Case because the Florida Charged Entities failed to fulfill their reporting and payment obligations under the Florida Charging Orders.

445.     **Two weeks later**, on August 2, 2017, Adkinson communicated with Austin, Texas, lawyer C. Ashley Callahan ("**Mr. Callahan**") regarding the Kennedy Enterprise's Hyperion scheme. After her initial communication with Mr. Callahan, on August 2, 2017, at 2:55 p.m., Adkinson sent an email, a true and correct copy of which is attached to this Complaint as **Exhibit 68**, to Mr. Callahan that read:

Ashley,

Thank you for talking with me today. Your client would be Hyperion Gulf Coast Ventures, Ltd. The general partner is Hyperion GP, LLC. The contact person is

Neil McPherson. His email address is Neil.mcpherson@mcphersonfinancial.com. Address for Hyperion is 1100 Richmond, Suite 550, Houston, TX 77042.

There are actually two separate judgments. Pleadings for both and abstracts for both are attached (abstracts also recorded in counties where real property is located).

I also have most of the documents for all of the charging orders that were obtained for both of these judgments. Right now, they want basic collection discovery to be sent out as soon as possible. We are getting a copy of the interrogatories and requests for disclosure that were sent to Lee Kennedy from a separate creditor (second in line) HCB Financial Corp. and will forward that to you as soon as we get it. I am also attaching the request that was sent to our firm by HCB.

Neil McPherson is Lee Kennedy's ex-husband. I can facilitate getting info to and from him if necessary.

Lee Kennedy's address (and the other entities that were defendants) has not changed from what is in the documents – 4720 Rockcliff Road, #3, Austin, 78746.

Please let me know what other info you need in the meantime.

Thank you!

Brenda

**Ex. 68**.

446.    As promised, Adkinson transmitted to Mr. Callahan HCB's November 14, 2014, subpoena to the Leighton/Adkinson Firm. **Ex. 68**.

447.    Mr. Callahan replied by email to Adkinson the same day, at 6:14 p.m., seeking confirmation and clarification of her assignment from Adkinson. Mr. Callahan's email read as follows:

Thanks so much for sending, and I am really looking forward to working on this matter.

If I am understanding correctly, my client would be Hyperion Gulf Coast Ventures, for whom the contact is Neil McPherson (ex-husband of Lee Kennedy).

My job will be to issue discovery to Lee Kennedy on behalf of Hyperion. I am assuming that Kennedy and McPherson still have a good relationship.

Three initial questions:

1. Who is the recipient of my engagement letter? (thinking McPherson via email, but not clear);

2. Who will pay my bills, and where should they be sent?; and

3. Will your firm accept service of the discovery for Kennedy?

**Ex. 68**.

448.    The next day, August 3, 2017, at 11:41 a.m., Adkinson sent Mr. Callahan a response by email. A true and correct copy of Adkinson's August 3, 2017, email to Mr. Callahan is attached to this Complaint as **Exhibit 69**. Adkinson responded directly in the body of Mr. Callahan's prior email. Adkinson wrote:

> If I am understanding correctly, my client would be Hyperion Gulf Coast Ventures, for whom the contact is Neil McPherson (ex-husband of Lee Kennedy). **YES**
>
> My job will be to issue discovery to Lee Kennedy on behalf of Hyperion. I am assuming that Kennedy and McPherson still have a good relationship. **YES**
>
> Three initial questions:
>
> 1. Who is the recipient of my engagement letter? (thinking McPherson via email, but not clear); **YES, Neil will receive it by email.**
>
> 2. Who will pay my bills, and where should they be sent?; and **Hyperion will pay; send through Neil to his email address.**
>
> 3. Will your firm accept service of the discovery for Kennedy? **YES**

**Ex. 69**.

449.    Then, on August 4, 2017, at 3:37 p.m., Adkinson transmitted by email HCB's interrogatories, requests for production and admissions previously served on Kennedy. A true and correct copy of Adkinson's August 4, 2017, email to Mr. Callahan is attached to this Complaint as **Exhibit 70**. Adkinson explained to Mr. Callahan that "[t]here was a motion to

compel after this and the judge narrowed many of the items, but hopefully this will help your drafting." **Ex. 70**.

450.    Mr. Callahan replied to Adkinson by email the same day at 4:42 p.m. as follows:

> Thanks. I have been working on a TRO so I am a little behind. Will get the engagement letter out this weekend. Not sure if I should put a retainer in there. Any thoughts? **The parties seem to have plenty of money, but then again I don't know them at all.** You and Lisa[30] being associated with them of course gives me quite a bit of security.

*Id.* (emphasis added).

451.    Adkinson responded favorably to Mr. Callahan's August 4, 2017, email, explaining that "[t]hey do pay regularly, usually by credit card. We have been doing considerable work for Lee and her entities since 2013. However, if you are more comfortable with a retainer, then certainly ask." A true and correct copy of Adkinson's August 4, 2017, email to Mr. Callahan is attached to this Complaint as **Exhibit 71**.

452.    On August 5, 2017, at 1:22 p.m., Mr. Callahan sent an engagement letter to Neil McPherson. A true and correct copy of Mr. Callahan's August 5, 2017, email to Neil McPherson is attached to this Complaint as **Exhibit 72**. Mr. Callahan copied Adkinson on his email transmittal to Neil McPherson. **Ex. 72**.

453.    On August 7, 2017, at 2:58 p.m., Adkinson sent an email to Mr. Callahan that recited, "Ashley, Attached is the engagement letter signed by Neil. I will call your office with a credit card number. Thank you! Brenda" A true and correct copy of Adkinson's August 7, 2017, email to Mr. Callahan is attached to this Complaint as **Exhibit 73**.

454.    Adkinson acted as the intermediary between Neil McPherson, the Manager of Hyperion GP, the General Partner of Hyperion, and Hyperion's new counsel Mr. Callahan. Neil

---

[30] On information and belief, Mr. Callahan meant attorney Lisa Michaux, one of the partners of the Leighton/Adkinson Firm.

McPherson signed Mr. Callahan's engagement letter and transmitted the executed engagement letter to Adkinson, who then transmitted the executed engagement letter to Mr. Callahan. **Ex. 73**.

455.    Then, just over an hour later, on August 7, 2017, at 4:10 p.m. CDT, Adkinson replied to Mr. Callahan's August 5, 2017, transmittal to Neil McPherson. A true and correct copy of Adkinson's 4:10 p.m., August 7, 2017, email to Mr. Callahan is attached to this Complaint as **Exhibit 74**. In her August 7, 2017, email, Adkinson notified Mr. Callahan that "they are going to deliver $3000 cash tomorrow." **Ex. 74**.

456.    On August 8, 2017, at 3:12 p.m., Mr. Callahan sent an email to Adkinson confirming receipt of the $3,000.00 retainer referenced in the Hyperion engagement letter. A true and correct copy of Mr. Callahan's August 8, 2017, email to Adkinson is attached to this Complaint as **Exhibit 75**. Mr. Callahan wrote, "Got it. ***They literally had 30 $100 bills delivered***. Definitely a first!" **Ex. 75** (emphasis added). Mr. Callahan also explained that she would "get to this soon." *Id*. (emphasis added).

457.    That same day, at 3:12 p.m. CDT, Adkinson replied to Mr. Callahan by email, a true and correct copy of which is attached to this Complaint as **Exhibit 76**, writing: "Thank you. Lee told me today that she has to go to Florida next week to testify regarding discovery in her case where the judgment is second in line after Hyperion. She just wants to be able to say that Hyperion has begun collection discovery." **Ex. 76** (emphasis added).125

458.    Adkinson was referring to the August 18, 2017, hearing scheduled on HCB's Motion for Contempt Order, and in her 3:12 p.m. CDT email to Mr. Callahan, Adkinson not only waived the attorney-client privilege, but also confirmed the Kennedy Enterprise's intentional effort to commit fraud on the Florida Court.

459.     In response, at 3:18 p.m. CDT, Mr. Callahan wrote, "Wow ok. So when do I need to have it served." A true and correct copy of Mr. Callahan's August 8, 2017, email to Adkinson is attached to this Complaint as **Exhibit 77**. Adkinson replied minutes later at 3:20 p.m. and explained: "You don't necessarily have to have the formal discovery served by next week – but if we could just maybe do an initial letter requesting some info, then follow up with the formal discovery requests. Will that work?" **Ex. 77**.

460.     On Saturday, August 12, 2017, at 9:50 a.m., Mr. Callahan sent an email to Adkinson that read, "Please see attached letter. If possible, we would like to receive the requested information voluntarily within the next 14 days. Of course, I am happy to work with you regarding scope and timing issues." A true and correct copy of Mr. Callahan's August 12, 2017, email to Adkinson is attached to this Complaint as **Exhibit 78**. Attached to Mr. Callahan's August 12, 2017, email was a three page letter outlining her engagement by Hyperion and requesting that Kennedy "voluntarily provide relevant information to assist with evaluating collection issues." **Ex. 78**. In her letter, Mr. Callahan also offered to enter into confidentiality agreement or protective order.

461.     Mr. Callahan's August 12, 2017, included 11 separate requests for production. Of those 11 requests, 10 were copied in whole or in part from HCB's prior requests for production to Kennedy. **Ex. 78**.

### 2.     Meanwhile, Mead perpetrated fraud on the Florida Court at the hearing on HCB's Motion for Contempt.

462.     After HCB filed its Motion for Contempt, none of the Charged Entities responded; however, on August 18, 2017, the morning of the hearing on HCB's Motion for Contempt, Attorney Mead, on Kennedy's behalf, filed a Notice of Filing Affidavit and the Affidavit of Lee McPherson, both of which are attached to this Complaint as **Exhibit 79**.

Kennedy executed the Affidavit of Lee McPherson on August 16, 2017. **Ex. 79**. Adkinson notarized the Affidavit of Lee McPherson. *Id.*

463.    Mead filed the Affidavit of Lee McPherson on August 18, 2017, online through the Okaloosa County, Florida, Clerk of Courts e-filing portal. *Id.*

464.    In the Affidavit of Lee McPherson, Kennedy attested that none of Lee Freyer Kennedy Crestview, LLC, Lee Freyer Kennedy Crestview II, LLC, Lagniappe Funding, LLC, Kennedy Five Acres Crestview, LLC, or Holiday Isle LFK Investments, LLC, made any distributions to her after December 3, 2014. **Ex. 79**.

465.    The Affidavit of Lee McPherson omitted any reference to BK II, which, in 2016, collected more than $1,000,000.00 from Old Republic and distributed those proceeds to the Babette Trust and to LK Freyer Investments in violation of the Florida Charging Orders. *Id.*

466.    On August 18, 2017, the Florida court conducted a hearing on HCB's Motion for Contempt. True and correct excerpts from the transcript of the August 18, 2017, hearing are attached to this Complaint as **Exhibit 80**.[31] Kennedy personally appeared at the hearing, along with her counsel, Mead and the Mead Law Firm. None of the Florida Charged Entities appeared at the hearing through counsel or otherwise. Even though Hyperion appeared and intervened in the Florida Charging Order Case when HCB initially moved for charging orders, Hyperion made no appearance at the hearing on HCB's Motion for Contempt.

467.    At the August 18, 2017, hearing, the Florida Court inquired whether anyone present represented any of the Florida Charged Entities, and Mead affirmatively represented to the Court that he did not represent any of the Florida Charged Entities: "MR. MEAD: Let me

---

[31] References in this Complaint to the transcript of the August 18, 2017, hearing will appear as "*2017 Contempt Trans.*, page:line."

answer for myself and the person with me [Kennedy]: The answer would be, no, to that question,

Your Honor." *2017 Contempt Trans.*, 3:20-22.

468.     Doubling down on his denials, Mead also represented to the Florida Court the

following:

> I'll be direct with you, Your Honor. ***I do not represent the corporation or LLCs***,
> and would not want to suggest to you, one way or the other, that they're being
> noticed or not noticed.

*         *         *

> They've not been notified through me, and ***I'm not here to represent them.***

*         *         *

> [ ] First and foremost, ***Your Honor, I cannot and will not respond to any
> obligations that have been met or not been met by the LLCs, because I don't
> represent them.*** And don't suggest that I'm arguing on their behalf for those
> entities or against those entities.

*2017 Contempt Trans.*, 5:1-5; 6:9-11; 10:18-23.

469.     Contrary to his assertion, Mead was not "direct" with the Florida Court. Mead

intentionally concealed his extensive representation of entities controlled by Kennedy.

### 3.      Mead's response to HCB's post-judgment discovery efforts demonstrates his duplicitous conduct.

470.     On March 31, 2016, HCB served on Mead a Subpoena Duces Tecum (the "**Mead

Subpoena**"), seeking documents related to transactions the Kennedy Enterprise conducted

through the Mead Law Firm. A true and correct copy of the Mead Subpoena is attached to this

Complaint as **Exhibit 81**.

471.     Kennedy moved to quash the Mead Subpoena on April 5, 2016. A true and correct

copy of Kennedy's Motion to Quash the Mead Subpoena is attached to this Complaint as

**Exhibit 82**.

472.    The District Court denied Kennedy's Motion to Quash on April 20, 2016, because, prior to filing her Motions to Quash, Kennedy failed to confer in good faith to resolve her purported objections to the Mead Subpoena and other subpoenas pursuant to L.U. Civ. R. 37(a).[32] *See* L.U. Civ. R. 37(c) ("Failure to comply with subsections (a) or (b) of this rule will result in a denial of the motion without prejudice to the party, who may refile the motion upon conformity with this rule."). After the District Court denied Kennedy's Motion to Quash, Kennedy made no subsequent effort to quash the Mead Subpoena, and Kennedy failed to interpose any other objection to the Mead Subpoena.

473.    On November 3, 2017, 20 months after service of the subpoena, Mead produced 548 pages of documents responsive to the Mead Subpoena, but Mead failed to produce all responsive documents in his or its possession, custody, or control.

474.    Indeed, Mead withheld 886 pages of documents Mead claimed were protected by the attorney-client privilege or the work-product doctrine.

475.    Mead served a Privilege Log with its production on November 3, 2017. A true and correct copy of Mead's Privilege Log is attached to this Complaint as **Exhibit 83**. In its Privilege Log, Mead wrote: "COMES NOW, Defendant, LEE F. KENNEDY, a/k/a Lee F. McPherson, a/k/a Lee Freyer, by and through her undersigned attorney and pursuant to Florida Rules of Civil Procedure 1.280(f) and Federal Rules of Civil Procedure 26(b)(5) files this her Privilege Log . . ." **Ex. 83** (emphasis added).[33]

---

[32] Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi.

[33] From all that appears, Mead's Privilege Log was filed on Kennedy's behalf even though Kennedy failed to raise the attorney-client privilege or work-product doctrine after the District Court denied her Motions to Quash.

476.   Mead asserted the privilege or work product doctrine with respect to the documents it withheld as follows:

| Mead Privilege Log as of November 3, 2017 | |
| --- | --- |
| **Description** | **No. Pages** |
| Email communication concerning Fountain Square FWB Holdings, LLC | 18 |
| Email communication concerning [BK] Properties II, LLC | 58 |
| Email communication concerning Destin Holdings Trust, LLC | 227 |
| Email communication concerning HCB Bank litigation matters | 583 |
| **Total** | **886** |

*Id.*

477.   Mead also produced numerous communications between Mead (including Mead employee Ms. Townsend) and Thomasville related to Thomasville's loan to Destin Holdings Trust; however, Mead claimed no privilege or work product with respect to those communications, even though those communications related directly to Mead's engagement by Thomasville and preparation of the documents required to perfect Thomasville's security interest in the Pink House.[34]

478.   On February 20, 2018, HCB filed Plaintiff's Motion to Compel Compliance with Non-Party Subpoena and for Sanctions (the "**Mead Motion to Compel**") in that certain miscellaneous action styled *HCB Financial Corp. v. Mead Law Firm*, United States District Court for the Northern District of Florida, Case No. 3:18-mc-00011-MCR-CJK (the "**Mead Case**"). In the Mead Motion to Compel, HCB sought an order requiring Mead to produce the hundreds of pages documents Mead withheld from production in response to the Mead Subpoena. Initially, Mead withheld production of more than 800 pages of documents that Mead claimed were protected under both the attorney-client privilege and the work-product doctrine, even though **Kennedy failed to object to any production under the Mead Subpoena**.

---

[34] *See infra* Part VI.B.

479.    In response to the Mead Motion to Compel, on April 4, 2018, Mead filed Mead Law & Title, PLLC's Response Memorandum in Opposition to HCB Financial Corp.'s Motion to Compel Compliance with Non-Party Subpoena and Sanctions (the "**Mead Response**") and submitted the Affidavit of Michael Wm. Mead ("the "**Mead Affidavit**"), in which Mead outlined his alleged efforts to comply with the Mead Subpoena. A true and correct copy of the Mead Mead Affidavit is attached to this Complaint as **Exhibit 84**.

480.    In the Mead Affidavit, Mead attested as follows: "I am or have been the attorney for the entities named in the Subpoena, along with the attorney for Lee F. Kennedy, also known as Lee F. McPherson, who is named in the Subpoena." **Ex. 84**, ¶ 5.

481.    When Mead produced documents in response to the Mead Subpoena, those documents included transactions involving the Babette Trust, Destin Holdings Trust, BK II, Hungry Otter, Fountain Square, LK Freyer Investments, Lee Kennedy Investments, and Freyer Investments.

482.    Despite attesting to his prior representation of numerous Kennedy entities, Mead intentionally concealed from the Florida Court his ongoing representation of Kennedy **and** the many entities Kennedy controls. Indeed, Mead expressly disavowed representing any entities controlled by Kennedy, leading the Florida Court to believe Mead represented only Kennedy, individually.

483.    In the Mead Affidavit, Mead swore also that "The Mead Law Firm has never represented Thomasville National Bank in any transaction or contemplated transaction in connection with Lee Kennedy." *Id*., ¶ 29. Such a statement apparently permitted Mead's production of communications between Mead and Thomasville while justifying Mead's refusal to produce communications between Mead and Kennedy.

484.     On August 14, 2018, Mr. Wylie Watt ("**Mr. Watt**"), Vice President of Thomasville, executed the Affidavit of Wylie M. Watt (the "**Watt Affidavit**"), a true and correct copy of which is attached to this Complaint as **Exhibit 85**.

485.     In the Watt Affidavit, Mr. Watt explained that Thomasville extended a $1,000,000 loan to Destin Holdings Trust secured by the Thomasville Mortgage, the Thomasville Assignment of Rents, and the Thomasville Guaranty.[35] **Ex. 85**, ¶¶ 3-4.

486.     Mr. Watt also attested as follows:

> 5.     I was the point of contact on behalf of [Thomasville] with respect to the Loan.

> 6.     [Thomasville] retained the Mead Law Firm of Fort Walton Beach, Florida, to provide legal services in connection with the Loan. [Thomasville] considered the Mead Law Firm to be representing both [Thomasville] and DHT with respect to the Loan.

> 7.     At the request of [Thomasville], the Mead Law Firm prepared the Mortgage and Assignment of Rents, and issued a Loan Policy of Title Insurance.

*Id*. at ¶¶ 5-7.

487.     In direct contradiction of the Mead Affidavit, Mr. Watt testified that Mead represented not only Destin Holdings Trust, but also, and more importantly, Thomasville.

488.     Thus, Mead not only withheld substantially more documents than it produced, but also falsely testified regarding Mead's role the Destin Holdings Trust/Thomasville financing.

### 4.     After the hearing on HCB's Motion for Contempt Orders, the Kennedy Enterprise escalated its continuing charade.

489.     **Two days after the hearing on HCB's Motion for Contempt Orders**, on August 20, 2017, at 11:55 a.m., Mr. Callahan followed up with Adkinson and asked, "[c]an we set up a call this week to discuss my letter requesting documents and next steps?" A true and

---

[35] *See infra* Part VI.

correct copy of Mr. Callahan's August 20, 2017, email is attached to this Complaint as **Exhibit 86**.

490.    Then, on September 1, 2017, at 4:39 p.m., Mr. Callahan again requested communication regarding the August 12, 2017, document requests. A true and correct copy of Mr. Callahan's September 1, 2017, email is attached to this Complaint as **Exhibit 87**. She wrote, "Please let me know your client's position on the requests in our letter." **Ex. 87**.

491.    On September 5, 2017, at 11:18 a.m., Adkinson responded by email to Mr. Callahan's requests. A true and correct copy of Adkinson's September 5, 2017, email is attached to this Complaint as **Exhibit 88**. Adkinson wrote, "I discussed the letter with Lee and she is willing to comply and provide documents responsive to your request. Can I please have until September 29 to respond?" **Ex. 88**.

492.    On November 13, 2017, at 10:56 a.m., Mr. Callahan again wrote to Adkinson seeking a response to her August 12, 2017, letter. A true and correct copy of Mr. Callahan's November 13, 2017, email is attached to this Complaint as **Exhibit 89**. Mr. Callahan wrote, "Don't think that I ever got a response to my letter requesting voluntary production of documents. Can you please provide? I recall you were working on it. No big deal, but want to make sure and follow up." **Ex. 89**.

493.    On November 14, 2017, at 11:40 a.m., Adkinson responded by email to Mr. Callahan. A true and correct copy of Adkinson's November 14, 2017, email is attached to this Complaint as **Exhibit 90**. Adkinson's November 14, 2017, email explained, "The general partner of Hyperion Gulf Coast Ventures, Ltd. has been changed. There is a new general partner entity –

Hyperion Management, LLC. Hyperion Management, LLC is managed by a man named Sam Reynolds. I believe you will be hearing from him soon. Thank you, Brenda."[36] **Ex. 90**.

494.     On December 1, 2017, Mr. Callahan again wrote again to Adkinson. In response to Adkinson's November 14, 2017, email, Mr. Callahan wrote: "I have never heard anything from Mr. Reynolds. Can you give him my contact information?" Later that same day, Adkinson replied: "Just did." A true and correct copy of Adkinson's and Mr. Callahan's November 14, 2017, email exchange is attached to this Complaint as **Exhibit 91**.

495.     On January 23, 2018, at 2:00 p.m., Mr. Callahan wrote to Adkinson seeking assistance as follows: "We are basically ready to file. It would make things a lot easier if the entities we are going after would (1) waive service, and (2) agree to the charging order. Can you assist with this?" Adkinson replied, "**Yes to both**." A true and correct copy of Adkinson's and Mr. Callahan's January 23, 2018, email exchange is attached to this Complaint as **Exhibit 92**.

496.     Two days later, on January 25, 2018, at 12:10 p.m., Mr. Callahan sent an email, a true and correct copy of which is attached to this Complaint as **Exhibit 93,** to Adkinson with a copy of Hyperion's Application for Charging Orders. Mr. Callahan wrote:

> Brenda:
>
> Attached is the application for charging orders. As you will see, it no longer seeks a turnover order.
>
> Also attached is a draft Rule 11 agreement on service and related issues. Taking this approach will save my client money, which I believe ultimately saves your clients money.
>
> Please make any changes to the letter you deem necessary. I would like to get this on file, and hopefully have the whole thing wrapped up by end of February.

**Ex. 93**.

---

[36] On information and belief, Adkinson did not disclose that Reynolds was her son.

497.   Mr. Callahan's January 25, 2018, email clearly was not the first communication in which Adkinson and Mr. Callahan exchanged drafts of the application for charging orders. Mr. Callahan remarked, "As you will see, **it no longer seeks a turnover order**," which clearly indicates a prior draft of the same document did, indeed, contain a turnover order.

498.   The next day, Adkinson returned an executed "Rule 11 agreement" by email to Mr. Callahan. Adkinson also transmitted to Mr. Callahan a Restated Certificate of Formation for Hyperion, revising Hyperion's general partner and Hyperion's new address. A true and correct copy of Adkinson's January 26, 2018, email is attached to this Complaint as **Exhibit 94**.

499.   Demonstrating Kennedy's control over Hyperion, on February 1, 2018, Adkinson sent Mr. Callahan an email, a true and correct copy of which is attached to this Complaint as **Exhibit 95**, as follows:

> I wanted to let you know that I am asking Sam to sign the attached releases to partially release the judgment liens against Lee McPherson's homestead. She is refinancing and the title company is requiring these releases. As you know, if he does not sign these documents, we can go through the affidavit process to basically accomplish the same thing, but would rather do it the easy way!

**Ex. 95**.

500.   Adkinson attached two documents entitled Partial Release of Judgment Lien releasing Kennedy's house from the liens of the Hyperion Judgments.[37] **Ex. 95**. On information and belief, Hyperion released its liens without any consideration.

501.   On **February 5, 2018, at 10:08 a.m. CDT**, Mr. Callahan filed an Application for Charging Orders in Cause No. 18-600. He sent a copy to Adkinson by email February 6, 2018.

---

[37] At the time Adkinson sent her February 1, 2018, email, she simultaneously represented Reynolds, Hyperion Management, Hyperion, and Kennedy, all in furtherance of the Kennedy Enterprise's scheme to defraud HCB.

Adkinson accepted service the next day. A true and correct copy of Adkinson's and Mr. Callahan's February 6, 2018, email exchange is attached to this Complaint as **Exhibit 96**.

502.     Kennedy's answer to the February 6, 2018, Application for Charging Order was due on or before February 26, 2018.

503.     On February 7, 2018, at 1:33 p.m., Mr. Callahan sent an email, a true and correct copy of which is attached to this Complaint as **Exhibit 97**, to Adkinson that read:

> Attached is a draft agreed order. If you are fine with it, please fill in the information at the end regarding the attorney from your firm who will be signing. I know you are not a litigator, so I thought that it could be someone else who signs. ***I will take it over to uncontested and have it signed once I get a copy back from you***.
>
> Of course, let me know if you have any changes. I basically just copied the relief sought by the pleading.

**Ex. 97** (emphasis added).

504.     On February 27, 2018, at 12:03 p.m., Adkinson sent the signed Agreed Charging Orders to Mr. Callahan. A true and correct copy of Adkinson's February 27, 2018, email is attached to this Complaint as **Exhibit 98**. In her transmittal email, Adkinson wrote, "As we previously discussed, attached is the signed Agreed Charging Order." **Ex. 98**.

505.     The following day, on February 28, 2018, at 5:23 a.m., Mr. Callahan sent a reply email to Adkinson. A true and correct copy of Mr. Callahan's February 28, 2017, email is attached to this Complaint as **Exhibit 99**. In his February 28, 2018, email, Mr. Callahan wrote:

> Thank you. Is someone also going to file answers? I think it is necessary in order for this to be effective because you need to be on record as their attorney. A general denial would probably work. Basically anything that shows in record you represent them.
>
> I can go and get order signed after that.

**Ex. 99**.

506.     At 7:56 a.m. the same day, Adkinson replied, "Ok. We will do that this week." *Id.*

507.     Later that day, Adkinson filed Judgment Debtor's and Respondent's Original Answer. Adkinson emailed the filed Answer to Mr. Callahan. A true and correct copy of Adkinson's February 28, 2018, email is attached to this Complaint as **Exhibit 100**.

508.     On March 8, 2018, at 9:04 a.m. CDT, the Texas Court entered the Agreed Charging Orders. A true and correct copy of the March 8, 2018, Agreed Charging Orders is attached to this Complaint as **Exhibit 101**.

509.     On March 9, 2018, at 8:00 a.m., Mr. Callahan sent the Agreed Charging Orders to Adkinson by email, a true and correct copy of which is attached to this Complaint as **Exhibit 102**, along with the following message:

> Per our agreement, attached is the final charging order signed yesterday by the court.
>
> Please provide me with the information and documents required by the order as soon as you can, so that we can wrap this up. I hope to close this file and send my final bill to the client this month.
>
> Give me a call if you would like to discuss.

**Ex. 102**.

510.     Mr. Callahan again emailed Adkinson on March 24, 2018, at 10:28 a.m. Mr. Callahan wrote: "Brenda, Can you please send me the documents required by the charging order? I would like to then pass them along to Sam, which will allow me to close this file and send my final bill at the end of the month." A true and correct copy of Mr. Callahan's March 24, 2018, email is attached to this Complaint as **Exhibit 103**.

511.     On March 27, 2018, at 5:07 p.m., Adkinson responded to Mr. Callahan by email. A true and correct copy of Adkinson's March 27, 2018, email is attached to this Complaint as **Exhibit 104**. Adkinson wrote: "Please see the attached documents. For 5950 State Bridge, it was originally a corporation that was converted to an LLC. **We don't have a Company Agreement**.

Apparently, Lee is not individually a Member of Gonzales LA Holdings. Brenda." **Ex. 104** (emphasis added).

512.    Adkinson transmitted to Mr. Callahan 187 pages of documents, consisting of the following:[38]

      a.      Certificate of Filing Certificate of Conversion;

      b.      Certificate of Formation of 5950 State Bridge Road, LLC;

      c.      Certificate of 5950 State Bridge Road, Inc., Managing Member of 5950 SB Georgia Holdings, LLC;

      d.      Amended and Restated Company Agreement of Compassionate Use, LLC, a Texas limited liability company;

      e.      Company Agreement of Compassionate Use II, LLC, a Texas limited liability company;

      f.      Company Agreement of Gonzales LA Holdings, LLC, a Texas limited liability company; and

      g.      Company Agreement of Organic Health, LLC, a Texas limited liability company.

513.    It is clear from the timing and nature of Adkinson's communication with Mr. Callahan that the Kennedy Enterprise (a) worked diligently to shield Kennedy's assets (i.e., 5950 State Bridge Road, 5950 SB Georgia Holdings, Compassionate Use, Compassionate Use II, Gonzales Holdings, and Organic Health) from HCB's continuing collection efforts and (b) intentionally interfered with HCB's contempt proceedings in the Florida Charging Order Case.

---

[38] Further demonstrating that Reynolds was nothing more than a pawn participating in the Kennedy Enterprise's scheme for Kennedy's sole benefit, in response to HCB's December 4, 2018, subpoenas to Reynolds and Hyperion Management, neither Reynolds nor Hyperion Management produced the documents Adksinon transmitted to Mr. Callahan on March 27, 2018. Reynolds testified on December 13, 2018, that he has never received or reviewed *any* documents relating to *any* of Kennedy's assets.

514.    Kennedy's efforts to ensure Hyperion "[had] begun collection discovery" are prima facie evidence of her efforts to commit fraud on the Florida Court to prevent any further collection efforts before that court.

515.    When HCB later moved for contempt directly against Kennedy, Kennedy directly implicated Mead in her deleterious conduct.

516.    During the hearing on HCB's Motion for Further Contempt on September 12, 2018, Kennedy testified that the Florida Charged Entities took no action to comply with the Florida Charging Orders because Kennedy did what Mead instructed her to do:

Q.    (By Mr. Petermann) Now, prior to engaging me to represent you here, which occurred earlier this summer, you had Mr. Mike Mead representing you.

A.    Correct.

Q.    He was present at the last hearing?

A.    Yes.

Q.    After that hearing was over with, did you follow all the advice Mr. Mead gave you with regard to what you were required to do?

A.    Yes. He said that – want me to expand on it or no?

Q.    You just followed his advice, right?

A.    I followed his exact advice.

*2018 Contempt Trans.*, 35:2-14.[39]

517.    From all that appears, Adkinson and Mead actively conspired with Kennedy. Instead of defending Kennedy against HCB collection efforts, Adkinson and Mead intentionally interfered with HCB's continuing collection efforts through subterfuge and obstruction.

---

[39] **Ex. 22**.

### 5.   Hyperion has distributed money to the Kennedy Enterprise.

518.    During the times the Kennedy Enterprise worked to promote Hyperion's judgments as a defense to HCB's collection efforts, Hyperion actually paid Kennedy and others. Hyperion's conduct is completely contrary to a judgment creditor's behavior and establishes without doubt that Hyperion's charging orders are meaningless.

### a.   Despite holding charging orders, Hyperion transferred money directly to Kennedy.

519.    After Hyperion obtained two default judgments and six charging orders, Hyperion GP, the General Partner of Hyperion, paid $36,912.00 directly to Kennedy. Hyperion GP made a series of transfers from its account ending in 5580 at JPMC to Kennedy's account ending in 9320 at JPMC, as shown in the following table:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 09/19/13 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $516.00 |
| 01/21/14 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $10,293.62 |
| 07/30/15 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $100.00 |
| 01/30/18 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $5,000.00 |
| 03/07/18 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $12,303.00 |
| 03/28/18 | Hyperion GP, LLC | 5580 | Lee Freyer Kennedy | 9320 | $8,700.00 |
| Total | | | | | $36,912.62 |

520.    At the time Hyperion GP made the September 19, 2013, January 21, 2014, and July 30, 2015, transfers to Kennedy, (a) Hyperion held two judgments against Kennedy, (b) Hyperion held charging orders against most of Kennedy's companies, and (c) Hyperion GP was Hyperion's General Partner.

521.    At the time Hyperion GP made the remaining transfers to Kennedy, Hyperion Management was Hyperion's general partner; however, Hyperion GP had actual knowledge of Hyperion's judgments and charging orders.

522.    At the time Hyperion GP made each of its transfers to Kennedy, Hyperion GP had actual knowledge of the HCB Judgment.

**b.      Hyperion also transferred $188,212.61 to Hungry Otter.**

523.    Since September 2013, Hyperion GP has transferred $188,212.61 to Hungry Otter via 14 intrabank transfers from Hyperion GP's account ending in 5580 at JPMC to Hungry Otter's account ending in 2835 at JPMC, as shown in the following table:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 10/09/13 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $500.00 |
| 01/06/14 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $15,000.00 |
| 01/21/14 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $11,112.61 |
| 01/22/14 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $35,000.00 |
| 01/28/14 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $10,000.00 |
| 01/30/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $5,000.00 |
| 02/03/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $12,000.00 |
| 02/07/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $90,000.00 |
| 03/28/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $1,000.00 |
| 04/22/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $1,000.00 |
| 04/30/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $5,300.00 |
| 05/06/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $400.00 |
| 05/06/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $500.00 |
| 05/09/18 | Hyperion GP, LLC | 5580 | Hungry Otter Holdings, LLC | 2835 | $1,400.00 |
| **Total** | | | | | **$188,212.61** |

524.    At the time Hyperion GP made the October 9, 2013, January 6, 2014, January 21, 2014, January 22, 2014, and January 28, 2014, transfers to Hungry Otter, (a) Hyperion held a charging order against Hungry Otter, and (b) Hyperion GP was Hyperion's General Partner.

525.    At the time Hyperion GP made the remaining transfers to Hungry Otter, (a) Hyperion held a charging order against Hungry Otter, and (b) Hyperion Management was Hyperion's general partner.

526.    At the time Hyperion GP made its October 9, 2013, transfer, Kennedy owned 100% of the membership interests of Hungry Otter. At all other relevant times, Kennedy owned 90% of the membership interests in Hungry Otter, and Neil McPherson owned 10% of the membership interests in Hungry Otter.

527.    At the time Hyperion GP made each of its transfers to Hungry Otter, Hyperion GP had actual knowledge of the HCB Judgment.

          **c.**    **Hyperion later distributed more than $1,100,000.00 to Freyer Investments, Rockliff Holdings, and Lee Kennedy Investments, all at Kennedy's direction.**

528.    In November 2017, Hyperion sold the Mobile County Property for $1,450,000.00, as evidenced by that certain Warranty Deed dated as of November 22, 2017, and recorded on November 28, 2017, in the Office of the Judge or Probate of Mobile County, Alabama, in Book LR7579, Page 1530. A true and correct copy of the Warranty Deed is attached to this Complaint as **Exhibit 105**.

529.    The Warranty Deed recited that is was prepared by Attorney Jason D. Smith ("**Attorney Smith**"), an attorney at Anders, Boyett & Brady, P.C., in Mobile, Alabama. *Id.*

530.    On November 27, 2017, Hyperion opened an account at UBS Group AG ("**UBS AG**") specifically to receive the proceeds from the sale of the Mobile County Property.

531.    On November 27, 2017, Kennedy sent an email to Ms. Lizzie Decarlo ("**Ms. Decarlo**") at UBS AG regarding Hyperion.[40] A true and correct copy of Kennedy's November 27, 2017, email to Ms. Decarlo is attached to this Complaint as **Exhibit 106**. The subject line of Kennedy's email read, "EIN for Hyperion Gulf Coast Ventures Ltd.pdf." **Ex. 106**. In her email, Kennedy wrote, "Need to open an Acct for this LP." *Id.* Kennedy attached to her November 27, 2017, email a copy of Hyperion's Form SS-4 dated as of November 27, 2017.[41] *Id.* In a reply email to Kennedy the same day, Ms. Decarlo responded, "We will follow up with any additional information that we will need." *Id.*

532.    Later that day, Mr. Cameron McCurry ("**Mr. McCurry**") at UBS AG sent an email to Kennedy in which he requested a copy of Hyperion's limited partnership agreement. A

---

[40] On information and belief, UBS AG's website and email servers are hosted by UBS AG in Zurich, Switzerland.

[41] From its initial formation in 2012 until November 27, 2017, Hyperion never applied for a federal employer identification number, despite conducting business for years.

true and correct copy of Mr. McCurry's November 27, 2017, email is attached to this Complaint as **Exhibit 107**.

533. Later in the day, at 4:31 p.m. CST, on November 27, 2017, Kennedy sent an email to Ms. Decarlo and Mr. McCurry at UBS AG with the subject line "Fwd: Hyperion." A true and correct copy of Kennedy's November 27, 2017, email to Ms. Decarlo and Mr. McCurry is attached to this Complaint as **Exhibit 108**. Kennedy forwarded to Ms. Decarlo and Mr. McCurry an email she received from Attorney Childs on June 6, 2014. **Ex. 108**. Attached to that email were the following:

a. Company Agreement of Hyperion GP dated as of August 20, 2012 prepared by the Dunagan Childs law firm;

b. Ownership Certificate No. 1.0 for Hyperion GP prepared by the Dunagan Childs law firm;

c. Harry Freyer's signature page to Hyperion's limited partnership agreement with the fax date stamp of March 1, 2013;

d. Certificate of Formation of Hyperion GP;

e. Initial Written Consent by the Members of Hyperion GP dated as of August 20, 2012;

f. Facsimile transmission from Harry Freyer to Attorney Childs of the Dunagan Childs law firm with pages 26 and 27 of the Hyperion's Limited Partnership Agreement executed by Neil McPherson, Harry Freyer, and Kennedy, on behalf of Rockcliff Holdings and Hungry Otter; and

g.      Pages 26 and 27 of Hyperion's Limited Partnership Agreement executed by Neil McPherson, Kniahynycky, and Kennedy, on behalf of Rockcliff Holdings and Hungry Otter.

534.    On November 28, 2017, Harry Freyer sent an email to Eric Wittenberg and Ms. Decarlo at UBS AG in which he wrote, in relevant part, "Lizzie, I assume we will be working together today on finalizing yesterday's transaction." A true and correct copy of Harry Freyer's email to Eric Wittenberg and Ms. Decarlo is attached to this Complaint as **Exhibit 109**.

535.    On November 28, 2017, Ms. Decarlo sent an email to Harry Freyer and Kennedy regarding opening an account for Hyperion at UBS AG. A true and correct copy of Ms. Decarlo's November 28, 2017, email to Kennedy and Harry Freyer is attached to this Complaint as **Exhibit 110**. Ms. Decarlo wrote, "We are working on getting the Hyperion account opened ASAP. I will circle back later today with an update our progress." **Ex. 110**.

536.    At 11:38 a.m. on November 28, 2017, Kennedy sent an email to Reynolds informing him that Ms. Kaitlyn Jones ("**Ms. Jones**") at UBS AG would be sending documents to him by email "to sign and email back [ ] today." Kennedy also wrote that Ms. Jones would provide an overnight label so Reynolds could transmit the original signed documents back to UBS AG. A true and correct copy of Kennedy's November 28, 2017, email to Reynolds is attached to this Complaint as **Exhibit 111**.

537.    On November 28, 2017, at 12:21 p.m. CST, Ms. Jones at UBS AG sent an email to Kennedy and Reynolds in which she provided incoming wire instructions for Hyperion's account ending in 3981 at UBS AG. A true and correct copy of Ms. Jones' November 28, 2017, email to Kennedy and Reynolds is attached to this Complaint as **Exhibit 112**. Ms. Jones also wrote that she would send a separate email to Reynolds with new account paperwork. **Ex. 112**.

538.    Minutes later, at 12:49 p.m. CST, Ms. Jones sent an email to Reynolds in which she wrote:

> It is a pleasure to meet you over email. Please find attached to this email the following documents to open the new account for Hyperion Gulf Coast Ventures, LTD.:
>
> Action Items:
>
> - Partnership Signature Page: please **sign and date** at the bottom of the page where noted in your capacity as managing member of Hyperion GP, LLC, which is the General Partner of Hyperion Gulf Coast Ventures, LTD.
> - Partnership Certification: please **sign and date** at the bottom of the page where noted in your capacity as managing member of Hyperion GP, LLC, which is the General Partner of Hyperion Gulf Coast Ventures, LTD.
> - UPS slip: For your convenience, I have included a UPS slip if you would like to mail back the forms.
>
> &ast;  &ast;  &ast;
>
> Please note: We will not require the originally signed form. If you would prefer to email or fax back the signed pages, that is perfectly acceptable.

A true and correct copy of Ms. Jones' November 28, 2017, email to Reynolds is attached to this Complaint as **Exhibit 113**.

539.    Ms. Jones attached the following to her November 28, 2017, email to Reynolds:

  a.  Partnership Signature Page;

  b.  Partnership Certification;

  c.  UPS slip;

  d.  Hyperion Gulf Coast Ventures Incoming Wire Instructions; and

  e.  Welcome Package. **Ex. 113**.

540.    Ms. Jones then emailed Reynolds and Kennedy notifying them that she had sent her prior email by secure means, and she asked Reynolds to provide his telephone number so she could call him. A true and correct copy of Ms. Jones' email to Kennedy and Reynolds is attached to this Complaint as **Exhibit 114**.

541.    On November 28, 2017, at 1:57 p.m. CST, Attorney Smith of Anders, Boyett & Brady sent an email to Kennedy confirming that he transmitted the proceeds of the sale of Mobile County Property to Hyperion's account at UBS. A true and correct copy of Attorney Smith's November 28, 2017, email to Kennedy is attached to this Complaint as **Exhibit 115**. Later that day, Kennedy forwarded to Harry Freyer the email she received from Attorney Smith. **Ex. 115**. The next morning, Harry Freyer forwarded to Ms. Decarlo the same email from Attorney Smith. *Id*.

542.    On November 28, 2017, Anders, Boyett & Brady sent $1,409,209.94 to Hyperion by interstate wire transfer. Anders, Boyett & Brady made the transfer from its account at Whitney Bank (ABA routing number 065104116) in Alabama to Hyperion's account ending in 3981 at UBS AG (ABA routing number 026007993) in New York.

543.    On November 29, 2017, at 7:46 a.m., Kennedy sent the following text message to Reynolds: "Please email Lizzie that 200k goes into Freyer Inv , 900k goes into Lee Kennedy Inv and remainder [sic] in Rockcliff. Tell her to leave 1000 in Hyperion. Thanks and I owe you[.]" Kennedy's November 29, 2017, text message to Reynolds appears as follows:



544.    On November 29, 2017, Kennedy, Harry Freyer, and Reynolds spoke to Mr. McCurry and Ms. Decarlo at UBS AG by telephone.

545.    After Kennedy, Harry Freyer, and Reynolds spoke with Mr. McCurry and Ms. Decarlo at UBS AG by telephone, on November 29, 2017, Ms. Jones, one of Kennedy's bankers at UBS AG, sent an email to Kennedy seeking approval of the distributions to be made by Hyperion to Lee Kennedy Investments and Rockcliff Holdings. A true and correct copy of Ms. Jones' November 29, 2017, email to Kennedy is attached to this Complaint as **Exhibit 116**. Ms. Jones wrote:

Good afternoon Lee,

I know that you spoke with Cameron this morning about the distribution from Hyperion to Freyer Investments, and we were able to complete the transfer this afternoon once Lizzie spoke with Sam.

Sam provided the following list of distributions from Hyperion Gulf Coast Venture, LTD, which included two additional transfers:
·   $200,000 to Freyer Investments, Ltd. (completed)
·   $900,000 to Lee Kennedy Investments, LP
·   $308,209.94 to Rockcliff Holdings LP

This will leave $1,000 in Hyperion Gul Coast Venture, LTD.

Could you please confirm that we can move forward with the transfers to Lee Kennedy Investments and Rockcliff?
Please let me know if there is anything else we can do for you.
Thank you,
Katie

**Ex. 116**.

546.   Kennedy personally directed and approved each of Hyperion's distributions to Freyer Investments, Lee Kennedy Investments, and Rockcliff Holdings. Reynolds did exactly as he was instructed.

547.   Hyperion distributed the proceeds of the sale of the Mobile County Property to Freyer Investments, Lee Kennedy Investments, and Rockcliff Holdings exactly as directed by Kennedy. On November 29, 2017, Hyperion distributed $1,408,209.94 as follows:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 11/27/17 | Hyperion | X3981 | Freyer Investments | 2862 | $200,000.00 |
| 11/29/17 | Hyperion | X3981 | Lee Kennedy Investments | 1203 | $900,000.00 |
| 11/29/17 | Hyperion | X3981 | Rockcliff Holdings | 2354 | $308,209.94 |
| **Total:** | | | | | **$1,408,209.94** |

548.   Hyperion's distributions to some, but not all, of its limited partners were disproportionate to Freyer Investments' and Rockcliff Holdings' interests. For instance, Freyer Investments owns 9.5% of the limited partnership interests in Hyperion, but it received 14.2% of the sale proceeds from the Mobile County Property. In stark contrast, Rockcliff Holdings owns

76% of the limited partnership interests in Hyperion, but it received only 21.9% of the sale proceeds from the Mobile County Property. Lee Kennedy Investments, **which owns no interests in Hyperion**, received 63.9% of the sale proceeds from the Mobile County Property.

549.    The same day Freyer Investments received its $200,000 distribution from Hyperion, Harry Freyer caused Freyer Investments to transfer $40,000.00 from its account ending in 2682 at UBS AG to LK Freyer Investments' account ending in 1202 at UBS AG.

550.    As of November 1, 2017, Freyer Investments' cash balance in its account ending in 2682 at UBS AG was only $613.87. Between November 1, 2017, and November 30, 2017, the only cash deposit into Freyer Investments' account ending in 2682 was Hyperion's distribution of $200,000.00 on November 27, 2017. As of November 30, 2017, Freyer Investments' cash balance in the account ending in 2682 was $160,613.87. Thus, Freyer Investments' distribution to LK Freyer Investments on November 27, 2017, was made with the proceeds of Hyperion's sale of the Mobile County Property.

551.    Of the proceeds received by Hyperion from the sale of the Mobile County Property, Rockcliff Holdings, LK Freyer Investments, and Lee Kennedy Investments received a total of $1,248,209.94. Of that amount, **Kennedy's pro rata interest in the Hyperion's proceeds from the sale of the Mobile County Property was $1,112,305.99**, as shown below:

| Entity | Kennedy's Percentage | Amount of Distribution | Kennedy's Pro Rata Interest in Distribution |
|---|---|---|---|
| Lee Kennedy Investments | 89.90% | $900,000.00 | $809,100.00 |
| Rockcliff Holdings | 89.90% | $308,209.94 | $277,080.74 |
| LK Freyer Investments | 92.04% | $40,000.00 | $36,816.00 |
| **Totals:** | | **$1,248,209.84** | **$1,112,305.99** |

552.    Instead of collecting and crediting the sale proceeds against its judgment against Kennedy, Hyperion distributed 89.11% of the Mobile County Property proceeds to Kennedy.

### 6. Reynolds was Kennedy and Adkinson's schill.

553.    With no prior business experience, on or about November 9, 2017, Reynolds formed or caused the formation of Hyperion Management and became Hyperion Management's manager. The same day, Hyperion Management became Hyperion's new General Partner, replacing Hyperion GP.

554.    Kennedy, Adkinson, and the Leighton/Adkinson Firm abused their collective relationship to install Reynolds as the Manager of Hyperion Management. In addition, Kennedy preyed on Reynolds' respect and admiration for her. After all, Reynolds, a 22 year old college student, could not help but look up to Kennedy – whom he understood to be a multi-millionaire real estate developer – because (according to his deposition testimony) Reynolds aspires to be developer, too.

555.    Reynolds' testimony during his December 13, 2018, deposition illuminated the Kennedy Enterprise's fraudulent efforts to shield Kennedy from HCB's collection efforts.

556.    Reynolds testified on December 13, 2018, that he knows nothing about Hyperion. He did what he was asked to do, and the Kennedy Enterprise paid him for his efforts.

557.    During his deposition, Reynolds testified unequivocally that:

    a.    It was not his idea to form Hyperion Management;

    b.    Adkinson asked Reynolds to form Hyperion Management;

    c.    He has never reviewed any of Hyperion's partnership records;

    d.    He does not know what assets Hyperion owns; and

    e.    He does not know what obligations Hyperion Management owes Hyperion as its General Partner.

558.    Regarding Hyperion's collection efforts against Kennedy, Reynolds testified that:

    a.    He has never seen Hyperion's judgments against Kennedy;

      b.      He has never seen copies of Hyperion's charging orders;

      c.      He has never reviewed any documents relating to Kennedy's assets;

      d.      His only expectation of payment from Kennedy is based on Adkinson's advice to him;

      e.      He does not know if Hyperion obtained the Agreed Charging Order in Cause No. 18-600; and

      f.      He does not know if Mr. Callahan, Hyperion's counsel in Case No. 18-600 has taken any actions to enforce the Agreed Charging Order.

559.    Most importantly, Reynolds does not know how much money Kennedy owes owes under Hyperion's judgments in Cause Nos. 13-625 and 13-1003.

560.    When Hyperion distributed the proceeds of the sale of the Mobile County Property, Reynolds distributed those proceeds as instructed by Kennedy.[42] During his deposition, Reybnolds testified that he did not know why he authorized those transfers. Twice during Reynolds' deposition, Adkinson coached Reynolds testimony. After such coaching from Adkinson, Reynolds' testimony changed. For example, Reynolds testified that he received the November 29, 2017, text message from Kennedy only after being reminded by Adkinson:

    Q.     We took a restroom break at your request, Mr. Reynolds. We're back on the record. Are there any answers you provided to any of my questions that should change?

    A.     Yes.

    Q.     What are they?

    A.     I was reminded by my counsel that there was a text from Lee McPherson.

    Q.     Move your hand away from your mouth.

---

[42] *See supra* ¶ 559.

A.      Sorry. There was a text from Lee McPherson letting me know where to send the moneys from this bank statement from Exhibit 2.

Q.      So Ms. McPherson sent a text message to whom?

A.      To me, personally.

Q.      To you directly?

A.      That's correct.

Q.      And what did her text message say?

A.      That asked me to send 200,000 to Freyer, I believe, and 900,000 to Lee Kennedy Investments, I believe.

561.    Thus, even though he was lured by Kennedy and Adkinson into the Kennedy Enterprise, Reynolds actively assisted in the Kennedy Enterprise's scheme to defraud.

## V.      *While laying the foundation for its divestment scheme, the Kennedy Enterprise perpetrated a classic short sale fraud on Wells Fargo.*

562.    In 2012 and 2013, the Kennedy Enterprise perpetrated a fraud on Wells Fargo,[43] as the holder of a first priority real estate mortgage, and HCB to consummate a fraudulent "short sale" of certain real property situated at 604 Gulf Shore Drive, Destin, Florida 32541 (the "**Pink House**").[44]

---

[43] At all relevant times, Wells Fargo was a financial institution as defined by 18 U.S.C. § 20; an insured depository institution as defined by 18 U.S.C. § 20(1); and mortgage lending business as defined by 18 U.S.C. § 20(10). Wells Fargo holds FDIC Certificate Number 3511, evidencing its insured status. Wells Fargo is involved in interstate commerce; it operates in 42 states in the United States.

[44] Traditionally, a "short sale" occurs when a property owner seeks to sell property for an amount less than the debt encumbering the property. For example, if a property owner owes $100,000.00, but can only sell her property for $75,000.00, then she can do so through a short sale. Ultimately, the creditor/lender must either accept or reject the transaction – not because the creditor has any right to approve the sale, but because the creditor must decide whether to accept a payoff in an amount less than what the debtor owes. If the creditor accepts a lower payoff, then the creditor will release its security interest in the property, thereby allowing the conveyance to close. If the debtor attempts to transfer the property without the lender's acceptance of a reduced payoff amount, then the transfer will occur subject to the creditor's security interest.

### A.    Kennedy acquired the Pink House as an investment property in 2004.

563.    On April 22, 2004, Kennedy, individually, bought the Pink House for $2,100,000.00. She borrowed $1,575,000.00 from Destin Bank, in Destin, Florida. Kennedy paid the balance of the purchase price in cash. Kennedy's $1,575,000.00 loan from Destin Bank was secured by that certain Mortgage by Kennedy in favor of Destin Bank, recorded in Official Records Book 2526, Page 3646, in the Public Records of Okaloosa County, Florida.

564.    Kennedy refinanced the Pink House in 2005. Then, on April 26, 2008, Kennedy again refinanced the Pink House, and Wachovia Mortgage, FSB ("**Wachovia**") made loan number 0002861326 (the "**Pink House Loan**") to Kennedy in the original principal amount of $1,790,000.00. To secure the Pink House Loan, Kennedy pledged the Pink House as collateral, as evidenced by that certain Mortgage by Kennedy in favor of Wachovia, recorded in Official Records Book 2839, Page 1963, in the Public Records of Okaloosa County, Florida (the "**Wachovia Financing**").[45]

565.    From 2008 to 2010, Kennedy timely made her payments under the Wachovia Financing.

### B.    Kennedy staged a strategic default on the Pink House to coerce Wells Fargo into a mortgage accommodation.

566.    With her extensive banking and real estate experience, Kennedy knew that lenders do not offer hardship accommodations for performing loans. A borrower with liquid assets and a positive payment history with a bank is unlikely to receive any hardship relief.

567.    In 2010, Kennedy defaulted under the Wachovia Financing, despite her ability to satisfy her obligations to Wells Fargo. Kennedy made only two payments to Wells Fargo in

---

[45] On November 1, 2009, Wells Fargo Bank, N.A., purchased Wachovia Mortgage, F.S.B. https://www.ffiec.gov/nicpubweb/nicweb/InstitutionHistory.aspx?parID_RSSD=1157433&parD T_END=20100319.

2010. From 2009 through 2016, Kennedy received nearly $900,000.00 in rental revenues from the Pink House.

568.    Once Kennedy defaulted, she began seeking Wachovia/Wells Fargo's consent to a short sale or some other mortgage accommodation. At all relevant times, Kennedy had ample ability to pay Wachovia/Wells Fargo; she simply chose not to make the payments.

569.    On April 15, 2010, Kennedy sent a letter by facsimile transmission to Wachovia's Loss Mitigation Department seeking hardship accommodations for several loans, including her loan on the Pink House ending in 1326. A true and correct copy of Kennedy's April 15, 2010, letter is attached to this Complaint as **Exhibit 117**.

570.    In her letter of April 15, 2010, Kennedy wrote:

I faxed my p/l statement with a hardship letter to you on February 2. I followed up today and spoke to Dennis in your workout area. He requested that I provide the following information for loan: XXXXXX1305, XXXXXX1322, XXXXXX1326, XXXXXXX3872, and lot loan XXXXXXXXXXX6849.

**Ex. 117**.

571.    Kennedy attached to her April 15, 2010 letter a spreadsheet entitled "Lee Kennedy Monthly Income and Expense" (the "**Hardship Spreadsheet**"). *Id*. at 3-5.

572.    In her Hardship Spreadsheet Kennedy outlined in writing her monthly income and expenses. Kennedy represented in her Hardship Spreadsheet that her monthly rental income for the Pink House was only $3,300.00. *Id*. at 3.

573.    Kennedy's representations regarding the monthly rental income from the Pink House were false, and Kennedy knew her representations were false.

574.    Kennedy intentionally misrepresented the monthly rental income from the Pink House to make her financial situation look worse than it actually was at the time.

575.    Kennedy misrepresented other items, too. For example, Kennedy indicated that the property belonging to FH Aspen located at 718 S. Mill St. Aspen, Colorado, generated no monthly rental income. According to Lee Kennedy Investments' Form 1065 tax returns, in 2009 and 2010, the Aspen, Colorado, property generated **monthly** revenues averaging $4,270.75 and $7,199.83 and annual gross rents of $51,249.00 and $86,398.00, respectively. *Id*. at 4.

576.    Despite Kennedy's efforts, Wells Fargo did not grant Kennedy any hardship accommodations.

577.    Kennedy remained in default. So, on November 2, 2011, Wells Fargo filed that certain civil action styled *Wells Fargo Bank, N.A., v. Lee F. Kennedy*, Circuit Court of Okaloosa County, Florida, Case No. 2011-CA-004958. The Clerk of the Circuit Court of Okaloosa County, Florida, did not issue a summons for service on Kennedy until October 24, 2012, when Wells Fargo filed and recorded a Notice of Lis Pendens in Official Records Book 3061, Page 682, in the Public Records of Okaloosa County, Florida.

578.    In its suit against Kennedy, Wells Fargo sought to foreclose its security interests in the Pink House.

579.    Immediately thereafter, Kennedy began manufacturing a "short sale," which Wells Fargo previously rejected.

C.      ***The Kennedy Enterprise fraudulently induced Wells Fargo into accepting a short sale of the Pink House.***

580.    From 2010 to 2012, Kennedy attempted unsuccessfully to obtain short sale approval from Wells Fargo. From all that appears, Wells Fargo rejected Kennedy's hardship and short sale requests prior to 2013.

581.    When Kennedy was unable to obtain hardship relief, Kennedy employed her longtime associates Anita Williams and Kniahynycky to accomplish illegally what she could not do legally.

582.    On or about December 6, 2012, Kennedy entered into that certain Exclusive Right of Sale Listing Agreement between Kennedy and Anita Williams/The Realty Firm. A true and correct copy of the Listing Agreement is attached to this Complaint as **Exhibit 118**. In the Listing Agreement, Kennedy agreed to sell the Pink House for $825,000 to a buyer ready willing and able, and Kennedy agreed to pay Anita Williams/The Realty Firm a commission of 4% on the sale of the Pink House. *Id*.

583.    On December 6, 2012, Kennedy transmitted or caused to be transmitted the executed Listing Agreement by facsimile from telephone/facsimile number (512) 329-0048 to Anita Williams.

584.    Several days later, on December 25, 2012, Anita Williams transmitted the fully executed Listing Agreement to Kennedy by email. **Ex. 118**.

585.    On January 3, 2013, Kennedy sent a letter to Wells Fargo again requesting a short sale. A true and correct copy of Kennedy's January 3, 2013, letter is attached to this Complaint as **Exhibit 119**. Kennedy wrote:

> I am writing with regard to my home located at 604 Gulfshore Drive, Destin, Florida, which has a mortgage owned by Wells Fargo. I have been behind on my mortgage payments for a while and I am writing to request a short sale on this property. At the time I purchased this home I was marred since [sic] then I have been divorced and I am now a single mom struggling to maintain my household for my 2 young children and their father provides no support.
>
> I appreciate your consideration and I look forward to working with you to approve this request for a short sale on my property.

**Ex. 119**.[46]

586.    The next day, on January 4, 2013, at Kennedy's instruction, Anita Williams sent an email to Kniahynycky to discuss the potential sale and purchase of the Pink House. A true and correct copy of Anita Williams' January 4, 2013, email to Kniahynycky is attached to this Complaint as **Exhibit 120**. Anita Williams wrote: "Hi Manny: Haven't talked to you in a while. Can you give me a call to discuss the offer for 604 Gulfshore Drive in Destin. I can be reached at 850-585-4869. I look forward to hearing from you. Anita Williams." **Ex. 120**.

587.    That same day, Kniahynycky caused Destin Holdings Trust to be organized as a Florida limited liability company. True and correct copies of the electronic Articles of Organization of Destin Holdings Trust, LLC, are attached to this Complaint as **Exhibit 121**.[47]

588.    Kniahynycky's involvement in the short sale transaction resulted from Kniahynycky's long-standing relationship with Kennedy.

### 1.    Kniahynycky was Kennedy's consultant, partner, and friend.

589.    Kniahynycky holds a master's degree in civil engineering and has 37 years of experience in site engineering, planning, and land development. He was a licensed professional engineer under the laws of the State of Florida from 1983 until 2001 and under the laws of the State of Michigan from 1982 until 2015.

---

[46] While portraying herself as a struggling single mother, Kennedy concealed her substantial net worth. According to Lee Kennedy Investments' 2012 Form 1065 tax return, as of December 31, 2012, Lee Kennedy Investments owned total assets of $8,890,576 and had a net worth of $6,586,364. LK Freyer Investments' tax returns for the same period indicated that LK Freyer Investments owned total assets of $3,728,426 and had a net worth of $3,278,060. Combined, the two companies generated $995,761 of ordinary income in 2012.

[47] Kniahynhycky caused Destin Holdings Trust's Articles to be filed electronically through the Florida Deprtment of State's website, https://dos.myflorida.com/sunbiz/start-business/efile/fl-llc/, which, on information and belief, is hosted on servers located in the State of Virginia.

590.    Kniahynycky met Kennedy in 2005 and has, since that time, developed a business relationship involving a number of real estate development projects in multiple states where Kniahynycky was Kennedy's development consultant responsible for evaluating, designing, entitling, and managing projects. In Kniahynycky's own words, he has "thousands of engineering and planning related documents generated over a 10+ year period on many projects where I was the development consultant for Ms. Kennedy."

591.    Among those projects was a proposed planned unit development in Saraland, Alabama – that is, the Mobile County Property – which was to be developed by Lee F. Kennedy Alabama. Attached to this Complaint as **Exhibit 122** is the Preliminary Plan for Lee F. Kennedy Alabama's Planned Unit Development (the "**Saraland PUD**") in Saraland, Alabama, dated as of September 23, 2009, and prepared by Kniahynycky. As shown on the Preliminary Plan for the Saraland PUD, Kniahynycky was the land planner for the project. **Ex. 122**.

592.    Kniahynycky is a friend and business partner with Kennedy. Kniahynycky was one of the original limited partners in Hyperion, and he had socialized with Kennedy and Harry Freyer on occasion.

**2.      Kniahynycky agreed to be Kennedy's strawman.**

593.    On January 14, 2013, Kniahynycky executed that certain "As Is" Residential Contract for Sale and Purchase be tween Kennedy and Destin Holdings Trust, pursuant to which Kennedy agreed to sell, and Destin Holdings Trust agreed to purchase, the Pink House for $775,000.00 (the "**Pink House Contract**"). A true and correct copy of the Pink House Contract is attached to this Complaint as **Exhibit 123**.

594.    According to the Pink House Contract, Destin Holdings Trust agreed to make an earnest money deposit of $10,000.00 "upon lender acceptance." **Ex. 123**, ¶ 2(d).

595.    The Pink House Contract contemplated that Kennedy's sale and Destin Holdings Trust's purchase of the Pink House would occur on or before March 29, 2013. *Id.*, ¶ 4.

596.    Destin Holdings Trust agreed that it "will pay cash or may obtain a loan for the purchase of the Property. There is no financing contingency to Buyer's obligation to close." *Id.*, ¶ 8(a).

597.    The Pink House Contract included addenda and riders, including a rider related specifically to "Short Sale Approval Contingency." *Id*. The Short Sale Approval Contingency provided a Short Sale Approval Deadline, which would in turn trigger either the Buyer's obligation to close or termination of the Pink House Contract. *Id*. Specifically, the Short Sale Approval Contingency instructed:

> Short Sale Approval Deadline; Termination. If Seller does not deliver written notice to Buyer that Seller has obtained Short Sale Approval within 45 (if blank, then 90) days from Effective Date ("Short Sale Approval Deadline"), then either party may thereafter terminate this Contract by delivering written notice to the other party, and the Deposit will be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

> This Contract shall automatically terminate if Seller has not delivered the Short Sale Approval to Buyer within 45 (if blank, then 120) days from Effective Date ("Contract Expiration Date"), in which event the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

**Ex. 123** at 11-12.

598.    To support the short sale concept, on January 24, 2013, Kennedy's counsel, Hall, sent a letter to Wells Fargo, a true and correct copy of which is attached to this Complaint as **Exhibit 124**, in which he wrote:

> I have been engaged to represent Destin Holdings Trust, LLC in reference to the purchase of certain real property lying situate in Okaloosa County, Florida. Specifically, the property has an address of 604 Gulfshore Drive, Destin, Florida 32541 and is identifiable as tax parcel number 00-2S-24-2486-000B-0110. Please be advised that I have verified that Destin Holdings Trust, LLC has $775,000.00 readily available to facilitate this transaction. I trust this information is sufficient

for your file and should you have any questions, please do not hesitate to contact me.

**Ex. 124**.

599.   On or about February 23, 2013, Destin Holdings Trust and Kennedy amended the Pink House Contract and extended the Short Sale Approval Deadline by 30 days.[48]

### 3. Wells Fargo approved the short sale based on Kennedy's, Kniahynycky's, and Anita Williams' false representations.

600.   On June 11, 2013, Wells Fargo sent an email to Anita Williams and provided initial approval of the short sale of the Pink House. A true and correct copy of Wells Fargo's June 11, 2013, email to Anita Williams is attached to this Complaint as **Exhibit 125**. Wells Fargo attached that certain Short Sale Affidavit (the "**Short Sale Affidavit**")[49] to its June 11, 2013, email to Anita Williams. **Ex. 125**.

601.   In its email to Anita Williams, Wells Fargo wrote:

The short sale approval letter is good through 08/04/2013.

\*          \*          \*

Please send in the Wells Fargo Short Sale Affidavit as soon as possible. This document is required to be fully completed at or before closing. All sellers, buyers, agents, transaction facilitator (if applicable) and the settlement agent must complete the document. This document must be notarized to meet requirements and be an acceptable document for closing. Please complete this document and return at or before closing.

Wells Fargo will not be able to close and release the lien without the fully completed (dated and executed) Short Sale Affidavit. . . .

*Id.*

---

[48] Kennedy and Destin Holdings Trust do not appear to have entered into subsequent written extensions of the Short Sale Approval Deadline; however, they acquiesced to a series of extensions while awaiting Wells Fargo's approval.

[49] Such "short sale affidavits" are sometimes known as "arm's length affidavits."

602.    Each of Kennedy, Anita Williams, and Kniahynycky signed and dated the Short Sale Affidavit as of June 11, 2013.[50] *Id.*

603.    Within hours after Anita Williams received the June 11, 2013, short sale approval and Short Sale Affidavit, **LK Freyer Investments – NOT Destin Holdings Trust** – sent $10,000.00 to Jeffrey Hall, Kennedy's counsel, by interstate wire transfer. LK Freyer Investments made the transfer from its account ending in 7565 at JPMC (ABA routing number 114000776) in New York to Hall's trust account at Community Bank of Mississippi ("**Community Bank**") (ABA routing number 065301566) in Mississippi.

604.    LK Freyer Investments' Wire Transfer Outgoing Request included the following notation: "ATTN: Jeff Hall and Kim Keen EMD for 604 Gulf Shore Drive." A true and correct copy of Kennedy's Wire Transfer Outgoing Request is attached to this Complaint as **Exhibit 126**.

605.    When LK Freyer Investments sent the $10,000.00 deposit to Hall, Kennedy was the manager of LK Freyer Investments. At that time, LK Freyer Investments owned no interest in the Pink House or in Destin Holdings Trust.

606.    On June 11, 2013, Community Bank sent a letter to Kennedy's attorneys notifying them of receipt of Kennedy's June 11, 2013, wire transfer in the amount of $10,000.00. A true and correct copy of Community Bank's June 11, 2013, letter is attached to this Complaint as **Exhibit 127**.

607.    On June 12, 2013, Hall sent $10,000.00 to Old South Land Title Company by interstate wire transfer. Hall made the transfer from his firm's account ending in 0159 at

---

[50] Kennedy, Anita Williams, and Kniahynycky previously executed the Short Sale Affidavit on February 21, 2013, February 22, 2013, and February 23, 2013, respectively. *Id.*

Community Bank (ABA routing number 065301566) in Mississippi, to Old South Land Title's account ending in 3802 at Coastal Bank & Trust, a subsidiary of Synovus (ABA routing number 061100606), in Georgia.

608.    By email that same day, Community Bank confirmed in an email to Kennedy's counsel that it sent the wire transfer to Old South Land Title. A true and correct copy of Community Bank's June 12, 2013, email is attached to this Complaint as **Exhibit 128**.

609.    Synovus Bank confirmed by email to Old South Land Title that it received the $10,000.00 wire transfer from Community Bank. A true and correct copy of Synovus Bank's June 12, 2013, email is attached to this Complaint as **Exhibit 129**.

###### D.    *As soon as Wells Fargo approved the Short Sale, Harry Freyer organized Cherry Hills to facilitate the Kennedy Enterprise's illicit financing transaction.*

610.    On July 23, 2013, after Wells Fargo initially approved the short sale, but before Wells Fargo gave final approval for the sale, Harry Freyer[51] organized Cherry Hills as a Colorado limited liability company. That day, Harry Freyer electronically filed the Articles of Organization of Cherry Hills with the Colorado Secretary of State, as Document No. 20131422933, and Entity ID 20131422933. A true and correct copy of Cherry Hills' Articles of Organization is attached to this Complaint as **Exhibit 130**.

611.    Three days later, on July 26, 2013, Harry Freyer executed that certain Operating Agreement of Cherry Hills Capital Funding, LLC, dated as of July 26, 2013. A true and correct copy of the Operating Agreement of Cherry Hills Capital Funding, LLC, is attached to this Complaint as **Exhibit 131**. According to Cherry Hills' Operating Agreement, Harry Freyer owned 100% of the membership interests in Cherry Hills. **Ex. 131**.

---

[51] Harry Freyer is Kennedy's father.

612.     From and after July 26, 2013, Cherry Hills never made any other filing with the Colorado Secretary of State. Cherry Hills has never filed a periodic report as required by Colo. Rev. Stat. § 7-90-501. To date, Cherry Hills has never filed articles of dissolution pursuant to Colo. Rev. Stat. § 7-80-801. Moreover, Cherry Hills has never filed a federal or state tax return.

### E.     When Wells Fargo provided final approval of the short sale, the Kennedy Enterprise funded its scheme to defraud the bank, ultimately advancing its plan to deprive HCB of another source of collection.

613.     On July 29, 2013, Wells Fargo approved the short sale of the Pink House by email to Anita Williams. A true and correct copy of Wells Fargo's July 29, 2013, email to Anita Williams is attached to this Complaint as **Exhibit 132**.

614.     In its July 29, 2013, email to Anita Williams, Wells Fargo wrote:

Please note: Attached is a blank copy of the short sale affidavit. Please ensure **each party signs and dates** at closing and send the completed affidavit along with the closing documents as instructed below.**********If the fully completed affidavit is not received, the wire WILL be returned.**

Your final HUD has been approved as attached. If any further changes need to be made, please send revised HUD for new approval. Please let me know if the closing date changes.

**Ex. 132** (emphasis original).

615.     Wells Fargo attached to its email to Anita Williams a letter (the "**Short Sale Approval Letter**") to Kennedy dated as of June 10, 2013, memorializing its approval. A true and correct copy of the Short Sale Approval Letter is attached to this Complaint as **Exhibit 133**. In the Short Sale Approval Letter, Wells Fargo's approval of the sale of the Pink House was expressly conditioned on several factors:

1)     This is specific to your above-referenced Wells Fargo Home Mortgage Account. Separate approval is required for all other liens including Wells Fargo liens securing other accounts or serviced by Wells Fargo or its affiliates.

2)     The closing (settlement date) and funding to be no later than 08/04/2013.

3)      The borrower(s) is to net $1,085,508 (zero) from the sale.

4)      The real estate agents' commissions to be withheld from the net proceeds check are not greater than $46,000 (4% of the contract sales price) and only customary closing charges including the referenced commissions may be disbursed to third parties.

5)      The contract for the sale of the property is an arms length transaction, negotiated between the borrower(s) and the buyer(s) who are unrelated parties, with each party acting in their own self interest. The contract sales price is the fair market value of the property, and has been fairly bargained for and agreed to by and between the parties to the sale contract. The borrower(s) affirmatively state that they are not related to the person(s) named as the buyer(s) in the contract for the sale of the property, by blood, marriage, friendship, commercial enterprise, or in any other manner.

6)      Wells Fargo's actual payoff due through 08/04/2013 is estimated at $1,440,000. The payoff includes: unpaid principal balance, accrued interest, late charges, and delinquency or other collection related charges and expenses.

7)      The borrower(s) are to pay $0.00 at closing.

8)      The net proceeds to Wells Fargo at closing is not to be less than $1,085,508 (including contribution from borrower, if applicable). Approved costs are as follows: Settlement fee-$350, Owner's title ins-$5,450, title search $80, State tax $8050 Recording[.]

**Ex. 133** at 1-2.

616.    Kennedy signed the Short Sale Approval Letter the same day. *Id*. at 4.

617.    Wells Fargo also required execution of the Short Sale Affidavit confirming that the sale and purchase of the Pink House was an arm's length transaction. A true and correct copy of the Short Sale Affidavit is attached to this Complaint as **Exhibit 134**.

618.    The Short Sale Affidavit provided in relevant part as follows:

As relates to a certain real estate purchase contract dated 1/14/13 concerning the [Pink House] under which the existing Lender(s) has agreed to accept less than full payoff of the debt owed in exchange for release of the Mortgaged Premises (a short sale), here too hereby certify and affirm under penalty of perjury that to the best of their knowledge and belief:

(a)     The sale of the Mortgaged Premises is an "arm's length" transaction, between the parties who are unrelated and unaffiliated by family, marriage, or commercial enterprise;

(b)     There are no agreements, understandings or contracts between the parties that the Seller will remain in the Mortgaged Premises as a tenant or later obtain title or ownership of the Mortgaged Premises;

*       *       *

(d)     There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to the Lender; . . .

**Ex. 134** (emphasis added).

619.    The Short Sale Affidavit also included the following representations:

Each signatory also understands, agrees and intends that the Lender, any Investor (in particular Freddie Mac if applicable), Insurer or Guarantor, of the subject Mortgage are relying upon the statements made in the affidavit as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Mortgaged Premises and agrees to indemnify the Lender, any Investor (in particular Freddie Mac, if applicable), Insurer or Guarantor, of the subject Mortgage for any and all loss resulting from any negligent or intentional misrepresentation made in the affidavit including, but not limited, to repayment of the amount of the reduced payoff of the Mortgage. Each signatory further understands that a misrepresentation may subject the responsible party to civil and/or criminal liability and agrees that this certification will survive the closing of the transaction.

*Id*.

620.    On July 29, 2013, Wells Fargo also approved the final HUD-1 Settlement Statement. The approved HUD-1 Settlement Statement is attached to this Complaint as **Exhibit 135**.

621.    The approved HUD-1 Settlement Statement accounted for the $10,000.00 earnest money deposit referenced in the Short Sale Contract and a payoff to Wells Fargo in the amount of $1,085,793.40, conforming the transaction to the Short Sale Approval Letter. **Ex. 135**.

622.    According to the HUD-1 Settlement Statement, Destin Holdings Trust required $1,133,239.91 at closing to fund its purchase obligations. *Id.*

623.    The HUD-1 Settlement Statement also included the following representation: "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, It Is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement." *Id.*

### F.    *The Kennedy Enterprise funded the entire short sale transaction.*

624.    After Wells Fargo provided final written approval of the short sale on July 29, 2013, the next day, on July 30, 2013, Kennedy instructed Mark Schepp at Citi Private Bank to send $1,152,664.92 from Lee Kennedy Investments to Hall's escrow account at Community Bank by interstate wire transfer. That same day, Kennedy sent a handwritten note by facsimile from telephone/facsimile number (281) 584-0038 in Houston, Texas, to Mr. Mark Schepp at Citi Private Bank in New York. A true and correct copy of Kennedy's July 30, 2013, facsimile transmission is attached to this Complaint as **Exhibit 136**. At that time, Kennedy was the manager of LFK GP, which was the general partner of Lee Kennedy Investments, and only Kennedy could authorize such a transaction on behalf of Lee Kennedy Investments.

625.    At Kennedy's instruction, on July 30, 2013, Citi Private Bank initiated a wire transfer in the amount of $1,152,664.92 from Lee Kennedy Investments' account ending in 5421 at Citi Private Bank, via Bank of New York Mellon (ABA routing number 021000018) in New York, to Hall's firm's account ending in 0159 at Community Bank (ABA routing number

065301566) in Mississippi.[52] A true and correct copy of the wire confirmation from the Federal Reserve's FedPayments Manager system is attached to this Complaint as **Exhibit 137**.[53]

626.    That same day, Community Bank sent a letter to Hall's firm notifying it of receipt of Kennedy's July 30, 2013, wire transfer in the amount of $1,152,664.92. (BNPA00276). A true and correct copy of Community Bank's July 30, 2013, letter is attached to this Complaint as **Exhibit 138**.

627.    By that time, Kennedy had transferred a total of $1,162,662.92 to her lawyers. Once Kennedy sent the money to her lawyers, her lawyers credited those funds to Kennedy's account.

628.    On July 31, 2013, at 12:34 p.m., Kennedy caused her attorneys to send $1,133,239.91 to Old South Land Title by interstate wire transfer. Kennedy's counsel made the transfer from its account ending in 0159 at Community Bank (ABA routing number 065301566) in Laurel, Mississippi, to Old South Land Title's account ending in 4015 at FNBT Bank (ABA routing number 063206207) in Ft. Walton Beach, Florida.

629.    By email that same day, Community Bank sent an email to Kennedy's counsel confirming transmission of the wire transfer to Old South Land Title. A true and correct copy of Community Bank's July 31, 2013, email is attached to this Complaint as **Exhibit 139**. Later that day, Synovus Bank confirmed by email to Old South Land Title receipt of the $1,133,239.91 wire transfer from Community Bank. A true and correct copy of Synovus Bank's July 31, 2013, email is attached to this Complaint as **Exhibit 140**.

---

[52] Lee Kennedy Investments' 2013 Form 1065 tax return reflects a "Loan to Cherry Creek Holdings" in the amount of $1,152,664.92.

[53] *See* https://www.americanexpress.com/us/content/foreign-exchange/articles/fedwire-transfers/ (explaining operation of Fedwire Payment System).

630.    On July 31, 2013, at 2:45 p.m., Old South Land Title Company sent $1,085,793.40 to Wells Fargo by interstate wire transfer. Old South Land Title initiated the wire transfer from its account ending in 4015 at FNBT Bank (ABA routing number 063206207) in Florida to Wells Fargo (ABA routing number 121000248) in California.

631.    On July 31, 2013, **three weeks after entry of the HCB Judgment and nine days after HCB served its First Requests for Admissions, Interrogatories, and Requests for Production**, the Kennedy Enterprise consummated the sale of the Pink House.[54]

632.    Upon receipt of the short sale proceeds, on August 2, 2013, Wells Fargo dismissed its Foreclosure Case against Kennedy and released the Notice of Lis Pendens encumbering the Pink House. Wells Fargo's Notice of Voluntary Dismissal and Release of Lis Pendens was recorded on August 21, 2013, in Official Records Book 3113, Page 579, in the Public Records of Okaloosa County, Florida. A true and correct copy of the Notice of Voluntary Dismissal and Release of Lis Pendens is attached to this Complaint as **Exhibit 141**.

633.    Also on August 21, 2013, Wells Fargo recorded that certain Release of Mortgage dated as of August 21, 2013, in Official Records Book 3113, Page 555, of the Public Records of Okaloosa County, Florida, and released its security interest in the Pink House.

### G.    *The Kennedy Enterprise engineered sham financing to conceal Kennedy's involvement in the fraudulent short sale scheme.*

634.    To disguise her subterfuge in connection with the short sale, Kennedy enlisted willing assistance from her friend, Anita Williams, her longtime business associate and consultant, Kniahynycky, and her father, Harry Freyer. Together, they set about to create a paper trail that presumed to hide Kennedy's manipulation of the short sale transaction.

---

[54] In 2016, when she submitted Lee Kennedy Investments' Statement of Financial Condition as of Decmbeer 31, 2015, to UBS AG, Kennedy admitted Lee Kennedy Investments purchased the Pink House in 2013.

635.    Two days after Wells Fargo provided its final approval of the short sale, and only eight days after the formation of Cherry Hills, Cherry Hills loaned Destin Holdings Trust $1,350,000.00 (the "**DHT Loan**"). Evidencing the DHT Loan, Kniahynycky executed that certain Promissory Note by Destin Holdings Trust in favor of Cherry Hills in the original principal amount of $1,350,000.00 (the "**DHT Promissory Note**"). A true and correct copy of the DHT Promissory Note is attached to this Complaint as **Exhibit 142**.

636.    The DHT Promissory Note was payable in bi-annual installments over 15 years at 5.0% annually. According to the DHT Promissory Note, the first payment of $64,054.26 was due to Cherry Hills on or before January 1, 2014. **Ex. 142** at 1.

637.    Destin Holdings Trust purported to secure its obligation to Cherry Hills through an attempted pledge of the membership interest in Destin Holdings Trust, as follows:

> The undersigned Maker owns one hundred percent (100%) of total interest in Destin Holdings Trust, LLC, a Florida limited liability company. The undersigned does hereby set over, assign and convey unto the Holder all of his interest of Destin Holdings Trust, LLC as security for the faithful repayment of the indebtedness evidenced by this Note. Upon default, the Holder may, upon presentment of this assignment to the proper authority of Destin Holdings Trust, LLC have said interest in said LLC changed to the name of Holder whereby Holder shall become the owner thereof. However, when this indebtedness has been paid in full, this Note (and this assignment) shall be terminated and held for naught and the shares of stock securing this indebtedness shall be returned to Maker.

*Id*. at 2.

638.    Kniahynycky executed the DHT Promissory Note. *Id*. at 2.

639.    Also on July 31, 2013, Kniahynycky executed that certain Mortgage by Destin Holdings Trust in favor of Cherry Hills and recorded in Official Records Book 3110, Page 613, of the Public Records of Okaloosa County, Florida (the "**DHT Mortgage**"). A true and correct copy of the DHT Mortgage is attached to this Complaint as **Exhibit 143**. The DHT Promissory Note was attached as an exhibit to the DHT Mortgage. **Ex. 143**.

640.   At the time Cherry Hills purported to make the DHT Loan, Cherry Hills had no assets, no bank accounts, no real estate, and no money to loan.

641.   Because Cherry Hills had no money to loan, Lee Kennedy Investments loaned Cherry Hills $1,150,000.00 (the "**Cherry Hills Loan**") so Cherry Hills could make the DHT Loan.

642.   On or about July 26, 2013, Harry Freyer, in his capacity as Member of Cherry Hills, executed that certain Promissory Note by Cherry Hills in favor of Lee Kennedy Investments in the original principal amount of $1,150,000.00 (the "**Cherry Hills Note**"). A true and correct copy of the Cherry Hills Note is attached to this Complaint as **Exhibit 144**.

643.   Like the DHT Promissory Note, the Cherry Hills Note was payable in bi-annual installments over 15 years at 5.0% annually. *Id*. According to the Cherry Hills Note, Cherry Hills' first payment in the amount of $54,564.78 was due on January 1, 2014. *Id*.

644.   Cherry Hills seemingly secured its obligation to Lee Kennedy Investments by pledging the membership interest in Destin Holdings Trust, as follows:

> The undersigned Maker has a valid security interest to one hundred percent (100%) of total interest in Destin Holdings Trust, LLC, a Florida limited liability company. The undersigned does hereby set over, assign and convey unto the Holder all of his interest of Destin Holdings Trust, LLC, if obtained as security for the faithful repayment of the indebtedness evidenced by this Note. Upon default, the Holder may, upon presentment of this assignment to the proper authority of Destin Holdings Trust, LLC have said interest in said LLC changed to the name of Holder whereby Holder shall become the owner thereof. However, when this indebtedness has been paid in full, this Note (and this assignment) shall be terminated and held for naught and the shares of stock securing this indebtedness shall be returned to Maker.

*Id*. at 2.

645.   None of the funds Kennedy sent to her counsel was ever transferred to Cherry Hills or credited for the benefit of Cherry Hills. None of the funds Kennedy sent to her lawyers

was ever transferred to Destin Holdings Trust or credited for the benefit of Destin Holdings Trust.

### 1. The Kennedy Enterprise closed the Cherry Hills Loan and the DHT Loan outside of closing to hide the transaction from Wells Fargo.

646. On August 1, 2013, the day after the short sale closed, Jeff Hall, Kennedy's counsel, sent a letter to Old South Land Title transmitting the DHT Mortgage and a check in the amount of $7,425.00 for documentary stamp taxes and intangibles taxes payable on the DHT Mortgage and the DHT Promissory Note. A true and correct copy of Hall's August 1, 2013, letter to Old South Land Title is attached to this Complaint as **Exhibit 145**.

647. In the ordinary course of business, financing costs and transfer taxes are reflected on real estate closing statements. Such costs and expenses generally are subject to review by all parties to a transaction. Title companies in particular prefer to have all of such costs and taxes reflected on the face of a closing statement because the title companies, as the escrow or closing agents, are responsible for disbursing all of the funds shown on a closing statement. The HUD-1 form settlement statement contemplates full disclosure, as evidenced by the representations included on the form.

648. The Pink House short sale transaction, however, was not in ordinary course of business. The DHT Promissory Note and the DHT Mortgage were not reflected on the HUD-1 Settlement Statement approved by Wells Fargo.

649. The DHT Mortgage, DHT Promissory Note, and the check for $7,425.00 were sent separately to ensure that the loan transactions by which Kennedy herself funded the short sale of the Pink House did not appear on the Approved HUD-1 Settlement Statement, despite specific provisions in the Short Sale Approval Letter to the contrary.

650.     Previously, in January 2013, Jeff Hall had represented to Wells Fargo that he represented Destin Holdings Trust and that he could confirm that Destin Holdings Trust was able to pay $775,000.00 for the Pink House. Specifically, Kennedy's counsel wrote: "Please be advised that I have verified that Destin Holdings Trust, LLC has $775,000.00 readily available to facilitate this transaction." **Ex. 124**.

651.     Moreover, disclosing the financing Kennedy "arranged" for Destin Holdings Trust likely would have required additional consideration and subsequent verification by Wells Fargo, ultimately proving that Destin Holdings Trust had no money "readily available" to consummate any transaction.

652.     Kennedy, Jeff Hall, Kniahynycky, and Anita Williams did all they could to avoid disclosing to Wells Fargo that in truth and in fact Cherry Hills and Harry Freyer were Destin Holdings Trust's lender. They avoided revealing the relationships among Kennedy, Kniahynycky, Destin Holdings Trust, Harry Freyer, and Cherry Hills. They actively concealed that Kennedy arranged financing in excess of the purchase price Wells Fargo approved for the sale of the Pink House.

### 2.     The fraudulent financing resulted in fraudulent assignments, and Kennedy reacquired the Pink House less than a year after the sale.

653.     Kennedy, Anita Williams, and Kniahynycky never disclosed to Wells Fargo that Destin Holdings Trust had to borrow the money to close the short sale of the Pink House and that the Kennedy Enterprise, with Kennedy at its helm, funded the entire short sale transaction.

654.     From and after July 31, 2013, Destin Holdings Trust never made a single loan payment to Cherry Hills.

655.     Likewise, from and after July 26, 2013, Cherry Hills never made a single loan payment to Lee Kennedy Investments.

656.     On information and belief, Destin Holdings Trust and Cherry Hills never intended to make loan payments. Instead, Destin Holdings Trust and Cherry Hills were nothing more than instruments devised to conceal the Kennedy Enterprise's scheme to avoid Wells Fargo's in rem claims against the Pink House and transfer Kennedy's million dollar property beyond HCB's reach.

657.     Not surprisingly, on January 1, 2014, (a) Destin Holdings Trust failed to make its scheduled payment under the DHT Promissory Note, and (b) Cherry Hills failed to make its scheduled payment under the Cherry Hills Note.

658.     Because of the manufactured default under the DHT Promissory Note, on or about March 31, 2014, Kniahynycky executed that certain Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC, assigning to Cherry Hills his entire interest in Destin Holdings Trust in lieu of other collection proceedings. A true and correct copy of the Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC, is attached to this Complaint as **Exhibit 146**.

659.     On April 23, 2014, at 7:45 a.m., **one week before Kennedy's May 1, 2014 post-judgment deposition by HCB,** Kniahynycky sent an email to Kennedy.[55] A true and correct copy of Kniahynycky's April 23, 2014, email to Kennedy is attached to this Complaint as **Exhibit 147**. In his email, Kniahynycky wrote, "Hi Lee: Here is the executed assignment. Manny." **Ex. 147**. Attached to Kniahynycky' April 23, 2014, email to Kennedy was an executed

---

[55] Kniahynycky sent his April 23, 2014, email from his email address ending in srj.com to Kennedy's email address in gmail.com. On information and belief, servers hosting the srj.com domain are located in Ann Arbor, Michigan. On information and belief, Google's data centers hosting the gmail.com domain are located in Google's data centers are situated in South Carolina, Iowa, Georgia, Alabama, North Carolina, Okalohoma, Tennessee, and Oregon. Thus any email communications between Kennedy and Kniahynycky would be transmitted interstate regardless of Kennedy's or Knianhynycky's physical location.

copy of the Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC. *Id*.

660.   **Less than two weeks later**, on or about May 6, 2014, Cherry Hills assigned the membership interests in Destin Holdings Trust to Lee Kennedy Investments. At that time, Harry Freyer executed that certain Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC (the "**Cherry Hills Assignment**"). A true and correct copy of the Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC, executed by Harry Freyer is attached to this Complaint as **Exhibit 148**.

661.   The lack of immediacy between the assignment from Kniahynycky to Cherry Hills and from Cherry Hills to Lee Kennedy Investments evidences the Kennedy Enterprise's desire to fabricate temporal distance between the two assignments. The Kennedy Enterprise's effort to create such distance failed.

662.   On May 6, 2014, **one day before Cherry Hills' purported assignment to Lee Kennedy Investments**, Kennedy executed that certain Amended and Restated Company Agreement of Destin Holdings Trust, LLC, a Florida limited liability company. A true and correct copy of Destin Holdings Trust's Amended and Restated Company Agreement is attached to this Complaint as **Exhibit 149**.

663.   Kennedy executed the Amended and Restated Company Agreement of Destin Holdings Trust as the "Member/Manager as to 100% of the Company interests" of LFK GP, on behalf of Lee Kennedy Investments. **Ex. 149**.

664.   When Kennedy signed the Amended and Restated Company Agreement, Lee Kennedy Investments did not own Destin Holdings Trust.

3.      After closing, Kennedy remained in possession of the Pink House.

665.    After Destin Holdings Trust purchased the Pink House, but before it defaulted under the fraudulent DHT Loan from Cherry Hills, Kennedy remained in possession of the Pink House, controlling its rental collections and even remedial construction work on the property.

666.    As discussed, *supra*, Kennedy collected all of the rental proceeds from the Pink House from 2009 through 2015. Even after the sale to Destin Holdings Trust, Kennedy continued collecting the rents from the Pink House in 2013. From August 2, 2013, through October 15, 2014, Kennedy collected and deposited **$244,728.05** in rental proceeds from the Pink House, which Kennedy deposited into her personal account ending in 4358 at JPMC.

667.    During 2013, Kennedy collected deposits and rent from people intending to rent the Pink House in 2014, as shown on **Exhibit 150** attached to this Complaint.

668.    In 2013, **after** the closing of the short sale, Kennedy collected and deposited more than $50,000.00 in rent deposits into her personal account ending in 4358 at JPMC, as follows:[56]

| Deposit Date | Check Date | Reference | Amount |
| --- | --- | --- | --- |
| 08/26/13 | 08/06/13 | Pink Palace 6-21 to 6-28 | $5,507.50 |
| 08/26/13 | 08/10/13 | Pink Palace - 11/23-11/30/13 | $3,440.00 |
| 08/26/13 | 07/23/13 | Pink Palace -Mar 27-30, 2014 | $2,809.50 |
| 08/28/13 | 08/10/13 | Pink Palace 1/2 Rent June 2014 | $4,057.50 |
| 08/28/13 | 08/10/13 | Pink Palace - June 2014 Security Deposit | $1,000.00 |
| 08/02/13 | 07/27/13 | 604 Gulf Shores - Aug 12-18 | $2,400.00 |
| 09/03/13 | 08/26/13 | Pink Palace Oct 7-14 2013 | $1,650.00 |
| 09/03/13 | 08/24/13 | Pink Palace Mar 27-30, 2014 | $2,809.50 |
| 09/16/13 | 09/10/13 | Pink Palace 10/19-10/26 | $1,865.00 |
| 09/20/13 | 08/28/13 | 7/19/2014-7/26/2014 | $4,500.00 |
| 10/25/13 | 10/11/13 | | $4,039.50 |
| 10/30/13 | 10/11/13 | Rent Balance Pink Palace Nov. 23-Nov. 30 | $1,840.00 |
| 11/06/13 | 11/01/13 | Beach home rental-3/21-3/24/14 | $2,587.50 |
| 11/07/13 | 11/01/13 | For Rental Prop 6-5-14 thru 6-12-14 | $4,696.50 |
| 11/21/13 | 11/05/13 | Beach House | $7,993.40 |
| **Total** | | | **$51,195.90** |

---

[56] Destin Holdings Trust did not open a bank account until October 2014.

669.    None of rental proceeds Kennedy collected were turned over to Destin Holdings Trust or credited to Destin Holdings Trust or Cherry Hills between July 31, 2013, and May 7, 2014, when Cherry Hills assigned Destin Holdings Trust to Lee Kennedy Investments.

670.    After the closing of the short sale, Kennedy paid Destin Water Users from her account ending in 4358 at JPMC for utility service for the Pink House. Kennedy made payments to Destin Water Users on September 30, 2013, October 25, 2013, and April 24, 2014, paying a total of $1,355.66 for water service for the Pink House. At the time of those payments, Destin Holdings Trust – not Kennedy – owned the Pink House.

671.    Demonstrating Kennedy's continuing control over the Pink House, on November 7, 2013, **after the sale to Destin Holdings Trust**, Kennedy personally paid the ad valorem property taxes for the Pink House in the amount of $12,421.97. On November 22, 2013, Kennedy paid the entire amount of ad valorem property taxes due with her credit card. At that time, Kniahynycky owned Destin Holdings Trust, and Destin Holdings Trust owned the Pink House. Kennedy continued to pay the ad valorem property taxes for the Pink House in 2014 and 2015, all on her credit card. True and correct copies of the 2012 through 2015 ad valorem tax bills and receipts for the Pink House are attached to this Complaiunt as **Exhibit 151**.

672.    In addition to collecting all of the rental income from the Pink House, Kennedy controlled construction and repair efforts at the Pink House from 2013 to 2014.

673.    In fact, Kennedy and Neil McPherson entered into contracts for repairs to be performed on the Pink House during the time (a) Destin Holdings Trust owned the Pink House, and (b) Kniahynycky owned Destin Holdings Trust.

674.    For example, Kennedy and Neil McPherson directed KTC Enterprises Incorporated d/b/a KTC Builders ("**KTC Builders**") to perform substantial repairs on the Pink

House totaling in the tens of thousands of dollars. From August 5, 2013, to October 4, 2013, KTC Builders performed construction work on the Pink House on behalf of Destin Holdings Trust, Neil McPherson, and Kennedy.

675.     When Neil McPherson and Kennedy failed to pay for KTC Builders' work and labor, KTC Builders recorded a Claim of Lien in Official Records Book 3131, Page 1571, of the Public Records of Okaloosa County, Florida. In the Claim of Lien, KTC Builders identified the "Property Owner" of the Pink House as Kennedy, Neil McPherson, and Destin Holdings Trust. KTC Builders also identified the "hiring party" as Kennedy and Neil McPherson.

676.     On May 21, 2014, KTC filed a complaint in that certain civil action styled *KTC Enterprises Incorporated d/b/a KTC Builders v. Destin Holdings Trust, LLC, Neil McPhearson, and Lee McPhearson*, Circuit Court of Okaloosa County, Florida, Case No. 2014 CC 001011 F, alleging that it entered into one or more contracts to perform work on the Pink House for Kennedy, Neil McPherson, and Destin Holdings Trust. A true and correct copy of KTC Builders' May 21, 2014, Complaint is attached to this Complaint as **Exhibit 152**.

677.     In its Complaint, KTC Builders alleged that Neil McPherson signed at least one contract on March 27, 2014, or March 28, 2014, **three days before Kniahynycky assigned his interests in Destin Holdings Trust to Cherry Hills**, and several weeks before Cherry Hills assigned its membership interests to Lee Kennedy Investments. **Ex. 152**, ¶ 5.

678.     After the sale of the Pink House, the Kennedy Enterprise paid $23,000.00 to KTC Builders by electronic payment or interstate wire transfers, as shown on the following table:

| Date | From | Account No. | To | Amount |
|------|------|-------------|-----|--------|
| 08/14/13 | Lee Kennedy Pink House | 4358 | John Campbell | $5,000.00 |
| 09/18/13 | Lee Kennedy Pink House | 4358 | John Campbell | $3,000.00 |
| 09/19/13 | Lee Kennedy Pink House | 4358 | John Campbell | $5,000.00 |
| 09/25/13 | Lee Kennedy Pink House | 4358 | John Campbell | $5,000.00 |
| 07/11/14 | Lee Kennedy Investments | 7472 | James C. Campbell, P.A. | $5,000.00 |
| **Total** | | | | **$23,000.00** |

**4.     To maintain the façade of an arm's length transaction, the Kennedy Enterprise filed false annual reports in 2014, 2015, and 2016.**

679.     Kennedy could not publicly claim ownership or control of Destin Holdings Trust without admitting the elaborate fraud committed by the Kennedy Enterprise.

680.     To perpetuate the sham, in its 2014 Annual Report, Destin Holdings Trust reported that its managing member was the Babette Trust, whose address was 4720 Rockcliff Road – Kennedy's home address.

681.     Destin Holdings Trust filed its 2014 Annual Report on May 7, 2014, **just one day after Cherry Hills assigned its interest in Destin Holdings Trust to Lee Kennedy Investments**. Harry Freyer signed Destin Holdings Trust's 2014 Annual Report as "Trustee," even though he personally signed the assignment from Cherry Hills to Lee Kennedy Investments.

682.     The following year, on January 9, 2015, Destin Holdings Trust filed its 2015 Annual Report. Destin Holdings Trust again reported its managing member was the Babette Trust. Kennedy, not Harry Freyer, signed Destin Holdings Trust's 2015 Annual Report as the "Manager" of Destin Holdings Trust.

683.     In 2016, when Destin Holdings Trust filed its Annual Report, Destin Holdings Trust reported again that Destin Holdings Trust's managing member was the Babette Trust. Like the 2014 Annual Report, Harry Freyer signed Destin Holdings Trust's 2016 Annual Report. True and correct copies of Destin Holdings Trusts' 2014, 2015, and 2016 annual reports are attached to this Complaint as **Exhibit 153**.

684.     Each of Destin Holdings Trust's annual reports was filed electronically through the Secretary of State of Florida's internet website, https://dos.myflorida.com/sunbiz/manage-business/efile/annual-report.

685.     According to Destin Holdings Trust's Annual Reports, Destin Holdings Trust's

ownership and management over time appear as follows:

| Filing Year | Filing Date | Registered Agent | Authorized Person(s) Detail | Title | Signed By |
|---|---|---|---|---|---|
| N/A | 01/04/2013 | United States Corp. Agents | Kniahynycky | MGRM | Sheila Dang |
| 2014 | 05/07/2014 | United States Corp. Agents | Babette Trust | MGRM | Harry Freyer |
| 2015 | 01/09/2015 | United States Corp. Agents | Babette Trust | MGRM | Lee McPherson |
| 2016 | 01/23/2016 | United States Corp. Agents | Babette Trust | MGRM | Harry Freyer |

**Ex. 153**.

686.     When Harry Freyer and Kennedy signed Destin Holdings Trust's 2014, 2015, and

2016 Annual Reports, they made the following certification:

> I hereby certify that the information indicated on this report or supplemental
> report is true and accurate and that my electronic signature shall have the same
> legal effect as if made under oath; that I am a managing member or manager of
> the limited liability company or the receiver or trustee empowered to execute this
> report as required by Chapter 605, Florida Statutes; and that my name appears
> above, or on an attachment with all other like empowered.

*Id*.

687.     Harry Freyer's and Kennedy's representations in the 2014, 2015, and 2016

Annual Reports of Destin Holdings Trust were false, and Harry Freyer and Kennedy knew their

representations were false.

### 5.     Kniahynycky's participation in the Kennedy Enterprise continued well beyond the short sale of the Pink House.

688.     On March 29, 2016, HCB filed in the District Court a Notice of Intent to Serve

Subpoena (Doc. 253), attaching a subpoena duces tecum directed to Kniahynycky (the

"**Kniahynycky Subpoena**"). True and correct copies of the Notice of Intent to Serve Subpoena

and the Kniahynycky Subpoena are attached to this Complaint as **Exhibit 154**.

689.     **Two days later**, on March 31, 2016, LK Freyer Investments sent $4,000.00 to

Kniahynycky by interstate wire transfer. LK Freyer Investments made the transfer from its

account ending in 7565 at JPMC (ABA routing number 021000021) to Kniahynycky via a Chase Quickpay Electronic Transfer.

690.    At the time LK Freyer Investments paid Kniahynycky $4,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

691.    On April 4, 2016, **six days after HCB filed its Notice of Intent to Serve Subpoena**, LK Freyer Investments paid $36,000.00 to Janet Kniahynycky, Manny Kniahynycky's wife, by interstate wire transfer. LK Freyer Investments transferred $36,000.00 from its account ending in 7565 at JPMC (ABA routing number 021000021) in New York to Janet Kniahynycky's account at PNC Bank (ABA routing number 041000124) in Ohio. LK Freyer Investments' April 4, 2016, payment to Janet Kniahynycky referenced a "Payment From Bee Cave Properties."

692.    At the time LK Freyer Investments paid Janet Kniahynycky $36,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

693.    **Two days later**, on April 6, 2016, Kennedy filed in the District Court a Motion to Quash or Alternatively for Protective Order – Emmanuel Kniahynycky Subpoena. Kennedy's April 6, 2016, Motion to Quash certainly made no mention of the Kennedy Enterprise's $40,000.00 payments to Kniahynycky and Janet Kniahynycky just two days earlier.

694.    Within one week after HCB filed its notice of intent to serve subpoena directed at Kniahynycky, LK Freyer Investments paid Kniahynycky $40,000.00.

### 6.    After defrauding Wells Fargo, Kennedy fraudulently attempted to clear her credit record of negative references to her default and charge-off.

695.    Not willing to settle for defrauding Wells Fargo, in 2015 Kennedy denied ever financing the Pink House so she could improve her own credit score.

696.     On or about April 13, 2015, Kennedy sent a letter to Transunion, one of the three major credit bureaus, in which she disputed several derogatory remarks on her credit report, including Wells Fargo's reports regarding Loan No. 0002861305. A true and correct copy of Kennedy's April 13, 2015, letter is attached to this Complaint as **Exhibit 155**.

697.     In her April 13, 2015, letter to Transunion, Kennedy wrote:

> I have recently requested that you look into items on my credit report and am NOT satisfied with the result of your investigation. I demand that you look into these items against that I have listed below which are still inaccurate. I am aware of my rights under the Fair Credit Reporting Act (FCRA) 15 USC section 1681i, and request an immediate re-investigation into these accounts. I am maintaining a log of all correspondence sent to your company for future legal action should you ignore my request.

**Ex. 155**.

698.     Among the accounts Kennedy disputed in her April 13, 2015, letter was Loan No. 0002861305, which was the Wachovia/Wells Fargo loan on the Pink House. Kennedy wrote, "This is not my account." *Id*.

699.     Not achieving the desired result from her threats to Transunion, Kennedy again wrote to Transunion on May 13, 2015. A true and correct copy of Kennedy's May 13, 2015, letter to Transunion is attached to this Complaint as **Exhibit 156**. That day, Kennedy wrote:

> You recently re-investigated items on my credit report and I am still **<u>NOT SATISFIED</u>** with the results of investigation! I demand that you look into these items that I have listed below again, they are still inaccurate. I am more than aware of my rights under the Fair Credit Reporting Act (FCRA) 15 USC section 1681i, and am requesting an immediate re-investigation into these accounts. I have maintained a log of all the correspondence I have sent to your company so far and intend to follow through with legal action should you ignore my request. **<u>I PLAN TO TAKE LEGAL ACTION AGAINST YOU IF YOU DO NOT HONOR MY REQUEST AND INVESTIGATE THESE NEGATIVE ITEMS PROPERLY!</u>**

**Ex. 156** (emphasis in original).

700.     Kennedy again listed Loan No. 2861305 among her disputed accounts. *Id*.

701.    Kennedy again wrote, "[t]his is not my account." *Id*.

702.    Kennedy's representations to Transunion were false, and Kennedy knew those representations were false.

### H.    In 2016, the Kennedy Enterprise sold the Pink House for $1,850,000, realizing a net gain of more than $700,000 from its fraudulent schemes.

703.    On or about June 17, 2016, almost three years after the Short Sale Transaction, the Kennedy Enterprise sold the Pink House for $1,850,000.00. By that time, (a) Kennedy had sold the Pink House to Destin Holdings Trust; (b) Kniahynycky had assigned Destin Holdings Trust to Cherry Hills; and (c) Cherry Hills had assigned Destin Holdings Trust to Lee Kennedy Investments. During the intervening period, Kennedy retained full control over the Pink House and realized substantial income from the Pink House.

704.    In connection with the sale of the Pink House, Kennedy signed a Limited Liability Company Affidavit dated as of June 17, 2016, and recorded on June 24, 2016, in Official Records Book 3254, Page 495, of the Public Records of Okaloosa County, Florida, a true and correct copy of which is attached to this Complaint as **Exhibit 157**.

705.    In the June 17, 2016, Affidavit, Kennedy attested, **under oath**, that she was the Manager of Destin Holdings Trust, just as she did in Destin Holdings Trust's 2015 Annual Report. **Ex. 157**.

706.    On June 21, 2016, Kennedy instructed Watson Sewell to transmit $725,422.64 to Lee Kennedy Investments by interstate wire transfer. Watson Sewell made the transfer from its account ending in 9168 at Trustmark Bank (ABA routing number 065300279) in Mississippi to Lee Kennedy Investments' account ending in 1203 at UBS AG (ABA routing number 026007993) in New York.

707.     As a result of the Kennedy Enterprise's fraudulent short sale, Kennedy realized

nearly $350,000.00 in savings in her payoff to Wells Fargo on the short sale of the Pink House.

Afer the fraudulent short sale and two sham defaults – the first by Destin Holdings Trust and the

second by Cherry Hills – the Kennedy Enterprise generated $468,357.00 in gross rents, as

follows:

| Year | Type | Gross Income/Benefit |
|---|---|---|
| 2013 | Rental Income | $116,354.00 |
| 2014 | Rental Income | $126,625.00 |
| 2015 | Rental Income | $182,307.00 |
| 2016 | Rental Income | $43,071.00 |
| **Total:** | | **$468,357.00** |

708.     Then, in 2016, the Kennedy Enterprise sold the Pink House for a net gain of

nearly $600,000.00. In all, the Kennedy Enterprise enjoyed more than $1,100,000 in ill-gotten

gains resulting from its scheme to defraud Wells Fargo and HCB.

## VI.     *The Kennedy Enterprise fraudulently induced Thomasville National Bank to make million dollar loans to Summer Winds Georgia and Destin Holdings Trust.*

709.     In 2014, the Kennedy Enterprise looked to Thomasville[57] to finance and then

refinance a townhouse development – Summerwind Townhomes – it purchased in Georgia.

710.     The following year, in 2015, the Kennedy Enterprise convinced Thomasville to

cash-out the equity in the Pink House through a $1,000,000.00 loan to Destin Holdings Trust.

### A.     *Thomasville loaned and the refinanced its million-dollar loan on the Summerwind Townhomes.*

711.     On April 18, 2014, Norris Bishop Enterprise, LLC ("**Norris Bishop**"), a Georgia

limited liability company, caused the formation of Hidden Hollow Townhomes, LLC, a Georgia

---

[57] At all relevant times, Thomasville was a financial institution as defined by 18 U.S.C. § 20; an insured depository institution as defined by 18 U.S.C. § 20(1); and mortgage lending business as defined by 18 U.S.C. § 20(10). Thomasville holds FDIC Certificate Number 34068, evidencing its insured status. Thomasville is involved in interstate commerce, and it makes loans in Georgia and Florida.

limited liability company. Shortly thereafter, on April 25, 2014, Hidden Hollow Townhomes, LLC, changed its name to Summerwind Townhomes, LLC. True and correct copies of the Certificate of Organization, Articles of Organization, and Articles of Amendment to the Articles of Organization of Hidden Hollow Townhomes, LLC, are attached to this Complaint as **Composite Exhibit 158**. The members of Summerwind Townhomes were Norris Bishop and Hungry Otter. Each member of Summerwind Townhomes owned 500 units, or 50%, of the membership interests in the limited liability company.

712.    On April 30, 2014, Norris Bishop purchased Summerwind Townhomes, a subdivision consisting of 22 townhouse units in Oakwood, Hall County, Georgia, from MB REO-GA Residential, LLC, a Delaware limited liability company, as evidenced by that certain Limited Warranty Deed dated as of April 30, 2014, and recorded in Deed Book 7360, Pages 552-556, of the records of the Clerk of the Superior Court of Hall County, Georgia. Norris Bishop immediately "flipped" the property to Summerwind Townhomes by Quit-Claim Deed, dated as of April 30, 2014, and recorded in Deed Book 7360, Pages 557-558, of the records of the Clerk of the Superior Court of Hall County, Georgia.

713.    Summerwind Townhomes financed its April 30, 2014, purchase of the townhomes with Loan No. 1023360 from Thomasville National Bank. The loan was secured by that certain Deed to Secure Debt by Summerwind Townhomes in favor of Thomasville, dated as of April 30, 2014, and recorded in Deed Book 7360, Page 559, of the records of the Clerk of the Superior Court of Hall County, Georgia.

714.    On or about September 11, 2014, Norris Bishop assigned its membership interests in Summerwind Townhomes to Hungry Otter. A true and correct copy of the Membership Units Transfer and Power of Attorney is attached to this Complaint as **Exhibit 159**. Kennedy executed

the Membership Units Transfer and Power of Attorney as the Manager of Hungry Otter. **Ex. 159**. Kennedy crossed out the words "Managing Member" in the signature blocks and replaced them with the word "Manager." *Id*.

715.    At that point, Hungry Otter became the sole member of Summerwind Townhomes.

> **1.     During Thomasville's initial underwriting for the Summerwind Townhomes, Kennedy substantially misrepresented her assets and liabilities.**

716.    Kennedy's primary contact at Thomasville was Mr. Watt, Thomasville's Assistant Vice President. Kennedy communicated with Mr. Watt extensively by email.

717.    On or about April 17, 2014, Kennedy submitted to Thomasville a Personal Financial Statement in support of her various loan applications. A true and correct copy of Kennedy's April 17, 2014, Personal Financial Statement is attached to this Complaint as **Exhibit 160**.

718.    In her April 17, 2014, Personal Financial Statement, Kennedy represented that she owned assets in excess of $10,000,000, including approximately $3,500,000 in cash on hand and in banks, $6,000,000 in cash value life insurance, a $40,000 automobile, royalty interests, and $2,711,618 in stocks and bonds. **Ex. 160**.

719.    Kennedy represented that the value of her residence, 4720 Rockcliff Road, #3, Austin, Texas 78746, was $2,300,000, with no mortgage maturity and no mortgage indebtedness. *Id*.

720.    Kennedy represented that she owed no contingent liabilities as an endorser or co-maker.*Id*.

721.    Kennedy represented that she owed no other liabilities. *Id*.

722.     Kennedy's representation to Thomasville regarding her life insurance was false, and Kennedy knew her representation was false.

723.     The only insurance life insurance Kennedy owned was Aviva Life and Annuity Company Policy No. IL01628030, a ten-year level term policy with no cash surrender value.[58]

724.     Kennedy's representation to Thomasville that she had no contingent liabilities was false, and Kennedy knew her representation was false.

725.     Kennedy failed to disclose the litigation against her in the St. Tammany Parish Case, and Kennedy failed to disclose debt she guaranteed on behalf of her companies.

726.     In addition, Kennedy's representation to Thomasville that she owed no other liabilities was false, and Kennedy knew her representation was false.

727.     Kennedy owed numerous other liabilities as of April 14, 2014, including, without limitation, credit card debt, her debt to Mercedes Benz Financial, and her indebtedness to KTC Builders for its work on the Pink House.

728.     Most importantly, Kennedy failed to disclose the HCB Judgment.

### 2.     The Kennedy Enterprise employed Summer Winds Georgia to refinance the Summerwind Townhomes.

729.     While working through the assignment of Norris Bishop's membership interests in Summerwind Townhomes, the Kennedy Enterprise began efforts to refinance Loan No. 1023360 with Thomasville and convey the property to a new entity. That new entity was Summer Winds Georgia.

730.     On July 7, 2014, at 4:05 p.m. EDT, Kennedy sent an email to Mr. Watt asking about the progress of Thomasville's underwriting for the refinancing of Loan No. 1023360.

---

[58] *See infra* paras. 818-820.

731.    The following day, at 8:29 a.m., Mr. Watt replied to Kennedy and wrote, "I need to get an updated personal financial statement on you." A true and correct copy of Mr. Watt's July 8, 2014, email to Kennedy is attached to this Complaint as **Exhibit 161**. Kennedy replied minutes later, asking Mr. Watt, "Did I not send you one[?]" **Ex. 161**. Mr. Watt remarked by email that he had not seen an updated personal financial statement, to which Kennedy replied, "Ok I send [sic] it." *Id*.

732.    As Thomasville moved through the underwriting process, on July 30, 2014, Mr. Watt sent Kennedy an email in which he asked, "Do you plan to keep it in the same LLC and have Norris removed or transfer it into a new LLC?" A true and correct copy of Mr. Watt's July 30, 2014, email is attached to this Complaint as **Exhibit 162**. Kennedy replied by email that she would talk with her attorney. **Ex. 162**.

733.    On August 25, 2014, Attorney Childs sent an email to Kennedy with formation documents for Summer Winds Georgia, for transmission to Thomasville for approval. Among the documents Attorney Childs sent Kennedy was the Company Agreement of Summer Winds Georgia dated as of August 12, 2014. The August 25, 2014, draft of the Company Agreement identified Hungry Otter and the Babette Trust as the only members of Summer Winds Georgia. Seeking quick approval of the ownership structure of Summer Winds Georgia, on August 25, 2014, Kennedy forwarded Attorney Childs' email to Mr. Watt and wrote, "We are ready to close." A true and correct copy of Kennedy's August 25, 2014, to Mr. Watt is attached to this Complaint as **Exhibit 163**.

734.    On September 3, 2014, Mr. Watt sent an email to Kennedy and requested copies of the documents settling the Babette Trust, the operating agreement for Summer Winds Georgia, and current financial statements and rent roll for the Summerwinds Townhomes.

Kennedy responded by email the same day and sent a copy of Babette's Last Will and Testament to Mr. Watt. A true and correct copy of Kennedy's September 3, 2014, email to Mr. Watt is attached to this Complaint as **Exhibit 164**.

735. On September 4, 2014, Thomasville's Georgia counsel, Mr. Kevin S. Cauley, sent an email to Mr. Watt regarding the structure of the Babette Trust. **Ex. 164**.

736. The same day, Mr. Watt asked Kennedy by email whether the three co-trustees identified in Babette's Last Will and Testament would be able to sign for the Babette Trust. *Id*.

737. To avoid any further inquiry into control and management of the Babette Trust, Kennedy replied by email on September 4, 2014, at 9:45 a.m. EDT, "Let's just simplify because parties named are diseased [sic] or otherwise engaged. I'll change ownership to Lee Kennedy Investments." A true and correct copy of Kennedy's September 4, 2014, email to Mr. Watt is attached to this Complaint as **Exhibit 165**.

738. Kennedy never disclosed to Thomasville that two of the original co-trustees declined their appointments as co-Trustees of the Babette Trust on June 30, 1988.

739. Kennedy never disclosed to Thomasville that neither she nor Harry Freyer ever petitioned the Probate Court to appoint a new trustee in Babette's Succession Case.

740. Kennedy never disclosed to Thomasville that she controlled the Babette Trust.

741. Kennedy never disclosed to Thomasville that, in the years prior to the Original Judgment and thew Amended Final Judgment, she was the Trustee of the Babette Trust.

742. Kennedy never disclosed to Thomasville that, two months after the entry of the Amended Final Judgment, Harry Freyer began acting as the Trustee of the Babette Trust.

743. Evidencing her intention to conceal facts from Thomasville, on September 5, 2014, Kennedy sent an email to Attorney Childs, in which she wrote: "Sorry to bug you, but the

bank is having heart burn with the [Babette] trust owning summerwinds. Can we change the owner to Lee Kennedy investments.[sic] *Then after it's financed change it*." A true and correct copy of Kennedy's September 5, 2014, email to Attorney Childs is attached to this Complaint as **Exhibit 166**.

744.    On September 8, 2014, Attorney Childs recommended that Kennedy use a dual member limited liability company, using Hungry Otter as one member and substituting Lee Kennedy Investments for the Babette Trust. **Ex. 166**. By reply email the same day, Kennedy agreed. *Id*. Then, Attorney Childs prepared the documents as agreed by Kennedy and forwarded them to Kennedy by email on September 8, 2014. Kennedy, in turn, transmitted to Mr. Watt the same email and the documents attached to it. *Id*.

745.    On October 9, 2014, Kennedy sent Mr. Watt two emails in which she transmitted the Company Agreement of Summer Winds Georgia, LLC, Ownership Certificates for Summer Winds Georgia, and the Initial Written Consent by the Members of Summer Winds Georgia, LLC, a Texas Limited Liability Company Reflecting Organizational Meeting, true and correct copies of which are attached to this Complaint as **Composite Exhibit 167**.

746.    According to the Company Agreement, the Initial Written Consent, and the ownership certificates, Hungry Otter and Lee Kennedy Investments owned 49% and 51% of the membership interests of Summer Winds Georgia, respectively. *Id*.

747.    Kennedy signed the Company Agreement, Ownership Certificates, and the Initial Written Consent on behalf of Hungry Otter, Lee Kennedy Investments, and Summer Winds Georgia. **Ex. 167.** Kennedy signed the Company Agreement, Ownership Certificates, and the Initial Written Consent as the Member of Hungry Otter. *Id*. She signed the documents as the

Managing Member of LFK GP, as the General Partner of Lee Kennedy Investments. *Id.* Kennedy signed the Ownership Certificates as the Manager of Summer Winds Georgia. *Id.*

748.     When Kennedy transmitted the Company Agreement, Initial Written Consent, and Ownership Certificates, Summer Winds Georgia did not exist.

### 3.     The Kennedy Enterprise tricked Thomasville into making a million-dollar loan to a company that did not exist.

749.     On November 14, 2014, Summerwind Townhomes conveyed its 22 townhomes in Hall County, Georgia, to Summer Winds Georgia by Warranty Deed dated as of November 14, 2014, and recorded in Deed Book 7461, Page 138, of the Office of the Clerk of the Superior Court of Hall County, Georgia.

750.     On November 14, 2014 – **before** Summer Winds Georgia was formed or organized – Thomasville made Loan No. 1023736 to Summer Winds Georgia, (i) evidenced by that certain Universal Note in the original principal amount $1,057,081.40; (ii) secured by that certain Deed to Secure Deed by Summer Winds Georgia, LLC, in favor of Thomasville, dated as of November 14, 2014, and recorded in Deed Book 7461, Page 138, of the Office of the Clerk of the Superior Court of Hall County, Georgia; and (iii) guaranteed by Kennedy pursuant to that certain Guaranty dated as of November 14, 2014, all of which are attached to this Complaint as **Composite Exhibit 168**.

751.     The Promissory Note expressed its terms from the first-person point of view. The Promissory Note provided as follows:

> **DEFINITIONS:** "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**Ex. 168-1**.

752.   Thus, according to the Promissory Note, the obligations expressed in the Promissory Note applied equally to the Borrower, Summer Winds Georgia, and to any guarantor, including Kennedy.

753.   The Promissory Note included among its terms default provisions as follows:

**DEFAULT:** I will be in default if any one or more of the following occur . . . (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; . . . (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided . . . .

*Id*.

754.   The Promissory Note also included representations and warranties regarding financial information, as follows:

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

*Id*.

755.   Kennedy signed the Promissory Note as the Manager of Summer Winds Georgia; however, at the time Kennedy signed the Promissory Note, Summer Winds Georgia did not exist.

756.   In the Deed to Secure Debt, Summer Winds Georgia granted Thomasville a security interest in the 22 townhouses. The Deed to Secure Debt provided as follows:

**Conveyance.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably grants, bargains, transfers, conveys and sells to Lender, with power of sale, the [Summerwind Townhomes].

**Ex. 168-2**, ¶ 2.

757.   In the Deed to Secure Debt, Summer Winds Georgia warranted its title to the Summerwind Townhomes as follows:

> **Warranty of Title.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, bargain, transfer, convey, and sell the Property to Lender, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

**Ex. 168-2**, ¶ 6.

758.   Kennedy signed the Deed to Secure Debt as the Manager of Summer Winds Georgia; however, at the time Kennedy signed the Deed to Secure Debt, Summer Winds Georgia did not exist.

759.   On November 14, 2014, Kennedy signed that certain Disbursement Authorization dated as of November 14, 2014, a true and correct copy of which is attached to this Complaint as **Exhibit 169**. In the Disbursement Authorization, Kennedy, as the Manager of Summer Winds Georgia, authorized and requested disbursements totaling $1,052,558.40 from Loan No. 1023736. **Ex. 169**.

760.   Kennedy signed the Disbursement Authorization as the Manager of Summer Winds Georgia; however, at the time Kennedy signed the Disbursement Authorization, Summer Winds Georgia did not exist.

761.   On November 14, 2014, McCollum, Rawlins, Cauley & Parrott, LLP, as agent for Old Republic National Title Insurance Company, issued Loan Policy of Title Insurance No. LX-10588133, a true and correct copy of which is attached ti this Complaint as **Exhibit 170**. Policy No. LX-10588133 specified that, as of November 14, 2014, title to the Summerwind Townhomes was vested in Summer Winds Georgia. **Ex. 170**.

762.   At the time McCollum, Rawlins, Cauley & Parrott, LLP, as agent for Old Republic, issued Policy No. LX-10588133, Summer Winds Georgia did not exist.

763.    By signing the Promissory Note, Deed to Secure Debt, and Disbursement Authorization as the Manager of a limited liability company that did not exist, Kennedy obligated herself for the liabilities of Summer Winds Georgia.[59]

764.    **Six days after Thomasville disbursed the proceeds of Loan No. 1023736**, on November 20, 2014, Attorney Childs organized Summer Winds Georgia as a Texas limited liability company by filing of its Certificate of Formation with the Secretary of the State of Texas, Filing No. 802104388, Document No. 579393820002, a true and correct copy of which is attached to this Complaint as **Exhibit 171**.

### 4.    The Kennedy Enterprise misrepresented Summer Wind Georgia's ownership and governance structure.

765.    After its formation, Summer Winds Georgia filed its annual Public Information Reports on April 13, 2015, February 16, 2016, and January 27, 2017, each of which Kennedy signed. In each of those reports, Kennedy identified herself as the manager of Summer Winds Georgia.

766.    On April 18, 2017, Summer Winds Georgia filed a Certificate of Amendment to amend its Certificate of Formation. According to Summer Winds Georgia's Certificate of Formation, Summer Winds Georgia was organized "for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code." In Summer Winds Georgia's Certificate of Amendment, Summer Winds Georgia's purpose was revised as follows:

> The Company's business and purpose shall consist solely of the acquisition, ownership, operation, maintenance and management of the following real

---

[59] Under Georgia law, "all persons purporting to act on behalf of a corporation, knowing there was no incorporation, are jointly and severally liability for all liabilities created while so acting." O.C.G.A. § 14-2-204.

property: (a) townhomes located on Summerwind Way Oakwood, GA and (b) townhomes located on Hidden Hollow Drive, Gainesville, GA, and such activities as are necessary, incidental or appropriate in connection therewith.

767.    Kennedy signed the Certificate of Amendment as Summer Winds Georgia's Manager. True and correct copies of Summer Winds Georgia's 2015, 2016, and 2017 Public Information Reports, and Summer Winds Georgia's Certificate of Amendment are attached to this Complaint as **Composite Exhibit 172**.

768.    According to the Company Agreement of Summer Winds Georgia, LLC, dated as of August 12, 2014, Lee Kennedy Investments and Hungry Otter were the members of Summer Winds Georgia. Lee Kennedy Investments owned 51%, and Hungry Otter owned 49%, of the membership interests in Summer Winds Georgia. **Ex. 167** at 13.

769.    On or about September 15, 2015, Summer Winds Georgia filed its 2014 Form 1065 tax return. Adkinson and the Leighton/Adkinson Firm prepared Summer Winds Georgia's 2014 return, and Adkinson and Kennedy both signed Summer Winds Georgia's 2014 return. According to Summer Winds Georgia's 2014 Form 1065, LK Freyer Investments – **NOT Lee Kennedy Investments** – owned 90% of the membership interests in Summer Winds Georgia, and Hungry Otter owned the remaining 10% of Summer Winds Georgia's membership interests.[60]

770.    Kennedy never notified Thomasville that Lee Kennedy Investments did not own any interests in Summer Winds Georgia, even though she had a duty to make such disclosure to Thomasville.

---

[60] In addition, Summer Winds Georgia's 2014 Form 1065 reflected Summer Winds Georgia's acquisition of the Summerwinds Townhomes for $1,217,932.00. Without explanation, Summer Winds Georgia's 2014 return included in Summer Winds Georgia's basis the Summerwinds Townhomes improvements in the amount of $41,352. Those improvements, however, were acquired by Summer Winds Georgia's predecessor in interest in June 2014, five months before Summer Winds Georgia was organized.

771.    Kennedy never notified Thomasville that LK Freyer Investments was the actual owner of a majority of the membership interests in Summer Winds Georgia, even though she had a duty to make such disclosure to Thomasville.

772.    Kennedy never notified Thomasville that Hungry Otter owned only 10% – not 49% – of the membership interests in Summer Winds Georgia, even though she had a duty to make such disclosure to Thomasville.

773.    In its efforts to close the loan from to Thomasville to Summer Winds Georgia, the Kennedy Enterprise committed numerous instances of bank fraud, wire fraud, and mail fraud.

**B.      *After defrauding Thomasville in 2014, the Kennedy Enterprise induced Thomasville into a $1,000,000 cash-out refi for the Pink House.***

774.    After Thomasville refinanced the Summerwinds Townhomes, the Kennedy Enterprise convinced Thomasville to loan $1,000,000.00 to Destin Holdings Trust.

775.    On October 2, 2015, Watt sent an email to Kennedy proposing general terms for a loan secured by the Pink House. A true and correct copy of Watt's October 2, 2015, email to Kennedy is attached to this Complaint as **Exhibit 173**. Watt wrote, "We could loan you 50% of the appraised value, up to $1,000,000.00. I need to do a global cash flow for our file, and would need to get copies of tax returns for the following entities. I also need an updated personal financial statement. . . ." **Ex. 173**. Watt requested copies of tax returns for Lee Kennedy Investments; LFK GP; Rockcliff Holdings; Rockcliff GP; Sealy Southtown, LLC; Sealy Uptown, LLC; Hungry Otter; Kennedy Five Acres Crestview, LLC; LK Freyer Investments; Summerwind Townhomes; Summer Winds Georgia; Georgia Lot Holdings, LLC; and Destin Holdings Trust. *Id*. Watt also requested copies of Kennedy's personal tax returns. *Id*.

776.    On October 26, 2015, Watt communicated by telephone and email with Mead employee Ms. Lisa Ward ("**Ms. Ward**"). A true and correct copy of Mr. Watt's October 26,

2015, to Ms. Ward is attached to this Complaint as **Exhibit 174**. In his October 26, 2015, email, Watt wrote:

> Nice talking with you. Thomasville National Bank plans to make a loan to Destin Holdings Trust, LLC in the amount of $1,000,000.00. The loan will be secured by 606 Gulf Shore Drive, Destin, FL. ***We would like for your firm to handle the title policy for us, as well as prepare a mortgage.*** The closing will likely be handled by mail. Lee McPherson is the owner of the LLC, and I have ccd her on this email. Please let me know what else you need from me. We will close whenever you are ready.

**Ex. 174** at 9 (emphasis added).

777.   On or about October 26, 2015, Mead, as agent for First American, issued that certain Commitment for Title Insurance bearing File No. 31774AT and an Effective Date of October 26, 2015, at 8:00 a.m. (the "**Thomasville Title Commitment**"). A true and correct copy of the Thomasville Title Commitment is attached to this Complaint as **Exhibit 175**. The Thomasville Title Commitment required, among other things, the "Payment, cancellation and satisfaction of record of mortgage in the original principal amount of $1,350,000.00, executed by Destin Holdings Trust, LLC in favor of Cherry Hills Capital Funding, LLc [sic], recorded August 2, 2013 in Book 3110, Page 613." *Id.*,  The Thomasville Title Commitment required the release of the DHT Mortgage. *Id.*

778.   On or about November 23, 2015, Ms. Townsend sent an email to Kennedy attaching a Mortgage Cancellation for execution by Harry Freyer. A true and correct copy of Ms. Townsend's November 23, 2015, email to Kennedy is attached to this Complaint as **Exhibit 176**. In her November 23, 2015, email, Ms. Townsend wrote:

> Attached is the Mortgage Cancellation for your father to sign. He must have it signed in the presence of a notary and the notary must sign and affix seal. If he could please email me a copy before he overnight the original back to me. I have also included the Fedex shipping label. I will need the original cancellation to record the day the file disburses.

**Ex. 176**.

779.     Attached to Ms. Townsend's email was a form of Mortgage Cancellation for execution by Harry Freyer. *Id*. Also attached was a Federal Express shipping label for Harry Freyer's use. **Ex. 176**.

780.     Shortly thereafter, Kennedy forwarded Ms. Townsend's November 23, 2015, email to Harry Freyer. *Id*. In her email to Harry Freyer, Kennedy wrote, "Dad, please sign and have the document scanned and emailed sent to me. Please overnight the original to Amy Townsend. Her address is below." *Id*.

781.     On or about November 24, 2015, Harry Freyer executed that certain Mortgage Cancellation dated as of November 24, 2015, and recorded on December 11, 2015, in Official Records Book 3227, Page 3616, in the Public Records of Okaloosa County, Florida, releasing and cancelling the DHT Mortgage. A true and correct copy of of the Mortgage Cancellation is attached to this Complaint as **Exhibit 177**. In his capacity as Managing Member of Cherry Hills, Harry Freyer signed the Mortgage Cancellation on behalf of "Cherry Hills Capital Funding, LLC, a Colorado Dissolved Limited Liability Company (in the process of winding up its affairs)." **Ex. 177**.

782.     Cherry Hills never dissolved. Its existence was forfeited because it failed to file its annual reports in 2014 and 2015. It had no affairs to "wind up" because it never had any business affairs. It never had any real assets. It never had any legal liabilities. It existed specifically to facilitate the Kennedy Enterprise's fraudulent schemes.

783.     On or about December 4, 2015, Thomasville made a loan to Destin Holdings Trust – then fully under Kennedy's control – in the amount of $1,000,000.00 (the "**Thomasville Loan**"). The Thomasville Loan was evidenced by that certain Promissory Note (the "**Thomasville Note**") in favor of Thomasville dated as of December 7, 2015, in the original

principal amount of $1,000,000.00 and secured by those certain (a) Mortgage and Security Agreement dated as of December 15, 2015, and recorded in Official Records Book 3227, Page 3618, in the Public records of Okaloosa County, Florida (the "**Thomasville Mortgage**"),  (b) Assignment of Rents and Leases, dated as of December 15, 2015, and recorded in Official Records Book 3227, Page 3627, in the Public records of Okaloosa County, Florida (the "**Thomasville Rent Assignment**"), (c) that certain Guaranty by Kennedy in favor of Thomasville, dated as of December 7, 2015. Kennedy executed the Thomasville Note, Thomasville Mortgage, and Thomasville Rent Assignment as the Manager of Destin Holdings Trust. Kennedy signed the Thomasville Mortgage and the Thomasville Rent Assignment in Austin, Travis County, Texas, on December 7, 2015. Texas notary Antonio Chivara notarized the Thomasville Mortgage and the Thomasville Rent Assignment.

784.    In addition, Kennedy signed several other instruments in connection with the Thomasville Loan, including (a) that certain "Affidavit," (b) that certain Affidavit of No Mortgages, and (c) that certain Affidavit of No Liens (together with the Thomasville Note, Thomasville Mortgage, and Thomas Rent Assignment, the "**Thomasville Documents**"). True and correct copies of the Thomasville Documents are attached to this Complaint as **Composite Exhibit 178**.

785.    Kennedy signed the "Affidavit" on or about November 30, 2015. The Affidavit recited:

> BEFORE ME, the undersigned authority, personally appeared Lee F McPherson fka Lee F Kennedy, ("Affiant") who being by me first duly sworn, on oath deposes and says that:
>
> 1.    The Affiant is the Manager of Destin Holdings Trust LLC, a Florida limited liability company.
>
> *        *        *

5.      This affidavit is given to induce First American Title Insurance Company to issue its title policy and Mead Law Firm to complete the contemplated transaction.

**Ex. 178-4**. Texas notary Corey Petty notarized Kennedy's Affidavit on November 30, 2015.[61] *Id*.

786.    On or about November 27, 2015, Kennedy signed that certain Affidavit of No Mortgages, which recited:

> BEFORE ME, the undersigned authority, did personally appear Destin Holdings Trust LLC, a Florida limited liability company ("Affiant"), who after first being duly sworn by me, did depose(s) and say(s):
>
> 1.      That I/we am/are the Owner(s) of the following described property located in Okaloosa County, Florida, to wit: [the Pink House] . . .
>
> 2.      THERE ARE NO MORTGAGES OR OTHER LIENS, WHETHER RECORDED OR UNRECORDED, AGAINST THE PROPERTY DESCRIBED IN PARAGRAPH 1 ABOVE.
>
> 3.      That this Affidavit is being made for the purpose of inducing the lender Thomasville National Bank to make a mortgage and First American Title Insurance Company, through its policy issuing agent, Mead Law Firm, to issue a policy or policies of Title Insurance covering the premises described in Paragraph I above.

**Ex. 178-5**.

787.    Kennedy signed the Affidavit of No Mortgages as the Manager of Destin Holdings Trust. *Id*.

788.    Texas notary Corey M. Petty notarized the Affidavit of No Mortgages on November 27, 2015.[62] *Id*. On information and belief, Kennedy witnessed her own signature on the Affidavit of No Mortgages.

---

[61] On or about December 7, 2015, Kennedy signed a virtually identical Affidavit (the "**Second Affidavit**") related to the exact same transaction. Texas notary Antonio Chavira notarized the Second Affidavit on December 7, 2015.
[62] On or about December 7, 2015, Kennedy signed a virtually identical Affidavit of No Mortgages related to the exact same transaction. Texas notary Antonio Chavira notarized and witnessed the December 7, 2015, Affidavit of No Mortgages.

789.     Kennedy also executed that certain Affidavit of No Liens in connection with the

Thomasville Loan. *Id*. In the Affidavit of No Liens, Kennedy attested, as Manager of Destin

Holdings Trust, as follows:

> BEFORE ME, the undersigned authority, did personally appear Destin Holdings Trust LLC, a Florida limited liability company ("Affiant"), who after first being duly sworn by me, did depose(s) and say(s):
>
> 1.     Affiant is the Owner of the following described property located in Okaloosa County, Florida, to wit: [the Pink House] . . .
>
> 2.     That there are no recorded or unrecorded liens, unpaid judgments or decree entered in any court of this State or of the United States against the Affiants, mechanics liens or other encumbrances of any nature and description whatsoever outstanding against the Affiant(s) which might attach against the property as a lien.
>
> \*          \*          \*
>
> 4.     That there are no matters pending against the undersigned Affiants that could give rise to a lien that would attach to the property between the date of closing and the recording of the interest to be insured.
>
> \*          \*          \*
>
> 6.     That this Affidavit is being made for the purpose of inducing the lender Thomasville National Bank to make a mortgage and First American Title Insurance Company, through its policy issuing agent, Mead Law Firm, to issue a policy or policies of Title Insurance covering the premises described in Paragraph 1 above. . . .

**Ex. 178-6**.

790.     Kennedy signed the Affidavit of No Liens on or about November 27, 2017. *Id*.

Texas notary Corey M. Petty notarized the Affidavit of No Liens on November 27, 2015. *Id*. On

information and belief, Kennedy witnessed her own signature on the Affidavit of No Liens.

791.     On or about December 7, 2015, Mead closed the Thomasville Loan. That day,

Thomasville disbursed $985,636.72 to Lee Kennedy Investments' account ending in 1203 at

UBS AG (ABA routing number 026007993) in New York.

792.    At the time his firm prepared the documents to consummate the Thomasville Loan, Mead had actual knowledge of the Amended Final Judgment and the Florida Charging Orders because Mead represented Kennedy in the Florida Charging Order Case. As explained, *supra*, Mead filed a Notice of Appearance on Kennedy's behalf in the Florida Charging Order Case on October 16, 2014, and Mead appeared at the hearing on HCB's Motion for Charging Orders on October 17, 2014, more than one year before closing the Thomasville Loan.

793.    Mead failed to disclose to Thomasville his actual knowledge of the Amended Final Judgment Judgment and the Florida Charging Orders.

794.    Mead failed to disclose to First American his actual knowledge of the Amended Final Judgment Judgment and the Florida Charging Orders.

795.    On or about December 11, 2015, Mead, as agent for First American, issued Loan Policy of Title Insurance No. 5011312-0394249e (the "**Thomasville Title Policy**"), to Thomasville, insuring its security interest in the Pink House. A true and correct copy of the Thomasville Title Policy is attached to this Complaint as **Exhibit 179**.

796.    On or about January 5, 2016, Mead sent a letter to Thomasville enclosing the recorded Thomasville Mortgage, Thomasville Rents Assignment, and Affidavit. Mead's January 5, 2016, letter Thomasville also enclosed the Thomasville Title Policy. A true and correct copy of Mead's January 5, 2016, letter to Thomasville is attached to this Complaint as **Exhibit 180**.

797.    By inducing Thomasville to make the Thomasville Loan, the Kennedy Enterprise cashed-out $1,000,000 of equity and encumbered the Pink House. The Kennedy Enterprise further clouded title to the Pink House in an effort to prevent HCB from using the Pink House as a source of collection of the HCB Judgment. The Kennedy Enterprise undertook such actions with the actual intent to defraud Thomasville and to hinder, delay, and defraud HCB in its efforts

to enforce the HCB Judgment. In so doing, the Kennedy Enterprise committed, at a minimum, bank fraud and wire fraud.

## VII. *The Kennedy Enterprise has for years employed BK II as one of the devices of its fraudulent schemes against Attorney's Title Insurance Fund and HCB.*

798.   BK II was organized on August 6, 2004, by the filing of BK II's Electronic Articles of Organization for Florida Limited Liability Company with the Florida Secretary of State.

799.   According to BK II's Articles or Organization, the original managing members of BK II were Paul Broadhead and Lee Kennedy. Upon formation of BK II, Paul Broadhead owned 45% of the membership interests of BK II, and Kennedy owned 55% of the membership interests of BK II.

800.   At some point between August 6, 2004, and November 16, 2006, BK II was administratively dissolved because it failed to file its 2005 Annual Report. BK II did nothing to resolve its administrative dissolution until 2013.

801.   On March 15, 2013, BK II filed its Limited Liability Company Reinstatement with the Florida Secretary of State. In its Limited Liability Company Reinstatement, BK II represented that **Kennedy was its managing member**, and Kennedy signed BK II's 2013 Limited Liability Company Reinstatement.

802.   In 2014 and 2015, in BK II's annual reports filed with the Florida Secretary of State, BK II continued representing that **Kennedy was the managing member of BK II**. True and correct copies of BK II's Articles of Organization, 2013 Limited Liability Company Reinstatement, and 2014 and 2015 Annual Reports are attached to this Complaint as **Composite Exhibit 181**.

803.    In 2006, BK II acquired certain real property situated in Destin, Okaloosa County, Florida, more particularly described in that certain Assignment of Lease dated as of August 30, 2006, and recorded in Official Records Book 2732, Page 0334, of the public records of Okaloosa County, Florida, and commonly known as "**Parcel C**."

804.    When BK II acquired Parcel C, BK II purchased an Owner's Policy of Title Insurance insuring title to Parcel C. On September 7, 2004, Chris Cadenhead, as agent for Attorney's Title Insurance Fund, Inc. ("**ATIF**"), issued a title commitment bearing Fund File Number: 43-2004-1597-A (the "**Parcel C Commitment**"). While specifically addressing several instruments of public record as "exceptions" under Schedule B-2, the Parcel C Commitment made no reference to that certain Easement Deed (the "**Spoils Easement**") in favor of the U.S. Army Corps of Engineers recorded in Official Records Book 705, Page 533, of the Public Records of Okaloosa County, Florida.

805.    On August 30, 2006, Chris Cadenhead, as agent for ATIF, issued Owner's Policy of Title Insurance No. OPM2936063 (the "**ATIF Policy**"), insuring BK II's interest in and to Parcel C.

806.    The ATIF Policy did not except from coverage the Spoils Easement. In fact, the ATIF Policy made no reference at all to the Spoils Easement.

### A.    *The Kennedy Enterprise asserted a fraudulent title claim against ATIF by fraudulently concealing Kennedy's actual knowledge of the Spoils Easement.*

807.    On or about October 26, 2010, six years after BK II acquired Parcel C, Kennedy contacted ATIF to initiate the claims procedure under the ATIF Policy.

808.    On October 26, 2010, at 2:15 p.m., Mr. Ford MacConnell, a Claims manager at ATIF, sent Kennedy an email regarding the title claims procedure under the ATIF Policy. On October 26, 2010, at 5:39 p.m., Kennedy sent a reply email to Mr. Ford MacConnell in which

she wrote, "Please find the attached title policy for BK Properties. It has come to my attention that there is an easement. Can you please research this and let me know." Then, on October 27, at 9:10 a.m., Mr. Ford MacConnell at ATIF sent an email to Ms. Vilma Fitzgerald, also at ATIF, to open a new claims file under the ATIF Policy. True and correct copies of the October 26, 2010, and October 27, 2010, emails are attached to this Complaint as **Exhibit 182**.

809.    ATIF later denied BK II's claim under the ATIF Policy.

810.    On or about June 22, 2012, BK II filed suit against ATIF in that certain civil action styled *BK Properties II, LLC v. Attorney's Title Insurance Fund, Inc.*, Circuit Court of Okaloosa County, Florida, Case No. 2012 CA 002842 F (the "**BK II Case**").

811.    In the BK II Case, BK II alleged that it was entitled to money damages resulting from ATIF's failure to identify the Spoils Easement, resulting in severe diminution of the value of Parcel C and triggering coverage for loss or diminution of value.

812.    From the initial claims process through the trial of the BK II Case, the Kennedy Enterprise perpetrated a fraud on ATIF and Old Republic lasting several years.

813.    Kennedy failed to disclose and intentionally misrepresented that prior to issuance of the ATIF Policy, she possessed actual knowledge of the existence of the Spoils Easement. Kennedy's knowledge of the Spoils Easement excepted the Spoils Easement from coverage under the ATIF Policy.

814.    In 2009, Kennedy disclosed her knowledge of the Spoils Easement to Aviva Life and Annuity Company ("**Aviva**") when she applied for life insurance in 2009. On June 8, 2009, Kennedy submitted to Aviva a Statement of Net Worth as of December 31, 2008 ("**Kennedy's 2008 PFS**"). A true and correct copy of Kennedy's 2008 PFS is attached to this Complaint as **Exhibit 183**.

815.    In Kennedy's 2008 PFS, Kennedy represented that Parcel C was worth $1,000,000.00. Kennedy's representation of Parcel C's value was qualified by Note 1 to Kennedy's 2008 PFS, which read, "Subject to easement by Army Core [sic] Engineers." **Ex. 183**.

816.    Kennedy's 2008 PFS demonstrates that as of December 31, 2008, Kennedy had actual knowledge of the Spoils Easement burdening Parcel C years before BK II made a claim under the ATIF Policy and filed suit against ATIF in 2012.

817.    Kennedy either denied knowledge of the Spoils Easement or failed to disclose her knowledge of the Spoils Easement in connection with her claims against ATIF.

### B.    *In 2015, the BK II Case went to trial, and the Kennedy Enterprise fraudulently transferred the Title Judgment Proceeds to the Babette Trust and LK Freyer Investments.*

818.    After several years of litigation, on or about September 28, 2015, the BK II Case went to trial. On or about October 2, 2015, a jury returned a verdict in favor of BK II and against ATIF.

819.    On March 17, 2016, the court in the BK II Case entered a Final Judgment (the "**Title Judgment**") in favor of BK II and against ATIF. A certified copy of the Title Judgment was recorded on March 21, 2016, in Official Records Book 3240, Page 979, of the Public Records of Okaloosa County, Florida, and is attached to this Complaint as **Exhibit 184**.

820.    In the Title Judgment, the court awarded $1,466,774.60 to BK II, as follows: (a) policy limits under the title policy of $1,000,000.00; (b) prejudgment interest in the amount of $270,161.30; (c) attorney's fees in the amount of $177,269.75; and (d) costs and expenses in the amount $19,343.61 (collectively, the "**Title Judgment Proceeds**"). **Ex. 184**.

821.    Neither BK II nor ATIF appealed from the Title Judgment.

822.    On March 18, 2016, at 1:38 p.m. EDT, ATIF's counsel and counsel for Old Republic National Title Insurance Company ("**Old Republic**"), ATIF's successor-in-interest,[63] sent an email to BK II's counsel, Litvak, Beasley & Wilson (the "**Litvak Firm**"), notifying BK II's counsel that ATIF intended to satisfy the BK II Judgment. A true and correct copy of the March 18, 2016, email is attached to this Complaint as **Exhibit 185**. In response, the Litvak Firm transmitted its incoming wire transfer instructions to Old Republic's counsel by email dated as March 22, 2016, at 4:20 p.m. EDT **Ex. 185** at 4.

823.    On March 23, 2016, at 10:58 a.m., Kennedy sent an email to the Litvak Firm in which she gave directions to the Litvak Firm regarding disbursement of the proceeds received from Old Republic. A true and correct copy of Kennedy's March 23, 2016, email to the Litvak Firm is attached to this Complaint as **Exhibit 186**. Kennedy addressed her March 23, 2016, email also to Ms. Decarlo at UBS AG.

824.    Several hours later, at 2:05 p.m. EDT, the Litvak Firm replied to Kennedy's 10:58 a.m. email as follows: "As of now we have not received the funds. Once received we will communicate the amount received and you can direct the distribution of funds." A true and correct copy of the Litvak Firm's March 23, 2016, email to Kennedy is attached to this Complaint as **Exhibit 187**.

825.    Also on March 23, 2016, at 3:37 p.m. EDT, the Litvak Firm sent another email to ATIF's counsel requesting confirmation upon transmission of the judgment proceeds. **Ex. 185** at 1.

---

[63] On March 2, 2017, ATIF filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in that certain case styled *In re: Attorney's Title Insurance Fund, Inc.*, United States Bankruptcy Court for the Middle District of Florida, Case No. 9:2017bk01712.

826.    On or about March 23, 2016, Old Republic, as successor to ATIF, satisfied the Title Judgment.

827.    That day, at 3:54 p.m. EDT, Old Republic sent $1,468,110.76 to BK II's counsel by interstate wire transfer. Old Republic made the transfer from its account at Wells Fargo (ABA routing number 121000248) in California to the Litvak Firm's account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606), in Georgia.

828.    On March 23, 2016, at 8:07 p.m. EDT, ATIF's counsel sent an email to the Litvak Firm confirming that the transfer of the judgment proceeds occurred earlier that afternoon. A true and correct copy of ATIF's counsel's March 23, 2016, to the Litvak Firm is attached to this Complaint as *Id*.

829.    The following day, at Kennedy's instruction, the Litvak Firm sent the Title Judgment Proceeds to the Babette Trust and LK Freyer Investments by interstate wire transfer.

830.    With actual knowledge of the HCB Judgment, the Florida Charging Orders, and the Hyperion Liens, on March 24, 2016 (the day after receiving the money), Kennedy caused the Litvak Firm to send $1,270,161.30 to the **Babette Trust** by interstate wire transfer. The Litvak Firm made the interstate wire transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606), in Georgia, to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York.

831.    With actual knowledge of the HCB Judgment, the Florida Charging Orders, the Hyperion Judgments, and the Hyperion Charging Orders, on March 24, 2016 (the day after receiving the money), Kennedy caused the Litvak Firm to send $173,381.86 to **LK Freyer Investments** by interstate wire transfer. The Litvak Firm made the transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606), in

Georgia to LK Freyer Investments' account ending in 1202 at UBS AG (ABA routing number 026007993) in New York.

832.    The Kennedy Enterprise fraudulently transferred the BK Judgment Proceeds to the Babette Trust and to LK Freyer Investments to deprive HCB of its rights under the HCB Judgment and the Florida Charging Orders. In executing its scheme, the Kennedy Enterprise committed no fewer than nine separate acts of federal wire fraud.

### C.    *The Kennedy Enterprise liquidated BK II and sequestered the sale proceeds in a new deposit account, again shielding Kennedy from HCB's collection efforts.*

833.    After fraudulently obtaining the BK II Judgment, the Kennedy Enterprise liquidated BK II and deposited the proceeds into a new bank account with the actual intent to hinder, delay, or defraud HCB in its collection efforts.

834.    On April 19, 2018, BK II entered into that certain Vacant Land Contract between "BK Properties II, w/Lee McPherson as Manager," as Seller, and Mr. Ira D. Pruitt ("**Mr. Pruitt**"), as Buyer, dated as of April 20, 2018. A true and correct copy of the Vacant Land Contract is attached to this Complaint as **Exhibit 188**. Pursuant to the Vacant Land Contract, BK II agreed to sell Parcel C to Pruitt for $218.000.00. **Ex. 188**. Kennedy signed the Vacant Land Contract on April 19, 2018, as the Manager of BK II. *Id*. Mr. Pruitt signed the Vacant Land Contract on April 20, 2018. *Id*. The Vacant Land Contract required Mr. Pruitt to deposit $5,000.00 of earnest money with the Escrow Agent, Mead, within three days after the Effective Date, which was April 20, 2018.

835.    On April 20, 2018, Ms. Zina N. Pruitt (Mr. Pruitt's wife) sent the $5,000.00 earnest money deposit directly to LK Freyer Investments by interstate wire transfer. Ms. Pruitt made the transfer from her account at Regions Bank (ABA routing number 062005690) in

Alabama to LK Freyer Investments' account ending in 2702 at JPMC (ABA routing number 114000776).

836.   On   April   20,   2018,   real   estate   agent   Mr.   Dennis   Fortenberry ("**Mr. Fortenberry**") sent the Vacant Land Contract to Mead employee Ms. Amy Townsend ("**Ms. Townsend**") by email. A true and correct copy of Mr. Fortenberry's April 20, 2018, email is attached to this Complaint as **Exhibit 189**.

837.   In his email, Mr. Fortenberry wrote:

Good morning! Please find a executed contract known as Parcel C on Holiday Isle overlooking the East Pass in Destin,FL. The seller is Lee McPherson of BK II II, LLC, and the buyer is IRA D Pruitt who has a home fronting Gulf Shore Drive and connects to the north Boundary Line of Parcel C (see enclosed pic). The deal points are as follows:

PP: $218,000
EMD: $5,000 ( was sent to the seller this morning)
Balance to Close: $213,000
Closing date: Both parties would like to close upon the completion of title work not to exceed April 30, 2018.
Brokers: NBI Properties, Inc - 2% of PP
The Reality Firm (Anita Williams Broker) 2%

**Ex. 189**.

838.   On April 26, 2018, Mr. Pruitt sent an email to Mead employee Ms. Townsend, indicating his intention to wire money to Mead to fund the purchase price of Parcel C. A true and correct copy of Mr. Pruitt's April 26, 2018, email is attached to this Complaint as **Exhibit 190**.

839.   On April 27, 2018, at 3:06 p.m. CDT, prior to executing any closing documents, Pruitt sent $213,000.00 to Mead by interstate wire transfer. Mr. Pruitt made the transfer from his account at Sweet Water State Bank (ABA routing number 062104290) in Sweet Water, Alabama, through Bryant Bank (ABA routing number 062206512) in Birmingham, Alabama, to Mead's account ending in 7784 at Smartbank (ABA routing number 064209216) in Tennessee.

840.    On April 27, 2018, at 3:07 p.m. CDT, Smartbank sent an email to Mead confirming receipt of the $213,000.00 wire transfer from Mr. Pruitt. A true and correct copy of Smartbank's email to Mead is attached to this Complaint as **Exhibit 191**.

841.    On April 30, 2018, at 10:45 a.m., Kennedy sent an email to Defendant Anita Williams, Ms. Townsend, Mr. Fortenberry, and Mr. Pruitt asking about the status of the closing on Parcel C. A true and correct copy of Kennedy's April 30, 2018, email is attached to this Complaint as **Exhibit 192**. Anita Williams replied by email at 10:53 a.m. the same day, writing "I reached out on Friday to Amy but haven't heard anything." **Ex. 192**.

842.    On May 1, 2018, at 2:17 p.m., Kennedy sent an email to Mr. Pruitt, Mr. Fortenberry, Ms. Townsend, and Anita Williams asking that copies of the conveyance documents for Parcel C be sent by email. A true and correct copy of Kennedy's 2:17 p.m., May 1, 2018, email is attached to this Complaint as **Exhibit 193**. Kennedy wrote, "Amy, can we get the docs via email today? It should be easy as there are no banks. Just need to sign the deed and hud." **Ex. 193**.

843.    On May 2, 2018, at 10:51 a.m., Ms. Townsend replied to Kennedy's 2:17 p.m., May 1, 2018, email as follows: "Here is the HUD for your review. I will send additional docs as soon as I receive approval." **Ex. 193**. Attached to Ms. Townsend's email was a file in portable document format (".pdf") entitled "HUD Settlement Statement for 35361AT.PDF." *Id.*

844.    On May 2, 2018, at 1:05 p.m., Ms. Townsend sent Kennedy another email that read, "Attached please find the closing documents for your review and signature. Please make sure you sign the deed in the presence of notary and two separate witnesses (instructions are attached). Several documents need to be notarized as well." A true and correct copy of Ms. Townsend's 1:05 p.m., May 2, 2018, email is attached to this Complaint as **Exhibit 194**.

Attached to Ms. Townsend's May 2, 2018, email was a .pdf file named "20180502130944176.pdf." *Id*. From all that appears, 20180502130944176.pdf contained the following closing documents for Kennedy's execution:

      a.    Interim Tax Agreement Certification/Compliance Agreement;

      b.    Affidavit (the "**BK Owner's Affidavit**") containing representations required to delete the so-called "Standard Exceptions" from the owner's policy of title insurance to be issued to the buyers;

      c.    Affidavit of No Mortgages;

      d.    Affidavit (the "**Authority Affidavit**") related to BK II's existence and authority to sell Parcel C;

      e.    Limited Liability Company Resolution;

      f.    Warranty Deed by BK Properties II, LLC, to Ira D. Pruitt, Jr., and Zina N. Pruitt, husband and wife, dated as of May 2, 2018; and

      g.    Net Proceeds Directive.

845.    Mead prepared and/or approved all of the closing documents for execution by Kennedy, Mr. Pruitt, and Ms. Pruitt.

846.    Then, on May 2, 2018, at 1:31 p.m. CDT, Mr. Pruitt caused P-Arrow Hunting Preserve, L.L.C., to transfer $1,158.55 to Mead by interstate wire transfer. P-Arrow Hunting Preserve, L.L.C., made the transfer from its account at Regions Bank (ABA routing number 062005690) in Alabama to Mead's account ending in 7784 at Smartbank (ABA routing number 064209216) in Tennessee.

847.    At the time Mead received interstate wire transfers from Mr. Pruitt and P-Arrow Hunting Preserve, L.L.C., Mead had actual knowledge of the Florida Charging Orders.

848.    On May 2, 2018, Kennedy signed the Affidavit of No Mortgages; the Authority Affidavit; the Limited Liability Company Resolution ratifying the sale of Parcel C; and the BK Owner's Affidavit. Texas notary public Corey M. Petty notarized the Affidavit of No Mortgages, Authority Affidavit, Limited Liability Company Resolution, and BK Owner's Affidavit, true and correct copies of which are attached to this Complaint as **Composite Exhibit 195**, for Kennedy in Travis County, Texas, on May 2, 2018.

849.    On May 2, 2018, Kennedy also executed the HUD-1 Settlement Statement memorializing the receipt and disbursement of funds related to the sale of Parcel C. **Ex. 195**. Kennedy signed the May 2, 2018, HUD-1 Settlement Statement as the Manager of LK Freyer Investments. *Id*. According to the May 2, 2018, HUD-1 Settlement Statement, BK II received from the sale of Parcel C net proceeds in the amount of $202,094.05, not including the $5,000.00 previously wired to LK Freyer Investments. *Id*.

850.    Kennedy also signed the Warranty Deed (the "**Unwitnessed Warranty Deed**"), and Texas notary public Corey M. Petty notarized the Warranty Deed on May 2, 2018, in Travis County, Texas. The Warranty Deed was not witnessed at the time it was notarized.

851.    Oddly enough, Kennedy signed another Warranty Deed on May 2, 2018. That day, Kennedy executed that certain Warranty Deed the ("**Recorded Warranty Deed**") dated as of May 2, 2018, and recorded in Official Records Book 3349, Page 1660, of the Public Records of Okaloosa County, Florida, conveying Parcel C to Ira D. Pruitt and Zina N. Pruitt, husband and wife. True and correct copies of the Unwitnessed Warranty Deed and the Recorded Warranty Deed are attached to this Complaint as **Composite Exhibit 196**.

852.    Kennedy signed the Recorded Warranty Deed as the Manager of LK Freyer Investments, as the Manager of BK II. **Ex. 196**.

853.    Beary, Kennedy's lawyer and business partner in New Orleans, Louisiana, notarized the Recorded Warranty Deed for Kennedy in Orleans Parish, Louisiana.[64] *Id*.

854.    Page Beary, another one of Kennedy's business partners, witnessed Kennedy's signature on the Recorded Warranty Deed. *Id*.

855.    Page Beary is Beary's wife.

856.    On May 3, 2018, at 9:27 a.m., Federal Express delivered Kennedy's executed original copies of the closing documents for the sale of Parcel C to Mead.

857.    On May 4, 2018, Mead disbursed the proceeds of the transactions in accordance with the HUD-1 Settlement Statement.

858.    Upon closing the sale of Parcel C, Mead issued Check No. 003329 dated May 4, 2018, to BK II. A true and correct copy of Check No. 003329 is attached to this Complaint as **Exhibit 197**. Check No. 003329 was drawn on Mead's account ending in 7784 at SmartBank (ABA routing number 064209216) in Tennessee. **Ex. 197**. At the time Mead issued Check No. 003329 to BK II, Mead had actual knowledge of the Florida Charging Orders.

859.    On information and belief, on or about May 4, 2018, Mead sent Check No. 003329 to Kennedy by United States mail. Days later, on May 14, 2018, Kennedy caused BK II to open a new Chase Total Business Checking Account ending in 5563 at JPMC.

860.    On May 14, 2018, Kennedy indorsed Check No. 003329 and negotiated Check No. 003329 at JPMCwhen she deposited Check No. 003329 into BK II's account ending 5563.

861.    On June 1, 2018, Mead sent a letter to Pruitt by United States mail. Mead's June 1, 2018, letter to Pruitt transmitted the Owner's Policy of Title Insurance No. 5011412-

---

[64] *See supra* Part I.D.

0537480e issued by First American Title Insurance Company and dated as of May 8, 2018, at

2:40 p.m., and "recorded documents," including the Recorded Warranty Deed.

### D.   *The Kennedy Enterprise defrauded Pruitt, First American, and HCB in connection with sale of Parcel C.*

862.    Except for the notary acknowledgment and witnesses, the Recorded Warranty

Deed and the Unwitnessed Warranty Deed are identical. **Ex. 197**.

863.    No reasonable justification explains why Kennedy signed the Unwitnessed

Warranty Deed before Texas notary Corey M. Petty and did not have the document witnessed at

that time. After all, Texas notary public Corey M. Petty and two witnesses signed the Affidavit

of No Mortgages.

864.    On information and belief, after receiving copies of the Parcel C closing

documents from Mead employee Ms. Townsend at 2:54 p.m. on May 2, 2018, Kennedy printed

and signed the closing documents, except the Warranty Deed, in front of a notary public and two

witnesses at Federal Express, where (on information and belief) Texas notary Corey M. Petty is

employed. Then, on information and belief, Kennedy travelled from Travis County, Texas, to

Orleans Parish, Louisiana, where she signed the Recorded Warranty Deed. The second signing

appears to have occurred in front of Beary, because he notarized the Warranty Deed, and two

witnesses, including Page Beary. Then, Kennedy appears to have shipped the closing documents

by Federal Express to Mead in Ft. Walton Beach, Florida, for delivery by Federal Express at

9:27 a.m. on May 3, 2018.

865.    Beyond what appears to be the fraudulent execution and delivery of the Recorded

Warranty Deed, the Kennedy Enterprise defrauded First American, Mr. Pruitt, and Ms. Pruitt in

the Owner's Affidavit and the Limited Liability Company Resolution, both of which were

prepared and/or approved by Mead.

866.    On May 2, 2018, when Kennedy executed the Owner's Affidavit, Kennedy represented that "Affiant [Kennedy] is the Manager of BK Properties II, a corporation existing under the laws of the State of Florida . . . ." **Ex. 195**.

867.    Kennedy also represented in the Owner's Affidavit on May 2, 2018, that "No judgment or decree has been entered in any court of this State or the United States against Affiant [Kennedy] which remains unsatisfied." *Id*.

868.    In the Owner's Affidavit, Kennedy attested as follows:

Affiant is familiar with the nature of an oath, and with the penalties as provided by the laws of the State aforesaid for falsely swearing to statements made in an instrument of this nature. Affiant further certifies that he has read or heard read to him this affidavit, and understands its context.

*Id*.

869.    Kennedy's representations in Paragraph 1 of the Owner's Affidavit were false, and Kennedy knew her representations were false. Mead also knew Kennedy's representations in Paragraph 1 of the Owner's Affidavit were false, and Mead suborned Kennedy's false representations.

870.    Kennedy was not the manager of BK II at the time she signed the Owner's Affidavit. Kennedy represented **under oath** at least three times on May 2, 2018, that she was the manager of LK Freyer Investments, and LK Freyer Investments was the manager of BK II.

871.    Kennedy's representations in Paragraph 10 of the Owner's Affidavit were false, and Kennedy knew her representations were false. Mead also knew Kennedy's representations in Paragraph 10 of the Owner's Affidavit were false, and Mead suborned Kennedy's false representations.

872.    When HCB secured the Florida Charging Orders, including its charging order against BK II, Mead represented Kennedy in the Florida Charging Order Case. Kennedy and

Mead both appeared on multiple occasions in those proceedings, and both Kennedy and Mead had actual knowledge of the HCB Judgment and the Florida Charging Orders.

873.    Thus, Kennedy again blatantly and intentionally misrepresented whether there were any unsatisfied judgments against her. This time, though, Mead actively engaged in that fraud:

a.    Mead requested and signed the Parcel C Title Commitment on April 23, 2018;

b.    Mead prepared and/or approved the affidavits, resolution, Warranty Deed, and HUD-1 Settlement Statement the parties executed when consummating the sale of Parcel C;

c.    Mead issued Policy No. 5011412-0537480e to Mr. Pruitt and Ms. Pruitt after the closing with actual knowledge of the HCB Judgment and the Florida Charging Order against BK II; and

d.    Mead was the escrow and disbursing agent who collected the purchase price from Mr. Pruitt and then disbursed the sale proceeds with actual knowledge of the pervasiveness of misrepresentations in the closing documents Kennedy executed.

874.    In addition, in the Limited Liability Company Resolution dated May 2, 2018, Kennedy represented under oath the she was the sole member of LK Freyer Investments, as the Manager of BK II. **Ex. 195**.

875.    Kennedy's representations in the Limited Liability Company Resolution were false, and Kennedy knew her representations were false. Mead also knew Kennedy's representations in the Limited Liability Company Resolution were false, and Mead suborned Kennedy's false representations.

876.   In her May 13, 2016, Supplemental Responses, Kennedy represented to HCB under oath that LKF Investments-Texas, the Babette Trust, and CWK owned all of the membership interests of LK Freyer Investments. **Ex. 12**.

> ### E.   *The Kennedy Enterprise generated more than $1,600,000.00 in fraudulently derived income through BK II.*

877.   In the scheme to defraud ATIF, Old Republic, First American, Pruitt, and HCB, the Kennedy Enterprise collected $1,680,755.31.[65]

878.   In 2016, BK Properties II collected $1,468,110.76 from the Title Judgment.

879.   Separately, in 2018, LK Freyer Investments received $5,000.00 directly from Mrs. Pruitt as a deposit for the sale of Parcel C.

880.   In 2018, BK Properties II collected $202,094.05 from the sale of Parcel C.

881.   For her role as the Kennedy Enterprise's real estate conduit in Florida, Anita Williams received a commission of $4,360.00 just 14 days after Kennedy and Pruitt executed the Vacant Land Contract.

882.   Mead collected fees and title insurance premiums in the amount for $1,190.50 for shepherding the fraudulent sale of Parcel C through its closing.

883.   In its efforts to monetize the unusable Parcel C, the Kennedy Enterprise committed multiple acts of mail fraud and wire fraud under federal law.

---

[65] In LK Freyer Investments' Form 1065 tax return for tax year 2016, LK Fryeer Investments reported that it sold Parcel C in 2016 for $1,791,774, and LK Freyer Investments claimed it benefited from $552,641 in long-term capital gain. Kennedy and LK Freyer Investments misrepresented both the nature of the gain and the recipient of the proceeds.

**VIII.   *In 2015, the Kennedy Enterprise defrauded First Florida and HCB with Fountain Square's "cash out" financing.***

884.   After successfully defrauding Wells Fargo in 2013, the Kennedy Enterprise engaged in fraudulent schemes against other lenders. In 2015, the Kennedy Enterprise defrauded First Florida.[66]

**A.    *The Kennedy Enterprise formed Fountain Square to convert its liquid assets into real estate by purchasing the Fountain Square Shopping Center in Ft. Walton Beach, Florida.***

885.   Fountain Square is a Texas limited liability company. Attorney Childs formed Fountain Square on July 21, 2014, by filing Fountain Square's Certificate of Formation of Limited Liability Company with the Texas Secretary of the State, Filing No. 802030335, Document No. 554493150002. Kennedy is the registered agent and the manager of Fountain Square. True and correct copies of Fountain Square's Certificate of Formation and Public Information Reports are attached to this Complaint as **Composite Exhibit 198**.

886.   On or about July 14, 2014, one week before Fountain Square's formation, Lee Kennedy Investments and Freyer Investments entered into that certain Company Agreement of Fountain Square FWB Holdings, LLC, a Texas Limited Liability Company. A true and correct copy of Fountain Square's Company Agreement is attached to this Complaint as **Exhibit 199**. According to Fountain Square's Company Agreement, Fountain Square issued 100 membership units – 10 units to Freyer Investments and 90 units Lee Kennedy Investments. **Ex. 199** at 13.

887.   On or about May 27, 2014, **less than one month after her May 1, 2014, deposition by HCB pursuant to Fed. R. Civ. P. 69(a)(2)**, Kennedy signed that certain

---

[66] At all relevant times, First Florida was a financial institution as defined by 18 U.S.C. § 20; an insured depository institution as defined by 18 U.S.C. § 20(1); and mortgage lending business as defined by 18 U.S.C. § 20(10). First Florida holds FDIC Certificate Number 58370, evidencing its insured status. First Florida is involved in interstate commerce.

Commercial Contract between Hungry Otter, LLC,[67] and Trustmark National Bank dated as of May 28, 2014, for the purchase and sale of certain real property situated at 196 Miracle Strip Parkway, Ft. Walton Beach, Florida 32548 (the "**Fountain Square Property**"). A true and correct copy of the Commercial Contract, as amended from time to time, is attached to this Complaint as **Exhibit 200**. Addendum A, dated as of June 24, 2014, to the Commercial Contract contemplated that "Hungry Otter, LLC" would assign its rights under the Commercial Contract to Fountain Square. **Ex. 200**. Kennedy executed Addendum A one month before Attorney Childs formed Fountain Square. *Id*. Addendum B, dated as of June 30, 2014, extended the due diligence/inspection period to July 31, 2014. *Id*. Addendum C, dated as of July 30, 2014, to the Commercial Contract extended the due diligence/inspection period until August 6, 2014. *Id*. Addendum D extended the closing date to August 19, 2014. *Id*. Addendum E extended the closing date to August 27, 2014. *Id*.

888.    On July 29, 2014, Mead, as agent for First American, issued Title Commitment No. 30380JS, dated as of July 29, 2014, at 8:00 a.m. A true and correct copy of Title Commitment No. 30380JS is attached to this Complaint as **Exhibit 201**. Title Commitment No. 30380JS required the following prior to insuring title the Fountain Square Property:

> Satisfactory evidence must be furnished as to the proper incorporation of Fountain Square FWB Holdings, LLC, a Texas limited liability company, prior to closing this transaction, together with proof as to the current status of said corporation in its state of origin. The Company reserves the right to make such additional requirements as it may deem necessary.

**Ex. 201**.

889.    On August 12, 2014, at 2:37 p.m., Anita Williams sent an email to Mead employee Ms. Jennifer Wood ("**Ms. Wood**") transmitting Fountain Square's company

---

[67] At the time Kennedy signed the Commercial Contact, there was no entity known as "Hungry Otter, LLC."

agreement, ownership certificates, and initial written consent of the members of Fountain Square. A true and correct copy of Anita Williams' August 12, 2014, email is attached to this Complaint as **Exhibit 202**. The documents Anita Williams sent to Ms. Wood were not executed at the time Anita Williams sent them. **Ex. 202**.

890.    On August 26, 2014, at 9:10 a.m., Ms. Wood sent an email to Kennedy transmitting closing documents for her signature. A true and correct copy of Ms. Wood's August 26, 2014, email is attached to this Complaint as **Exhibit 203**. In addition to forward closing documents for Kennedy's signature, Ms. Wood wrote, "You have deposited a total of $880,000.00 into our escrow account. The remainder due is $74,034.33. You can wire the funds if you choose or return a certified check made payable to 'Mead Law Firm'. I have attached our wiring instructions for your reference." **Ex. 203**.

891.    On August 26, 2014, Fountain Square purchased the Fountain Square Property for $947,000.00 with no financing.

892.    According to Mead's esxrow ledger, Fountain Square funded its purchase of the Fountain Square Property with contributions from LK Freyer Investments, Georgia Lot Holdings, LLC,[68] Lee Kennedy Investments, and Freyer Investments, as follows:

| DATE | ENTITY | AMOUNT | PERCENTAGE |
|------|--------|--------|------------|
| 06/03/14 | LK Freyer Investments, LLC | $10,000.00 | 1.0% |
| 08/25/14 | Georgia Lot Holdings, LLC | $500,000.00 | 51.9% |
| 08/25/14 | Lee Kennedy Investments, LP | $250,000.00 | 25.9% |
| 08/25/14 | Freyer Investments, LP | $120,000.00 | 12.4% |
| 08/26/14 | LK Freyer Investments, LLC | $73,944.33 | 7.7% |
| 08/27/14 | LK Freyer Investments, LLC | $10,000.00 | 1.0% |
| **Total** | | **963,994.33** | **100.0%** |

A true and correct copy of Mead's escrow ledger reflecting such deposits is attached hereto as

**Exhibit 204**.

---

[68] On information and belief, Rockcliff Holdings owns 100% of the membership interests of Georgia Lot Holdings. Thus, Kennedy owns and controls Georgia Lot Holdings.

893.    On June 3, 2014, LK Freyer Investments sent $10,000.00 to the Mead Law Firm by interstate wire transfer. LK Freyer Investments made the transfer from its account ending in 7565 at JPMC (ABA routing number 021000021) in New York to Mead's account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida.

894.    On August 25, 2014, the Kennedy Enterprise sent $870,000.00 to the Mead Law Firm by three separate interstate wire transfers:

a.    Georgia Lot Holdings made a transfer in the amount of $500,000.00 from its account ending in 3145 at Regions Bank (ABA routing number 062005690) in Alabama, to Mead's account ending in 3145 at FNBT Bank (ABA routing number 063206207) in Florida;

b.    Lee Kennedy Investments made a transfer in the amount of $250,000.00 from its account ending in 6542 at Citi Private Bank, via Pershing LLC (ABA routing number PRSHUS33) in New Jersey, and Bank of New York Mellon (ABA routing number 021000018) in New York, to Mead's account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida; and

c.    Freyer Investments made a transfer in the amount of $120,000.00 from its account ending in 0799 at Collegiate Peaks Bank (ABA routing number 102105997) in Colorado to Mead's account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida.

895.    On August 26, 2014, LK Freyer Investments sent $73,944.33 to the Mead Law Firm by interstate wire transfer. LK Freyer Investments made the transfer from its account ending in 2702 at JPMC (ABA routing number 021000021) in New York to Mead's account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida.

896.    On August 27, 2014, LK Freyer Investments sent $10,000.00 to the Mead Law Firm by interstate wire transfer. LK Freyer Investments made the transfer from its account

190

ending in 7565 at JPMC (ABA routing number 021000021) in New York to Mead's account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida.

897.    On August 26, 2014, Trustmark Executive Vice President Todd Seagle executed that certain Special Warranty Deed conveying the Fountain Square Property to Fountain Square. The Special Warranty Deed was recorded on August 28, 2014, at 2:56 p.m., in Official Records Book 3162, Page 646, in the Public Records of Okaloosa County, Florida. A true and correct copy of the Special Warranty Deed is attached to this Complaint as **Exhibit 205**.

898.    Also on August 26, 2014, Kennedy signed that certain Affidavit recorded on August 28, 2014, in Official Records Book 3162, Page 648, in the Public Records of Okaloosa County, Florida, regarding her authority to act for or on behalf of Fountain Square as its Manager. A true and correct copy of the August 26, 2014, Affidavit is attached to this Complaint as **Exhibit 206**.

899.    Kennedy also signed that certain Acknowledgement and Waiver dated as of August 27, 2014, a true and correct copy of which is attached to this Complaint as **Exhibit 207**. The Acknowledgment and Waiver provided as follows:

> Fountain Square FWB Holding s, LLC, a Texas limited liability company (hereinafter referred to as "buyer"), does herein acknowledge that the Mead Law Firm, including Michael Wm Mead, Michael Wm Mead, Jr. and John S. Mead, all represent Trustmark National Bank (hereinafter referred to as "seller") in this transaction.
>
> Fountain Square FWB Holdings, LLC, a Texas limited liability company further has been advised that Mead Law Firm does not represent the buyer, corporately or individually, and as such the Buyer has been advised to obtain separate independent legal counsel before the signing of any of the closing documents. Any monies paid by the buyer to the attorney (Mead Law Firm) is strictly related to those services being required to be paid by the buyer.
>
> Buyer waives any and all conflict of interest in the Mead Law Firm representing the seller.

**Ex. 207**.[69]

900.     On August 28, 2014, Mead, as agent for First American, issued Owner's Policy of Title Insurance No. 5011412-0210083e with an effective date of August 28, 2014, at 2:56 p.m. A true and correct copy of Policy No. 5011412-0210083e is attached to this Complaint as **Exhibit 208**.

### B.       *The Kennedy Enterprise fraudulently induced First Florida to cash out the Fountain Square Property.*

901.     In October 2015, Kennedy applied for two loans from First Florida Bank. She hoped to refinance the Fountain Square Shopping Center and the Pink House.

902.     On October 6, 2015, Kennedy spoke with Mr. Brett Wilson ("**Mr. Wilson**"), President of First Florida, on the telephone.

903.     The next day, on October 7, 2015, at 11:46 a.m. CDT, Ms. Tammy Winters ("**Ms. Winters**"), First Florida's Vice President of Commercial Lending, sent an email to Kennedy with a commercial loan application for Kennedy's review and completion. A true and correct copy of Ms. Winters' October 7, 2015, email is attached to this Complaint as **Exhibit 209**. Among the items required with the commercial loan application were business and personal financial statements, tax returns, organizational and governance documents, and other related information. **Ex. 209**.

904.     On October 9, 2015, Kennedy sent an email to Ms. Winters and Mr. Wilson that read: "Attached is the explanation of the legal issues. This was prepared by my attorney and I'm happy to put you in touch with him if you have any questions. Thank you, Lee." A true and correct copy of Kennedy's October 9, 2015, email is attached to this Complaint as **Exhibit 210**.

---

[69] Despite other conflicts of interest, on information and belief, Mead has not requested that Kennedy execute any other conflict waivers such as the Acknowledgment and Waiver.

Attached to Kennedy's email was a document entitled "Foreclosures and Transfers in Lieu of Foreclosure Transactions," that purported to explain Kennedy's "legal issues" and appears to have been prepared by Attorney Childs. **Ex. 210**.

905.    With respect to the judgment held by Hyperion, Kennedy's October 9, 2015, email explained:

> Hyperion Gulf Coast Ventures, L.P. purchased the above-referenced notes from the holders (Whitney's successors) and Hyperion obtained a judgment against Mrs. McPherson in the amount of $2,300,000.00. ***Hyperion Gulf Coast Ventures, L.P. is majority-owned (96%) by entities in which Mrs. McPherson [i.e., Kennedy] owns an interest.***[70]

*Id*. (emphasis added).

906.    Regarding the HCB Judgment, Kennedy's October 9, 2015, email included the following explanation:

> Litigation: HCB Financial Corporation v. Lee F. Kennedy in the US District Court for the Southern District of Mississippi, Cause No. 110-cv-559 HSO-JMR. HCB has a judgment of approximately $1.8 million. However, the parties are negotiating toward settlement for a nominal sum. Factually, Mrs. McPherson had exited a real estate partnership 5 years before a loan to that entity became delinquent. Mrs. McPherson contends that the lender fraudulently used her guarantee to lend additional monies to her old partner for a different project, despite notification that Mrs. McPherson had exited the partnership. The bank went under and certain of its principals are in jail, the FDIC took the liability when the notes were sold off and HCB obtained a judgment on what Mrs. McPherson believes was a technicality.

*Id*.[71]

907.    Kennedy's representations to First Florida regarding the HCB Judgment were false, and Kennedy knew they were false.

---

[70] As of the time Kennedy made such representations to First Florida, Kennedy had never disclosed to HCB her ownership interests in Hyperion.

[71] By the time Kennedy submitted the "Foreclosures and Transfers in Lieu of Foreclosure Transactions" to First Florida, she had already filed the Kennedy/Hall Case.

908.    The actual amount of the HCB Judgment was $2,036,577.46. That amount was never reduced, and Kennedy has never made any payments to HCB. Kennedy misrepresented the amount of the judgment by more than 10%. In addition, HCB and Kennedy were not "negotiating toward settlement for a nominal sum."

909.    Beyond Kennedy's affirmative misrepresentations, in her October 9, 2015, email to First Florida, Kennedy omitted information she was under a duty to disclose to First Florida.

910.    Kennedy failed to disclose that:

        a.    HCB continued to pursue a multi-million dollar deficiency judgment in the St. Tammany Parish Case;

        b.    HCB was continuing its post-judgment discovery efforts to collect under the Amended Final Judgment;

        c.    HCB had obtained the Texas Charging Orders and the Florida Charging Orders; or

        d.    Biel REO was actively pursuing the Harrison County Case.

911.    First Florida clearly was concerned with Kennedy's October 9, 2015, representations regarding the Hyperion and HCB litigation.

912.    On October 14, 2015, Winters sent Kennedy an email requesting a comfort letter from Kennedy's counsel. Specifically, Winters wrote, "It was certainly a pleasure speaking with you again via phone this afternoon. Regarding the 'Foreclosures and Transfers in Lieu of Foreclosure Transactions' letter submitted to our bank, we would kindly request a written opinion from your attorney indicating that this litigation will not adversely affect our proposed collateral." A true and correct copy of Ms. Winters' October 9, 2015, email is attached to this Complaint as **Exhibit 211**.

913.    On October 23, 2015, Ms. Winters sent Kennedy an email with sample terms for the loans for which she applied. A true and correct copy of Ms. Winters' October 23, 2015, email to Kennedy is attached to this Complaint as **Exhibit 212**. By separate email the same day, a true and correct copy of which is attached to this Complaint as **Exhibit 213**, Ms. Winters also requested copies of Destin Holdings Trust's 2013 and 2014 tax returns. Kennedy responded on October 23, 2015, at 3:16 p.m., by reply email, as follows: "[Destin Holdings Trust] is owned by Lee Kennedy Investments so I believe it's in that return for 2014. In 2013 the income is reflected in my personal return." **Ex. 213**.

914.    On October 23, 2015, at 5:46 p.m. CDT, Anita Williams sent an email to Kennedy with the Pink House's 2014 rental data attached. A true and correct copy of Anita Williams' October 23, 2015, email to Kennedy is attached to this Complaint as **Exhibit 214**. Approximately 20 minutes later, at 6:07 p.m., Kennedy transmitted the Pink House's 2014 rental data by email to Ms. Winters and Mr. Wilson at First Florida. **Ex. 214**.

915.    Kennedy's October 23, 2015, email also represented that Destin Holdings Trust collected $12,930 in sales tax in 2014; however, on information and belief, none of Kennedy, Destin Holdings Trust, or Lee Kennedy Investments filed a Florida Form DR-15 Sales and Use Tax Return for 2014 with the Florida Department of Revenue ("**FDOR**"). Moreover, none of Kennedy, Destin Holdings Trust, Lee Kennedy Investments remitted the $12,930 in sales tax to the Florida Department of Revenue.[72]

916.    Kennedy also submitted to First Florida a "Statement of Net Worth as of December 31, 2014," in which Kennedy represented she owned total assets of $13,639,704.00

---

[72] On information and belief, FDOR issued Kennedy sales tax Certificate Number 56-80131266679, and prior to the short sale of the Pink House, Kennedy regularly remitted sales tax to FDOR.

and **zero** liabilities. A true and correct copy of Kennedy's Statement of Net Worth as of December 31, 2014, is attached to this Complaint as **Exhibit 215**. In her Statement of Net Worth as of December 31, 2014, Kennedy represented that she individually owned 100% of the ownership interests in numerous entities and assets. **Ex. 215**. In addition, Kennedy provided First Florida with a schedule of her ownership interests in various entities, real estate values for assets by those entities, and Kennedy's proportionate share of the equity in those entities and their respective assets. Kennedy represented that the entities and values were as shown on **Exhibit 216**.

917.   On October 28, 2015, at 10:04 a.m., Ms. Winters sent an email to Kennedy transmitting two loan term sheets. A true and correct copy of Ms. Winters' October 28, 2015 email is attached to this Complaint as **Exhibit 217**. First Florida offered to refinance the Fountain Square property with a $700,000.00 loan bearing interest equal to "Wall Street Journal Prime + 2%, adjustable annually (currently 5.25%)." First Florida also proposed a 1% origination fee. **Ex. 217**.

918.   First Florida offered to refinance the Pink House with a $1,000,000.00 loan bearing interest equal to "Wall Street Journal Prime + 2%, adjustable annually (currently 5.25%)." First Florida also proposed a 1% origination fee payable in connection with the Pink House loan. *Id.*

919.   On October 28, 2015, Kennedy replied to First Florida's loan proposals, and she sought a ceiling or cap on the adjustable interest rate with an initial rate of 5% on the proposed Fountain Square loan. She also requested a reduction in the proposed origination fee. She did not reference the Pink House in her October 28, 2015, email. *Id.*

920.   In response, Ms. Winters sent Kennedy an email that explained:

The Term Sheets already include the best rate and fee that we can offer you in consideration of your credit bureau. You have multiple derogatory blemishes on your credit report including a foreclosure, a history of 90+ late pays (there are a total of 72 / 90-day late pays) and two judgments totaling nearly $2MM. These issues alone are way out of our loan policy limits for extending credit, but we've overlooked these items in consideration of the 50% LTV parameter. Also, the Board agreed to make two more exceptions to loan policy omitting any corporate guaranties for the borrowing entities who are majority owned by other entities. Rather, we agreed on just your personal guaranty in lieu and noted another exception to loan policy. There is an 18% ceiling on all loans, which is bank policy.

That said, the terms indicated on the Term Sheet are our best offer in consideration of your overall financial landscape.

*Id*.

921.    On December 3, 2015, First Florida loaned Fountain Square $612,500.00 (the "**First Florida Loan**"). Kennedy, as manager of Fountain Square, executed that certain Promissory Note in favor of First Florida, dated as of December 3, 2015, in the original principal amount of $612,500.00. Kennedy also executed (a) that certain Commercial Real Estate Mortgage in favor of First Florida dated as of December 3, 2015, and recorded in Official Records Book 3227, Page 44; and (b) that certain Assignment of Lease and Rents in favor of First Florida dated as of December 3, 2015, and recorded in Official Records Book 3227, Page 44, both in the Public Records of Okaloosa County, Florida. Kennedy guaranteed Fountain Square's indebtedness to First Florida pursuant to that certain Unlimited Continuing Guaranty in favor of First Florida, dated as of December 3, 2015. True and correct copies of the Promissory Note, Commercial Real Estate Mortgage, Assignment of Rents and Leases, and Unlimited Continuing Guaranty are attached to this Complaint as **Composite Exhibit 218**.

922.    On December 3, 2015, First Florida sent the First Florida Loan proceeds in the amount of $612,500.00 by interstate wire transfer through the Fedwire system to the Mead Law Firm's account ending in 3375 at FNBT Bank (ABA routing number 063206207).

923.     On December 4, 2015, the Mead Law Firm disbursed to Fountain Square $596,135.60, representing the First Florida Loan proceeds less the expenses of the loan transaction, by interstate wire transfer. The Mead Law Firm made the transfer from its account ending in 3375 at FNBT Bank (ABA routing number 063206207) in Florida to Fountain Square's account ending in 0082 at Regions Bank (ABA routing number 062005690) in Alabama.

### C.     *The Kennedy Enterprise misrepresented Fountain Square's ownership and value to hinder, delay, and defraud HCB in its ongoing collection efforts.*

924.     In Fountain Square's Form 1065 for tax years 2014, 2015, and 2016, Fountain Square represented that Rockcliff Holdings owned 60% of its outstanding membership interests, and Lee Kennedy Investments owned the remaining 40% of the membership interests of Fountain Square.

925.     According to those returns, Freyer Investments never owned any interest in Fountain Square; however, in the Company Agreement for Fountain Square the Kennedy Enterprise provided to First Florida, Freyer Investments owned 10% of the membership interests and Lee Kennedy Investments owned 90% of the membership interests of Fountain Square.

926.     Fountain Square's 2015 Form 1065 Schedule L disclosed an outstanding liability at the beginning of the tax year to Freyer Investments in the amount of $120,000.00. Fountain Square paid Freyer Investments two payments of $60,000.00 each on September 9, 2015, and on December 9, 2015, respectively. By the end of the 2015 tax year, Fountain Square had retired all of its indebtedness (if any) to Freyer Investments.

927.     According to Fountain Square's 2015 Form 1065, Rockcliff Holdings' capital account balance was $542,453, and Lee Kennedy Investments' capital account balance was

$372,295. Fountain Square owned total assets of $1,675,748 as of December 31, 2015, which Kennedy failed to disclose ot HCB in her post-judgment discovery responses.

928.    In her Supplemental Responses, Kennedy attested **under oath** that Fountain Square's membership interests were owned as follows:

| Member | Percentage Interest |
|---|---|
| Rockcliff Holdings | 50% |
| Lee Kennedy Investments | 40% |
| Freyer Investments | 10% |
| **Total:** | **100%** |

**Ex. 12.**

929.    The representations of ownership Kennedy made to First Florida were different from the representations Kennedy made to HCB; however, the representations she made to First Florida and to HCB, respectively, were false, and Kennedy knew they were false.

930.    In addition, Kennedy failed to disclose that as of December 31, 2015, Fountain Square had $459,370 in cash in banks **and** owned a condominium unit worth nearly $300,000.

   **D.    The Kennedy Enterprise fraudulently diverted the First Florida Loan Proceeds to purchase a condominium unit after First Florida said it would not finance the purchase.**

931.    Revisiting Kennedy's October 2015 communications with Ms. Winters,[73] on October 27, 2015, prior to the closing of the First Florida Loan, Kennedy sent an email to Ms. Winters regarding a condominium unit at The Palms of Destin, a high-end condominium resort in Destin, Florida. A true and correct copy of Kennedy's October 27, 2015, email to Ms. Winters is attached as **Exhibit 219**. In her email to Ms. Winters, Kennedy wrote, "Can you underwrite this property. The borrower will be a new LLC." **Ex. 219**.

---

[73] *See supra* ¶¶ 918-40.

932.   In response, Ms. Winters wrote, "Per Brett [First Florida's president], we are not financing any real estate in the Palms of Destin as there have been several issues with that property including ongoing lawsuits with the HOA, etc." *Id.*

933.   Even though Fountain Square could not otherwise afford it, the Kennedy Enterprise was not dissuaded from utilizing the First Florida Loan proceeds to purchase a condominium unit in The Palms of Destin.

934.   On December 3, 2015, Fountain Square's total cash assets were $43,081.01, according to Fountain Square's Balance Sheet Detail as of December 31, 2015. A true and correct copy of Fountain Square's Balance Sheet Detail as of December 31, 2015, is attached as **Exhibit 220**.

935.   On December 4, 2015, Fountain Square made two deposits into its checking account ending in 0082 at Regions Bank (ABA routing number 062005690) in Alabama. The first deposit was detailed "Rental Income" in the amount of $13,629.63. The first deposit increased the balance of Fountain Square's account ending in 0082 to $56,710.64. The second deposit was in the amount of $596,135.60 – the net proceeds of the First Florida Loan – and increased the balance of Fountain Square's account ending in 0082 to $652,846.24. **Ex. 220**.

936.   Three days later, on December 7, 2015, Fountain Square transferred $2,500.00 to Neil McPherson. *Id.*

937.   Five days after receiving the First Florida Loan Proceeds, on December 9, 2015, Fountain Square transferred $60,000.00 to Freyer Investments, the second of two payments to Freyer Investments to redeem its interest in Fountain Square. *Id.*

938.   Despite First Florida's admonitions regarding The Palms of Destin, 10 days after receiving the First Florida Loan Proceeds, on December 14, 2015, Fountain Square transmitted

$147,524.07 to the Hall & Runnels law firm to purchase a condominium unit ("**Unit 21117**") at The Palms of Destin. *Id*.

939.     Without the deposit of the First Florida Loan Proceeds into Fountain Square's account ending in 0082 on December 4, 2015, Fountain Square would not have had cash assets adequate to make its December 9, 2015, payment to Freyer Investments.

940.     Likewise, but for the deposit of the First Florida Loan Proceeds into Fountain Square's account ending in 0082 on December 4, 2015, Fountain Square would not have had cash assets adequate to transfer $147,524.07 on December 14, 2015, for the purchase of Unit 21117 at The Palms of Destin.

941.     Despite First Florida's notification to Kennedy that it would not finance condominium units at The Palms of Destin, the Kennedy Enterprise caused Fountain Square to divert the First Florida Loan Proceeds to purchase Unit 21117. Neither Kennedy nor Fountain Square ever disclosed that she or it intended to use the First Florida Loan Proceeds to purchase Unit 21117.

942.     Even though the Kennedy Enterprise concealed the purchase of Unit 21117 from First Florida and HCB, the Kennedy Enterprise included Unit 21117 in its document entitled Lee McPherson Entities and Holdings (as of March 1, 2016; updated 10/19/2016), a true and correct copy of which is attached to this Complaint as **Exhibit 221**. In it, the Kennedy Enterprise represented that Fountain Square owned 100% of the membership interests of Palms Destin Holdings, and Palms Destin Holdings owned Unit 21117. Also, the enterprise represented that Unit 21117 was encumbered by a loan from First Florida with an approximate balance of $140,000.00 (which was false), but there was no mention of Palms Destin Holdings' loan from Gulf Coast Bank.

1.      **Adkinson and the Leighton/Adkinson Firm formed Palms Destin Holdings to facilitate the fraudulent purchase of Unit 21117.**

943.    Palms Destin Holdings is a Texas limited liability company.[74] At Kennedy's request, on or about December 1, 2015, Adkinson and the Leighton/Adkinson Firm formed Palms Destin Holdings by filing its Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 802340354, Document No. 642688790002. A true and correct copy of Palms Destin Holdings' Certificate of Formation of Limited Liability Company is attached to this Complaint as **Exhibit 222**. Neil McPherson is the registered agent and the manager of Palms Destin Holdings.

944.    In Palms Destin Holdings' 2016 and 2017 Public Information Reports, Palms Destin Holdings reported that its manager was Fountain Square, not Neil McPherson as shown on Palms Destin Holdings' Certificate of Formation. Kennedy, not Neil McPherson, signed Palms Destin Holdings' 2016 and 2017 Public Information Reports. **Ex. 222**.

2.      **The Kennedy Enterprise never disclosed that it borrowed all of the money it used to purchase Unit 21117.**

945.    On December 14, 2015, Palms Destin Holdings purchased Unit 21117.

946.    According to the Warranty Deed executed in favor of Palms Destin Holdings, Palms Destin Holdings purchased Unit 21117 for $285,000.00.

947.    Palms Destin Holdings borrowed $142,500.00 from Gulf Coast Bank and Trust Co. ("**Gulf Coast Bank**"), in Gulfport, Mississippi, to purchase Unit 21117, reflecting a loan-to-cost ratio of .50 or 50% (within traditional lending norms for rental real estate). Palms Destin Holdings' obligations to Gulf Coast Bank were secured pursuant to that certain Mortgage by

---

[74] Kennedy has never previously disclosed to HCB the existence of Palms Destin Holdings in her post-judgment discovery responses. Moreover, Fountain Square's 2016 Form 1065 makes no reference to Palms Destin Holdings or any income or expenses associated with Palms Destin Holdings.

Palms Destin Holdings in favor of Gulf Coast Bank, dated as of December 14, 2015, and recorded in Official Records Book 3228, Page 1904, of the Public Records of Okaloosa County, Florida.

948.   Combining the loan proceeds from Gulf Coast Bank in the amount of $142,500.00 with the First Florida Loan Proceeds provided by Fountain Square in the amount of $147,524.07, Palms Destin Holdings had available to it approximately $290,000.00 with which it was able to purchase Unit 21117.

949.   None of Kennedy, Neil McPherson, Fountain Square, or Palms Destin Holdings disclosed to First Florida or Gulf Coast Bank that the Kennedy Enterprise bought Unit 21117 with money borrowed from other banks. Neither Kennedy nor Fountain Square disclosed to First Florida that Palms Destin Holdings even existed. Neither Kennedy nor Fountain Square disclosed that Fountain Square's wholly-owned subsidiary would be indebted to another bank. The Kennedy Enterprise intentionally concealed those facts despite a duty to disclose such facts.

> **3.    The Kennedy Enterprise concealed the ownership and concealed the purchase of Unit 21117 to hinder, delay, and defraud HCB in its ongoing collection efforts.**

950.   According to Fountain Square's 2015 Form 1065 tax return, Fountain Square owns 100% of the membership interests in Palms Destin Holdings.

951.   Fountain Square's 2015 Form 1065 tax return and its accompanying Form 8825 reflected Palms Destin Holdings' purchase of Unit 21117. It showed also Palms Destin Holdings' liability to Gulf Coast Bank and Trust Co., with respect to its $142,500.00 loan to Palms Destin Holdings. In contrast, Fountain Square's 2016 Form 1065 made no reference to Unit 21117. In fact, after Fountain Square referred to Palms Destin Holdings in its 2015 tax returns, Palms Destin Holdings and Unit 21117 disappeared from all of the Kennedy Enterprise's tax returns.

952.    Fountain Square's 2016 Form 1065 showed a decrease in Fountain Square's assets (specifically, buildings and other depreciable assets) of $289,502, but it reflected no corresponding sale and transfer of the buildings and other depreciable assets. According to the Form K-1 Fountain Square provided to Rockcliff Holdings, Fountain Square distributed "other assets" (as shown on Line 19 of Schedule K-1) to Rockcliff Holdings in the amount of $229,569. Similarly, Lee Kennedy Investments' Schedule K-1 from Fountain Square reflected a decrease in its capital account and distribution of "other assets" in the amount of $153,047.

953.    On or about March 30, 2018, Palms Destin Holdings sold Unit 21117 for $370,000, as reflected on that certain Warranty Deed by Palms Destin Holdings dated as of March 30, 2018, and recorded in Official Records Book 3343, Page 4733, of the Public Records of Okaloosa County, Florida. Palms Destin Holdings realized a gain of approximately $85,000.00 on the sale of Unit 21117.

954.    Throughout its communications and transactions with First Florida, the Kennedy Enterprise committed several acts of mail fraud, wire fraud, and bank fraud. The Kennedy Enterprise's efforts to cash-out the equity in the Fountain Square Property and acquire and sell Unit 21117 without any disclosure or payment to HCB were made with the specific intent to hinder, delay, and defraud HCB in its collection efforts.

## IX.    *In 2016, the Kennedy Enterprise defrauded Gibraltar Title, First American, and HCB when it sold the Summerlake Townhouse and fraudulently transferred the proceeds to the Babette Trust.*

955.    As an element of its continuing scheme to cash out equity and liquidate unencumbered assets, the Kennedy Enterprise engaged in a scheme to defraud Gibraltar Title and First American. The ultimate end of the Kennedy Enterprise's scheme was to deprive HCB of the proceeds of the HCB Judgment after HCB properly recorded the HCB Judgment in the public records of Walton County, Florida.

**A.** **Kennedy's purchase of the Summerlake Townhouse.**

956.    On or about December 28, 2004, Kennedy purchased certain real property situated at 340 Scenic Gulf Drive, Unit 16, Miramar Beach, Florida 32550, which is more particularly described as follows: Unit 16, Building 6, Summerlake Townhomes, according to the Plat thereof as recorded in Plat Book 13, Page 17, of the Public Records of Walton County, Florida (the "**Summerlake Townhouse**"). A true and correct copy of the Warranty Deed vesting title to the Summerlake Townhouse in Kennedy's name is attached to this Complaint as **Exhibit 223**. As shown on the vesting deed, Kennedy took title to the Summerlake Townhouse as Lee K. Freyer, Trustee of the Lee K. Freyer Trust.

957.    At the time Kennedy purchased the Summerlake Townhouse, there was no trust entity known as the Lee K. Freyer Trust, and there was no trust instrument creating the Lee K. Freyer Trust. As a result, title to the Summerlake Townhouse vested in Kennedy individually.

**B.** **In 2015 and 2016, while executing its scheme to cash out equity and liquidate assets, the Kennedy Enterprise sold the Summerlake Townhouse.**

958.    On or about November 29, 2015, Kennedy signed that certain "AS IS" Residential Contract for Sale and Purchase (the "**Summerlake Contract**") between the Lee K. Freyer Trust and Kelsey A. Benso and/or Fran B. Benso (the "**Bensos**"), in which Kennedy agreed to sell the Summerlake Townhouse. A true and correct copy of the Summerlake Contract is attached to this Complaint as **Exhibit 224**.

959.    The Summerlake Contract obligated Kennedy to convey marketable title to the Summerlake Townhouse. **Ex. 224**, ¶ 18.H.

960.    According to the Summerlake Contract, the Bensos were entitled to examine and either accept and reject a title commitment related to the Summerlake Townhouse. *Id*. The Summerlake Contract provided as follows:

The Title Commitment shall set forth those matters to be discharged by Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's Marketable Title to the Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the Plat or otherwise common to the subdivision: (c) outstanding oil, gas and mineral rights of record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines; (e) taxes for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any.

*Id.*, ¶ 18.A.(i).

961.    On or about December 5, 2015, Gibraltar Title, as agent for First American, issued a Commitment for Title Insurance for its File No.: 15-03690 (the "**Gibraltar Title Commitment**"). A true and correct copy of the Gibraltar Title Commitment is attached to this Complaint as **Exhibit 225**.

962.    In the Gibraltar Title Commitment, Gibraltar Title, as agent for First American, represented that it would insure fee simple title to the Summerlake Townhouse upon the satisfaction of certain requirements memorialized in Schedule B-1 of the Gibraltar Title Commitment (the "**B-1 Requirements**").

963.    The B-1 Requirements included, among other things, the following requirement: "Record Certification of Trust pursuant to Section 736.1017, F.S., executed by the Trustee or, if more than one Trustee, each Co-Trustee of the Lee K Freyer Trust. (Company's FATCO Form CT-1 or. if more than one Trustee, FATCO Form CT-2, or similar format.)." **Ex. 225**.

964.    In addition, Schedule B-2 of the Gibraltar Title Commitment provided that any policy of title insurance issued in connection therewith would except from coverage several matters (the "**B-2 Exceptions**"), unless those matters were resolved to the satisfaction of First American. *Id.*

965.    Certain of the B-2 Exceptions (the "**Standard Exceptions**") could be resolved "upon [First American's] receipt of an acceptable Non-Lien and Possession Affidavit." *Id.*

### C.    *To induce Gibraltar Title and First American to insure title, Kennedy made numerous false representations.*

966.    On or about January 7, 2016, Kennedy sold the Summerlake Townhouse to the Bensos for $150,000.00.

967.    In connection with sale, on January 4, 2016, Kennedy signed a "Trustee's Deed," dated as of January 7, 2016. The Trustee's Deed was recorded on January 15, 2016, in Official Records Book 2999, Page 3490, of the Public Records of Walton County, Florida. A true and correct copy of the Trustee's Deed is attached to this Complaint as **Exhibit 226**.

968.    According to the Trustee's Deed, Kennedy conveyed the Summerlake Townhouse as "**Lee K Freyer, individually and as Trustee of the Lee K. Freyer Trust**, whose address is 444 Madison Avenue 28th Floor, New York, New York 10022." **Ex. 226** (emphasis added).

969.    To avoid having to produce a copy of trust instrument that did not exist, on January 4, 2016, Kennedy also signed that certain Certification of Trust,[75] which is attached to this Complaint as **Exhibit 227**. In the Certification of Trust, Kennedy made a series of false representations.

970.    Kennedy acknowledged that she signed the Certification of Trust "for the purpose of inducing First American Title Insurance Company and Gibraltar Title Services to insure title to the Property." **Ex. 227**.

---

[75] Pursuant to Fla. Stat. § 736.1017, a party may execute and deliver a certification of trust in lieu of providing a copy of the trust instrument or document creating the trust relationship.

971.    Finally, Kennedy represented that she was "familiar with the nature of an oath and with the penalties as provided by the laws of the State [of Florida] for falsely swearing to statements made in an instrument of this nature." *Id*.

972.    On January 4, 2016, Kennedy also executed that certain Affidavit of Ownership (the "**Owner's Affidavit**"), a true and correct copy of which is attached to this Complaint as **Exhibit 228**.

973.    In the Owner's Affidavit, Kennedy represented the following:

There are no outstanding or unpaid taxes or assessment (pending or certified) or any unpaid or unsatisfied mortgage, claims of lien or other matters that constitute a lien or encumbrance against the property or any improvements on it or any part of it or against any personal property located on it.

*            *            *

There are no actions, proceedings, judgments, bankruptcies, liens or executions recorded among the public records of Walton County, Florida, or any other county in Florida or pending against Owner in the courts of Walton, County, Florida, or any other courts.

**Ex. 228**, ¶¶ 8, 10.

974.    Kennedy acknowledged that she executed the Owner's Affidavit "(1) to induce [the Bensos] to purchase all of the property and (2) to induce First American Title Insurance Company to issue a policy to insure the title to the property." *Id*., ¶ 13.

975.    Finally, Kennedy represented that she signed the Owner's Affidavit "with the full knowledge of Applicable Florida laws regarding sworn Affidavit [sic] and the penalties and liabilities resulting from false statements and misrepresentations therein." *Id*., ¶ 14.

976.    Kennedy's representations in the Owner's Affidavit were false, and Kennedy knew they were false.

977.    At the time Kennedy signed the Owner's Affidavit, HCB had domesticated the HCB Judgment in Florida and recorded the HCB Judgment in Walton County, Florida. The HCB

Judgment constituted a judgment lien that attached to and encumbered the Summerlake Townhouse.

978.     In addition, in January 2016, HCB was actively pursuing collection of the HCB Judgment and prosecuting the St. Tammany Parish Case.

979.     Kennedy executed the Trustee's Deed, the Certification of Trust, and the Owner's Affidavit in Austin, Travis County, Texas, and then sent those instruments to Gibraltar Title in Jacksonville, Duval County, Florida.

> **D.     The Kennedy Enterprise furthered its scheme to deprive HCB of the sale proceeds by causing Gibraltar Title to disburse the sale proceeds to the Babette Trust.**

980.     In connection with the closing of sale of the Summerlake Townhouse, Kennedy signed that certain Instructions to Title Company Regarding the Disbursement of the Seller's Net Proceeds, dated as of January 7, 2016, a true and correct copy of which is attached to this Complaint as **Exhibit 229**. In the disbursement instructions, Kennedy instructed Gibraltar Title to disburse $140,592.48 to **the Babette Trust** by interstate wire transfer. Gibraltar Title made the transfer from its account at Compass Bank (ABA routing number 063013924) in Florida to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York, **even though the Babette Trust held no legal or equitable interest in the Summerlake Townhouse**.

981.     In the Babette Trust's 2013 Form 1041, the Babette Trust reported that it received $10,000.00 in rental income related to 340 Scenic Gulf Drive – that is, the Summerlake Townhouse.

982.     In its 2014 Form 1041 tax return, the Babette Trust reported that it received $12,000.00 in rents attributable to the Summerlake Townhouse. The Babette Trust reported that the Summerlake Townhouse was rented at fair rental value 365 days in 2014. The Babette Trust

reported total expenses of $3,559.00 attributable to the Summerlake Townhouse. Its net income

from the Summerlake Townhouse was $8,441.00 in 2014.

983.    In its 2015 Form 1041, the Babette Trust reported that it received no rents and

paid no expenses attributable to the Summerlake Townhouse. According to the Babette Trust's

2016 Form 1041, the Babette Trust – not Kennedy – sold the Summerlake Townhouse on

January 4, 2016, for $150,000.00.

984.    The Babette Trust's representations regarding the Summerlake Townhouse were

false.

985.    The Babette Trust never owned any interest in the Summerlake Townhouse, and

the Babette Trust never paid any consideration for the Summerlake Townhouse.

986.    As shown in the following table, all of the maintenance payments, association

payments, and other expenses attributable to the Summerlake Townhouse were paid by Kennedy

(individually), LK Freyer Investments, LKF Investments-Texas, and Destin Holdings Trust:

| Date | From | Account No. | To | Amount |
|------|------|-------------|----|--------|
| 03/04/13 | LK Freyer Investments, LLC | 7565 | Summer Lake | $200.00 |
| 03/07/13 | Lee Freyer Kennedy | 1065 | Summer Lake | $195.00 |
| 04/19/13 | LKF Investments-Texas, LLC | 7480 | Summer Lake | $461.00 |
| 06/12/13 | LKF Investments-Texas, LLC | 7480 | Summer Lake | $315.00 |
| 07/16/13 | Lee F. Kennedy | 8264 | Summer Lake | $560.50 |
| 10/31/13 | LKF Investments-Texas, LLC | 7480 | Summer Lake | $491.00 |
| 02/12/14 | LKF Investments-Texas, LLC | 7480 | Summer Lake | $434.00 |
| 07/11/14 | LKF Investments-Texas, LLC | 7480 | Summer Lake | $1,110.00 |
| 11/07/14 | Lee Freyer Kennedy | 1065 | Summer Lake | $661.00 |
| 12/20/14 | Lee Freyer Kennedy | 1065 | Summer Lake | $195.25 |
| 08/24/15 | Destin Holdings Trust, LLC | 9595 | Summer Lake | $2,538.00 |

987.    Moreover, Kennedy deposited all of the rental proceeds she received from the

Summerlake Townhouse in her personal accounts ending in 8264 and 1065 at JPMC, as shown

on **Exhibit 230** attached to this Complaint.

988.    The Kennedy Enterprise manifested its obfuscation and numerous

misrepresentations relating to the Summerlake Townhouse through numerous acts of mail and

wire fraud, all of which were intended to protect Kennedy's interest in the Summerlake Townhouse and to deprive HCB of the proceeds of the Amended Final Judgment.

**X.**     ***The Kennedy Enterprise fraudulently transferred assets to Canndescent JV to invest in marijuana cultivation in California and to hinder, delay, or defraud HCB in its continuing collection efforts.***

989.     In 2016, the Kennedy Enterprise began investing in marijuana cultivation in violation of federal law.

**A.**     ***The Kennedy Enterprise formed Canndescent JV to convert its liquid assets into equity interests in a California limited liability company.***

990.     Canndescent JV is a Texas limited liability company. Adkinson and the Leighton/Adkinson Firm formed Canndescent JV on February 8, 2016, by the filing of a Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 802386681, Document No. 654655140002. A true and correct copy of Canndescent JV's Certificate of Formation of Limited Liability Company is attached to this Complaint as **Exhibit 231**. According to Canndescent JV's Certificate of Formation, Kennedy is the manager and registered agent of Canndescent JV. **Ex. 231**.

991.     On or about February 8, 2016, the members of Canndescent JV entered into that certain Company Agreement of Canndescent JV, LLC. A true and correct copy of Canndescent JV's Company Agreement is attached to this Complaint as **Exhibit 232**. Kennedy signed Canndescent JV's Company Agreement on behalf of Rockcliff Holdings and Lee Kennedy Investments. **Ex. 232**. Harry Freyer signed the Company Agreement of Canndescent JV as the trustee of the Babette Trust.[76] *Id.*

---

[76] While the signature purports to be Harry Freyer's signature, onninformation and belief, Kennedy affixed Harry Freyer's name to the Company Agreement

B.     **Through Canndescent JV, the Kennedy Enterprise invested more than $1,500,000.00 in Fiore's marijuana cultivation operation.**

992.    Canndescent JV owns membership interests in Fiore Management, LLC, f/k/a Canndescent, LLC, a California limited liability company ("**Fiore**").

993.    According to Fiore's website,[77] Fiore's "agribusiness professionals are dedicated to offering our clients the highest quality consulting in the agriculture industry." Fiore's describes its mission as "assisting small to medium companies in California establish and operate controlled environment agriculture operations, typically running small to mid-size organic controlled environment farms." *Id*. Moreover, Fiore "provide[s] services to optimize yield, productivity, labor costs and energy." *Id*.

994.    Fiore exists to provide consulting services to Canndescent MBC, which grows recreational marijuana in Desert Hot Springs, California, for resale in more than 150 marijuana dispensaries in California.

995.    The Kennedy Enterprise acquired its interests in Fiore between March 2016 and June 2017.

1.     **Canndescent JV invested more than $1,000,000 in Fiore.**

996.    On or about March 1, 2016, Kennedy executed that certain Canndescent, LLC, Accredited Investor Questionnaire, a true and correct copy of which is attached to this Complaint as **Exhibit 233**. The Accredited Investor Questionnaire provided as follows: "THIS QUESTIONNAIRE MUST BE ANSWERED FULLY AND RETURNED ALONG WITH YOUR COMPLETED SUBSCRIPTION AGREEMENT IN CONNECTION WITH YOUR PROSPECTIVE PURCHASE OF SECURITIES FROM CANNDESCENT, LLC. (THE 'COMPANY')." **Ex. 233** at 1.

---

[77] https://fioremgmt.com

997.    The Accredited Investor Questionnaire required that any potential investor in Fiore qualify as an Accredited Investor by certifying the investor's net worth or other factors establishing the investor's suitability to invest in Fiore. It provided specifically:

> The undersigned represents and warrants that he, she or it comes within at least one category marked below, and that for any category marked, he, she or it has truthfully set forth, where applicable, the factual basis or reason the undersigned comes within that category. The undersigned agrees to furnish any additional information which the Company deems necessary in order to verify the answers set forth below.

**Ex. 233** at 1.

998.    Kennedy represented that she, Rockcliff Holdings, and Lee Kennedy Investments were Accredited Investors according to Category H of the Accredited Investor Questionnaire. Category H recited as follows: "The undersigned is an entity (other than a trust) in which all of the equity owners are "accredited investors" within one or more of the above categories. *If relying upon this category, list names of equity owners and indicate statement category applicable to each such equity owner*." *Id*. at 2 (emphasis added).

999.    Kennedy represented that she was an Accredited Investor as described in Category A of the Accredited Investor Questionnaire. *Ibid*.

1000.   Category A recited the following: "The undersigned is an individual natural person (not a partnership, corporation, etc.), whose individual net worth, or joint net worth with his or her spouse, at the time of purchase exceeds $1,000,000, excluding the value of the primary residence of such individual." *Id*. at 1.

1001.   Kennedy also represented that Rockcliff Holdings and Lee Kennedy Investments were qualified investors as described in Category F of the Accredited Investor Questionnaire. *Id*. at 2.

1002.   Category F of the Accredited Investor Questionnaire described an Accredited Investor as follows: "The undersigned is either a corporation, partnership, Massachusetts business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Shares and with total assets in excess of $5,000,000. (describe entity)." **Ex. 233** at 2.

1003.   Kennedy did not describe the entities as required by Category F of the Accredited Investor Questionnaire. *Ibid*.

1004.   Kennedy signed the Accredited Investor Questionnaire as the Manager of Canndescent JV. *Id.* at 6.

1005.   Upon signing the Accredited Investor Questionnaire, Kennedy agreed as follows: "The undersigned is informed of the significance to the Company of the foregoing representations and answers contained in this Accredited Investor Questionnaire and such answers have been provided under the assumption that the Company will rely on them." *Ibid*.

1006.   Kennedy represented that Rockcliff Holdings owned more than $5,000,000 in assets. *Id*. at 2.

1007.   Kennedy's representation in the Accredited Investor Questionnaire was false, and Kennedy knew her representation was false.

1008.   Rockcliff Holdings and Kennedy represented in Rockcliff Holdings 2015 Form 1065 tax return that as of December 31, 2015, Rockcliff Holdings owned assets valued at $5,433,941.

1009.   Rockcliff Holdings' assets as of December 31, 2015, included $1,140,007 in "TD Ameritrade Securities."

1010.   Rockcliff Holdings' 2015 Form 1065 tax return also reported indebtedness to Neil McPherson of $1,193,942. On information and belief, Rockcliff Holdings' TD Ameritrade Account actually belonged to Neil McPherson, who was sheltering his personal assets from collection by his former wife, Angelique McPherson, and the receiver of Angelique McPherson's bankruptcy estate in Canada. Rockcliff Holdings' 2015 tax return balanced the addition of the TD Ameritrade account against the newly incurred indebtedness owed to Neil McPherson.

1011.   In Rockcliff Holdings' 2016 Form 1065 tax return, Kennedy and Rockcliff Holdings represented that Rockcliff Holdings' assets were only $4,399,077, a decrease of $1,034,864 from December 31, 2015, to December 31, 2016. During 2016, Rockcliff Holdings liquidated its TD Ameritrade Account and eliminated its indebtedness to Neil McPherson.

1012.   Kennedy also represented in the Accredited Investor Questionnaire that she was a member of Canndescent JV. Kennedy's representation was false, and Kennedy knew her representation was false.

1013.   According to Kennedy's Supplemental Response, Kennedy did not own any interest in Canndescent JV. **Ex. 12**.

1014.   The Babette Trust, however, was a member of Canndescent JV. Kennedy never disclosed to Fiore that the Babette Trust owned any portion of Canndescent JV. Any such disclosure would have required the Trustee of the Babette Trust to complete a separate Accredited Investor Questionnaire.

1015.   Kennedy never completed an accredited investor questionnaire on behalf of the Babette Trust.

1016.   Kennedy intentionally concealed the Babette Trust's ownership of any interest in Canndescent JV because the Babette Trust could not qualify as an accredited investor.

1017.  Ultimately, in connection with the Subscription Agreement and Accredited Investor Questionnaire, Kennedy executed Fiore's Limited Liability Company Agreement. Kennedy signed the Limited Liability Company Agreement on behalf of Canndescent JV, as its Manager, as of March 1, 2016.

1018.  On March 2, 2016, at 7:45 a.m., Kennedy sent an email to Ms. Decarlo at UBS AG, instructing her to send $300,000 to Fiore by interstate wire transfer. A true and correct copy of Kennedy's March 2, 2016, email to Ms. Decarlo is attached to this Complaint as **Exhibit 234**. Shortly thereafter, at 7:52 a.m., Ms. Decarlo replied by email to Kennedy confirming Kennedy's instructions. A true and correct copy of Ms. Decarlo's email to Kennedy is attached to this Complaint as **Exhibit 235**.

1019.  On March 2, 2016, UBS AG disbursed $300,000.00 to Fiore by interstate wire transfer as directed by Kennedy. UBS AG made the transfer from LK Freyer Investments' loan account ending in 0057 at UBS AG (ABA routing number 026007993) in New York to Fiore's account at Compass Bank (ABA routing number 321170538) in California. The FedFunds reference number for the transfer was 0302B6B7IK2C000606.

1020.  Separately, on May 2, 2016, Kennedy caused Hidden Hollow Townhomes, LLC[78] and Fountain Square to transmit an additional $100,000.00 and $200,000.00, respectively, to Fiore by interstate wire transfer. Hidden Hollow Townhomes transferred $100,000.00 from its account ending in 3145 at Regions Bank (ABA routing number 062005690) in Alabama to Fiore's account at Compass Bank (ABA routing number 321170538) in California. Fountain Square transferred $200,000.00 from its account ending in 0082 at Regions Bank (ABA routing

---

[78] Hungry Otter owns 100% of the membership interests of Hidden Hollow Townhomes, n/k/a Summerwinds Townhomes. Kennedy, in turn, owns at least 90% of the membership interests of Hungry Otter.

number 062005690) in Alabama to Fiore's account at Compass Bank (ABA routing number 321170538) in California.

1021.   On March 10, 2016, at 1:09 p.m., Kennedy sent an email to Ms. Decarlo at UBS AG, instructing her to send another $400,000.00 to Fiore by interstate wire transfer. A true and correct copy of Kennedy's March 10, 2016, email to Ms. Decarlo is attached to this Complaint as **Exhibit 236**. Kennedy asked Ms. Decarlo to send $50,000.00 from Lee Kennedy Investments and $350,000 from "the trust account." **Ex. 236**. She also instructed Ms. Decarlo to "[p]lease draw on the credit line for both." *Id*.

1022.   At 1:12 p.m. the same day, Ms. Decarlo replied by email to Kennedy confirming Kennedy's instructions. A true and correct copy of Ms. Decarlo's email to Kennedy is attached to this Complaint as **Exhibit 237**.

1023.   Based on Kennedy's instructions, on March 10, 2016, UBS AG transferred $50,000.00 from LK Freyer Investments' account ending in 0057 at UBS AG (ABA routing number 026073192) to Fiore's account at Compass Bank (ABA routing number 321170538) in California. The FedFunds reference number for the transfer was 0310B6B7IK1C002855.

1024.   UBS AG then disbursed $350,000.00 from the Babette Trust's account ending in 3592 at UBS AG (ABA routing number 026073192) to Fiore's account at Compass Bank (ABA routing number 321170538) in California. The FedFunds reference number for the transfer was 0310B6B7IK1C003613.

1025.   During 2016, the Kennedy Enterprise invested $1,000,000.00 in Fiore, as follows:

| Date | Account | Account No. | Amount |
|------|---------|-------------|--------|
| 03/02/2016 | LK Freyer Investments | X0057 | $300,000.00 |
| 03/02/2016 | Hidden Hollow Town | | $100,000.00 |
| 03/02/2016 | Fountain Square | | $200,000.00 |
| 03/10/2016 | LK Freyer Investments | X0057 | $50,000.00 |
| 03/10/2016 | Babette Trust | X3592 | $350,000.00 |
| **Total** | | | **$1,000,000.00** |

1026.   Neither Rockcliff Holdings nor Lee Kennedy Investments actually invested any money in Canndescent JV or Fiore in 2016, despite representations to the contrary.

1027.   On June 21, 2017, at 11:10 a.m., Kennedy sent an email to Ms. Decarlo at UBS AG instructing her to send $192,620.05 to Fiore by interstate wire transfer from Rockcliff Holdings, Lee Kennedy Investments, and the Babette Trust. A true and correct copy of Kennedy's June 21, 2017, email to Ms. Decarlo is attached to this Complaint as **Exhibit 238**. Kennedy forwarded to Ms. Decarlo an email Kennedy received from Adkinson explaining to Kennedy what amounts to send Fiore based on each entity's interests in Canndescent JV. **Ex. 238**. Ms. Decarlo replied to Kennedy by email at 1:09 p.m. confirming receipt of Kennedy's instructions. A true and correct copy of Ms. Decarlo's June 21, 2017, email to Kennedy is attached to this Complaint as **Exhibit 239**.

1028.   On June 22, 2017, Mr. Thomas Johnson ("**Mr. Johnson**") at UBS AG sent an email to Kennedy confirming that UBS AG sent $192,620.05 as Kennedy instructed. A true and correct copy of Mr. Johnson's June 22, 2017, email to Kennedy is attached to this Complaint as **Exhibit 240**.

1029.   In accordance with Kennedy's instructions, on June 22, 2017, UBS AG transferred $57,786.01 by interstate wire transfer from Rockcliff Holdings' account ending in 2354 at UBS AG (ABA routing number 026073192) to Fiore's account at Wells Fargo in California. The FedFunds reference number for the transfer was 0622B6B7IK1C000570.

1030.  On June 22, 2017, UBS AG transferred $67,417.02 by interstate wire transfer from Lee Kennedy Investments' account ending in 1203 at UBS AG (ABA routing number 026073192) to Fiore's account at Wells Fargo in California. The FedFunds reference number for the transfer was 0622B6B7IK2C000144.

1031.  On June 22, 2017, UBS AG transferred $67,417.02 by interstate wire transfer from the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026073192) to Fiore's account at Wells Fargo in California. The FedFunds reference number for the transfer was 0622B6B7IK2C000148.

1032.  In summary, Lee Kennedy Investments, Rockcliff Holdings, and the Babette Trust contributed another $192,620.05 to Fiore on June 22, 2017, as follows:

| Date | Account | Account No. | Amount |
|---|---|---|---|
| 06/22/2017 | Lee Kennedy Investments | 1203 | $67,417.02 |
| 06/22/2017 | Babette Trust | 1215 | $67,417.02 |
| 06/22/2017 | Rockcliff Holdings | 2354 | $57,786.01 |
| **Total** | | | **$192,620.05** |

1033.  In all, the Kennedy Enterprise has invested $1,192,620.05 in Fiore.

## 2.    In 2016, Beary and MSLTD, L.L.C., invested $500,000 in Fiore.

1034.  In early 2016, Kennedy introduced her lawyer, friend, and business partner Beary to Fiore's chief executive officer. In fact, when Kennedy executed the Subscription Agreement, the Accredited Investor Questionnaire, and the Limited Liability Company Agreement, Beary transmitted those documents to Fiore on Kennedy's behalf.

1035.  As a result of that introduction, Beary and his company, MSLTD, L.L.C., a Louisiana limited liability company, invested $500,000.00 in Fiore. On information and belief, Beary is the sole member and manager of MSLTD, L.L.C.

1036.  On or about March 8, 2016, Chris Beary executed that certain Subscription Agreement between MSLTD, L.L.C., and Fiore, pursuant to which MSLTD, L.L.C., agreed to

purchase membership interests in Fiore. As Kennedy did, Beary also executed an Accredited

Investor Questionnaire.

1037.   On or about March 14, 2016, Beary and MSLTD, L.L.C., transmitted $500,000.00

to Fiore by interstate wire transfer.

1038.   Together, Kennedy and Beary, through Canndescent JV and MSLTD, L.L.C.,

have invested at least $1,692,620 in Fiore.

### C.    The Kennedy Enterprise has misrepresented its interests in Fiore and Canndescent JV to hinder, delay, and defraud HCB in its collection efforts.

1039.   On May 13, 2016, Kennedy first disclosed Canndescent JV's existence in her

Supplemental Responses. **Ex. 12**. In her Supplemental Responses, Kennedy represented under

oath that the Babette Trust, Rockcliff Holdings, and Lee Kennedy Investments owned 30%,

35%, and 35% of Canndescent JV, respectively. *Id.*

1040.   Kennedy's representations regarding the ownership of Canndescent JV were false,

and Kennedy knew they were false.

1041.   At various times, Kennedy has represented the ownership of Canndescent JV in

different ways. Only once has Kennedy represented that the Babette Trust owned 30% of the

membership interests in Canndescent JV – to HCB in her Supplemental Responses, as follows:

| Date | Source | Kennedy | Babette Trust | Lee Kennedy Investments | Rockcliff Holdings |
|------|--------|---------|---------------|-------------------------|--------------------|
| 02/08/16 | Company Agreement | 0% | 35% | 35% | 30% |
| 03/01/16 | Accredited Investor Questionnaire | 35% | 0% | 35% | 30% |
| 05/13/16 | Supplemental Response | 0% | 30% | 35% | 35% |
| 12/31/16 | Form 1065 Tax Return | 0% | 35% | 35% | 30% |
| 06/21/17 | Email to Ms. Decarlo | 0% | 35% | 35% | 30% |
| 09/01/17 | Financial Statements | 0% | 35% | 35% | 30% |

1042.   On or about March 6, 2018, Kennedy, Canndescent JV, Beary, and MSLTD,

L.L.C., sued Fiore in that certain civil action styled *Canndescent JV, LLC v. Fiore Management,*

*LLC*, Superior Court of the State of California, County of Santa Barbara, Case No. 18CV01128

(the "**California Case**"). In their Complaint in the California Case, Kennedy, Canndescent JV, Beary, and MSLTD, L.L.C. alleged that Fiore breached certain contractual terms (a) among Kennedy, Canndescent JV, and Fiore, and (b) among Beary, MSLTD, L.L.C., and Fiore. Moreover, and more importantly, in both the Complaint and the Amended Complaint in the California Case, Kennedy and Canndescent JV admitted that Kennedy "is the managing member of [Canndescent] JV."

1043.   In addition to her misrepresentations regarding the ownership of Canndescent JV, Kennedy represented in her Supplemental Responses – again, **under oath** – that Canndescent JV owned only 1% of Fiore. **Ex. 12**.

1044.   Kennedy's representations regarding Canndescent JV's ownership in Fiore were false, and Kennedy knew they were false.

1045.   Canndescent JV's 2016 Schedule K-1, a true and correct copy of which is attached to this Complaint as **Exhibit 241**, reflects that as of December 31, 2016, Canndescent JV owned 6.9047% of Fiore's profit interests and 18.622% of Fiore's loss and capital interests, as shown in the following table:

| Share | Beg. Year | End Year |
|---|---|---|
| **Profit** | 0.0000% | 6.9047% |
| **Loss** | 0.0000% | 18.622% |
| **Capital** | 0.0000% | 18.622% |

**Ex. 241**.

1046.   Furthermore, Canndescent JV's 2016 Schedule K-1 from Fiore reflected Canndescent JV's total investment in Fiore in 2016:

| Beginning balance | $0. |
|---|---|
| Capital contributed during 2016 | $1,000,000. |
| 2016 increase (decrease) | $(418,045.) |
| Ending balance | $581,955. |

*Ibid*.

1047.   Canndescent JV's beginning capital account in Fiore in 2016 was $0, but it contributed $1,000,000 during tax year 2016. Canndescent JV's ending capital account in 2016 was $581,955 or 18.622%. *Id.*

1048.   Neither Lee Kennedy Investments' 2016 Form 1065 nor Rockcliff Holdings' 2016 Form 1065 tax returns includes any reference to Canndescent JV.

1049.   In contrast, the Babette Trust's 2016 Form 1041 reflects losses attributable to Canndescent JV for 2016 in the amount of $146,804, which comports with the Babette Trust's 2016 Schedule K-1 from Canndescent JV.

1050.   As of December 31, 2017, Canndescent JV's interest in Fiore had increased to 11.33%.

1051.   The Kennedy Enterprise's investment in Fiore represented the reinvestment of the proceeds of the racketeering activities comprising the activities and actions described in this Complaint. In connection with its investments in Fiore, the Kennedy Enterprise committed numerous instances of wire fraud, mail fraud, and racketeering, all to the detriment of HCB.

## XI.   *The Kennedy Enterprise converted 5950 State Bridge Road from a corporation to a limited liability company to protect Kennedy's ownership from HCB's collection efforts.*

1052.   To prevent HCB from executing against Kennedy's shares in 5950 State Bridge Road, the Kennedy Enterprise fraudulently converted 5950 State Bridge Road from a corporation to a limited liability company.

### A.   *5950 State Bridge Road was incorporated to purchase 5950 State Bridge Road, Duluth, Georgia.*

1053.   On or about May 14, 2015, 5950 State Bridge Road was incorporated as a Texas for-profit corporation by the filing of its Certificate of Formation with the Secretary of the State of Texas, Filing No. 802215294, Document No. 606732950002. True and correct copies of 5950

State Bridge Road's filings with the Texas Secretary of State are attached to this Complaint as **Composite Exhibit 242**.

1054.   According to 5950 State Bridge Road's Certificate of Formation, Kennedy is 5950 State Bridge Road's registered agent, and its registered office is 4720 Rockcliff Road, Unit 3, Austin, Texas 78746 – Kennedy's home address. **Ex. 242**. 5950 State Bridge Road's Certificate of Formation identified Neil McPherson and Kennedy as its initial directors. *Id*. Attorney Childs organized 5950 State Bridge Road. *Id*.

1055.   On or about February 16, 2016, 5950 State Bridge Road filed its 2016 Public Information Report. Kennedy signed 5950 State Bridge Road's 2016 Public Information Report.

> **B.**     **_With Adkinson and the Leighton/Adkinson Firm's Assistance, Kennedy and Neil McPherson converted 5950 State Bridge from a corporation to a limited liability company._**

1056.   On or about December 22, 2016, **six days after Kennedy served her Third Supplemental Response to Plaintiff's Interrogatories**, 5950 State Bridge Road filed a Certificate of Conversion, by which it converted from a Texas for-profit corporation to a Texas limited liability company. Kennedy signed the Certificate of Conversion on December 22, 2016, as the President of 5950 State Bridge Road. A true and correct copy of 5950 State Bridge Road's Certificate of Conversion is attached to this Complaint as **Exhibit 243**. Attached to 5950 State Bridge Road's Certificate of Conversion was the Certificate of Formation of 5950 State Bridge Road, LLC, Filing No. 802611850, Document No. 70613757001. **Ex. 243**.

1057.   According to 5950 State Bridge Road's 2016 Certificate of Formation, Kennedy is the registered agent and manager of 5950 State Bridge Road. *Id*.

1058.   5950 State Bridge Road's Certificate of Conversion and the attached Certificate of Formation of 5950 State Bridge Road, LLC, were transmitted to the Texas Secretary of State's

office by facsimile transmission from telephone/facsimile number (512) 322-0882, which is the facsimile number for the Leighton/Adkinson Firm.[79]

1059.   On or about January 17, 2017, 5950 State Bridge Road filed its 2017 Public Information Report. Kennedy signed 5950 State Bridge Road's 2017 Public Information Report as its Manager.

1060.   5950 State Bridge Road's 2017 Public Information Report failed to report the identities of 5950 State Bridge Road's members; however, according to Kennedy's 2016 Supplemental Responses, **Ex. 12.**, the members of 5950 State Bridge Road are Kennedy, Neil McPherson, and the Babette Trust, as follows:



1061.   Kennedy is the Manager of 5950 State Bridge Road, and Kennedy controls all of 5950 State Bridge Road's activities.

1062.   According to its 2015 and 2016 Form 1065 tax returns, 5950 State Bridge Road owns 75% of the membership interests of 5950 SB Georgia Holdings, LLC. Servo Ventures JCGA, LLC, owns the remaining 25% of the membership interests in 5950 SB Georgia Holdings, LLC.

---

[79] http://leightonlawfirm.com/index.php?option=com_content&view=article&id=63&Itemid=60

1063.   5950 SB Georgia Holdings owns certain real property situated at 5950 State Bridge Road, Duluth, Georgia 30097.

1064.   As of December 31, 2015, 5950 State Bridge Road had total assets of $874,748 comprised of its investment in 5950 SB Georgia Holdings and a securities account at TD Ameritrade with a value of $380,000.

1065.   5950 State Bridge Road's sole liability as of December 31, 2015, was a $400,000.00 loan from Neil McPherson.

1066.   From all that appears, the loan from Neil McPherson consisted of the assignment of $380,000 of securities at TD Ameritrade.

1067.   As of December 31, 2016, 5950 State Bridge Road's investment in 5950 SB Georgia Holdings was $514,980. It had $44,130 in cash deposits. It owed its shareholders $43,027.

1068.   As of the end of the 2016 tax year, 5950 State Bridge Road's outstanding liability to Neil McPherson was only $43,027. 5950 State Bridge Road reduced its liability to Neil McPherson by $356,973 in 2016.

1069.   In addition to the securities it bought and sold in 2016, 5950 State Bridge Road appears to have liquidated or otherwise transferred its other $380,000 of assets at TD Ameritrade in 2016.

1070.   According to 5950 State Bridge Road's 2016 Form 1120S tax return, 5950 State Bridge Road's investment 5950 SB Georgia Holdings was $514,980. Its net income from rental real estate in 2016 was $41,739.

1071.  Each shareholder's value in 5950 State Bridge Road for the years ended December 31, 2015, and December 31, 2016, is as follows:



1072.  In 2016, 5950 State Bridge Road bought and sold more than $1,400,000 in publicly traded securities, generating a loss of $396 as follows:

| Description | Bought | Sold | Proceeds | Cost basis | Gain (Loss) |
|---|---|---|---|---|---|
| 4,500 shares Credit Suisse AG | 09/02/16 | 11/10/16 | $94,024 | $91,972 | $2,052 |
| 4,800 shares Credit Suisse AG | various | 04/06/16 | $95,988 | $91,034 | $4,954 |
| 1,000 shares Direxion Shares Trust | 01/04/16 | 03/07/16 | $54,789 | $58,870 | $0 |
| 7,900 shares Direxion Shares Trust | various | 05/19/16 | $512,015 | $504,777 | $7,238 |
| 13,000 shares Direxion SHS | various | 10/13/16 | $539,266 | $555,140 | -$15,507 |
| 3,000 shares Proshares | 05/10/16 | 05/11/16 | $45,829 | $45,500 | $329 |
| 1,500 shares Proshares Ultra | 05/12/16 | 05/12/16 | $101,988 | $101,450 | $538 |
| **Totals** | | | **$1,443,899** | **$1,448,743** | **-$396** |

1073.  As noted elsewhere in this Complaint, a judgment-debtor's stock in a Texas corporation can be executed upon by turnover. A creditor may not, however, compel turnover of a judgment-debtor's interests in a limited liability company.

1074.  Upon conversion of 5950 State Bridge Road on December 31, 2016, the Kennedy Enterprise converted an asset with a value of $559,110 that was subject to a turnover action into an asset with the same value but against which HCB may only obtain a charging order.

1075.  As of December 31, 2017, Neil McPherson owned no membership interests in 5950 State Bridge Road. Kennedy somehow succeeded to Neil McPherson's 10% interest,

raising her individual interest to 75%. The Babette Trust owns the remaining 25% of the membership interests in 5950 State Bridge Road.

1076.   As of December 31, 2017, Kennedy and the Babette Trust's respective capital account values were as follows:

| Member | Ownership in % | 12/31/17 Value |
|---|---|---|
| Kennedy | 75% | $411,619.50 |
| Babette Trust | 25% | $136,706.50 |
| **Totals** | **100%** | **$546,826.00** |

1077.   As of the end of 2016, 5950 State Bridge Road's TD Ameritrade account was liquidated, and 5950 State Bridge Road owed no liabilities to Neil McPherson.[80]

1078.   At the time the Kennedy Enterprise converted 5950 State Bridge Road from a corporation to a limited liability company, 5950 State Bridge Road was a valuable asset. The Kennedy Enterprise converted 5950 State Bridge Road with the actual intent to hinder, delay, or defraud HCB in its collection efforts.

## XII.   *In 2017, the Kennedy Enterprise organized the Medicus entities to operate its own marijuana cultivation business.*

1079.   After investing in Fiore, the Kennedy Enterprise sought other opportunities to expand its holdings in marijuana cultivation industry.

### A.   *The Kennedy Enterprise formed and capitalized Medicus Arkansas to obtain a medical marijuana cultivation license in Arkansas.*

1080.   In August 2017, the Kennedy Enterprise formed a series of limited liability companies to apply for a medical marijuana cultivation license in Arkansas.

1081.   On August 10, 2017, Adkinson and the Leighton/Adkinson Firm filed the Articles of Organization of Medicus Arkansas, LLC, an Arkansas limited liability company, with the

---

[80] As with Rockcliff Holdings' indebtedness to Neil McPherson, 5950 State Bridge Road's indebtedness to Neil McPherson was a sham loan. Again, the Kennedy Enterprise sought to insulate Neil McPherson from his ex-wife's claims in litigation in Canada.

Secretary of State of Arkansas, as Document No. 8980725001, Filing No. 811141252. True and correct copies of the Articles of Organization of Medicus Arkansas are attached to this Complaint as **Exhibit 244**. Medicus Arkansas is a manager-managed limited liability company, and Kennedy is its Manager. **Ex. 244**. According to the Articles of Organization, Medicus Arkansas' principal office is Kennedy's home address, 4720 Rockcliff Road. *Id*.

1082.   The members of Medicus Arkansas entered into that certain Operating Agreement of Medicus Arkansas, as of September 1, 2017. A true and correct copy of the Medicus Arkansas Operating Agreement is attached to this Complaint as **Exhibit 245**. According to Medicus Arkansas Operating Agreement, the members of Medicus Arkansas are the following:

| Member | Ownership in Units |
|---|---|
| Medicus Arkansas II, LLC | 40 |
| Steve K. Im | 14 |
| Leigh Wood | 10.5 |
| Amanda Raible | 10.5 |
| Josh Reed | 13 |
| Nathan Atchison | 3 |
| Sun Lee | 5 |
| Robert Reis | 4 |
| **Total** | **100** |

1083.   Kennedy signed the Medicus Arkansas Operating Agreement as the manager of Medicus Arkansas II, LLC.

1084.   Medicus Arkansas II, LLC ("**Medicus II**"), is an Arkansas limited liability company. On September 13, 2017, Adkinson and the Leighton/Adkinson Firm filed the Articles of Organization of Medicus II with the Secretary of State of Arkansas, as Document No. 9073312001, Filing No. 811144381. True and correct copies of the Articles of Organization of Medicus II are attached to this Complaint as **Exhibit 246**.

1085.   On or about September 13, 2017, the members of Medicus II entered into that certain Operating Agreement of Medicus Arkansas II, LLC. A true and correct copy of the

Medicus II Operating Agreement is attached to this Complaint as **Exhibit 247**. According to Medicus II's Operating Agreement, the members of Medicus II are the following:

| Member | Ownership in Units |
|---|---|
| Medicus Arkansas III, LLC | 60 |
| **Kennedy** | **20** |
| Page D. Beary | 9 |
| Pike Powers | 6 |
| Edward "Eddy" Patterson | 3 |
| Amanda Raible | 1 |
| Leigh Wood | 1 |
| **Total** | **100** |

1086. Kennedy signed the Medicus II Operating Agreement (a) as the manager of Medicus Arkansas III, LLC, and (b) in her individual capacity.

1087. Medicus Arkansas III, LLC ("**Medicus III**"), is an Arkansas limited liability company. On September 13, 2017, Adkinson and the Leighton/Adkinson Firm filed the Articles of Organization of Medicus III with the Secretary of State of Arkansas, as Document No. 9075910001, Filing No. 811144458. A true and correct copy of the Articles of Organization of Medicus III is attached to this Complaint as **Exhibit 248**.

1088. Also on or about September 13, 2017, the members of Medicus III entered into that certain Operating Agreement of Medicus Arkansas III, LLC. A true and correct copy of the Medicus II Operating Agreement is attached to this Complaint as **Exhibit 249**. According to the Operating Agreement of Medicus III, the members of Medicus III are the following:

| Member | Ownership in Units |
|---|---|
| **Kennedy** | **25.53** |
| Leighton | 25.53 |
| Page D. Beary | 31.91 |
| Stan Bienasz | 12.77 |
| Edward "Eddy" Patterson | 4.26 |
| **Total** | **100.00** |

**Ex. 249**.

**B.**   *Kennedy controls the management and distributions of the Medicus Entities.*

1089.   As shown above, Kennedy individually owns 25.53% of Medicus III. Medicus III owns 60% of Medicus II. Kennedy individually owns 20% of Medicus II. When joined with her interest in Medicus III, Kennedy owns 35.318% of Medicus II. Medicus II owns 40% of Medicus Arkansas. Kennedy owns an aggregate 14.13% of Medicus Arkansas.

1090.   Overall, Kennedy's ownership percentages in the Medicus entities flow from Medicus III up to Medicus Arkansas, as follows:



1091.   On or about September 13, 2017, Medicus Arkansas and Medicus II entered into that certain Management Agreement pursuant to which Medicus Arkansas retained Medicus II as its manager. A true and correct copy of the Medicus Management Agreement is attached to this

Complaint as **Exhibit 250**. According to the Medicus Management Agreement, Medicus Arkansas agreed to pay Medicus II the Preferred Distribution, as defined in the Medicus Arkansas Operating Agreement. **Ex. 250**, ¶ 8(a). The Preferred Distribution is "the first Ten Million Dollars ($10,000.000.00) in distributions from the Company, regardless of the source of the funds distributed (excess earnings, sale of assets, refinancing of loans, equity contributions, etc.)." **Ex. 247**, ¶ 6.1. In addition, Medicus Arkansas agreed to pay Medicus II an annual management fee equal to 5% of Medicus Arkansas' gross revenues. **Ex. 250**, ¶ 8(b).

1092.   Kennedy signed the Medicus Management Agreement as the Manager of Medicus Arkansas and as the Manager of Medicus II. *Id.*, at 6.

1093.   Based on Kennedy's 35.318% ownership in Medicus II, Kennedy would be entitled to a proportionate share of the Preferred Distribution in the amount of $3,531,800.00.

### C.      The Kennedy Enterprise attempted to defraud the Arkansas Medical Marijuana Commission when Medicus Arkansas applied for a medical marijuana cultivation license.

1094.   On or about September 18, 2017, Medicus Arkansas submitted an Application for Medical Marijuana Cultivation Facility (the "**Medicus Application**") to the State of Arkansas Medical Marijuana Commission ("**Arkansas MMC**"). True and correct excerpts of the Medicus Application are attached hereto as **Exhibit 251**.

1095.   The Medicus Application included several sections and subparts.

1096.   Section A of the Medicus Application provided general information about the applicant, Medicus Arkansas, including its business mailing address, 248 Addie Roy Rd., Suite B204, Austin, TX 78746, which is the office of Defendants the Leighton/Adkinson Firm, Leighton, Attorney Williams, and Adkinson. Medicus Arkansas' business telephone number is Kennedy's personal cell phone number. **Ex. 251**.

1097.   Kennedy signed the Medicus Application on September 12, 2017, certifying

the information provided [to be] complete and accurate [and] that any misstatement or concealment of fact may be grounds for refusal of application or revocation of license if later disclosed.

*Id*.

1098.  Adkinson notarized Kennedy's execution of the Medicus Application on September 12, 2017. *Id*.

1099.  Section B of the Medicus Application included application materials and disclosure statements from each of Medicus Arkansas' members, including contact information, residency, tax liabilities, "other financial liabilities," regulatory history, and professional licensure.

1100.  With respect to "other financial liabilities," the Medicus Application asked each individual member of the Medicus Entities the following question: "Are you a party to any legal proceedings where damages, fines, or civil penalties may reasonably be expected to exceed $500,000.00 above any insurance coverage available to cover the claim?" If any applicant answered affirmatively, then Section B required that person to submit additional information, as follows:

If the answer to the above question is "yes", attach a statement describing the litigation, including the title and docket number of the litigation, the name and location of the court in which it is pending, the identity of all parties to the litigation, the general nature of the claims being made and the impact an unfavorable opinion may have on your ability to finance and operate the proposed cultivation facility. Any documents submitted in response to this requirement must be labeled with "Section B, Other Financial Liabilities".

*Id*.

1101.  Section E of the Medicus Application included Letters of Commitment from Financiers and Proof of Assets for the financing members of Medicus Arkansas.

1102.  According to the Medicus Application, Kennedy owned 14.13% of the membership interests in Medicus Arkansas, which was the largest membership allocation.

1103.   Leighton owned 6.13% of the membership interests in Medicus Arkansas.

1104.   Page Beary, Christopher Beary's wife, owned 11.26% of the membership interests in Medicus Arkansas.

1105.   In addition, Kennedy's co-manager in Compassionate Use, Edward Patterson, was a member of Medicus Arkansas. Edward Patterson owned 2.22% of the membership interests of Medicus Arkansas.

1106.   As noted above, Kennedy signed the Medicus Application for Medicus Arkansas. When she signed the Medicus Application, Kennedy represented to the Arkansas MMC that the application was "complete and accurate.".

1107.   Kennedy's representation to the Arkansas MMC was false, and Kennedy knew her representation was false. The Medicus Application was not "complete and accurate."

1108.   In connection with the Medicus Application, Kennedy submitted her own Section B Disclosure Statement. In Kennedy's Section B Disclosure Statement, Kennedy listed her percentage of equity interest as 14.13%.

1109.   When asked whether she had any "other financial liabilities," as of September 1, 2017, Kennedy answered "No."

1110.   Kennedy's response was false, and Kennedy knew her response was false.

1111.   Kennedy owes millions of dollars of "other financial liabilities" that she did not disclose in the Medicus Application.

1112.   Kennedy did not disclose that she owes HCB more than $2,000,000.00 under the HCB Judgment.

1113.   Kennedy did not disclose that HCB continues to pursue a deficiency judgment in excess of $8,000,000.00 in the St. Tammany Parish Case.

1114.   Kennedy did not disclose the she owes Biel REO $472,653.14, plus attorney's fees of $48,475.50, under Biel REO's judgment against her in the Harrison County Case.

1115.   Kennedy did not disclose the fraudulent Hyperion Liens.

1116.   At the end of Kennedy's Section B Disclosure Statement, Kennedy certified "that the information provided in this form and its attachments is complete and accurate." Kennedy signed the Section B Disclosure Statement and accompanying certification on September 2, 2017.

1117.   Kennedy's representation her Section B disclosure statement was "complete and accurate" was false, and Kennedy knew her representation was false.

1118.   Kennedy also executed a Letter of Commitment as of September 5, 2017. In the Letter of Commitment, Kennedy pledged to contribute or cause to be contributed $2,500,000.00 to Medicus Arkansas if Medicus Arkansas won a cultivation license from the Arkansas MMC.

1119.   Kennedy signed the September 5, 2017, Commitment Letter as both the Chief Executive Officer of Medicus Arkansas and as the "Committed Investor."[81]

1120.   In addition, in Schedule 4 to the Medicus Application, Kennedy submitted proof of assets as one of the financiers of Medicus Arkansas. Among the documents Kennedy submitted as proof of her assets was a reference letter from UBS AG.

1121.   Prior to making her submission in Schedule 4, Kennedy intended to misrepresent her assets to the Arkansas MMC.

1122.   On August 9, 2017, at 1:29 p.m., Kennedy sent an email to Ms. Decarlo and Thomas Johnson at UBS AG seeking a letter of reference. A true and correct copy of Kennedy's

---

[81] Page Beary pledged to contribute or cause to be contributed $1,000,000.00 to Medicus Arkansas, over and above the $75,000.00 she contributed to Medicus III.

August 9, 2017, email is attached to this Complaint as **Exhibit 252**. Specifically, Kennedy wrote, "Can I get a letter addressed to the Arkansas Marijuana Commission stating the I have liquid assets totaling 7 million or whatever that number is." **Ex. 252**.

1123.   Ms. Decarlo sent a reply email to Kennedy on August 9, 2017, at 1:33 p.m., notifying Kennedy that "[w]e are going to have to work with compliance on the letter." A true and correct copy of Ms. Decarlo's August 9, 2017, email to Kennedy is attached to this Complaint as **Exhibit 253**.

1124.   On August 10, 2017, the same day the Kennedy Enterprise organized Medicus Arkansas, Mr. McCurry at UBS AG provided Kennedy with a "statement of financial condition" via email. A true and correct copy of Mr. McCurry's August 10, 2017, email is attached to this Complaint as **Exhibit 254**. Attached to Mr. McCurry's August 10, 2017, email was a document entitled "Lee McPherson Confirmation Letter."

1125.   The Lee McPherson Confirmation Letter provided as follows:

Confirmation: Information regarding the accounts of Lee McPherson

To the State of Arkansas

The following client has requested UBS AG Financial Services Inc. to provide you with a letter of reference to confirm her banking relationship with our firm.

Mrs. Lee Freyer McPherson
4720 RockCliff Rd, Apt 3
Austin, TX 78746

Lee McPherson has been a valued client of ours since November 2015, and as of the close of business on Wednesday, August 9th, the Lee McPherson household of accounts has a total value in excess of $7,275,000.

Please be aware this account is a securities account not a "bank" account. Securities, mutual funds and other non-deposit investment products are not FDIC-insured or bank guaranteed and are subject to market fluctuation. ***The assets in the account, including cash balances, have been pledged to a financial institution as collateral and may also be subject to the risks of withdrawal and***

*transfer.* This securities account has been approved for margin. The above-referenced account value may reflect assets not held at UBS.

**Ex. 254** (emphasis added).

1126.   The following day, at 5:20 a.m., after receiving the Lee McPherson Confirmation Letter, Kennedy sent another email to Ms. Decarlo. A true and correct copy of Kennedy's email to Ms. Decarlo is attached to this Complaint as **Exhibit 255**. In her August 11, 2017, email to Ms. Decarlo, Kennedy wrote, "the letter says the balances have been pledged as collateral - can we clarify that you can still access the funds at any time? Or have them remove that altogether by any chance?" **Ex. 255**.

1127.   Ms. Decarlo responded the same day at 10:30 a.m. A true and correct copy of Ms. Decarlo's August 11, 2017, email is attached to this Complaint as **Exhibit 256**. In her August 11, 2017, reply email, Ms. Decarlo wrote:

> Hi Lee,
>
> We spoke with compliance this morning and we cannot remove that clause about the collateral. Currently 5 of your 8 accounts (80% of your assets at UBS) are being pledged to your securities-based loans. Additionally, your RockCliff Custody account is a margin account. Hence, compliance must include the language on collateral.
>
> We can have a second letter generated that shows how much your credit line is approved for if that is helpful.

**Ex. 256**.

1128.   Kennedy agreed by email on August 11, 2017, at 3:35 p.m., that the second letter would be helpful. **Ex. 256**.

1129.   On August 14, 2017, Mr. McCurry at UBS AG sent Kennedy a follow-up email, which read: "Per the below email, please find attached a summary letter, which includes the Financial Condition Letter and two reports regarding your lines of credit." A true and correct copy of Mr. McCurry's August 14, 2017, email is attached to this Complaint as **Exhibit 257**.

1130.  Mr. McCurry transmitted with his August 14, 2017, email a subsequent confirmation letter for Kennedy's use. **Ex. 257**.

1131.  The August 14, 2017, confirmation letter recited:

UBS AG has issued a statement of financial condition for Lee McPherson reflecting the value of her brokerage accounts as $7,275,000. In addition, we have provided two reports to support information pertaining to her lines of credit, which are approved to borrow a combined amount of $3,100,000 and have available borrowing capacity of $1,657,000.

*Id*.

1132.  Two Credit Line Availability Reports accompanied the August 14, 2017, Confirmation Letter. *Id*. The first report reflected the status of the LK Freyer Investments credit line account ending in 0057. *Id*. The second report reflected the balance and availability under the Babette Trust's credit line account ending in 3592. **Ex. 257**.

1133.  Kennedy submitted the two confirmation letters and the Credit Line Availability Reports to the Arkansas MMC to support the Medicus Application.

1134.  Ultimately, the Arkansas MMC awarded five (5) medical marijuana cultivation licenses, but Medicus Arkansas was not one of the successful applicants.

1135.  The Medicus Application was disqualified and never scored. On October 2, 2017, the Arkansas MMC sent a letter to Kennedy explaining Medicus Arkansas' disqualification. A true and correct copy of the October 2, 2017, letter is attached to this Complaint as **Exhibit 258**. In its letter, the Arkansas MMC wrote:

Your application for a medical marijuana cultivation facility was reviewed by Medical Marijuana Commission staff. You failed to provide adequate information for the staff to verify that your application meets the minimum criteria required for submission for merit review by the Commission.

Specifically, the applicant, Lee McPherson, is not an Arkansas resident as required by Ark. Constitutional Amendment 98, Section 8(c)(i) and Arkansas Medical Marijuana Commission Rules, Section IV(4)(a)(ii).

**Ex. 258**.

1136.   The Kennedy Enterprise's numerous acts of mail fraud and wire fraud made Medicus Arkansas look like a viable applicant before the Arkansas MMC, but the Kennedy Enterprise's fraud is inexcusable.

**XIII.**   **In 2017, the Kennedy Enterprise invested $3,000,000 in Compassionate Cultivation, a marijuana cultivator in Texas.**

    **A.**   **Formation of Compassionate Use, Compassionate Use II, and Organic Health.**

1137.   Compassionate Use is a Texas limited liability company. Attorney Thalia Banowsky of the Exall & Wood law firm formed Compassionate Use on August 28, 2017, by filing its Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 802801583, Document No. 759022900002. A true and correct copy of Compassionate Use's Certificate of Formation is attached here as **Exhibit 259**. Compassionate Use is a manager-managed limited liability company. **Ex. 259**. Eddy Patterson was Compassionate Use's initial manager. *Id*. Though not named in Compassionate Use's Certificate of Formation, Kennedy is one of Compassionate Use's co-managers.

1138.   On or about November 1, 2017, Kennedy and Eddy Patterson executed that certain Amended and Restated Company Agreement of Compassionate Use, LLC, dated as of November 1, 2017. A true and correct copy of Compassionate Use's Company Agreement is attached to this Complaint as **Exhibit 260**.

1139.   According to the Company Agreement of Compassionate Use, Kennedy and Eddy Patterson each own 100 units of the Class B membership interests in Compassionate Use. **Ex. 260** at 21.

1140.   As owners of all of the Class B membership units, Kennedy and Eddy Patterson are the only members of Compassionate Use entitled to vote on any matter. *Id*.

1141.  The Company Agreement of Compassionate Use includes distribution waterfall provisions governing the priority and amount of the Company's distributions to its members. According to the Company Agreement of Compassionate Use, the members are entitled to distributions as follows:

       a.      First, distributions to the members for taxes;

       b.      Second, 100% to the Class A (non-voting) Members until the Class A members have received distributions equal to their aggregate Capital Contributions;

       c.      Third, 100% to the Class B Members (Kennedy and Eddy Patterson) until the cumulative distributions to them equal 12% of the aggregate distributions to the Class A Members; and

       d.      Fourth, 88% to the Class A Members and 12% to the Class B Members (Kennedy and Eddy Patterson). **Ex. 260**, ¶ 4.01.

1142.  Kennedy and Eddy Patterson are the Managers of Compassionate Use. *Id.*, ¶ 5.04. As the Managers of the company, Kennedy and Eddy Patterson are entitled to compensation in the form of a Management Fee. *Id.*, ¶ 5.07. The Company Agreement defines the Management Fee as three percent (3%) of the aggregate Capital Contributions made to the Company during any period in which the Company receives such contributions. *Id.*, ¶ 5.15(a).

1143.  The Company Agreement provides that "[e]ach Manager shall be entitled to direct that all or any portion of the Management Fees payable to it by the Company be paid to an affiliate of such Manager or any third party or parties designated in writing by such Manager." *Id.*, ¶ 5.15(b).

1144.  Compassionate Use's Company Agreement includes a specific waiver of conflicts with respect to the Exall & Wood law firm. It provides:

Each Member acknowledges that Exall & Wood, PLLC and its attorneys (the "*Firm*") have represented only the Company, rather than any Member in connection with the negotiation and preparation of this Agreement and that each Member has been advised by the Firm to obtain independent legal counsel regarding the legal, tax and other consequences of this Agreement. Each Member and the Company waives any conflict of interest or potential conflict of interest related to the representation of Edward A. Patterson by the Firm, including without limitation as a result of the prior or current representation of Edward A. Patterson or his respective affiliates  in other matters.

**Ex. 260**, ¶ 9.11.

1145.  The Company Agreement of Compassionate Use also includes a specific limitation of liabilities provision relating to the services provided by the Exall & Wood law firm:

> *Limitation of Liabilities*. The Company and each Member acknowledges  and agrees that Subsection N of Section 33 of the Texas Securities Act (entitled Limitation of Liability in Small Business Issuances) limits the potential liability of a person who has been engaged to provide services relating to offers of securities to three times the fee paid by the issuer or other seller to the person for the services, unless the trier of fact finds the person engaged in intentional wrongdoing in providing the services. The Company and each Member agree that this limitation of potential liability shall apply to any offering of the Company's Interests, including to the services provided by the Firm, and that the required disclosure was provided.

**Ex. 260**, ¶ 9.12.

1146.  Kennedy and Eddy Patterson signed the Company Agreement of Compassionate Use as the Class B Members and as the Managers. *Id*. at 20.

### B.  *Compassionate Use II was formed as a mirror image of Compassionate Use.*

1147.  Compassionate Use II also is a Texas limited liability company. Adkinson and the Leighton/Adkinson Firm formed Compassionate Use II on December 12, 2017, by filing its Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 802880371, Document No. 780784940002. A true and correct copy of Compassionate Use II's Certificate of Formation is attached here as **Exhibit 261**. Like Compassionate Use,

Compassionate Use II is a manager-managed limited liability company, and its two co-managers are Kennedy and Eddy Patterson. **Ex. 261**.

1148.   Because Compassionate Use II's name is so similar to Compassionate Use's name, Compassionate Use II obtained the consent of Compassionate Use to use a similar name. On December 7, 2017, Compassionate Use executed that certain Consent to Use of Similar Name. Kennedy executed the Consent to Use of Similar Name as the manager of Compassionate Use as of December 7, 2017. Adkinson and the Leighton/Adkinson Firm filed the Consent to Use of Similar Name with Compassionate Use II's Certificate of Formation. **Exhibit 262**.

1149.   Kennedy and Eddy Patterson are the members of Compassionate Use II.

1150.   On or about December 12, 2017, the members of Compassionate Use II executed that certain Company Agreement of Compassionate Use II, LLC, dated as of December 12, 2017. A true and correct copy of the Company Agreement of Compassionate Use II is attached to this Complaint as **Exhibit 263**.

1151.   The Company Agreement of Compassionate Use II is nearly identical to the Company Agreement of Compassionate Use. For example, both agreements provide that the Managers of each company are entitled to a Management Fee equal to 3% of all Capital Contributions to the Company, and the Managers can direct that their Management Fees be paid to a third party.

1152.   While both agreements include waterfall provisions, the Company Agreement of Compassionate Use II contemplates a 10% "catch-up return" for the Class B Members. It also provides for a final 90/10 split after distributions (a) for taxes, (b) to return the Class A Members' Capital Contributions, and (c) for payment of the "catch-up returns." **Ex. 263**, ¶ 4.01.

1153.   Unlike the Company Agreement of Compassionate Use, the Company Agreement of Compassionate Use II does not include any conflict waivers for the Exall & Wood law firm. The Company Agreement of Compassionate Use II likewise includes no limitation of liability provisions for the Exall & Wood law firm.[82]

### C.   *The Kennedy Enterprise formed Organic Health as another marijuana investment vehicle for Compassionate Cultivation.*

1154.   Organic Health is a manager-managed limited liability company formed under the laws of the State of Texas. Adkinson and the Leighton/Adkinson Firm formed Organic Health on March 13, 2017, by filing its Certificate of Formation of Limited Liability Company with the Secretary of the State of Texas, Filing No. 802672504, Document No. 721581900002. A true and correct copy of Organic Health's Certificate of Formation is attached here as **Exhibit 264**. As of March 13, 2017, Kennedy was the sole member and manager of Organic Health. **Ex. 264**.

1155.   On or about March 13, 2017, Kennedy executed that certain Company Agreement of Organic Health dated as of March 13, 2017. A true and correct copy of Organic Health's Company Agreement is attached to this Complaint as **Exhibit 265**.

1156.   According to the Organic Health Company Agreement, Kennedy is the sole member and manager of Organic Health. **Ex. 265** at 13.

1157.   Furthermore, Kennedy alone exercises all management duties of Organic Health and decides when and whether Organic Health may make any distributions to its members. *Id.*, ¶ 5.2(a).

---

[82]   Those specific omissions suggest that the Exall & Wood did not prepare the Company Agreement of Compassionate Use II. Instead, the Company Agreement of Compassionate Use II likely was plagiarized by someone for use by Compassionate Use II.

**D.    Beginning in 2017, the Kennedy Enterprise invested in Compassionate Cultivation, one of only three licensed marijuana dispensaries in Texas.**

1158.    Compassionate Cultivation, LLC ("**Compassionate Cultivation**") is one of only three licensed medical marijuana dispensers/cultivators in Texas under the Texas Compassionate-Use Act, Tex. Health & Safety Code §§ 487.001-.201.

1159.    In 2017, the Kennedy Enterprise began investing in Compassionate Cultivation.

1160.    Between October 10, 2017, and July 25, 2018, the Kennedy Enterprise funded a $2,000,000.00 loan to Compassionate Cultivation as shown on the following table:[83]

| Date | From | To | Amount |
|------|------|-----|--------|
| 10/10/17 | Compassionate Use | Compassionate Cultivation | $100,000.00 |
| 11/09/17 | Compassionate Use | Compassionate Cultivation | $300,000.00 |
| 11/09/17 | LK Freyer Investments | Compassionate Cultivation | $600,000.00 |
| 04/26/18 | Compassionate Use | Compassionate Cultivation | $500,000.00 |
| 07/25/18 | Compassionate Use | Compassionate Cultivation | $500,000.00 |
| **Total** | | | **$2,000,000.00** |

1161.    On or about November 8, 2017, Compassionate Cultivation executed and delivered that certain Convertible Promissory Note in the original principal balance of $4,000,000.00 memorializing the loan from Compassionate Use to Compassionate Cultivation. A true and correct copy of the Convertible Promissory Note is attached to this Complaint as **Exhibit 266**.

1162.    On November 8, 2017, at 3:19 p.m., Kennedy sent an email to Ms. Decarlo at UBS AG instructing UBS AG to send $600,000 to Compassionate Cultivation by interstate wire transfer. A true and correct copy of Kennedy's November 8, 2017, email to Ms. Decarlo is attached to this Complaint as **Exhibit 267**. On November 8, 2017, at 3:28 p.m., Ms. Decarlo confirmed receipt of Kennedy's instructions. A true and correct copy of Ms. Decarlo's

---

[83] Records produced by Compassionate Cultivation confirm the April 26, 2018, and July 25, 2018, payments from Compassionate Use, but those records do not indicate the source accounts for those payments.

November 8, 2017, email to Kennedy is attached to this Complaint as **Exhibit 268**. Ms. Decarlo wrote:

> Hi Lee,
>
> Per our conversation, we will send $600,000 to the below instructions tomorrow:
>
> Bank Information:
> Horizon Bank
> 600 Congress Avenue, Suite 400
> Austin, TX 78701
> Telephone #: XXX-XXX-5730
>
> Beneficiary, Payment Details or Bank-to-Bank info:
> Name: Compassionate Cultivation, LLC
> Routing#: 111907940
> Account#: XXX4645
>
> Best,
> Lizzie

**Ex. 268**.

1163.   The next morning, at 8:39 a.m., Kennedy sent a follow-up email to Ms. Decarlo asking her to confirm when the $600,000 wire transfer was transmitted to Compassionate Cultivation. A true and correct copy of Kennedy's November 9, 2017, email to Ms. Decarlo is attached to this Complaint as **Exhibit 269**. Ms. Decarlo replied to Kennedy by email at 9:00 a.m.

1164.   On November 9, 2017, UBS AG disbursed $600,000.00 to Compassionate Cultivation by interstate wire transfer. UBS AG made the transfer from LK Freyer Investments' loan account ending in 0057 at UBS AG (ABA routing number 026007993) in New York to Compassionate Cultivation's account at Horizon Bank, SSB (ABA routing number 111907940) in Texas.

1165.   At 9:09 a.m., Ms. Jones at UBS AG sent an email to Kennedy in which Ms. Jones wrote, "[t]he wire transfer has been completed; the fed reference number is:

1109B6B7IK2C000457." A true and correct copy of Ms. Jones' November 9, 2017, email to Kennedy is attached to this Complaint as **Exhibit 270**.

1166.   After funding the Convertible Promissory Note, the Kennedy Enterprise directly purchased equity interests in Compassionate Cultivation.

1167.   As the Kennedy Enterprise moved forward with its funding under the Convertible Promissory Note, Compassionate Cultivation offered it another investment choice.

1168.   On or about November 10, 2017, Organic Health executed that certain Confidential Subscription Agreement bearing Control Number 2017-53(R) pursuant to which it agreed to purchase, and Compassionate Cultivation agreed to sell, up to 524,000 shares of Class A membership interests in Compassionate Cultivation. A true and correct copy of the Subscription Agreement is attached to this Complaint as **Exhibit 271**.

1169.   At some point in late 2017, the Kennedy Enterprise reached an agreement with some of the members of Compassionate Cultivation to purchase at least a portion of their equity interests in Compassionate Cultivation, beyond the Units to which the enterprise was contractually obligated to purchase under the Subscription Agreement.

1170.   On December 7, 2017, at 12:39 p.m., Kennedy sent an email to Ms. Decarlo instructing her to send $750,000 to the Leighton/Adkinson Firm by interstate wire transfer. A true and correct copy of Kennedy's December 12, 2017, email to Ms. Decarlo is attached to this Complaint as **Exhibit 272**. Kennedy wrote, "Lizzie, please wire 750,000 to the instructions below. I'd like to take it from my margin. What do you suggest. Lee" **Ex. 272**.

1171.   At the time, the Kennedy Enterprise did not have enough availability under its lines of credit with UBS AG to fund the transactions with borrowed money as Kennedy intended.

1172.   On December 7, 2017, at 1:47 p.m., Ms. Decarlo confirmed receipt of Kennedy's instructions. A true and correct copy of Ms. Decarlo's December 7, 2017, email to Kennedy is attached to this Complaint as **Exhibit 273**. In her December 7, 2017, email to Kennedy, Ms. Decarlo wrote:

> Hi Lee,
>
> We are going to add your managed equity accounts in the Babette Trust (Dividend Ruler, Kayne, Polen & WCM) to the loan collateral pool and this will give you enough release to complete the 750k wire.
>
> Thomas is going to work with Brenda to have the documents signed electronically and we will expedite this as much as we can.
>
> Best,
>
> Lizzie

**Ex. 273**.

1173.   On December 7, 2017, the Kennedy Enterprise caused UBS AG to disburse $750,000.00 to the Leighton/Adkinson Firm by **two** separate interstate wire transfers.

1174.   At Adkinson's direction, UBS AG made one transfer in the amount of $350,000.00 from the Babette Trust's account ending in 3592 at UBS AG (ABA routing number 026007993) in New York to the Leighton/Adkinson Firm's account at JPMC (ABA routing number 111000614) in Texas.

1175.   At Kennedy's direction, UBS AG made the other transfer in the amount of $400,000.00 from LK Freyer Investments' account ending in 0057 at UBS AG (ABA routing number 026007993) in New York to the Leighton/Adkinson Firm's account ending in 8900 at JPMC (ABA routing number 111000614) in Texas.

1176.   On December 7, 2017, at 4:16 p.m., Ms. Jones at UBS AG sent an email to Kennedy and Adkinson, a true and correct copy of which is attached to this Complaint as **Exhibit 274**, as follows:

> Good afternoon Lee and Brenda,
>
> As requested, we sent two transfers to Leighton, Michaux, Adkinson & Brown, PLLC - IOLTA Trust Account this afternoon totaling $750,000. The wires have been completed, and the fed reference numbers are as follows:
>
> From the Trust UWO Babette L Wiener FBO Lee McPherson for $350k: 1207B6B7IK1C003468
>
> From the LK Freyer Investments LLC account for $400k: 1207B6B7IK2C001321
>
> Please let me know if you have any questions or if there is anything else we can do for you today.
>
> Thank you,
>
> Katie

**Ex. 274**.

1177.   On December 7, 2017, the Leighton/Adkinson Firm received wire transfers in the amount of $850,000.00, as follows:

| Date | From | Amount |
|------|------|--------|
| 12/07/17 | Eddy Patterson | $100,000.00 |
| 12/07/17 | Babette Trust | $350,000.00 |
| 12/07/17 | LK Freyer Investments | $400,000.00 |
| **Total** | | **$850,000.00** |

1178.   Upon receipt of the proceeds from UBS AG, the Leighton/Adkinson Firm disbursed almost $1,000,000.00 to Compassionate Cultivation and its members as follows:

| Date | To | Amount |
|------|------|--------|
| 12/08/17 | Compassionate Cultivation | $524,000.00 |
| 12/08/17 | Burke Edwards | $75,074.30 |
| 12/08/17 | Michael Rubin | $106,287.06 |
| 12/08/17 | Morris Denton | $128,214.82 |
| 12/08/17 | Josh Duke | $141,423.81 |
| **Total** | | **$974,999.99** |

1179.   On December 8, 2017, the Leighton/Adkinson Firm disbursed nearly $125,000.00 more than it collected from Eddy Patterson, the Babette Trust, and LK Freyer Investments.

1180.   Despite HCB's efforts to discover the source of the payments made by the Leighton/Adkinson Firm on behalf of Compassionate Use, the Leighton/Adkinson Firm has not produced all relevant documents in its possession, custody, or control, indicating the source of all of the $974,999.99 it disbursed to Compassionate Cultivation on December 8, 2017.

1181.   The Kennedy Enterprise's investment in Compassionate Cultivation is approximately $3,000,000.00.

1182.   Aggregated with its investments in the Medicus Entities and Fiore, the Kennedy Enterprise has invested or committed to invest more than $6,500,000 in marijuana cultivation businesses in California, Texas, and Arkansas, all in violation of federal law.

## COUNT 1 – VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)

1183.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1184.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; (d) Adkinson, in her capacity as Trustee of the Babette Trust; (e) Harry Freyer, in his individual capacity; (f) Kniahynycky; (g) Neil McPherson; (h) Reynolds; (i) Anita Williams; (j) 5950 State Bridge Road; (k) Fountain Square; (l) Freyer Investments; (m) Hyperion GP; (n) Hyperion; (o) Hyperion Management; (p) Lee Kennedy Investments; (q) LKF Investments-Texas; (r) LK Freyer Investments; (s) Palms Destin Holdings; (t) Rockcliff Holdings; and (u) Summer Winds Georgia (the "**Count 1 Defendants**").

1185.   At all relevant times, HCB was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

1186.   At all relevant times, each Count 1 Defendant was a person within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

## A.   Enterprise

1187.   The Count 1 Defendants formed an association-in-fact for the purpose of employing the acts described in this Complaint to defraud Kennedy's creditors, including HCB. The Count 1 Defendants have functioned as a continuing unit or organization for the purpose of defrauding HCB by fraudulently transferring Kennedy's assets, which could have been used to satisfy the Amended Final Judgment, to Kennedy's insiders and affiliates (e.g., conveying Kennedy's million-dollar asset from Kennedy, in her individual capacity, to entities owned or otherwise controlled by Kennedy) to avoid collection efforts by her creditors, including HCB. Such transfers allowed Kennedy to continue controlling her substantial wealth, collecting hundreds of thousands of dollars of annual revenues, and preserving Kennedy's investment and equity cushion in her assets, to the detriment of Kennedy's creditors, including HCB.

1188.   The Count 1 Defendants' association-in-fact was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which was structured through the familial and contractual relationships among the Count 1 Defendants, and at all relevant times, the Count 1 Defendants existed separate and apart from the Kennedy Enterprise as a whole.

## B.   Interstate Commerce

1189.   At all relevant times, and as described in this Complaint, the Count 1 Defendants were engaged in, and their activities affected, interstate commerce, as follows:

| Year | Component of Scheme | Participants | States affected |
|------|---------------------|--------------|-----------------|
| 2010 | 2010 Divestment Transactions | Kennedy, Harry Freyer | CO, FL, TX, NY |
| 2012 | Hyperion loan purchases | Kennedy, Neil McPherson, Harry Freyer, Kniahynycky | AL, LA, MA, MI, MS, NY, TX |
| 2013-2018 | Hyperion Liens | Kennedy, Adkinson, Kniahynycky, Mead, Reynolds, Williams | AL, AR, CA, CO, FL, LA, MI, MS, TX |
| 2014 | Fraud on Florida Court | Kennedy, Mead, Neil McPherson | AL, FL, MS, TX |
| 2013-2014 | Short sale of Pink House | Kennedy, Hall, Harry Freyer, Kniahynycky, Neil McPherson, Anita Williams | CA, CO, FL, IA, MI, NY, TX |
| 2014 | Purchase and refinance of Summer Winds Townhomes | Kennedy, Adkinson, Neil McPherson | TX, GA, NY |
| 2015 | Cash-out of Pink House | Kennedy, Harry Freyer, Mead, Anita Williams | FL, GA, NY, TX |
| 2015 | Cash-out of Fountain Square and purchase of Unit 21117 | Kennedy, Adkinson, Neil McPherson, Anita Williams | FL, MS, NY, TX |
| 2016 | Sale of Summerlake Townhouse | Kennedy, Anita Williams | FL, NY, LA, TX |
| 2016 | Title Judgment Proceeds | Kennedy, Adkinson, Harry Freyer | FL, LA, NY |
| 2016 | Investment in Fiore Management | Kennedy, Adkinson, Beary, Harry Freyer | AL, CO, CA, LA, NY, TX |
| 2016 | Conversion of 5950 State Bridge Road | Kennedy, Adkinson, Neil McPherson | GA, TX |
| 2017 | Investment in Medicus | Kennedy, Adkinson, Beary | AR, LA, NY, TX |
| 2017 | Investment in Compassionate Cultivation | Kennedy, Adkinson | NY, TX |
| 2017 | Sale of Mobile County Property | Kennedy, Adkinson, Harry Freyer, Neil McPherson, Reynolds | AL, NY, TX |
| 2018 | Sale of Parcel C | Kennedy, Beary, Mead, Anita Williams | AL, FL, TX |

## C.    Pattern of Racketeering Activity

1190.   At all relevant times, the Count 1 Defendants and others associated with the

Kennedy Enterprise agreed to and conducted or participated, directly or indirectly, in the conduct

of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of

RICO, 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of

defrauding HCB and others.

1191.   Pursuant to and in furtherance of their fraudulent scheme, the Count 1 Defendants committed multiple related acts of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, racketeering under 18 U.S.C. § 1952, money laundering under 18 U.S.C. § 1956, and/or witness tampering under 18 U.S.C. § 1512. Thus, the Count 1 Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the actions as set forth in this Complaint. Each of the Count 1 Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

1192.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The foregoing actions were related to each other by virtue of common participants, common victims (including HCB), common methods of commission, and the common purpose and common result of defrauding the HCB of the proceeds of the Amended Final Judgment and enriching the Kennedy Enterprise at HCB's expense while concealing the Kennedy Enterprise's fraudulent activities. The Kennedy Enterprise's actions described above are not isolated events; they commenced as early as 2010 and continue presently. Moreover, given their nature and duration, the actions of the Kennedy Enterprise pose a threat of continuing criminal conduct.

1193.   The Count 1 Defendants voluntarily and knowingly conducted and participated, directly or indirectly, in the conduct of the Kennedy Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), as described throughout this Complaint.

1194. Each Count 1 Defendant engaged in at least two acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1), one of which occurred after the effective date of

Civil RICO and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Each Count 1 Defendant committed and/or aided and abetted the commission of two or more acts of racketeering activity.

1195.   The acts set forth in this Count constitute mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, racketeering under 18 U.S.C. § 1952, money laundering under 18 U.S.C. § 1956, and/or witness tampering under 18 U.S.C. § 1512.

### D.     Causation and Damages

1196.   As a direct and proximate result of the Count 1 Defendants' racketeeting activities and violations of 18 U.S.C. § 1962(c), HCB has been injured in its business and property by (a) being deprived of the proceeds of the Amended Final Judgment and lost revenue in an amount to be proven at trial, and (b) being limited in its ability to reinvest those proceeds in HCB's business. Furthermore, HCB has been forced to expend hundreds of thousands of dollars and time and effort investigating the scheme at large. The Kennedy Enterprise has denied HCB its opportunity and ability to invest proceeds of the Amended Final Judgment and other amounts allocated to HCB's efforts to collect the Amended Final Judgment and investigation of the Kennedy Enterprise's scheme and the amounts which were due and owing to it as of March 14, 2013.

1197.   The damages suffered by HCB were and are foreseeable, natural, direct, and intended consequence of the Count 1 Defendants' scheme to defraud Kennedy's creditors, including HCB, and deprive HCB of the proceeds of the Amended Final Judgment. There are no independent factors that account for HCB's injury, nor injury suffered by HCB in any way derivative of any other injury.

**WHEREFORE,** HCB demands judgment against the Count 1 Defendants (a) awarding money damages in an amount to be determined by a jury; (b) awarding treble damages pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c); (c) awarding attorney's fees and the costs of this action; and (d) granting any other relief to which HCB may be entitled.

## COUNT 2 – Civil RICO – Reinvestment, 18 U.S.C. § 1962(a)

1198.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1199.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; (d) Adkinson, in her capacity as Trustee of the Babette Trust; (e) Canndescent JV; (f) Compassionate Use; (g) Compassionate Use II; (h) Fountain Square; (i) Lee Kennedy Investments; (j) Medicus Arkansas; (k) Medicus II; (l) Medicus III; (m) Organic Health; and (n) Rockcliff Holdings (the "**Count 2 Defendants**").

1200.   The Kennedy Enterprise is an enterprise engaged in and whose activities affect interstate commerce, as follows:

| Year | Component of Scheme | Participants | States affected |
|------|---------------------|--------------|-----------------|
| 2010 | 2010 Divestment Transactions | Kennedy, Harry Freyer | CO, FL, TX, NY |
| 2012 | Hyperion loan purchases | Kennedy, Neil McPherson, Harry Freyer, Kniahynycky | AL, LA, MA, MI, MS, NY, TX |
| 2013-2018 | Hyperion Liens | Kennedy, Adkinson, Kniahynycky, Mead, Reynolds, Williams | AL, AR, CA, CO, FL, LA, MI, MS, TX |
| 2014 | Fraud on Florida Court | Kennedy, Mead, Neil McPherson | AL, FL, MS, TX |
| 2013-2014 | Short sale of Pink House | Kennedy, Hall, Harry Freyer, Kniahynycky, Neil McPherson, Anita Williams | CA, CO, FL, IA, MI, NY, TX |
| 2014 | Purchase and refinance of Summer Winds Townhomes | Kennedy, Adkinson, Neil McPherson | TX, GA, NY |
| 2015 | Cash-out of Pink House | Kennedy, Harry Freyer, Mead, Anita Williams | FL, GA, NY, TX |
| 2015 | Cash-out of Fountain Square and purchase of Unit 21117 | Kennedy, Adkinson, Neil McPherson, Anita Williams | FL, MS, NY, TX |
| 2016 | Sale of Summerlake Townhouse | Kennedy, Anita | FL, NY, LA, TX |

| Year | Component of Scheme | Participants | States affected |
|------|---------------------|--------------|-----------------|
|      |                     | Williams     |                 |
| 2016 | Title Judgment Proceeds | Kennedy, Adkinson, Harry Freyer | FL, LA, NY |
| 2016 | Investment in Fiore Management | Kennedy, Adkinson, Beary, Harry Freyer | AL, CA, CO, LA, NY, TX |
| 2016 | Conversion of 5950 State Bridge Road | Kennedy, Adkinson, Neil McPherson | GA, TX |
| 2017 | Investment in Medicus | Kennedy, Adkinson, Beary | AR, LA, NY, TX |
| 2017 | Investment in Compassionate Cultivation | Kennedy, Adkinson | NY, TX |
| 2017 | Sale of Mobile County Property | Kennedy, Adkinson, Harry Freyer, Neil McPherson, Reynolds | AL, NY, TX |
| 2018 | Sale of Parcel C | Kennedy, Beary, Mead, Anita Williams | AL, FL, TX |

1201.   The Count 2 Defendant(s) used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.

1202.   Specifically, the Count 2 Defendants invested in Fiore, Medicus Arkansas, and Compassionate Cultivation using income derived from a pattern of racketeering related to the Kennedy Enterprise's scheme to defraud HCB. In addition, the Count 2 Defendants invested in Fiore, Medicus Arkansas, and Compassionate Cultivation while engaging in additional unlawful conduct involving mail fraud, wire fraud, racketeering, and witness tampering.

1203.   The Count 2 Defendants' conduct constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

1204.   As a direct and proximate result of the Count 2 Defendants' racketeeting activities and violations of 18 U.S.C. § 1962(a), HCB has been injured in its business and property by (a) being deprived of the proceeds of the Amended Final Judgment and lost revenue in an amount to be proven at trial, and (b) being limited in its ability to reinvest those proceeds in HCB's business. Furthermore, HCB has been forced to expend hundreds of thousands of dollars and time and effort investigating the scheme at large. The Kennedy Enterprise has denied HCB its opportunity and ability to invest proceeds of the Amendded Final Judgment and other amounts

allocated to HCB's efforts to collect the Amended Final Judgment and investigation of the Kennedy Enterprise's scheme and the amounts which were due and owing to it as of March 14, 2013.

**WHEREFORE,** HCB demands judgment against the Count 2 Defendants (a) awarding money damages in an amount to be determined by a jury; (b) awarding treble damages pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c); (c) awarding attorney's fees and the costs of this action; and (d) granting any other relief to which HCB may be entitled.

### COUNT 3 – RICO Conspiracy, 18 U.S.C. § 1962(d)

1205.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1206.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; (d) Adkinson, in her capacity as Trustee of the Babette Trust; (e) Harry Freyer, in his individual capacity; (f) Kniahynycky; (g) Neil McPherson; (h) Reynolds; (i) Anita Williams; (j) 5950 State Bridge Road; (k) Canndescent JV; (l) Compassionate Use; (m) Compassionate Use II; (n) Fountain Square; (o) Freyer Investments; (p) Hyperion GP; (q) Hyperion; (r) Hyperion Management; (s) Lee Kennedy Investments; (t) LKF Investments-Texas; (u) LK Freyer Investments; (v) Medicus Arkansas; (w) Medicus II; (x) Medicus III; (y) Organic Health; (z) Palms Destin Holdings; (aa) Rockcliff Holdings; and (bb) Summer Winds Georgia (the "**Count 3 Defendants**").

1207.   As explained in set forth above, the Count 3 Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c). Specifically:

| Year | Component of Scheme | Participants | States affected |
|------|---------------------|--------------|-----------------|
| 2010 | 2010 Divestment Transactions | Kennedy, Harry Freyer | CO, FL, TX, NY |
| 2012 | Hyperion loan purchases | Kennedy, Neil McPherson, Harry Freyer, Kniahynycky | AL, LA, MA, MI, MS, NY, TX |

| Year | Component of Scheme | Participants | States affected |
|------|---------------------|--------------|-----------------|
| 2013-2018 | Hyperion Liens | Kennedy, Adkinson, Kniahynycky, Mead, Reynolds, Williams | AL, AR, CA, CO, FL, LA, MI, MS, TX |
| 2014 | Fraud on Florida Court | Kennedy, Mead, Neil McPherson | AL, FL, MS, TX |
| 2013-2014 | Short sale of Pink House | Kennedy, Hall, Harry Freyer, Kniahynycky, Neil McPherson, Anita Williams | CA, CO, FL, IA, MI, NY, TX |
| 2014 | Purchase and refinance of Summer Winds Townhomes | Kennedy, Adkinson, Neil McPherson | TX, GA, NY |
| 2015 | Cash-out of Pink House | Kennedy, Harry Freyer, Mead, Anita Williams | FL, GA, NY, TX |
| 2015 | Cash-out of Fountain Square and purchase of Unit 21117 | Kennedy, Adkinson, Neil McPherson, Anita Williams | FL, MS, NY, TX |
| 2016 | Sale of Summerlake Townhouse | Kennedy, Anita Williams | FL, NY, LA, TX |
| 2016 | Title Judgment Proceeds | Kennedy, Adkinson, Harry Freyer | FL, LA, NY |
| 2016 | Investment in Fiore Management | Kennedy, Adkinson, Beary, Harry Freyer | AL, CA, CO, LA, NY, TX |
| 2016 | Conversion of 5950 State Bridge Road | Kennedy, Adkinson, Neil McPherson | GA, TX |
| 2017 | Investment in Medicus | Kennedy, Adkinson, Beary | AR, LA, NY, TX |
| 2017 | Investment in Compassionate Cultivation | Kennedy, Adkinson | NY, TX |
| 2017 | Sale of Mobile County Property | Kennedy, Adkinson, Harry Freyer, Neil McPherson, Reynolds | AL, NY, TX |
| 2018 | Sale of Parcel C | Kennedy, Beary, Mead, Anita Williams | AL, FL, TX |

1208.   The Count 3 Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count 3 Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. The Count 3 Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d).

1209.   As a direct and proximate result of the Count 3 Defendants' racketeeting activities and violations of 18 U.S.C. § 1962(d), HCB has been injured in its business and property by (a) being deprived of the proceeds of the Amended Final Judgment and lost revenue in an amount to be proven at trial, and (b) being limited in its ability to reinvest those proceeds in HCB's business. Furthermore, HCB has been forced to expend hundreds of thousands of dollars and time and effort investigating the scheme at large. The Kennedy Enterprise has denied HCB its opportunity and ability to invest proceeds of the Amended Final Judgment and other amounts allocated to HCB's efforts to collect the Amended Final Judgment and investigation of the Kennedy Enterprise's scheme and the amounts which were due and owing to it as of March 14, 2013.

**WHEREFORE,** HCB demands judgment against the Count 3 Defendants (a) awarding money damages in an amount to be determined by a jury; (b) awarding treble damages pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c); (c) awarding attorney's fees and the costs of this action; and (d) granting any other relief to which HCB may be entitled.

## COUNT 4 – Fraudulent Transfer of Hyperion Liens

1210.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1211.   HCB asserts this Count against Kennedy, Adkinson, Neil McPherson, Reynolds, Hyperion, Hyperion GP, Hyperion Management, and the following entity defendants (the "**Charged Entity Defendants**"): 5950 State Bridge Road, BK II, Compassionate Use, Compassionate Use II, Gonzales Holdings, Hungry Otter, Iron Glades Slope, KWF Group, Lee Kennedy Investments, LFK GP, LKF Investments-Texas, LK Freyer Investments, Organic Health, Rivercrest Lot, Rockcliff GP, and Rockcliff Holdings (together with Kennedy, Adkinson, Neil McPherson, Reynolds, Hyperion, Hyperion GP, and Hyperion Management, the "**Count 4 Defendants**").

1212.   As explained in this Complaint,[84] the Kennedy Enterprise initially formed Hyperion for purposes of acquiring Whitney's loans to Lee F. Kennedy Alabama and Factory Hill secured by the Mobile County Property and the Harrison County Property, respectively.

1213.   Hyperion's formation and structure generally was closely guarded. Overall, upon the formation of Hyperion, Kennedy owned 90% of Hyperion's partnership interests.

1214.   On or about September 13, 2012, Biel REO (Whitney's successor in interest) assigned the Lee F. Kennedy Alabama Mortgage and the Factory Hill Deed of Trust to Hyperion.

1215.   After acquiring Whitney's loans to Lee F. Kennedy Alabama and Factory Hill, On or about January 11, 2013, Hyperion foreclosed the Harrison County Property. On or about March 15, 2013, Hyperion foreclosed the Mobile County Property.

1216.   After acquiring the Harrison County Property and the Mobile County Property through non-judicial foreclosure sales in Mississippi and Alabama, Hyperion filed two lawsuits in Texas: Cause No. 13-625 and Cause No. 13-1003. Hyperion pursued deficiency judgments in both lawsuits.

1217.   On March 21, 2013, Hyperion sought and obtained a Final Default Judgment against Factory Hill and Kennedy in the amount of $896,164.70, because neither Kennedy nor Factory Hill answered or otherwise defended Hyperion's Original Petition in Cause No. 13-625.

1218.   On April 29, 2013, in Cause No. 1003, Hyperion sought and obtained a Final Default Judgment against Lee F. Kennedy Alabama and Kennedy in the amount of $1,069,220.00 because neither Kennedy nor Factory Hill answered or otherwise defended Hyperion's Original Petition in Cause No. 13-1003.

---

[84] *See supra* Part IV.

1219.   After entry of the Final Default Judgments in Cause No. 13-625 and Cause No. 13-1003, on May 29, 2013, Hyperion recorded the Foreign Judgment Affidavit in Okaloosa County, Florida.

1220.   After entry of the Final Default Judgments, Hyperion applied for and obtained charging orders against Kennedy in Cause No. 13-625, as follows:

| Date | Cause No. | Charged Entity |
|------|-----------|----------------|
| 04/12/13 | 13-625 | BK Properties |
| 04/12/13 | 13-625 | FH Aspen |
| 04/12/13 | 13-625 | Iron Glades Slope |
| 04/12/13 | 13-625 | Lee Kennedy Investments |
| 04/12/13 | 13-625 | LFK Investments-Texas |
| 04/12/13 | 13-625 | LK Freyer Investments |
| 04/12/13 | 13-625 | LK Freyer Shumaker |
| 04/12/13 | 13-625 | Rivercrest Lot |
| 04/12/13 | 13-625 | Rockcliff Holdings |
| 04/29/13 | 13-625 | Hungry Otter |
| 12/13/13 | 13-625 | KWF Group |
| 12/13/13 | 13-625 | Rockcliff GP |
| 12/13/13 | 13-625 | LFK GP |
| 09/25/14 | 13-625 | BK II |

1221.   Kennedy never defended or appealed any of Hyperion's charging order applications in Cause No. 13-625.

1222.   After entry of the Final Default Judgments, Hyperion applied for and obtained charging orders against Kennedy in Cause No. 13-1003 as follows:

| Date | Cause No. | Charged Entity |
|------|-----------|----------------|
| 7/26/13 | 13-1003 | BK Properties, LLC |
| 7/26/13 | 13-1003 | FH Aspen |
| 7/26/13 | 13-1003 | Hungry Otter |
| 7/26/13 | 13-1003 | Iron Glades Slope |
| 7/26/13 | 13-1003 | KWF Group |
| 7/26/13 | 13-1003 | LFK GP |
| 7/26/13 | 13-1003 | LK Freyer Investments |
| 7/26/13 | 13-1003 | LK Freyer Shumaker |
| 7/26/13 | 13-1003 | LKF Investments-Texas |
| 7/26/13 | 13-1003 | Rivercrest Lot |
| 7/26/13 | 13-1003 | Rockcliff GP |
| 9/25/14 | 13-1003 | BK II |

1223.   Kennedy never defended Hyperion's efforts to obtain Charging Orders in Cause No. 13-1003.

1224.   On February 5, 2018, Hyperion filed a new civil action and Application for Charging Orders in Cause No. 18-600. Hyperion applied for charging orders against Kennedy's interests in 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings, none of which even existed at the time Hyperion last applied for charging orders from the Travis County Court.

1225.   On February 28, 2018, Adkinson signed and filed an Original Answer on behalf of Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings in Cause No. 18-600. The Original Answer was the first appearance Kennedy made in any case filed by Hyperion.

1226.   On March 8, 2018, Hyperion, Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings entered into Agreed Charging Orders, which were then entered by the Travis County Court. **Ex. 63**. Adkinson signed the Agreed Charging Orders on behalf of Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Organic Health, and Gonzales Holdings. *Id.*

1227.   Generally, membership interests in a limited liability company are not subject to attachment, levy, garnishment, or turnover. Instead, "[t]he entry of a charging order is the exclusive remedy by which a judgment creditor of a member or of any other owner of a membership interest may satisfy a judgment out of the judgment debtor's membership interest." Tex. Bus Org. Code § 101.112.

1228.   The Count 4 Defendants did not defend Hyperion's claims in Cause No. 13-625 and Cause No. 13-1003.

1229.   The Count 4 Defendants did not defend Hyperion's efforts to obtain the Final Default Judgments in Cause No. 13-625 and Cause No. 13-1003.

1230.   The Count 4 Defendants did not defend Hyperion's charging orders applications in Cause No. 13-625 and Cause No. 1003.

1231.   The Count 4 Defendants' inaction and/or omissions in Cause No. 13-625 and Cause No. 13-1003 were intentional and intended to facilitate and permit the entry of the Final Default Judgments to accelerate and elevate Hyperion's judgment liens over the claims of any and all other creditors with respect to Kennedy's real property assets in Texas and Florida.

1232.   Kennedy and the Charged Entity Defendants' inaction and/or omissions in Cause No. 13-625 and Cause No. 13-1003 were intentional and intended to facilitate and permit the entry of the Final Default Judgments and Hyperion Charging Orders in Cause No. 13-625 and Cause No. 13-1003 to accelerate and elevate Hyperion's liens over the claims of any and all other creditors with respect to Kennedy's interests in BK II, Hungry Otter, Iron Glades Slope, KWF Group, Lee Kennedy Investments, LFK GP, LKF Investments-Texas, LK Freyer Investments, Rivercrest Lot, Rockcliff GP, and Rockcliff Holdings.

1233.   Moreover, by consenting to the Agreed Charging Orders, Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Gonzales Holdings, and Organic Health granted liens or acquiesced to the imposition of liens against Kennedy's interests in 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Gonzales Holdings, and Organic Health.

1234.   The Count 4 Defendants' intentional inaction, omissions, acquiescence, and/or agreements caused the entry of (a) the Final Default Judgments in Cause No. 13-625 and Cause

No. 13-1003, (b) the Charging Orders in Cause No. 13-625 and Cause No. 13-1003, and (3) the Agreed Charging Orders in Cause No. 18-600.

1235.  On information and belief, each of Hyperion's Application for Charging Orders was filed with the Travis County Court's duty judge during the court's "uncontested" docket times. Uopon filing of each application, Williams and/or Mr. Callahan represented to the Travis County Court that Hyperion's applications were "uncontested." Based on such representations from Hyperion's counsel, the Travis County Court granted Hyperion exactly the relief it sought. Thus, Kennedy and each of the Charged Entity Defendants necessarily consented to Hyperion's motions and applications. If Kennedy and the Charged Entity Defendants did not consent, then Williams, Hyperion's counsel in Cause No. 13-625 and Cause No. 13-1003, actively defrauded the Travis County Court.

1236.  Kennedy's interests in the Charged Entity Defendants are assets within the meaning of Tex. Bus. & Com. Code § 24.101(2).

1237.  The voluntary creation and/or imposition of the Hyperion Liens is a transfer within the meaning of Tex. Bus. & Com. Code § 24.101(12).

1238.  The Count 4 Defendants created, imposed, and/or acquiesced to the Hyperion Liens with the actual intent to hinder, delay, or defraud HCB in its collection efforts by creating or imposing a lien of higher priority than the lien of the HCB Judgment or the Texas Charging Orders.

1239.  By creating, imposing, and/or acquiescing to the Hyperion Liens, the Count 4 Defendants attempted to shield Kennedy's real property assets in Texas and Florida and her interests in the Charged Entity Defendants from HCB's collection efforts in violation of the TUFTA.

1240. The transfer of the Title Judgment proceeds satisfies various of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that the transfer of the Hyperion Liens is void, as shown below:

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (1) Transfer or obligation was to an insider | Kennedy and Hyperion are insiders pursuant to Tex. Bus. & Com. Code § 24.002(1) and (7). Kennedy controls Hyperion. Moreover, even though Reynolds is the Manager of Hyperion Management, the General Partner of Hyperion, Kennedy controls Reynolds by virtue of her relationships with Reynolds and with Adkinson, Reynolds' mother. Moreover, Kennedy ultimately owns and/or controls 99.95% of the partnership interests in Hyperion. |
| (2) Debtor retained possession or control of the property transferred after the transfer | Aside from entry of the Hyperion Liens, Kennedy has maintained complete control over her assets. Hyperion recorded its Foreign Judgment Affidavit in Okaloosa County, Florida, on May 29, 2013, imposing its judgment lien on Kennedy's real property assets in Okaloosa County, Florida, including the Pink House. On June 13, 2013, Neil McPherson, as the Manager of Hyperion GP, the General Partner of Hyperion signed a Partial Release of Judgment releasing its judgment lien against the Pink House to facilitate the short sale. <br><br> After Hyperion sold the Mobile County Property in 2017, Hyperion distributed the proceeds of that sale to Freyer Investments, Lee Kennedy Investments, and Rockcliff Holdings. Upon receipt of its distribution from Hyperion, Freyer Investments distributed $40,000.00 to LK Freyer Investments. <br><br> Kennedy controls Lee Kennedy Investments, LK Freyer Investments, and Rockcliff Holdings. Kennedy, then, controlled the Mobile County Property after Hyperion foreclosed it in 2013, and Kennedy received or controlled substantially all of the proceeds when Hyperion sold the Mobile County Property in 2017. |
| (3) Transfer or obligation was concealed | Kennedy revealed the occurrence of Hyperion's foreclosure of the Mobile County Property and the Harrison County Property, as well as the Hyperion's judgments against her. Even though Kennedy personally directed payments to Dunagan Childs' escrow account for the purchase of the Whitney loans, Kennedy never disclosed the circumstances of Hyperion's acquisition of the Whitney loans. <br><br> Moreover, Kennedy has never disclosed that Hyperion filed Cause No. 18-600 and that the Count 4 Defendants entered into the Agreed Charging Orders. HCB discovered that matter on its own and then pursed third party discovery to determine the nature of Cause No. 18-600. |
| (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | HCB obtained the Original Judgment against Kennedy on March 14, 2013. Less than 30 days later, on April 11, 2013, Hyperion sought its first Final Default Judgment, Kennedy took no action to defend against Hyperion's efforts. As HCB sought to execute its judgment against Kennedy, the Count 4 Defendants took action to block HCB's collection efforts. |

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (5) The transfer was of substantially all the debtor's assets | The Hyperion Liens appeared to encumber or attach to virtually all of Kennedy's interests in the Charged Entity Defendants. Those entities not affected by the Hyperion Liens were subsidiaries of one or more of the Charged Entity Defendants. Thus, the Count 4 Defendants sought to encumber every entity in which Kennedy owned any interest in her individual capacity. |
| (g) Debtor removed or concealed assets | Kennedy failed to disclose her majority interests in Hyperion to HCB until she served her Supplemental Responses. **Ex. 12**. By that time, Hyperion had foreclosed its interests in the Mobile County Property and the Harrison County Property, effectively preventing HCB from executing against Kennedy's interests in those assets.<br><br>Kennedy repeatedly referred to Hyperion as a "bank" in her December 19, 2013, and May 1, 2014, depositions, without disclosing her connections to Hyperion, in an effort to conceal her control over Hyperion. |
| (h) Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | None of the Count 4 Defendants exchanged consideration in connection with Hyperion Liens. |

1241.  The fraudulent transfer of the Hyperion Liens prevented HCB from asserting collection efforts with respect to the Charged Entity Defendants.

1242.  Since entry of the Amended Final Judgment, Kennedy has transferred $41,400.00 directly to Hyperion; however, Hyperion has distributed $36,912.62 to Kennedy.

1243.  Since entry of the Amended Final Judgment, the Charged Entity Defendants have transferred $219,500.00 directly to Hyperion. Of that amount, Hungry Otter has transferred $199,500.00. Hyperion, however, has paid Hungry Otter $188,212.61. LK Freyer Investments has transferred $20,000.00 to Hyperion.

1244.  In contrast, since entry of the Amended Final Judgment, the Charged Entity Defendants have fraudulently distributed at least $612,234.51 directly to Kennedy at least $612,234.51, and since entry of the Texas Charging Orders in favor of HCB, the Charged Entity Defendants have fraudulently distributed $444,646.11 directly to Kennedy.

1245.  Since entry of the Amended Final Judgment, Hyperion has distributed or transferred $1,637,335.17 to one or more the Charged Entity Defendants.

1246.  The Count 4 Defendants' fraudulent transfer of the Hyperion Liens has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 4 Defendants (a) avoiding the Hyperion Liens; (b) levying execution against The Kennedy's interests in the Charged Entity Defendants; (c) preliminarily and permanently enjoining the Count 4 Defendants from alienating in any manner her, its, or their interests in the Charged Entity Defendants; (d) appointing a receiver to take charge of The Kennedy's interests in the Charged Entity Defendants for the benefit of HCB; (e) awarding money damages equal to the value of Kennedy's interests in the Charged Entity Defendants in an amount to be determined by a jury; (f) awarding attorney's fees and the costs of this action; and (g) granting any other relief to which HCB may be entitled.

## COUNT 5 – Conspiracy to Commit Fraudulent Transfer – Hyperion Liens

1247.  HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1248.  HCB asserts this Count against Kennedy, Adkinson, Neil McPherson, Reynolds, Hyperion, Hyperion GP, Hyperion Management, 5950 State Bridge Road, BK II, Compassionate Use, Compassionate Use II, Gonzales Holdings, Hungry Otter, Iron Glades Slope, KWF Group, Lee Kennedy Investments, LFK GP, LKF Investments-Texas, LK Freyer Investments, Organic Health, Rivercrest Lot, Rockcliff GP, and Rockcliff Holdings (the "**Count 5 Defendants**").

1249.  Kennedy's inaction and/or omissions in Cause No. 13-625 and Cause No. 13-1003 were intentional and intended to facilitate and permit the entry of the Final Default Judgments to accelerate and elevate Hyperion's judgment liens over the claims of any and all other creditors with respect to Kennedy's real property assets in Texas and Florida.

1250.   Kennedy and the Charged Entity Defendants' inaction and/or omissions in Cause No. 13-625 and Cause No. 13-1003 were intentional and intended to facilitate and permit the entry of the Final Default Judgments and Hyperion Charging Orders in Cause No. 13-625 and Cause No. 13-1003 to accelerate and elevate Hyperion's liens over the claims of any and all other creditors with respect to Kennedy's interests in BK II, Hungry Otter, Iron Glades Slope, KWF Group, Lee Kennedy Investments, LFK GP, LKF Investments-Texas, LK Freyer Investments, Rivercrest Lot, Rockcliff GP, and Rockcliff Holdings.

1251.   Moreover, by consenting to the Agreed Charging Orders, Kennedy, 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Gonzales Holdings, and Organic Health granted liens or acquiesced to the imposition of liens against Kennedy's interests in 5950 State Bridge Road, Compassionate Use, Compassionate Use II, Gonzales Holdings, and Organic Health.

1252.   The Count 5 Defendants' intentional inaction, omissions, acquiescence, and/or agreements caused the entry of (a) the Final Default Judgments in Cause No. 13-625 and Cause No. 13-1003, (b) the Charging Orders in Cause No. 13-625 and Cause No. 13-1003, and (3) the Agreed Charging Orders in Cause No. 18-600.

1253.   The Count 5 Defendants created, imposed, and/or acquiesced to the Hyperion Liens with the actual intent to hinder, delay, or defraud HCB in its collection efforts by creating or imposing a lien of higher priority than the lien of the HCB Judgment or the Texas Charging Orders.

1254.   By creating, imposing, and/or acquiescing to the Hyperion Liens, the Count 5 Defendants attempted to shield Kennedy's real property assets in Texas and Florida and her

interests in the Charged Entity Defendants from HCB's collection efforts in violation of the TUFTA.

1255.  The Count 5 Defendants conspired with one another to create, impose, and/or acquiesce to the Hyperion Liens.

1256.  The Count 5 Defendants' conspiracy with respect to the Hyperion Liens was entered into with the actual intent to hinder, delay, or defraud HCB in its collection efforts against Kennedy.

1257.  The Count 5 Defendants' conspiracy with respect to the Agreed Charging Orders has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 5 Defendants awarding compensatory and punitive damages in an amount to be determined by a jury; awarding attorney's fees and the costs of this action; and granting any other relief to which HCB may be entitled.

### COUNT 6 – Fraudulent Transfers in Violation of Texas Charging Order

1258.  HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1259.  HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Lee Kennedy Investments; (c) Hungry Otter; (d) Rockcliff Holdings; (e) FH Aspen; (f) KWF Group; and (g) LKF Investments-Texas (the "**Count 6 Defendants**").

1260.  On December 16, 2014, the Travis County Court entered the **Texas Charging Order**, charging Kennedy's interests in the **Texas Charged Entities**, including Lee Kennedy Investments, Rockcliff Holdings, Hungry Otter, FH Aspen, LKF Investments-Texas, and KWF Group.

1261.   None of the Texas Charged Entities has made any payment to HCB under the Texas Charging Order.

1262.   Instead, since December 16, 2014, the Texas Charged Entites have distributed **$94,200.00** (the "**Count 6 Proceeds**") directly to Kennedy in direct violation of the Texas Charging Orders.

1263.   Since December 16, 2014, Lee Kennedy Investments has transferred $41,000.00 directly to Kennedy. Lee Kennedy Investments made such transfers from its account ending in 7472 at JPMC to Kennedy's account ending in 1065 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|---|---|---|---|---|---|
| 10/06/16 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $6,000.00 |
| 12/08/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $10,000.00 |
| 12/22/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $15,000.00 |
| 12/26/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $10,000.00 |
| **Total** | | | | | **$41,000.00** |

1264.   On August 12, 2017, Rockcliff Holdings transferred $15,000.00 from its account ending in 7373 at JPMC to Kennedy's account ending in 1065 at JPMC.

1265.   Since December 16, 2014, Hungry Otter has transferred $14,200.00 directly to Kennedy. Hungry Otter made such transfers from its account ending in 2835 at JPMC to Kennedy's account ending in 9032 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|---|---|---|---|---|---|
| 03/02/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $9,700.00 |
| 05/22/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $3,000.00 |
| 06/22/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $1,000.00 |
| 06/29/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $500.00 |
| **Total** | | | | | **$14,200.00** |

1266.   Since December 16, 2014, FH Aspen has transferred $9,500.00 directly to Kennedy. FH Aspen made such transfers from its account ending in 7365 at JPMC to Kennedy's account ending in 1065 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|---|---|---|---|---|---|
| 07/31/17 | FH Aspen | 7365 | Kennedy | 1065 | $3,000.00 |
| 08/18/17 | FH Aspen | 7365 | Kennedy | 1065 | $2,500.00 |
| 01/18/18 | FH Aspen | 7365 | Kennedy | 1065 | $4,000.00 |
| **Total** | | | | | **$9,500.00** |

1267.   On November 7, 2017, KWF Group transferred $8,500.00 from its account ending in 9317 at JPMC to Kennedy's account ending in 1065 at JPMC.

1268.   On April 19, 2018, LKF Investments-Texas transferred $6,000.00 from its account ending in 7480 at JPMC to Kennedy's account ending in 8264 at JPMC.

1269.   Each transfer was made in knowing violation of the Texas Charging Order.

1270.   The Count 6 Defendants' transfers to Kennedy circumvented the Texas Charging Order, denying HCB of its right to collect such distributions in accordance with the Texas Charging Order.

1271.   The Count 6 Defendants made such transfers with the actual intent to hinder, delay, or defraud HCB in its collection efforts in violation of Tex. Bus. & Com. Code § 24.005(a)(1).

1272.   The Count 6 Defendants' transfers in violation of the Texas Charging Order have caused HCB to suffer substantial damages.

1273.   **WHEREFORE,** HCB demands judgment against the Count 6 Defendants (a) avoiding the transfers from Lee Kennedy Investments, Rockcliff Holdings, Hungry Otter, FH Aspen, LKF Investments-Texas, and KWF Group in violation of the Texas Charging Order; (b) levying execution against the Count 6 Defendants' interests in the Count 6 Proceeds; (c) preliminarily and permanently enjoining the Count 6 Defendants from taking actions affecting the Count 6 Proceeds in any manner that prevents HCB's collection of the Count 6 Proceeds or otherwise rendering their interests therein exempt in any manner from execution by HCB; (d) preliminarily and permanently enjoining the Count 6 Defendants from alienating in any manner

their interests in the Count 6 Proceeds; (e) appointing a receiver to take charge of the Count 6 Proceeds for the benefit of HCB; (f) awarding money damages equal to the value of the Count 6 Proceeds in an amount not less than $94,200.00, exclusive of pre-judgment interest; (g) awarding attorney's fees and the costs of this action; and (h) granting any other relief to which HCB may be entitled.

### COUNT 7 – Conspiracy to Commit Fraudulent Transfers
### in Violation of Texas Charging Orders

1274.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1275.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Lee Kennedy Investments; (c) Hungry Otter; (d) Rockcliff Holdings; (e) FH Aspen; (f) KWF Group; and (g) LKF Investments-Texas (the "**Count 7 Defendants**").

1276.   On December 16, 2014, the Travis County Court entered the **Texas Charging Order**, charging Kennedy's interests in the **Texas Charged Entities**, including Lee Kennedy Investments, Rockcliff Holdings, Hungry Otter, FH Aspen, LKF Investments-Texas, and KWF Group.

1277.   None of the Texas Charged Entities has made any payment to HCB under the Texas Charging Order.

1278.   Instead, since December 16, 2014, the Texas Charged Entites have distributed the Count 6 Proceeds directly to Kennedy in direct violation of the Texas Charging Orders.

1279.   Since December 16, 2014, Lee Kennedy Investments has transferred $41,000.00 directly to Kennedy. Lee Kennedy Investments made such transfers from its account ending in 7472 at JPMC to Kennedy's account ending in 1065 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 10/06/16 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $6,000.00 |
| 12/08/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $10,000.00 |
| 12/22/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $15,000.00 |
| 12/26/17 | Lee Kennedy Investments | 7472 | Kennedy | 1065 | $10,000.00 |
| **Total** | | | | | **$41,000.00** |

1280.   On August 12, 2017, Rockcliff Holdings transferred $15,000.00 from its account ending in 7373 at JPMC to Kennedy's account ending in 1065 at JPMC.

1281.   Since December 16, 2014, Hungry Otter has transferred $14,200.00 directly to Kennedy. Hungry Otter made such transfers from its account ending in 2835 at JPMC to Kennedy's account ending in 9032 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 03/02/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $9,700.00 |
| 05/22/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $3,000.00 |
| 06/22/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $1,000.00 |
| 06/29/15 | Hungry Otter Holdings | 2835 | Kennedy | 9320 | $500.00 |
| **Total** | | | | | **$14,200.00** |

1282.   Since December 16, 2014, FH Aspen has transferred $9,500.00 directly to Kennedy. FH Aspen made such transfers from its account ending in 7365 at JPMC to Kennedy's account ending in 1065 at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|------|------|-------------|-----|-------------|--------|
| 07/31/17 | FH Aspen | 7365 | Kennedy | 1065 | $3,000.00 |
| 08/18/17 | FH Aspen | 7365 | Kennedy | 1065 | $2,500.00 |
| 01/18/18 | FH Aspen | 7365 | Kennedy | 1065 | $4,000.00 |
| **Total** | | | | | **$9,500.00** |

1283.   On November 7, 2017, KWF Group transferred $8,500.00 from its account ending in 9317 at JPMC to Kennedy's account ending in 1065 at JPMC.

1284.   On April 19, 2018, LKF Investments-Texas transferred $6,000.00 from its account ending in 7480 at JPMC to Kennedy's account ending in 8264 at JPMC.

1285.   Each transfer was made in knowing violation of the Texas Charging Order.

1286.   The Count 7 Defendants' transfers to Kennedy circumvented the Texas Charging Order, denying HCB of its right to collect such distributions in accordance with the Texas Charging Order.

1287.   The Count 7 Defendants transferred the Count 7 Proceeds with the actual intent to hinder, delay, or defraud HCB in its collection efforts in violation of Tex. Bus. & Com. Code § 24.005(a)(1).

1288.   The Count 7 Defendants conspired with one another to transfer the Count 6 Proceeds to Kennedy in violation of the Texas Charging Order.

1289.   The Count 7 Defendants' conspiracy to transfer the Count 6 Proceeds to Kennedy was entered into with the actual intent to hinder, delay, or defraud HCB in its collection efforts against Kennedy.

1290.   The Count 7 Defendants' conspiracy to to transfer the Count 6 Proceeds to Kennedy has caused HCB to suffer substantial damages.

**WHEREFORE**, HCB demands judgment against the Count 7 Defendants (a) awarding compensatory and punitive damages in an amount to be be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

### COUNT 8 – Fraudulent Transfer of Summerlake Townhouse Sale Proceeds

1291.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1292.   HCB asserts this Count against (a) Kennedy, in her individual capacity, (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; and (d) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 8 Defendants**").

1293.   On or about January 7, 2016, Kennedy sold the Summerlake Townhouse, in Walton County, Florida.

1294.   Upon the sale of the Summerlake Townhouse, Kennedy instructed Gibraltar Title to disburse $140,592.48 to **the Babette Trust** by interstate wire transfer. On January 7, 2016, Gibraltar Title transferred $140,592.48 from its account at Compass Bank (ABA routing number 063013924) in Florida to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York. At the time of such transfer, **the Babette Trust held no legal or equitable interest in the Summerlake Townhouse**.

1295.   Kennedy caused Gibraltar Title to transfer the Summerlake Townhouse sale proceeds to the Babette Trust with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1296.   The transfer of the proceeds of the sale of the Summerlake Townhouse satisfies several of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that the transfer of the proceeds of such sale Title Judgment proceeds is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
| --- | --- |
| (a) Transfer or obligation was to an insider | Kennedy and the Babette Trust are insiders pursuant to Fla. Stat. § 726.102(1), (7), and (8). Kennedy controls the Babette Trust (and Harry Freyer and/or Adkinson as the Trustee of the Babette Trust). |
| (b) Debtor retained possession or control of the property transferred after the transfer | Kennedy is the sole beneficiary of the Babette Trust, and she controls the Babette Trust. Pursuant to the Agreement to Serve as Trustee (**Ex. 276**), Kennedy controls Adkinson in the performance of her fiduciary obligations as the Trustee of the Babette Trust. Through her control of the Babette Trust, Kennedy retained control of the sale proceeds from the Summerlake Townhouse. |
| (c) Transfer or obligation was concealed | Kennedy misrepresented the ownership of the Summerlake Townhouse and then failed to disclose to HCB that she transferred the proceeds of the sale of the Summerlake Townhouse to the Babette Trust. |
| (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | HCB obtained the HCB Judgment against Kennedy on July 11, 2013. HCB sought charging orders against numerous entities in Florida, Texas, and Louisiana. |
| (g) Debtor removed or concealed assets | Instead of paying the proceeds to HCB, Kennedy caused Gibraltar Title to transfer the proceeds of the sale of the Summerlake Townhouse to the Babette Trust. |

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (h)  Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | Kennedy received no consideration from the Babette Trust in connection with the transfer of the sale proceeds. |

1297.   The fraudulent transfer of the proceeds of the sale of the Summerlake Townhouse prevented HCB from collecting those proceeds even though it held a properly recorded, first priority judgment lien encumbering the Summerlake Townhouse.

1298.   The Count 8 Defendants' fraudulent transfer of the Summerlake Townhouse sale proceeds has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 8 Defendants (a) avoiding of the transfer of the proceeds of the sale of the Summerlake Townhouse; (b) levying execution against the proceeds of the sale of the Summerlake Townhouse; (c) preliminarily and permanently enjoining the Count 8 Defendants from further transferring the proceeds of the sale of the Summerlake Townhouse except in connection with payment of the HCB Judgment; (d) appointing a receiver to take charge of the proceeds of the sale of the Summerlake Townhouse for the benefit of HCB; (e) awarding money damages equal to the value of the sale of the Summerlake Townhouse in an amount not less than $140,592.48, exclusive of pre-judgment interest; (f) awarding HCB attorney's fees and the costs of this action; and (g) granting any other relief to which HCB may be entitled.

### COUNT 9 – Conspiracy to Commit Fraudulent Transfer of Summerlake Townhouse Sale Proceeds

1299.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1300.   HCB asserts this Count against (a) Kennedy, in her individual capacity, (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as

Trustee of the Babette Trust; and (d) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 9 Defendants**").

1301.   On or about January 7, 2016, Kennedy sold the Summerlake Townhouse, in Walton County, Florida.

1302.   Upon the sale of the Summerlake Townhouse, Kennedy instructed Gibraltar Title to disburse $140,592.48 to **the Babette Trust** by interstate wire transfer. On January 7, 2016, Gibraltar Title transferred $140,592.48 from its account at Compass Bank (ABA routing number 063013924) in Florida to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York. At the time of such transfer, **the Babette Trust held no legal or equitable interest in the Summerlake Townhouse**.

1303.   Kennedy caused Gibraltar Title to transfer the Summerlake Townhouse sale proceeds to the Babette Trust with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1304.   The transfer of the proceeds of the sale of the Summerlake Townhouse satisfies several of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that the transfer of the proceeds of such sale Title Judgment proceeds is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (a)   Transfer or obligation was to an insider | Kennedy and the Babette Trust are insiders pursuant to Fla. Stat. § 726.102(1), (7), and (8). Kennedy controls the Babette Trust (and Harry Freyer and/or Adkinson as the Trustee of the Babette Trust). |
| (b)   Debtor retained possession or control of the property transferred after the transfer | Kennedy is the sole beneficiary of the Babette Trust, and she controls the Babette Trust. Pursuant to the Agreement to Serve as Trustee (**Ex. 276**) Kennedy controls Adkinson in the performance of her fiduciary obligations as the Trustee of the Babette Trust. Through her control of the Babette Trust, Kennedy retained control of the sale proceeds from the Summerlake Townhouse. |
| (c)   Transfer or obligation was concealed | Kennedy misrepresented the ownership of the Summerlake Townhouse and then failed to disclose to HCB that she transferred the proceeds of the sale of the Summerlake Townhouse to the Babette Trust. |

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | HCB obtained the HCB Judgment against Kennedy on July 11, 2013. HCB sought charging orders against numerous entities in Florida, Texas, and Louisiana. |
| (g) Debtor removed or concealed assets | Instead of paying the proceeds to HCB, Kennedy caused Gibraltar Title to transfer the proceeds of the sale of the Summerlake Townhouse to the Babette Trust. |
| (h) Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | Kennedy received no consideration from the Babette Trust in connection with the transfer of the sale proceeds. |

1305.   The fraudulent transfer of the proceeds of the sale of the Summerlake Townhouse prevented HCB from collecting those proceeds even though it held a properly recorded, first priority judgment lien encumbering the Summerlake Townhouse.

1306.   The Count 9 Defendants conspired with one another to transfer the Summerlake Townhome sale proceeds to the Babette Trust.

1307.   The Count 9 Defendants' conspiracy to transfer the Summerlake Townhome sale proceeds the Babette Trust was entered into with the actual intent to hinder, delay, or defraud HCB in its collection efforts against Kennedy.

1308.   The Count 9 Defendants' conspiracy to transfer the Summerlake Townhome sale proceeds to the Babette Trust has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 9 Defendants (a) awarding compensatory and punitive damages in an amount to be be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

## COUNT 10 – Fraudulent Transfer of Title Judgment Proceeds

1309.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1310.  HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; (d) Adkinson, in her capacity as Trustee of the Babette Trust; (e) BK II; and (f) LK Freyer Investments (the "**Count 10 Defendants**").

1311.  On or about March 23, 2016, Old Republic, ATIF's successor-in-interest, satisfied the Title Judgment against ATIF.

1312.  That day, at 3:54 p.m. EDT, Old Republic transmitted by interstate wire transfer the Title Judgment Proceeds in thew amount of $1,468,110.76 to BK II's counsel, the Litvak Firm, in Pensacola, Florida.

1313.  On March 24, 2016, Kennedy caused the Litvak Firm to transmit $1,270,161.30 of the Title Judgment Porceeds to the Babette Trust by interstate wire transfer. The Litvak Firm made the transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606) in Georgia to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York.

1314.  At the time the Litvak Firm transmitted $1,270,161.30 to the **Babette Trust** by interstate wire transfer, HCB held the HCB Judgment and the BK II Charging Order. Kennedy had actual knowledge of the HCB Judgment and the BK II Charging Order. Despite Kennedy's knowledge, Kennedy caused the Litvak Firm to transfer $1,270,161.30 to the Babette Trust.

1315.  On March 24, 2016, Kennedy caused the Litvak Firm to transmit $173,381.86 pf the Title Judgment Proceeds to **LK Freyer Investments** by interstate wire transfer. The Litvak Firm made the transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606) in Georgia to LK Freyer Investments' account ending in 1202 at UBS AG (ABA routing number 026007993) in New York.

1316.   At the time the Litvak Firm transmitted $173,381.86 to LK Freyer Investments by interstate wire transfer, HCB held the BK II Charging Order, and Kennedy had actual knowledge of the BK II Charging Order. Despite Kennedy's knowledge, Kennedy still caused the Litvak Firm to transfer $173,381.86 to LK Freyer Investments.

1317.   The Count 10 Defendants caused the Litvak Firm to transfer the Title Judgment Proceeds to the Babette Trust and to LK Freyer Investments with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1318.   The transfer of the Title Judgment Proceeds satisfies various of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that the transfer of the Title Judgment Proceeds is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
| --- | --- |
| (a)   Transfer or obligation was to an insider | Kennedy, BK II, the Babette Trust, and LK Freyer Investments are insiders pursuant to Fla. Stat. § 726.102(1), (7), and (8). Kennedy controls BK II, the Babette Trust (and Harry Freyer and/or Adkinson as the Trustee of the Babette Trust), and LK Freyer Investments. |
| (b)   Debtor retained possession or control of the property transferred after the transfer | Kennedy is the sole member and manager of BK Properties, and Kennedy is the manager of LK Freyer Investments. Pursuant to the Agreement to Serve as Trustee (**Ex. 276**), Kennedy controls Adkinson in the performance of her fiduciary obligations as the Trustee of the Babette Trust. Through her control of BK II, LK Freyer Investments, and the Babette Trust, Kennedy retained control of the Title Judgment proceeds. |
| (c)   Transfer or obligation was concealed | Kennedy failed to disclose to HCB that she transferred the proceeds of the Title Judgment out of BK II to the Babette Trust and to LK Freyer Investments. |
| (d)   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | HCB obtained the HCB Judgment against Kennedy on July 11, 2013. HCB sought charging orders against numerous entities in Florida, Texas, and Louisiana, including BK Properties and LK Freyer Investments. On November 10, 2014, HCB obtained the BK II Charging Order. On October 25, 2016, HCB obtained a charging against LK Freyer Investments. |
| (g)   Debtor removed or concealed assets | Instead of paying the proceeds to HCB, Kennedy caused BK II to transfer the proceeds of the Title Judgment to the Babette Trust and LK Freyer Investments. The transfers occurred within just a few hours of the Litvak Firm's receipt of the Title Judgment proceeds. Kennedy never disclosed those transfers to HCB. |
| (h)   Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | BK II received no consideration from the Babette Trust or LK Freyer Investments in connection with the transfer of the Title Judgment proceeds. |

1319.   The fraudulent transfer of the Title Judgment Proceeds prevented HCB from collecting those proceeds.

1320.   The Count 10 Defendants' fraudulent transfer of the Title Judgment Proceeds has caused HCB to suffer substantial damages.

**WHEREFORE**, HCB demands judgment against the Count 10 Defendants (a) avoiding of the transfer of the Title Judgment Proceeds; (b) levying execution against the Title Judgment Proceeds; (c) preliminarily and permanently enjoining the Count 10 Defendants from further transferring the Title Judgment Proceeds except in connection with payment of the HCB Judgment; (d) appointing a receiver to take charge of the Title Judgment Proceeds for the benefit of HCB; (e) awarding money damages equal to the value of the Title Judgment Proceeds in an amount not less than $1,468,110.76, exclusive of pre-judgment interest; (f) awarding HCB attorney's fees and the costs of this action; and (g) granting any other relief to which HCB may be entitled.

### COUNT 11 – Conspiracy to Commit Fraudulent Transfer of Title Judgment Proceeds

1321.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1322.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; (d) Adkinson, in her capacity as Trustee of the Babette Trust; (e) BK II; and (f) LK Freyer Investments (the "**Count 11 Defendants**").

1323.   On or about March 23, 2016, Old Republic, ATIF's successor-in-interest, satisfied the Title Judgment against ATIF.

1324.   That day, at 3:54 p.m. EDT, Old Republic transmitted by interstate wire transfer the Title Judgment Proceeds in thew amount of $1,468,110.76 to BK II's counsel, the Litvak Firm, in Pensacola, Florida.

1325.   On March 24, 2016, Kennedy caused the Litvak Firm to transmit $1,270,161.30 of the Title Judgment Porceeds to the Babette Trust by interstate wire transfer. The Litvak Firm made the transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606) in Georgia to the Babette Trust's account ending in 1215 at UBS AG (ABA routing number 026007993) in New York.

1326.   At the time the Litvak Firm transmitted $1,270,161.30 to the **Babette Trust** by interstate wire transfer, HCB held the HCB Judgment and the BK II Charging Order. Kennedy had actual knowledge of the HCB Judgment and the BK II Charging Order. Despite Kennedy's knowledge, Kennedy caused the Litvak Firm to transfer $1,270,161.30 to the Babette Trust.

1327.   On March 24, 2016, Kennedy caused the Litvak Firm to transmit $173,381.86 pf the Title Judgment Proceeds to **LK Freyer Investments** by interstate wire transfer. The Litvak Firm made the transfer from its account at Coastal Bank and Trust, a subsidiary of Synovus Bank (ABA routing number 061100606) in Georgia to LK Freyer Investments' account ending in 1202 at UBS AG (ABA routing number 026007993) in New York.

1328.   At the time the Litvak Firm transmitted $173,381.86 to LK Freyer Investments by interstate wire transfer, HCB held the BK II Charging Order, and Kennedy had actual knowledge of the BK II Charging Order. Despite Kennedy's knowledge, Kennedy still caused the Litvak Firm to transfer $173,381.86 to LK Freyer Investments.

1329.   The Count 11 Defendants caused the Litvak Firm to transfer the Title Judgment Proceeds to the Babette Trust and to LK Freyer Investments with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1330.   The transfer of the Title Judgment Proceeds satisfies various of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that the transfer of the Title Judgment Proceeds is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (a)  Transfer or obligation was to an insider | Kennedy, BK II, the Babette Trust, and LK Freyer Investments are insiders pursuant to Fla. Stat. § 726.102(1), (7), and (8). Kennedy controls BK II, the Babette Trust (and Harry Freyer and/or Adkinson as the Trustee of the Babette Trust), and LK Freyer Investments. |
| (b)  Debtor retained possession or control of the property transferred after the transfer | Kennedy is the sole member and manager of BK Properties, and Kennedy is the manager of LK Freyer Investments. Pursuant to the Agreement to Serve as Trustee (**Ex. 276**), Kennedy controls Adkinson in the performance of her fiduciary obligations as the Trustee of the Babette Trust. Through her control of BK II, LK Freyer Investments, and the Babette Trust, Kennedy retained control of the Title Judgment proceeds. |
| (c)  Transfer or obligation was concealed | Kennedy failed to disclose to HCB that she transferred the proceeds of the Title Judgment out of BK II to the Babette Trust and to LK Freyer Investments. |
| (d)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | HCB obtained the HCB Judgment against Kennedy on July 11, 2013. HCB sought charging orders against numerous entities in Florida, Texas, and Louisiana, including BK Properties and LK Freyer Investments. On November 10, 2014, HCB obtained the BK II Charging Order. On October 25, 2016, HCB obtained a charging against LK Freyer Investments. |
| (g)  Debtor removed or concealed assets | Instead of paying the proceeds to HCB, Kennedy caused BK II to transfer the proceeds of the Title Judgment to the Babette Trust and LK Freyer Investments. The transfers occurred within just a few hours of the Litvak Firm's receipt of the Title Judgment proceeds. Kennedy never disclosed those transfers to HCB. |
| (h)  Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | BK II received no consideration from the Babette Trust or LK Freyer Investments in connection with the transfer of the Title Judgment proceeds. |

1331.   The Count 11 Defendants conspired with one another to transfer the Title Judgment proceeds from BK II to the Babette Trust and LK Freyer Investments.

1332.   The Count 11 Defendants' conspiracy to transfer the Title Judgment proceeds from BK II to the Babette Trust and LK Freyer Investments prevented HCB from collecting the Title Judgment proceeds in its efforts to enforce the HCB Judgment.

1333.   The Count 11 Defendants' conspiracy to transfer the Title Judgment proceeds from BK II to the Babette Trust and LK Freyer Investments has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 11 Defendants (a) awarding compensatory and punitive damages in an amount to be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

### COUNT 12 – Fraudulent Transfers to Kniahynycky and Janet Kniahynycky

1334.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1335.   HCB asserts this Count against (a) Kennedy, individually; (b) Kniahynycky; (c) Janet Kniahynycky; and (d) LK Freyer Investments (the "**Count 12 Defendants**").

1336.   After entry of the Amended Final Judgment, on or about July 31, 2013, Kennedy sold the Pink House to Destin Holdings Trust.[85] At the time Kennedy sold the Pink House to Destin Holdings Trust, Kniahynycky was the sole member of Destin Holdings Trust.

1337.   The Count 12 Defendants endeavored to present the sale of the Pink House as an arm's length short sale between unrelated parties on commercially reasonable terms, all the while knowing that Kennedy, Lee Kennedy Investments, and LK Freyer Investments were funding Destin Holdings Trust's purchase of the Pink House from Kennedy. The Count 12 Defendants

---

[85] *See supra* Part V.

engaged in such activities with the specific intent to defraud not only Wells Fargo, but also HCB, while enabling Kennedy to maintain control and possession of her very valuable assets.

1338.   During HCB's ongoing post-judgment discovery efforts, on March 29, 2016, HCB filed in the District Court a Notice of Intent to Serve Subpoena (Doc. 253), attaching the Kniahynycky Subpoena. **Ex. 154**.

1339.   **Two days later**, on March 31, 2016, LK Freyer Investments sent $4,000.00 to Kniahynycky by interstate wire transfer. LK Freyer Investments made the transfer from its account ending in 7565 at JPMC (ABA routing number 114000776) to Kniahynycky via a Chase Quickpay Electronic Transfer.

1340.   At the time LK Freyer Investments paid Kniahynycky $4,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

1341.   On April 4, 2016, **six days after HCB filed its Notice of Intent to Serve Subpoena**, LK Freyer Investments paid $36,000.00 (together with the $4,000.00 payment to Kniahynycky, the "**Count 12 Proceeds**") to Janet Kniahynycky, Kniahynycky's wife, by interstate wire transfer. LK Freyer Investments transferred $36,000.00 from its account ending in 7565 at JPMC (ABA routing number 114000776) to Janet Kniahynycky's account at PNC Bank (ABA routing no. 041000124) in Ohio. LK Freyer Investments' April 4, 2016, payment to Janet Kniahynycky referenced a "Payment From Bee Cave Properties."[86]

---

[86] On information and belief, neither Kniahynycky nor Janet Kniahynycky has ever been entitled to payment for, on behalf of, or from "Bee Caves Properties." Kennedy has never disclosed any involvement with any entity or property known as "Bee Caves Properties." The only apparent connection between Kennedy and "Bee Caves Properties" is the Leighton/Adkinson Firm's prior office address on Bee Caves Road. *See supra* Part 3.A.

1342.   At the time LK Freyer Investments paid Janet Kniahynycky $36,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

1343.   **Two days later**, on April 6, 2016, Kennedy filed in the District Court a Motion to Quash or Alternatively for Protective Order – Emmanuel Kniahynycky Subpoena. Kennedy's April 6, 2016, Motion to Quash made no mention of the payment of the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky just two days earlier.

1344.   The Count 12 Defendants transferred and/or received the Count 12 Proceeds with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1345.   The transfer of the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky satisfies several of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that such transfer is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
| --- | --- |
| (1)   Transfer or obligation was to an insider | Kennedy and Kniahynycky are insiders and/or affiliates pursuant to Tex. Bus. and Comm. Code § 24.002 (1) and (7). |
| (3)   Transfer or obligation was concealed | Neither Kennedy nor Kniahynycky ever disclosed such payment during post-judgment discovery. The Kniahynycky Subpoena specifically requested "Any and all documents referring or relating to any business transactions between you and Kennedy" and "[a]ny and all documents referring or relating to monies owed by Kennedy to you," but Kniahynycky failed to produce any documents or otherwise reveal the March 31, 2016, or April 4, 2016, payments to Kniahynycky and Janet Kniahynycky. **Ex. 154**. |
|  | The Amended Final Judgment had been entered prior to the payments to Kniahynycky and Janet Kniahynycky. Two days after HCB filed its Notice of Intent to Servce the Kniahynycky Subpoena, Kennedy and LK Freyer Investments transferred $4,000.00 to Kniahynycky. Four days later, Kennedy and LK Freyer Investments transferred $36,000.00 to Janet Kniahynycky. Two days later, Kennedy moved to quash the Kniahynycky subpoena. |
| (8)   Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | None of Kennedy, LK Freyer Investments, Kniahynycky, or Janet Kniahynycky exchanged consideration in connection with the transfer of $40,000.00 to Kniahynycky and Janet Kniahynycky. |

1346.   Kennedy and LK Freyer Investments made the March 31, 2016, and April 4, 2016, payments to Kniahynycky and Janet Kniahynycky to influence Kniahynycky's response to the HCB subpoena and to hinder HCB's post-judgment discovery and collection efforts. Moreover, Kennedy and LK Freyer Investments made the March 31, 2016, and April 4, 2016, payments to Kniahynycky and Janet Kniahynycky to prevent discovery of the fraudulent nature of the short sale of the Pink House to Destin Holdings Trust.

1347.   On May 1, 2014, Kennedy testified that she did not remember who purchased the Pink House. *Kennedy, Vol. II*, 324:17-24; 325:14-18.

1348.   Just one week earlier, on April 23, 2014, Kniahynycky sent an email to Kennedy in which he transmitted an executed copy of the Agreement and Assignment of Membership Interest of Destin Holdings Trust, LLC, pursuant to which Kniahynycky transferred to Cherry Hills 100% of the membership interests in Destin Holdings Trust.

1349.   Six days after Kennedy's May 1, 2014, deposition testimony, Cherry Hills assigned to Lee Kennedy Investments 100% of the membership interests in Destin Holdings Trust.

1350.   The fraudulent transfer of the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky was made with the actual intent to hinder, delay, or defraud HCB in its collection efforts.

1351.   The Count 12 Defendants' fraudulent transfer of the Count 12 Proceeds has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 12 Defendants (a) avoiding of the transfer of the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky; (b) levying execution against the Count 12 Proceeds; (c) preliminarily and permanently enjoining the Count

12 Defendants from further transferring the Count 12 Proceeds except in connection with payment of the HCB Judgment; (d) appointing a receiver to take charge of the Count 12 Proceeds for the benefit of HCB; (e) awarding money damages to HCB in an amount not less than $40,000.00, exclusive of pre-judgment interest; (f) awarding HCB attorney's fees and the costs of this action; and (g) granting any other relief to which HCB may be entitled.

### COUNT 13 – Conspiracy to Commit Fraudulent Transfer – Payments To Kniahynycky And Janet Kniahynycky

1352.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1353.   HCB asserts this Count against (a) Kennedy, individually; (b) Kniahynycky; (c) Janet Kniahynycky; and (d) LK Freyer Investments (the "**Count 13 Defendants**").

1354.   After entry of the Amended Final Judgment, on or about July 31, 2013, Kennedy sold the Pink House to Destin Holdings Trust. At the time Kennedy sold the Pink House to Destin Holdings Trust, Kniahynycky was the sole member of Destin Holdings Trust.

1355.   The Count 13 Defendants endeavored to present the sale of the Pink House as an arm's length short sale between unrelated parties on commercially reasonable terms, all the while knowing that Kennedy, Lee Kennedy Investments, and LK Freyer Investments were funding Destin Holdings Trust's purchase of the Pink House from Kennedy. The Count 13 Defendants engaged in such activities with the specific intent to defraud not only Wells Fargo, but also HCB, while enabling Kennedy to maintain control and possession of her very valuable assets.

1356.   During HCB's ongoing post-judgment discovery efforts, on March 29, 2016, HCB filed in the District Court a Notice of Intent to Serve Subpoena (Doc. 253), attaching the Kniahynycky Subpoena. **Ex. 154**.

1357.   **Two days later**, on March 31, 2016, LK Freyer Investments sent $4,000.00 to Kniahynycky by interstate wire transfer. LK Freyer Investments made the transfer from its

account ending in 7565 at JPMC (ABA routing number 114000776) in New York to Kniahynycky via a Chase Quickpay Electronic Transfer.

1358.  At the time LK Freyer Investments paid Kniahynycky $4,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

1359.  On April 4, 2016, **six days after HCB filed its Notice of Intent to Serve Subpoena**, LK Freyer Investments paid $36,000.00 to Janet Kniahynycky, Kniahynycky's wife, by interstate wire transfer. LK Freyer Investments transferred $36,000.00 from its account ending in 7565 at JPMC (ABA routing number 114000776) in New York to Janet Kniahynycky's account at PNC Bank (ABA routing no. 041000124) in Ohio. LK Freyer Investments' April 4, 2016, payment to Janet Kniahynycky referenced a "Payment From Bee Cave Properties."

1360.  At the time LK Freyer Investments paid Janet Kniahynycky $36,000.00, Kennedy was the manager of LK Freyer Investments, and she alone had the authority to make such a payment.

1361.  **Two days later**, on April 6, 2016, Kennedy filed in the District Court a Motion to Quash or Alternatively for Protective Order – Emmanuel Kniahynycky Subpoena. Kennedy's April 6, 2016, Motion to Quash certainly made no mention of the payment of $40,000.00 to Kniahynycky and Janet Kniahynycky just two days earlier.

1362.  Kennedy caused LK Freyer to pay $40,000.00 to Kniahynycky and Janet Kniahynycky with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1363.  The transfer of the $40,000.00 to Kniahynycky and Janet Kniahynycky satisfies several of the "badges of fraud" establishing a prima facie case and raising a rebuttable presumption that such transfer is void, as shown in the following table:

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|

| Badges of Fraud | Supporting Inference of Fraud |
|---|---|
| (1) Transfer or obligation was to an insider | Kennedy and Kniahynycky are insiders and/or affiliates pursuant to Tex. Bus. and Comm. Code § 24.002 (1) and (7). |
| (3) Transfer or obligation was concealed | Neither Kennedy nor Kniahynycky ever disclosed such payment during post-judgment discovery. The Kniahynycky Subpoena specifically requested "Any and all documents referring or relating to any business transactions between you and Kennedy" and "[a]ny and all documents referring or relating to monies owed by Kennedy to you," but Kniahynycky failed to produce any documents or otherwise reveal the March 31, 2016, or April 4, 2016, payments to Kniahynycky and Janet Kniahynycky. **Ex. 154**. |
| (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit | The Amended Final Judgment had been entered prior to the payments to Kniahynycky and Janet Kniahynycky. Two days after HCB filed its Notice of Intent to Serve the Kniahynycky Subpoena, Kennedy and LK Freyer Investments transferred $4,000.00 to Kniahynycky. Four days later, Kennedy and LK Freyer Investments transferred $36,000.00 to Janet Kniahynycky. Two days later, Kennedy moved to quash the Kniahynycky subpoena. |
| (8) Value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred | None of Kennedy, LK Freyer Investments, Kniahynycky, or Janet Kniahynycky exchanged consideration in connection with the transfer of $40,000.00 to Kniahynycky and Janet Kniahynycky. |

1364.   The Count 13 Defendants conspired with one another to transfer the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky.

1365.   The Count 13 Defendants' conspiracy to transfer the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky prevented HCB from pursuing effective post-judgment discovery in its efforts to enforce the HCB Judgment.

1366.   The Count 13 Defendants' conspiracy to transfer the Count 12 Proceeds to Kniahynycky and Janet Kniahynycky has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 13 Defendants (a) awarding compensatory and punitive damages in an amount to be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

## COUNT 14 – Fraudulent Transfer of 5950 State Bridge Road

1367.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1368.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Neil McPherson; (c) Kennedy, in her capacity as Trustee of the Babette Trust; (d) Harry Freyer, in his capacity as Trustee of the Babette Trust; and (e) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 14 Defendants**").

1369.   On or about May 14, 2015, Attorney Childs incorporated 5950 State Bridge Road as a Texas for-profit corporation by filing its Certificate of Formation with the Secretary of the State of Texas, Filing No. 802215294, Document No. 606732950002.

1370.   As of May 14, 2015, 5950 State Bridge Road's shareholders were Kennedy, Neil McPherson, and the Babette Trust. At that time, either Kennedy or Harry Freyer was the Trustee of the Babette Trust.

1371.   On or about December 22, 2016, **just six days after Kennedy served her Third Supplemental Response to Plaintiff's Interrogatories**, 5950 State Bridge Road filed a Certificate of Conversion, by which it converted from a Texas for-profit corporation to a Texas limited liability company. At that time, either Kennedy or Harry Freyer was the Trustee of the Babette Trust.

1372.   Attached to 5950 State Bridge Road's Certificate of Conversion was the Certificate of Formation of 5950 State Bridge Road, LLC, Filing No. 802611850, Document No. 70613757001.

1373.   Adkinson and the Leighton/Adkinson Firm prepared 5950 State Bridge Road's Certificate of Conversion and the Certificate of Formation of 5950 State Bridge Road, LLC.

1374.   5950 State Bridge Road's Certificate of Conversion and the attached Certificate of Formation of 5950 State Bridge Road, LLC, were transmitted to the Texas Secretary of State's

office by facsimile transmission from the Leighton/Adkinson Firm's telephone number, (512) 322-0882.

1375.   According to 5950 State Bridge Road's 2015 Form 1120S U.S. Income Tax Return, Kennedy, Neil McPherson, and the Babette Trust owned the issued and outstanding stock of 5950 State Bridge Road as follows:

> a.      Kennedy – 65%;
>
> b.      Neil McPherson – 10%; and
>
> c.      Babette Trust – 25%.

1376.   As of December 31, 2015, 5950 State Bridge Road's net worth was $874,748. Each shareholder's allocable interest in 5950 State Bridge Road was as follows:

> a.      Kennedy – $568,586.20;
>
> b.      Neil McPherson – $87,474.80; and
>
> c.      Babette Trust – $218,687.00.

1377.   As of December 31, 2016, 5950 State Bridge Road's net worth was $559,110. Each shareholder's allocable interest in 5950 State Bridge Road was as follows:

> a.      Kennedy – $363,421.50;
>
> b.      Neil McPherson – $55,911.00; and
>
> c.      Babette Trust – $139,777.50.

1378.   Under Texas law, stock in corporation is personal property pursuant to Tex. Bus Org. Code § 21.801. Stock in a corporation is subject to attachment, levy, garnishment, and turnover. *See* Tex. Bus. & Com. Code § 8.112; Tex. R. Civ. P. 669.

1379.   In contrast, membership interests in a limited liability company are not subject to attachment, levy, garnishment, or turnover. According to Tex. Bus Org Code § 101.112, "[t]he

entry of a charging order is the exclusive remedy by which a judgment creditor of a member or of any other owner of a membership interest may satisfy a judgment out of the judgment debtor's membership interest."

1380.  The Count 14 Defendants converted 5950 State Bridge Road from a for-profit corporation to a limited liability company after Kennedy's liability to HCB under the HCB Judgment arose.

1381.  Kennedy's interest in the pre-conversion stock in 5950 State Bridge Road is an asset within the meaning of Tex. Bus. & Com. Code § 24.101(2).

1382.   The conversion of 5950 State Bridge Road from a for-profit corporation to a limited liability company is a transfer within the meaning of Tex. Bus. & Com. Code § 24.101(12).

1383.  By converting 5950 State Bridge Road from a for-profit corporation to a limited liability company, the Count 14 Defendants converted Kennedy's pre-conversion stock (which was subject to attachment, levy, garnishment, or turnover) to limited liability membership interests seemingly exempt from attachment attachment, levy, garnishment, or turnover.

1384.  The Count 14 Defendants' conversion of 5950 State Bridge Road from a for-profit corporation to a limited liability company prevented HCB from exercising any collection remedies available to judgment creditors seeking to execute against stock in a corporation.

1385.  The Count 14 Defendants converted 5950 State Bridge Road from a for-profit corporation to a limited liability company with the actual intent to hinder, delay, or defraud HCB in its collection efforts in violation of Tex. Bus. & Com. Code § 24.005(a)(1).

1386.  The Count 14 Defendants' conversion of 5950 State Bridge Road from a for-profit corporation to a limited liability company has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 14 Defendants (a) avoiding of the conversion of 5950 State Bridge Road from a for-profit corporation to a limited liability company; (b) levying execution against the Count 14 Defendants' interests in 5950 State Bridge Road; (c) preliminarily and permanently enjoining the Count 14 Defendants from taking actions affecting the corporate status of 5950 State Bridge Road in any manner that renders their interests therein exempt in any manner from execution by HCB; (d) preliminarily and permanently enjoining the Count 14 Defendants from alienating in any manner their interests in 5950 State Bridge Road; (e) appointing a receiver to take charge of the Count 14 Defendants' interests in 5950 State Bridge Road for the benefit of HCB; (f) awarding money damages equal to the value of the Count 14 Defendants' interests in 5950 State Bridge Road in an amount to be determined by a jury; (g) awarding attorney's fees and the costs of this action; and (h) granting any other relief to which HCB may be entitled.

### COUNT 15 – Conspiracy to Commit Fraudulent Transfer of 5950 State Bridge Road

1387.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1388.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Neil McPherson; (c) Kennedy, in her capacity as Trustee of the Babette Trust; (d) Harry Freyer, in his capacity as Trustee of the Babette Trust; and (e) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 15 Defendants**").

1389.   On or about May 14, 2015, Attorney Childs incorporated 5950 State Bridge Road as a Texas for-profit corporation by filing its Certificate of Formation with the Secretary of the State of Texas, Filing No. 802215294, Document No. 606732950002.

1390.   As of May 14, 2015, 5950 State Bridge Road's shareholders were Kennedy, Neil McPherson, and the Babette Trust. At that time, either Kennedy or Harry Freyer was the Trustee of the Babette Trust.

1391.   On or about December 22, 2016, **just six days after Kennedy served her Third Supplemental Response to Plaintiff's Interrogatories**, 5950 State Bridge Road filed a Certificate of Conversion, by which it converted from a Texas for-profit corporation to a Texas limited liability company. At that time, either Kennedy or Harry Freyer was the Trustee of the Babette Trust.

1392.   Attached to 5950 State Bridge Road's Certificate of Conversion was the Certificate of Formation of 5950 State Bridge Road, LLC, Filing No. 802611850, Document No. 70613757001.

1393.   Adkinson and the Leighton/Adkinson Firm prepared 5950 State Bridge Road's Certificate of Conversion and the Certificate of Formation of 5950 State Bridge Road, LLC.

1394.   Adkinson and the Leighton/Adkinson Firm sent 5950 State Bridge Road's Certificate of Conversion and the attached Certificate of Formation of 5950 State Bridge Road, LLC, to the Texas Secretary of State's office by facsimile transmission from (512) 322-0882, the Leighton/Adkinson Firm's telephone/facsimile number.

1395.   According to 5950 State Bridge Road's 2015 Form 1120S U.S. Income Tax Return, Kennedy, Neil McPherson, and the Babette Trust owned the issued and outstanding stock of 5950 State Bridge Road as follows:

     a.      Kennedy – 65%;

     b.      Neil McPherson – 10%; and

     c.      Babette Trust – 25%.

1396.  As of December 31, 2015, 5950 State Bridge Road's net worth was $874,748. Each shareholder's allocable interest in 5950 State Bridge Road was as follows:

      a.      Kennedy – $568,586.20;

      b.      Neil McPherson – $87,474.80; and

      c.      Babette Trust – $218,687.00.

1397.  As of December 31, 2016, 5950 State Bridge Road's net worth was $559,110. Each shareholder's allocable interest in 5950 State Bridge Road was as follows:

      a.      Kennedy – $363,421.50;

      b.      Neil McPherson – $55,911.00; and

      c.      Babette Trust – $139,777.50.

1398.  Under Texas law, stock in corporation is personal property pursuant to Tex. Bus Org. Code § 21.801. Stock in a corporation is subject to attachment, levy, garnishment, and turnover. *See* Tex. Bus. & Com. Code § 8.112; Tex. R. Civ. P. 669.

1399.  In contrast, membership interests in a limited liability company are not subject to attachment, levy, garnishment, or turnover. According to Tex. Bus Org. Code § 101.112, "[t]he entry of a charging order is the exclusive remedy by which a judgment creditor of a member or of any other owner of a membership interest may satisfy a judgment out of the judgment debtor's membership interest."

1400.  The Count 7 Defendants converted 5950 State Bridge Road from a for-profit corporation to a limited liability company after Kennedy's liability to HCB under the HCB Judgment arose.

1401.  Kennedy's interest in the pre-conversion stock in 5950 State Bridge Road is an asset within the meaning of Tex. Bus. & Com. Code § 24.101(2).

1402. The conversion of 5950 State Bridge Road from a for-profit corporation to a limited liability company is a transfer within the meaning of Tex. Bus. & Com. Code § 24.101(12).

1403. By converting 5950 State Bridge Road from a for-profit corporation to a limited liability company, the Count 4 Defendants converted Kennedy's pre-conversion stock (which was subject to attachment, levy, garnishment, or turnover) to limited liability membership interests seemingly exempt from attachment, levy, garnishment, or turnover.

1404. The Count 15 Defendants conspired with one another to convert 5950 State Bridge Road from a for-profit corporation to a limited liability company.

1405. The Count 15 Defendants conspired with one another to convert Kennedy's pre-conversion stock in 5950 State Bridge Road (which was subject to attachment, levy, garnishment, or turnover) to limited liability membership interests seemingly exempt from attachment, levy, garnishment, or turnover.

1406. The Count 15 Defendants' conspiracy to convert of 5950 State Bridge Road from a for-profit corporation to a limited liability company prevented HCB from exercising any collection remedies available to judgment creditors seeking to execute against stock in a corporation.

1407. The Count 15 Defendants' conspiracy to convert of 5950 State Bridge Road from a for-profit corporation to a limited liability company was entered into with the actual intent to hinder, delay, or defraud HCB in its collection efforts against Kennedy.

1408. The Count 15 Defendants' conspiracy to convert of 5950 State Bridge Road from a for-profit corporation to a limited liability company has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 15 Defendants (a) awarding compensatory and punitive damages in an amount to be be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

### COUNT 16 – Fraudulent Transfer to ASG Law in Violation of Texas Charging Order

1409.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1410.   HCB asserts this Count against (a) Kennedy, in her individual capacity; and (b) KWF Group (the "**Count 16 Defendants**").

1411.   On December 16, 2014, the Travis County Court entered the **Texas Charging Order**, charging Kennedy's interests in the **Texas Charged Entities**, including KWF Group.

1412.   None of the Texas Charged Entities has made any payment to HCB under the Texas Charging Order.

1413.   Instead, the Texas Charged Entities, including KWF Group, have made payments to third parties on Kennedy's behalf to conceal their distributions to Kennedy.

1414.   On July 17, 2017, HCB filed a Motion for Contempt Order against Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC, because those entities failed to fulfill their obligations under the Florida Charging Orders.

1415.   On August 18, 2017, the Florida Court held a hearing on HCB's Motion for Contempt Order at which Kennedy appeared in person with her counsel, Attorney Mead.

1416.   On September 7, 2017, the Florida Court granted HCB's Motion for Contempt Order. The Florida Court held the Florida Charged Entities[87] in contempt for failing to comply with the terms of the Florida Charging Orders applicable to them. The Florida Court ordered each of the entities to comply with the Florida Charging Orders within 30 days after entry of the order. *Id.*

1417.   The Florida Court also imposed civil fines associated with the Florida Charged Entities' continued failure to comply with Florida Charging Orders. *Id.* First, the Florida Court imposed a fine of $5,000.00 if the Charged Entities failed to comply with the Charging Orders on or before October 7, 2017. *Id.* Second, the Florida Court imposed a fine of $2,500.00 for each 30-day period after October 7, 2017, in which the Charged Entities continue in contempt. *Id.*

1418.   At the time the Florida Court entered the Contempt Order, Kennedy was the manager or managing member of each of the Florida Charged Entities. Accordingly, Kennedy controlled (and controls) the actions of the Florida Charged Entities.

1419.   Because Kennedy and the Charged Entities still had not complied with the Florida Charging Orders or the Florida Court's Order Granting Motion for Contempt Order, on June 12, 2018, HCB filed a Motion for Further Contempt Orders, to Foreclose Interests, to Appoint Receiver, and to Reduce Civil Fines to Judgment.

1420.   On June 21, 2018, KWF Group paid $4,000.00 (the "**Count 16 Proceeds**") to ASG Law by interstate wire transfer. KWF Group made such transfer from its account ending in 9317 at JPMC (ABA routing number 114000776) in New York to ASG Law's account at Hancock Whitney Bank (routing number 065503681) in Florida.

---

[87] Specifically, Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC.

1421.   KWF Group has never had any interest in the Florida Charging Order Case; however, at the time KWF Group made its June 21, 2018, payment to ASG Law, Kennedy was a member and the only manager of KWF Group, and Kennedy alone had authority to make such a payment. Thus, KWF Group paid the Count 16 Proceeds to ASG Law to retain ASG Law's services solely on Kennedy's behalf.

1422.   KWF Group's payment of the Count 16 Proceeds to ASG Law on Kennedy's behalf was in direct violation of the Texas Charging Order.

1423.   KWF Group's payment of the Count 16 Proceeds to ASG Law was made with the actual intent to hinder, delay, and defraud HCB in its collection efforts.

1424.   The Count 16 Defendants' transfer of the Count 16 Proceeds in violation of the Texas Charging Order has caused HCB to suffer substantial damages.

1425.   **WHEREFORE,** HCB demands judgment against the Count 16 Defendants (a) awarding money damages equal to the value of the Count 16 Proceeds in an amount not less than $4,000.00; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

### COUNT 17 – Conspiracy to Commit Fraudulent Transfer<br>To ASG Law in Violation of Texas Charging Order

1426.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1427.   HCB asserts this Count against (a) Kennedy, in her individual capacity; and (b) KWF Group (the "**Count 17 Defendants**").

1428.   On December 16, 2014, the Travis County Court entered the **Texas Charging Order**, charging Kennedy's interests in the **Texas Charged Entities**, including KWF Group.

1429.   None of the Texas Charged Entities has made any payment to HCB under the Texas Charging Order.

1430.   Instead, the Texas Charged Entities, including KWF, have made payments to third parties on Kennedy's behalf to conceal their distributions to Kennedy.

1431.   On July 17, 2017, HCB filed a Motion for Contempt Order against Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC, because those entities failed to fulfill their obligations under the Florida Charging Orders.

1432.   On August 18, 2017, the Florida Court held a hearing on HCB's Motion for Contempt Order at which Kennedy appeared in person, with Defendant Mead, Kennedy's counsel, at her side.

1433.   On September 7, 2017, the Florida Court granted HCB's Motion for Contempt Order. The Florida Court concluded that the Florida Charged Entities[88] were in contempt for failing to comply with the terms of the Florida Charging Orders applicable to them. The Florida Court ordered each of the entities to comply with the Florida Charging Orders within 30 days after entry of the order. *Id*.

1434.   The Florida Court also imposed civil fines associated with the Entities' continued failure to comply with Florida Charging Orders. *Id*. First, the Florida Court imposed a fine of $5,000.00 if the Charged Entities failed to comply with the Charging Orders on or before October 7, 2017. *Id*. Second, the Florida Court imposed a fine of $2,500.00 for each 30-day period after October 7, 2017, in which the Charged Entities continue in contempt. *Id*.

---

[88] Specifically, Lee Freyer Kennedy Crestview, LLC; Lee Freyer Kennedy Crestview II, LLC; Holiday Isle LFK Investments, LLC; Kennedy Five Acres Crestview, LLC; and Lagniappe Funding, LLC.

1435.   At the time the Florida Court entered the Contempt Order, Kennedy was the manager or managing member of each of the Florida Charged Entities. Accordingly, Kennedy controlled (and controls) the actions of the Florida Charged Entities.

1436.   Because Kennedy and the Charged Entities still had not complied with the Florida Charging Orders or the Florida Court's Order Granting Motion for Contempt Order, on June 12, 2018, HCB filed a Motion for Further Contempt Orders, to Foreclose Interests, to Appoint Receiver, and to Reduce Civil Fines to Judgment.

1437.   On June 21, 2018, KWF Group paid the Count 16 Proceeds to ASG Law by interstate wire transfer. KWF made the transfer from its account ending in 9317 at JPMC (ABA routing number 114000776) in New York to ASG Law's account at Hancock Whitney Bank (routing number 065503681) in Florida.

1438.   KWF Group has never had any interest in the Florida Charging Order Case; however, at the time KWF Group made its June 21, 2018, payment to ASG Law, Kennedy was a member and the sole manager of KWF Group, and she alone had authority to make such a payment. Thus, KWF Group paid the Count 16 Proceeds to ASG Law to retain ASG Law's services solely on Kennedy's behalf.

1439.   KWF Group's payment of the Count 16 Proceeds to ASG Law on Kennedy's behalf was in direct violation of the Texas Charging Order.

1440.   The Count 17 Defendants conspired with one another to transfer the Count 16 Proceeds to ASG Law in violation of the Texas Charging Order.

1441.   The Count 17 Defendants' conspiracy to transfer the Count 16 Proceeds to Kennedy was entered into with the actual intent to hinder, delay, or defraud HCB in its collection efforts against Kennedy.

1442.   The Count 17 Defendants' conspiracy to transfer the Count 16 Proceeds to ASG Law has caused HCB to suffer substantial damages.

**WHEREFORE,** HCB demands judgment against the Count 17 Defendants (a) awarding compensatory and punitive damages in an amount to be be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which HCB may be entitled.

## COUNT 18 – Declaratory Judgment – Babette Trust

1443.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1444.   HCB asserts this Count against (a) Kennedy, in her individual capacity; (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as Trustee of the Babette Trust; and (d) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 18 Defendants**").

### A.      *The Count 18 Defendants have abused the formalities of the Babette Trust.*

1445.   The Babette Trust was created under Babette's Last Will and Testament.

1446.   In her Last Will and Testament, Babette established separate trusts for her daughter Kay and each of Kay's daughters, Aimee, Carol, and Kennedy.

1447.   Legal title to the Babette Trust's assets vests in the trustee of the Babette Trust, and the Babette Trust's beneficiary owns any equitable interests in the assets of the trust.

1448.   The beneficiary of the Babette Trust is entitled to the economic benefits of the trust corpus.

1449.   According to Babette's Last Will and Testament, Kennedy is the sole beneficiary of the Babette Trust. The Babette Trust exists solely for Kennedy's benefit.

1450.   Babette's Last Will and Testament included language intended to incorporate the full complement of spendthrift protection under the Louisiana Trust Code. Specifically, the Babette Trust provided as follows:

> No interest in the principal or income of any trust herein created shall be anticipated, assigned or encumbered, or subject to any creditor's claim or to legal process prior to its actual receipt by the particular beneficiary, it being my intention to subject each trust herein created to the maximum restraints on alienation, both voluntary and involuntary, possible under the laws of Louisiana, including the spendthrift trust provisions of the Louisiana Trust Code.

**Ex. 25**, ¶ IV.E. at 6.

1451.   The Babette Trust included specific instructions for the appointment and resignation of a trustee. According to Babette's Last Will and Testament:

> No nomination or appointment contained in this Will shall be construed to obligate the nominee or appointee to serve, whether as a trustee or co-trustee, an executor or co-executor, or an attorney-at-law to probate this Will and represent my executor or the trusts and trustees; neither shall any provision contained herein, nor the absence of any express provision in the law of Louisiana, be construed to prevent any person from resigning any such office after having commenced to serve. To resign, such person must file a resignation in my succession proceedings at least ten (10) days in advance of the effective date of such resignation and shall mail copies thereof to each major competent legatee and Beneficiary, and to the personal representative of any minor or incompetent legatee.

**Ex. 25**, ¶ IX.B. at 15.

1452.   The Babette Trust does not observe the formalities provided in Babette's Last Will and Testament or the Louisiana Trust Code, La. Rev. Stat. Ann. § 9:1721.

1453.   The Count 19 Defendants have abused the trust formalities governing the Babette Trust in a manner intended to insulate Kennedy's control of the Babette Trust from discovery and execution by Kennedy's creditors.

B.     *Kennedy controls the Babette Trust's assets.*

1454.   Kennedy controlled the Babette Trust's at Credit Suisse. On May 5, 2015, Harry Freyer executed that certain Trading Authorization and Indemnification Form granting Kennedy virtually plenary authority over the Babette Trust's securities account ending in 6828 at Credit Suisse. According to the Trading Authorization and Indemnification Form, Kennedy could conduct virtually any transaction, with the exception of withdrawing assets from the Babette Trust's securities account ending in 6828 at Credit Suisse.

1455.   Now, the Babette Trust's assets are held at UBS AG, and Kennedy controls disbursements from the Babette Trust's accounts at UBS AG. For instance,

        a.     On March 10, 2016, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $400,000.00 to Fiore by interstate wire transfer. Kennedy instructed Ms. Decarlo to send $350,000 from the Babette Trust. *Id*. Ms. Decarlo and Mr. Jeremy Wittenberg at UBS AG confirmed Kennedy's instructions by reply emails on March 10, 2016.

        b.     On March 10, 2016, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $72,817.00 to American Express by interstate wire transfer. Kennedy specifically instructed Ms. Decarlo to send $72,817.00 from the Babette Trust.

        c.     On June 21, 2017, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $192,620.05 to Fiore by interstate wire transfer. Kennedy specifically instructed Ms. Decarlo to send $67,417.02 from the Babette Trust. *Id*. Kennedy instructed that the balance of the $192,620.05 be drawn from Rockcliff Holdings and Lee Kennedy Investments.

1456.   Kennedy's control over the assets of the Babette Trust is directly contrary to the Babette Trust's spendthrift provisions and the Louisiana Trust Code.

### C.     *Kennedy controls the Trustee of the Babette Trust.*

1457.   None of the Count 19 Defendants ever utilized the required manner of appointment or resignation of a Trustee through the Probate Court in Babette's Succession Case.

1458.   In 2017, Kennedy and Harry Freyer, with Adkinson's assistance and participation, manipulated control of the Babette Trust.

1459.   On or about September 1, 2017, Harry Freyer, Kennedy, and Adkinson, entered into that certain Resignation and Appointment of Successor Trustee, dated as of September 1, 2017. A true and correct copy of the Resignation and Appointment of Successor Trustee is attached to this Complaint as **Exhibit 275**. Harry Freyer executed the Resignation and Appointment of Successor Trustee on September 1, 2017. **Ex. 275**. Kennedy and Brenda Adkinson executed the Resignation and Appointment of Successor Trustee on September 21, 2017. *Id.*

1460.   According to the Resignation and Appointment of Successor Trustee, Harry Freyer was the sole Trustee of the Babette Trust. *Id.*

1461.   Harry Freyer resigned as Trustee of the Babette Trust in a manner wholly inconsistent with the terms of the Babette Trust.

1462.   Upon Harry Freyer's resignation, Harry Freyer and Kennedy together purported to appoint Adkinson as the sole Trustee of the Babette Trust, in direct contravention of the terms of the Babette Trust. **Ex. 275**, ¶ 1.

1463.   Then, Kennedy and Brenda Adkinson entered into that certain Agreement to Serve as Trustee, dated as of September 1, 2017. A true and correct copy of the Agreement to Serve as Trustee is attached to this Complaint as **Exhibit 276**.

1464.   The Agreement to Serve as Trustee recites that "McPherson is the sole beneficiary of the Trust U/W/O Babette L. Wiener for the benefit of Lee K. Freyer." **Ex. 276, ¶ A**.

1465.   According to the Agreement to Serve as Trustee, Brenda Adkinson freely agreed to serve as the Trustee of the Babette Trust. *Id.*, ¶ 1.

1466.   The Agreement to Serve as Trustee purports to authorize Kennedy to remove Adkinson as Trustee at any time. *Id.*, ¶ 2. In addition, the Agreement to Serve as Trustee obligates Adkinson to resign as Trustee at Kennedy's request, as follows: "<u>Removal or Resignation</u>. Brenda Adkinson acknowledges that she may be removed as Trustee by McPherson at any time. Brenda Adkinson agrees that she will resign as Trustee upon the request of McPherson." *Id.*, ¶ 2.

1467.   The Agreement to Serve as Trustee relieves Adkinson of any decision-making or management authority, and Adkinson had no obligation to make investment or other management decisions for the Babette Trust. *Id.*, ¶ 2. The Agreement to Serve as Trustee explained that "Brenda Adkinson is entitled to follow the direction of McPherson in acting as Trustee for the Trust and may shall [sic] investment decisions based on the direction of McPherson. Brenda Adkinson shall not be required to exercise her own judgment in making investment decisions as Trustee of the Trust." *Id.*, ¶ 3.

1468.   Thus, the Agreement to Serve as Trustee absolved Adkinson from any requirement to exercise her independent judgment as a fiduciary of the Babette Trust.

1469.   Beyond relief from decision-making authority, the Agreement to Serve as Trustee requires Kennedy to indemnify and release Adkinson from any liability incurred in her capacity as Trustee of the Trust, except for claims relating to fraud or willful misconduct. **Ex. 276**, ¶ 4.

1470.   The Agreement to Serve as Trustee effectively appointed Brenda Adkinson as the Trustee of the Babette Trust in name only, while imposing upon Brenda Adkinson no fiduciary obligations as a Trustee. *Ibid*.

1471.   Kennedy exercises absolute control and dominion over the Babette Trust, and Kennedy controls Adkinson, as Trustee.

1472.   Kennedy, the beneficiary, can remove Adkinson, the Trustee, at any time.

1473.   Kennedy may ask Adkinson to resign, and Adkinson must resign if asked.

1474.   Kennedy may instruct Adkinson's actions, and Adkinson must follow Kennedy's instructions.

1475.   Unlike most trust scenarios, Kennedy, the beneficiary, must indemnify and release Adkinson, the Trustee, from and against any and all claims or loss resulting from Adkinson's service as Trustee.

### D.   *Kennedy is the Trustee of the Babette Trust.*

1476.   Prior to Harry Freyer's purported appointment as Trustee of the Babette Trust, Kennedy was the Trustee of the Babette Trust.

1477.   For several years, Kennedy held herself out as the Trustee or fiduciary of the Babette Trust in the Babette Trust's federal and state tax returns and other instruments.

1478.   In the Babette Trust's 2009, 2010, 2011, 2014, and 2015 tax returns, Kennedy identified herself as the Trustee or signed the returns as the fiduciary of the Babette Trust, as shown in the following table:

| Tax Year | Date Filed | Trustee | Prepared By | Signed By |
|---|---|---|---|---|
| 2009 | Not Shown | Lee K. Freyer | Meena Lachman | Not Shown |
| 2010 | Not Shown | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2014 | 09/15/15 | None Named | Brenda L. Adkinson | Lee F. McPherson |
| 2014 | 09/15/15 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |

1479.   In the Babette Trust's 2009, 2010, and 2011 Form 1041 tax returns, Kennedy identified herself as the Trustee of the Babette Trust. As late as September 11, 2012, when the Babette Trust filed its 2011 Form 1041 tax return, Kennedy identified herself as the Trustee of the Babette Trust. In the Babette Trust's 2011 Arkansas and Louisiana state tax returns, Kennedy continued identifying herself as the Trustee of the Babette Trust.

1480.   At some time after entry of the HCB Judgment, Harry Freyer became the Trustee of the Babette Trust. Harry Freyer signed the Babette Trust's 2012 Form 1041 tax return on September 6, 2013, at which time he purported to be the Trustee of the Babette Trust.

1481.   Even after Harry Freyer assumed the role of Trustee of the Babette Trust, on September 15, 2016, Kennedy signed the Babette Trust's 2015 state and federal tax returns as the Babette Trust's "fiduciary."[89]

1482.   In other tax returns, Kennedy identified herself as the fiduciary of the Babette Trust. 5950 State Bridge Road's 2015 and 2016 Form 1120S tax returns represent that Kennedy – **NOT** Harry Freyer or Adkinson – is responsible for reporting the Babette Trust's K-1 income, deductions, credits, or losses.[90]

1483.   There is a genuine and bona fide dispute and an actual controversy and disagreement among HCB; Kennedy, in her individual capacity; Kennedy, in her capacity as Trustee of the Babette Trust; Harry Freyer, in his capacity as Trustee of the Babette Trust; and Adkinson, in her capacity as Trustee of the Babette Trust regarding the identity of the Trustee of

---

[89] *See* Treas. Reg. § 301.7701-6(b)(1) (1997) (defining "fiduciary").

[90] Schedule B-1 to Form 1120S is entitled "Information on Certain Shareholders of an S Corporation." In 5950 State Bridge Road's 2015 and 2016 Schedule B-1, 5950 State Bridge Road identified the Babette Trust as a shareholder.

the Babette Trust and whether the Babette Trust is a valid spendthrift trust under the Louisiana Trust Code.

**WHEREFORE,** pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2201, HCB demands judgment against the Count 4 Defendants declaring the following:

a.     Upon Babette Wiener's death, the Babette Trust was settled under Babette's Last Will and Testament;

b.     Upon Babette Wiener's death, Kennedy became the beneficiary of the Babette Trust;

c.     Kennedy repeatedly has identified herself as the Trustee of Babette Trust;

d.     Upon Kennedy's acceptance of Harry Freyer's resignation as the Trustee of the Babette Trust, and Kennedy and Harry Freyer's appointment of Adkinson as the Trustee of the Babette Trust, Kennedy unequivocally demonstrated her control and dominion over the assets of the Babette Trust;

e.     Kennedy has exercised powers and authority as the Trustee or fiduciary of the Babette Trust;

f.     The principal or corpus of the Babette Trust is not subject to the spendthrift provisions of the Babette Trust or of the Louisiana Trust Code; and

g.     HCB may execute upon the principal and income of the Babette Trust to satisfy the HCB Judgment.

### COUNT 19 – Seizure of Principal and Income of the Babette Trust

1484.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1485.   HCB asserts this Count against (a) Kennedy, in her individual capacity, (b) Kennedy, in her capacity as Trustee of the Babette Trust; (c) Harry Freyer, in his capacity as

Trustee of the Babette Trust; and (d) Adkinson, in her capacity as Trustee of the Babette Trust (the "**Count 19 Defendants**").

### A.     *The Count 19 Defendants have abused the formalities of the Babette Trust.*

1486.   The Babette Trust was created under Babette's Last Will and Testament.

1487.   In her Last Will and Testament, Babette established separate trusts for her daughter Kay and each of Kay's daughters, Aimee, Carol, and Kennedy.

1488.   Legal title to the Babette Trust's assets vests in the trustee of the Babette Trust, and the Babette Trust's beneficiary owns any equitable interests in the assets of the trust.

1489.   The beneficiary of the Babette Trust is entitled to the economic benefits of the trust corpus.

1490.   According to Babette's Last Will and Testament, Kennedy is the sole beneficiary of the Babette Trust. The Babette Trust exists solely for Kennedy's benefit.

1491.   Babette's Last Will and Testament included language intended to incorporate the full complement of spendthrift protection under the Louisiana Trust Code. Specifically, the Babette Trust provided as follows:

> No interest in the principal or income of any trust herein created shall be anticipated, assigned or encumbered, or subject to any creditor's claim or to legal process prior to its actual receipt by the particular beneficiary, it being my intention to subject each trust herein created to the maximum restraints on alienation, both voluntary and involuntary, possible under the laws of Louisiana, including the spendthrift trust provisions of the Louisiana Trust Code.

**Ex. 25**, ¶ IV.E. at 6.

1492.   The Babette Trust included specific instructions for the appointment and resignation of a trustee. According to Babette's Last Will and Testament:

> No nomination or appointment contained in this Will shall be construed to obligate the nominee or appointee to serve, whether as a trustee or co-trustee, an executor or co-executor, or an attorney-at-law to probate this Will and represent my executor or the trusts and trustees; neither shall any provision contained

herein, nor the absence of any express provision in the law of Louisiana, be construed to prevent any person from resigning any such office after having commenced to serve. To resign, such person must file a resignation in my succession proceedings at least ten (10) days in advance of the effective date of such resignation and shall mail copies thereof to each major competent legatee and Beneficiary, and to the personal representative of any minor or incompetent legatee.

*Id.*, ¶ IX.B. at 15.

1493.   The Babette Trust does not observe the formalities provided in Babette's Last Will and Testament or the Louisiana Trust Code, La. Rev. Stat. Ann. § 9:1721.

1494.   The Count 20 Defendants have abused the trust formalities governing the Babette Trust in a manner intended to insulate Kennedy's control of the Babette Trust from discovery and execution by Kennedy's creditors.

**B.      *Kennedy controls the Babette Trust's assets.***

1495.   Kennedy controlled the Babette Trust's at Credit Suisse. On May 5, 2015, Harry Freyer executed that certain Trading Authorization and Indemnification Form granting Kennedy virtually plenary authority over the Babette Trust's securities account ending in 6828 at Credit Suisse. According to the Trading Authorization and Indemnification Form, Kennedy could conduct virtually any transaction, with the exception of withdrawing assets from the Babette Trust's securities account ending in 6828 at Credit Suisse.

1496.   Now, Kennedy controls disbursements from the Babette Trust's accounts at UBS AG.

1497.   On March 10, 2016, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $400,000.00 to Fiore by interstate wire transfer. Kennedy instructed Ms. Decarlo to send $350,000 from the Babette Trust. *Id*. Ms. Decarlo and Mr. Jeremy Wittenberg at UBS AG confirmed Kennedy's instructions by reply emails on March 10, 2016.

1498.   On March 10, 2016, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $72,817.00 to American Express by interstate wire transfer. Kennedy specifically instructed Ms. Decarlo to send $72,817.00 from the Babette Trust.

1499.   On June 21, 2017, Kennedy sent an email to Ms. Decarlo at UBS AG and instructed her to transmit $192,620.05 to Fiore by interstate wire transfer. Kennedy specifically instructed Ms. Decarlo to send $67,417.02 from the Babette Trust. *Id*. Kennedy instructed that the balance of the $192,620.05 be drawn from Rockcliff Holdings and Lee Kennedy Investments.

1500.   Kennedy's control over the assets of the Babette Trust is directly contrary to the Babette Trust's spendthrift provisions and the Louisiana Trust Code.

### C.     Kennedy controls the Trustee of the Babette Trust.

1501.   None of the Count 5 Defendants ever utilized the required manner of appointment or resignation of a Trustee through the Probate Court in Babette's Succession Case.

1502.   In 2017, Kennedy and Harry Freyer, with Adkinson's assistance and participation, manipulated control of the Babette Trust.

1503.   On or about September 1, 2017, Harry Freyer, Kennedy, and Adkinson, entered into ther Resignation and Appointment of Successor Trustee. **Ex. 275**.

1504.   According to the Resignation and Appointment of Successor Trustee, Harry Freyer was the sole Trustee of the Babette Trust. *Id*.

1505.   Harry Freyer resigned as Trustee of the Babette Trust in a manner wholly inconsistent with the terms of the Babette Trust.

1506.   Upon Harry Freyer's resignation, Harry Freyer and Kennedy together purported to appoint Adkinson as the sole Trustee of the Babette Trust, in direct contravention of the terms of the Babette Trust. *Id*., ¶ 1.

311

1507. Then, Kennedy and Brenda Adkinson entered into that certain Agreement to Serve as Trustee, dated as of September 1, 2017. **Ex. 276**.

1508. The Agreement to Serve as Trustee recites that "McPherson is the sole beneficiary of the Trust U/W/O Babette L. Wiener for the benefit of Lee K. Freyer." *Id*., ¶ A.

1509. According to the Agreement to Serve as Trustee, Brenda Adkinson freely agreed to serve as the Trustee of the Babette Trust. *Id*., ¶ 1.

1510. The Agreement to Serve as Trustee purports to authorize Kennedy to remove Adkinson as Trustee at any time. *Id*., ¶ 2. In addition, the Agreement to Serve as Trustee obligates Adkinson to resign as Trustee at Kennedy's request, as follows: "Removal or Resignation. Brenda Adkinson acknowledges that she may be removed as Trustee by McPherson at any time. Brenda Adkinson agrees that she will resign as Trustee upon the request of McPherson." *Id*., ¶ 2 at 1.

1511. The Agreement to Serve as Trustee relieves Adkinson of any decision-making or management authority, and Adkinson had no obligation to make investment or other management decisions for the Babette Trust. **Ex. 276**, ¶ 2 at 1. The Agreement to Serve as Trustee explained that "Brenda Adkinson is entitled to follow the direction of McPherson in acting as Trustee for the Trust and may shall [sic] investment decisions based on the direction of McPherson. Brenda Adkinson shall not be required to exercise her own judgment in making investment decisions as Trustee of the Trust." *Id*., ¶ 3.

1512. Thus, the Agreement to Serve as Trustee absolved Adkinson from any requirement to exercise her independent judgment as a fiduciary of the Babette Trust.

1513.   Beyond relief from decision-making authority, the Agreement to Serve as Trustee requires Kennedy to indemnify and release Adkinson from any liability incurred in her capacity as Trustee of the Trust, except for claims relating to fraud or willful misconduct. **Ex. 276**, ¶ 4.

1514.   The Agreement to Serve as Trustee effectively appointed Brenda Adkinson as the Trustee of the Babette Trust in name only, while imposing upon Brenda Adkinson no fiduciary obligations as a Trustee. *Id.*, ¶ 4.

1515.   Kennedy exercises absolute control and dominion over the Babette Trust, and Kennedy controls Adkinson, as Trustee.

1516.   Kennedy, the beneficiary, can remove Adkinson, the Trustee, at any time.

1517.   Kennedy may ask Adkinson to resign, and Adkinson must resign if asked.

1518.   Kennedy may instruct Adkinson's actions, and Adkinson must follow Kennedy's instructions.

1519.   Unlike most trust scenarios, Kennedy, the beneficiary, must indemnify and release Adkinson, the Trustee, from and against any and all claims or loss resulting from Adkinson's service as Trustee.

### D.     *Kennedy is the Trustee of the Babette Trust.*

1520.   Prior to Harry Freyer's purported appointment as Trustee of the Babette Trust, Kennedy was the Trustee of the Babette Trust.

1521.   For several years, Kennedy held herself out as the Trustee or fiduciary of the Babette Trust in the Babette Trust's federal and state tax returns and other instruments.

1522.   In the Babette Trust's 2009, 2010, 2011, 2014, and 2015 tax returns, Kennedy identified herself as the Trustee or signed the returns as the fiduciary of the Babette Trust, as follows:

| Tax Year | Date Filed | Trustee | Prepared By | Signed By |
|----------|------------|---------|-------------|-----------|
| 2009 | Not Shown | Lee K. Freyer | Meena Lachman | Not Shown |
| 2010 | Not Shown | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2011 | 09/11/12 | Lee K. Freyer | Meena Lachman | Not Shown |
| 2014 | 09/15/15 | None Named | Brenda L. Adkinson | Lee F. McPherson |
| 2014 | 09/15/15 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |
| 2015 | 09/15/16 | Harry Freyer | Brenda L. Adkinson | Lee F. McPherson |

1523.  In the Babette Trust's 2009, 2010, and 2011 Form 1041 tax returns, Kennedy identified herself as the Trustee of the Babette Trust. As late as September 11, 2012, when the Babette Trust filed its 2011 Form 1041 tax return, Kennedy identified herself as the Trustee of the Babette Trust. In the Babette Trust's 2011 Arkansas and Louisiana state tax returns, Kennedy continued identifying herself as the Trustee of the Babette Trust.

1524.  At some time after entry of the HCB Judgment, Harry Freyer became the Trustee of the Babette Trust. Harry Freyer signed the Babette Trust's 2012 Form 1041 tax return on September 6, 2013, at which time he purported to be the Trustee of the Babette Trust.

1525.  Even after Harry Freyer assumed the role of Trustee of the Babette Trust, on September 15, 2016, Kennedy signed the Babette Trust's 2015 state and federal tax returns as the Babette Trust's fiduciary.

1526.  In other tax returns, Kennedy identified herself as the fiduciary of the Babette Trust. 5950 State Bridge Road's 2015 and 2016 Form 1120S tax returns represent that Kennedy – **NOT** Harry Freyer or Adkinson – is responsible for reporting the Babette Trust's K-1 income, deductions, credits, or losses.

**WHEREFORE,** HCB demands judgment against the Count 20 Defendants (a) levying execution against the assets of the Babette Trust; (b) preliminarily and permanently enjoining the

Count 20 Defendants from taking actions affecting the status of the assets of the Babette Trust in any manner that renders Kennedy's interests therein exempt in any manner from execution by HCB; (c) preliminarily and permanently enjoining the Count 20 Defendants from alienating in any manner the assets of the Babette Trust; (d) appointing a receiver to take charge of the Babette Trust's assets for the benefit of HCB; (e) awarding money damages equal to the value of assets of the Babette Trust in an amount in an amount to be determined by a jury; (f) awarding attorney's fees and the costs of this action; and (g) granting any other relief to which HCB may be entitled.

## COUNT 20 – Reverse Veil Piercing

1527.   HCB incorporates by reference Paragraphs 1 through 1199 of the Complaint.

1528.   HCB asserts this Count against (a) 5950 State Bridge Road; (b) BK II; (c) KWF Group; (d) Lee Kennedy Investments; (e) LKF Investments-Texas; (f) LK Freyer Investments; and (g) Rockcliff Holdings (the "**Count 20 Defendants**").

1529.   The Count 20 Defendants are Kennedy's alter egos. There is such unity between Kennedy and the Count 20 Defendants that the separateness between them has ceased, and holding only Kennedy liable would be unjust. Kennedy individually owns or controls each of the other Count 20 Defendants, and she operates the other Count 20 Defendants in a manner indistinguishable from her personal affairs and in a manner calculated to mislead those dealing with her to their detriment.

1530.   Moreover, Kennedy utilizes the Count 21 Defendants to shield her assets from HCB's collection efforts and to perpetrate fraud on HCB such that holding only Kennedy liable for the HCB Judgment would be unjust and inequitable.

### A.    *Kennedy controls the Count 20 Defendants.*

1531.   Kennedy owns and controls the Count 21 Defendants.

315

### 1.   5950 State Bridge Road

1532.   Kennedy directly or indirectly owns 75% of the membership interests in 5950 State Bridge Road. **Ex. 242**. The Babette Trust owns the remaining 25% of the membership interests of 5950 State Bridge Road. *Id*. Accordingly, Kennedy owns 100% of the equitable or beneficial interests of 5950 State Bridge Road. Moreover, Kennedy is the Manager of 5950 State Bridge Road. *Id*. Thus, Kennedy alone owns and controls 5950 State Bridge Road.

### 2.   BK II

1533.   In her September 2015 trial testimony in the BK II Case, Kennedy testified that she is and always has been the sole member of BK II. *Kennedy, BK II Trial Trans.*, 4:19-5:3. Kennedy also is the manager or managing member of BK II. *Ibid*. Therefore, Kennedy exercises complete control over BK II. **Ex. 183**.

### 3.   KWF Group

1534.   KWF Group is a Texas limited liability company. Meena Lachman organized KWF Group on December 6, 2012, when she filed KWF Group's Certificate of Formation with the Texas Secretary of State as Document No. 4558186002. According to KWF Group's Certificate of Formation, KWF Group is a member-managed limited liability company.

1535.   In KWF Group's 2013, 2014, and 2015 Public Information Reports, Kennedy identified herself as the sole member of KWF Group; however, during her May 1, 2014, deposition, Kennedy testified under oath that the Babette Trust, the CWK Trust, and the BFK Trust own KWF Group. In KWF Group's 2016 Public Information Report, which Kennedy signed electronically, Kennedy reported that she is the manager of KWF Group, even though KWF Group is member-managed.[91] In her 2016 Supplemental Responses, Kennedy finally

---

[91] On information and belief, KWF Group has never amended its Certificate of Formation.

disclosed that she, personally, owns 33.33% of the membership interests of KWF Group. **Ex. 12**. In KWF Group's 2017 Public Information Report, which Kennedy signed, Kennedy reported again that she is the sole member, not the manager, of KWF Group. True and correct copies of KWF Group's Certificate of Formation and Public Information Reports are attached hereto as **Composite Exhibit 277**.[92]

1536.   In KWF Group's 2013, 2014, 2015, and 2016 Form 1065 tax returns, Kennedy represented that she owns 100% of KWF Group's membership interests. Thus, Kennedy owns and controls KWF Group.

1537.   Kennedy, however, has repeatedly misrepresented her ownership and control of KWF Group.

1538.   Kennedy testified **under oath** on May 1, 2014, that she owned no interests individually in KWF Group. She claimed instead that the Babette Trust owned her membership interests in KWF Group. *Kennedy, Vol II.*, 305:5-20.

1539.   KWF Group's 2013 Form 1065 tax return reveals that Kennedy claims ownership of 100% of the membership interests of KWF Group. KWF Group's Schedule B-1, Part II, instructs, "Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership." As the tax matters partner of KWF Group, Kennedy represented that her "Maximum Percentage Owned in Profit, Loss, or Capital" was 100%. Kennedy made the same representations in KWF Group's 2014, 2015, and 2016 Form 1065 tax returns.

---

[92] On information and belief, KWF Group is not governed by an operating agreement or company agreement.

4.    **LFK GP, Lee Kennedy Investments, LKF Investments-Texas, and LK Freyer Investments**

1540.   Kennedy exercises complete and unfettered control over LFK GP, Lee Kennedy Investments, LKF Investments-Texas, and LK Freyer Investments.

1541.   In the aggregate, directly and indirectly, Kennedy owns:

    a.    90% of the issued and outstanding membership interests of LFK GP;

    b.    89.9% of the total partnership interests of Lee Kennedy Investments;

    c.    89.9% of the issued and outstanding membership interests of LKF Investments-Texas; and

    d.    92.13% of the issued and outstanding membership interests of LK Freyer Investments.

1542.   As shown below, Kennedy controls the management functions of LFK GP, Lee Kennedy Investments, LKF Investments-Texas, and LK Freyer Investments:



### 5. Rockcliff Holdings

1543.   Kennedy controls Rockcliff Holdings, just as she does Lee Kennedy Investments. The two entities are identical in structure.

1544.   Directly and indirectly, Kennedy owns (a) 90% of the issued and outstanding membership interests of Rockcliff GP, and (b) 89% of the limited partnership interests of Rockcliff Holdings. In the aggregate, Kennedy owns 89.9% of the total partnership interests in Rockcliff Holdings.

1545.   Kennedy controls Rockcliff Holdings from top to bottom, as follows:



1546.   Kennedy's control of the Count 20 Defendants and their respective affiliates and subsidiaries is best demonstrated when the Kennedy entity structure is examined as a whole:



## B.      The Count 21 Defendants do not follow corporate formalities.

1547.  The Count 21 Defendants do not follow corporate formalities. They transfer money back and forth without documentation. They do not file franchise tax returns or sales tax returns as and when required by Texas, Louisiana, or Florida law. They do not make the

disclosures required in their annual reporting with the various secretaries of the state where they are organized or formed. They do not register or qualify as foreign entities to do business in states where they conduct their business.

### 1. BK II

1548.   Since its original formation, BK II has not followed corporate formalities.

1549.   As explained in this Complaint, BK II was organized on August 6, 2004. BK II filed annual reports with the Florida Secretary of State in 2006 and 2007. *Id*. From 2007 until 2013, BK II did not file any annual reports. Then, on March 15, 2013, one day after entry of the Original Judgment and months after filing the BK II Case, BK II filed an annual report reflecting that Kennedy was the managing member of BK II.

1550.   From 2006 to 2018, BK II's Annual Reports varied in the candor regarding ownership and management of BK II, as shown in the following table:

| Report Year | Managing Members/Managers | Signed by | Capacity |
|---|---|---|---|
| 2006 | Lee F. Kennedy | Lee F. Kennedy | None |
| 2007 | Lee F. Kennedy | Meena Lachman | None |
| 2013 | Lee F. Kennedy | Lee Kennedy | None |
| 2014 | Lee F. McPherson | Lee McPherson | Managing Member |
| 2015 | Lee F. McPherson | Lee McPherson | Manager |
| 2016 | LK Freyer Investments | Lee McPherson | Manager |
| 2017 | LK Freyer Investments | Lee McPherson | Manager |
| 2018 | LK Freyer Investments | Lee McPherson | Manager |

1551.   Since entry of the Amended Final Judgment, Kennedy has concealed the true ownership of BK II. While **under oath**, Kennedy repeatedly misrepresented the ownership BK II.

1552.   On December 16, 2013, ATIF deposed Kennedy in the BK II Case.[93] Kennedy testified **under oath** at that time that BK II was owned by (1) LK Freyer Investments, (2) CWK, (3) BFK, and (4) the Babette Trust. *Kennedy v. ATIF, Depo. Vol. I*, 12:15-13:21.

1553.   **Just three days later**, HCB deposed Kennedy, and Kennedy's testimony was different. On December 19, 2013, Kennedy testified **under oath** that BK II is divided among five members: (1) Lee Kennedy Investments, (2) the Babette Trust, (3) the CWK Trust, (4) the BFK Trust, and (5) LK Freyer Investments. *Kennedy*, *Vol. I*, 89:17-90:13. Kennedy also testified that neither she nor any of the entities transferred her or its ownership in BK II prior to Kennedy's December 19, 2013, deposition. *Id*., 89:2, 92:22-93:3.

1554.   On July 10, 2015, Kennedy was deposed by ATIF a second time in the BK II Case.[94] During her July 10, 2015, deposition in the BK II Case, Kennedy testified the she alone was the managing member of BK II. *Kennedy v. ATIF, Depo. Vol. II*, 12:16-21.

1555.   She also testified that none of her entities owned any interest in BK II. *Kennedy v. ATIF, Depo. Vol. II*, 14:15-15:1.

1556.   During the trial of BK II Case on September 28, 2015, Kennedy again testified **under oath** that she alone owns BK II:[95]

Q.   Can you explain your relationship to the company known as BK Properties II?

A.   Yes. I was – I'm the sole managing member and sole owner. One of my entities is BK Properties II.

Q.   And when did you become manager of BK Properties II?

---

[93] References to the transcript of Kennedy's December 16, 2013, deposition will appear in this Complaint as "*Kennedy v. ATIF, Depo. Vol. I*, page:line."
[94] References to the transcript of Kennedy's July 10, 2015, deposition will appear in this Complaint as "*Kennedy v. ATIF, Depo. Vol. II*, page:line."
[95] References to the transcript of Kennedy's September 28, 2015, trial testimony will appear in this Complaint as "*BK II Trial Transcr.*, page:line."

A.       I was always the manager, but I became a sole manager, January 3, 2005.

Q.       And when did you become the sole owner?

A.       January, I believe; January 25th, 2006.

*BK II Trial Transcr.*, 4:19-5:3.

1557.   Four months later, on January 23, 2016, Kennedy certified in BK II's Annual Report that she was the Manager of BK II, but LK Freyer Investments was the managing member of BK II.

1558.   Then, in her May 13, 2016, Supplemental Responses, Kennedy represented **under oath** that LK Freyer Investments **owns** 100% of the membership interest of BK II. **Ex. 12** at 6.

1559.   In October 2016, when LK Freyer Investments' filed its 2015 Form 1065 federal tax return, Kennedy and LK Freyer Investments represented that LK Freyer Investments owned Parcel C, but LK Freyer Investments' return made no mention of BK II. Adkinson and the Leighton/Adkinson Firm prepared LK Freyer Investments' 2015 Form 1065 federal tax return.

1560.   Kennedy repeatedly misrepresented the ownership of BK II to suit the particular circumstances of her testimony. Kennedy's December 19, 2013 testimony conflicted with her December 16, 2013, testimony. Kennedy's September 28, 2015, trial testimony contradicted her December 16, 2013, and December 19, 2013, deposition testimony. Kennedy's 2016 Supplemental Responses contradicted her prior trial testimony and her deposition testimony.

1561.   Furthermore, when BK II transferred the Title Judgment Proceeds to LK Freyer Investments and the Babette Trust, neither LK Freyer Investments nor the Babette Trust had any entitlement or right to those proceeds. And those transfers were not documented in any manner by BK II, LK Freyer Investments, or the Babette Trust.

1562.   Then, LK Freyer Investments reported the income of the Title Judgment Proceeds as the sale of Parcel C so it could unlawfully claim long term capital gains tax treatment on Title Judgment Proceeds.

1563.   In sum, BK II did not and does not follow corporate formalities.

### 2.   Hungry Otter

1564.   Even though Hungry Otter was formed in 2011, Hungry Otter did not file any tax returns until 2014. Hungry Otter did not issue any Schedule K-1s during 2011, 2012, 2012, or 2013. Instead, Kennedy reported Hungry Otter's earnings on her personal Form 1040 tax returns. Kennedy's personal tax returns treated Hungry Otter's gains and losses as though Kennedy was trading stock in Hungry Otter instead of trading stocks through Hungry Otter.

1565.   In 2011 and 2012, Hungry Otter engaged in hundreds of millions of purchase and sale transactions in various equities markets. According to Kennedy personal tax returns, Hungry Otter purchased and sold $13,000,000 of securities in 2011 and more than $200,000,000 in securities in 2012:

| Tax Year | Sales Price | Cost or other basis | Adjustments | Gain(Loss) |
|---|---|---|---|---|
| 2011 | $12,662,818.00 | $13,000,366.00 | $408,393.00 | $70,845.00 |
| 2012 | $209,513,276.00 | $229,852,649.00 | $20,034,382.00 | ($304,991.00) |
| **Totals** | **$222,176,094.00** | **$242,853,015.00** | **$20,442,775.00** | **($234,146.00)** |

1566.   Kennedy's 2013 Form 1040 tax return makes almost no reference to Hungry Otter, except to report $1.00 in earned interest, $14,734.00 in ordinary dividends, and $18,654.00 in passive income attributable to Hungry Otter.

1567.   Further evidencing the disregard of corporate formalities, Kennedy has repeatedly misrepresented the ownership interests in Hungry Otter. On December 19, 2013, Kennedy testified that she was the owner of Hungry Otter. *Kennedy*, *Vol. I*, 49:8-11. Kennedy did not identify any other owners of Hungry Otter during her December 19, 2013, deposition.

1568.  When Kennedy testified **under oath** on May 1, 2014, she identified four owners of Hungry Otter, including Neil McPherson and her children. *Kennedy, Vol. II*, 247:10-18. Then, when asked during her May 1, 2014, deposition whether there was any change in Hungry Otter's ownership between from 2011 to 2014, Kennedy answered unequivocally "No." *Kennedy, Vol. II*, 247:19-21.

1569.  Only months before, however, Kennedy had already conveyed 10% of the membership interests of Hungry Otter to Neil McPherson. Indeed, when Kennedy filed (or caused to be filed) Hungry Otter's 2014 Public Information Report on March 5, 2014, Kennedy identified Neil McPherson as the only other member of Hungry Otter. In her 2016 Supplemental Responses, Kennedy represented to HCB **under oath** that she owned 50% of Hungry Otter's membership interests, and Neil McPherson owned the remaining 50% of Hungry Otter's membership interests.

### 3.     LK Freyer Investments

1570.  LK Freyer Investments does not follow corporate formalities.

1571.  From 2002 through 2005, LK Freyer Investments failed to file any annual reports. Consequently, on October 15, 2005, the Louisiana Secretary of State revoked LK Freyer Investments' Articles of Organization. After filing an Annual Report and Reinstatement in 2006, LK Freyer Investments did not file any annual reports for another 11 years.

1572.  On August 20, 2017, **two days after the hearing on HCB's Motion for Contempt in the Florida Case**, Kennedy signed and LK Freyer Investments' 2017 annual report as the Manager of LK Freyer Investments.

1573.  Despite the various assignments of Kennedy's and Kennedy-Custodian's respective interests in LK Freyer Investments, neither Kennedy nor Kennedy-Custodian executed

any instrument evidencing the assignment of their membership interests in LK Freyer Investments.

1574.   LK Freyer Investments is governed by an Operating Agreement. **Ex. 30**. Kennedy, in her individual capacity, and Kennedy-Custodian signed the Operating Agreement, effective as of January 1, 2009. *Id*. at 33.

1575.   On information and belief, none of Lee Kennedy Investments, the Babette Trust, or LKF Investments-Texas ever signed the Operating Agreement of LK Freyer Investments.

### 4.        Lee Kennedy Investments

1576.   Lee Kennedy Investments does not follow corporate formalities.

1577.   From August 16, 2010, until February 2, 2016, Lee Kennedy Investments filed no Public Information Reports as required by Tex. Tax Code § 171.252. Then, on February 2, 2016, Lee Kennedy Investments filed its 2016 Public Information Report. In the 2016 Public Information Report, Kennedy reported that she was the manager of Lee Kennedy Investments.[96] **Ex. 27**.

1578.   On information and belief, Lee Kennedy Investments has never qualified to do business in Florida or any other states (other than Texas) in which it does business.

1579.   On information and belief, Lee Kennedy Investments failed to file franchise tax returns in the State of Texas from 2010 to 2016, thereby failing to report its gross revenues for franchise tax purposes.

1580.   On information and belief, Lee Kennedy Investments has never filed a sales tax return in Florida, even Destin Holdings Trust was required to collect sales tax attributable to the rental proceeds from the Pink House.

---

[96] Limited partnership typically do not have "managers."

### 5.      Rockcliff Holdings

1581.   Rockcliff Holdings does not follow corporate formalities.

1582.   From its formation in 2010 until February 16, 2016, Rockcliff Holdings filed no Public Information Reports as required by Tex. Tax Code § 171.252. Then, on February 16, 2016, Rockcliff Holdings filed its 2016 Public Information Report. In the 2016 Public Information Report, Kennedy reported that she was the manager of Rockcliff Holdings.[97] Moreover, in the Public Information Reports actually filed by Rockcliff Holdings, Rockcliff Holdings did not identify the entities in which it owns 10% or more of the equity interests.

1583.   On information and belief, Rockcliff Holdings has never qualified to do business in any other states (other than Texas) in which it does business.

1584.   On information and belief, Rockcliff Holdings failed to file franchise tax returns in the State of Texas from 2010 to 2016, thereby failing to report its gross revenues for franchise tax purposes.

1585.   Even though the Kennedy Enterprise extensively documented the Capitalization Transaction for Rockcliff Holdings, none of the transactions contemplated were consummated as agreed in the Capitalization Documents. Indeed, even the Capitalization Documents were not properly executed, as evidenced by Kennedy's apparent use of Harry Freyer's signature.

### C.      *The Count 21 Defendants commingle their assets, and Kennedy uses the Count 21 Defendants for personal purposes.*

1586.   Kennedy LK Freyer Investments and Kennedy regularly commingle their assets, and Kennedy uses LK Freyer Investments for personal purposes. Since entry of the HCB Judgment, Kennedy has used LK Freyer Investments to pay for luxury cars, shopping trips in

---

[97] Again, limited partnership typically do not have "managers."

Beverly Hills, weekend getaways in Las Vegas, extravagant vacations in Europe, and ski trips to Colorado and Montana.

### 1.  Cash withdrawals

1587.  In 2017, LK Freyer Investments fraudulently transferred $20,500.00 directly to Kennedy via cashier's checks drawn on JPMC, as shown below:

| Date | From | To | Account No. | Amount |
|------|------|-----|-------------|--------|
| 03/06/17 | LK Freyer Investments | Lee Freyer Kennedy | 1065 | $4,500.00 |
| 04/28/17 | LK Freyer Investments | Lee F. Kennedy | 8264 | $4,000.00 |
| 04/28/17 | LK Freyer Investments | Lee F. Kennedy | 8264 | $4,000.00 |
| 04/28/17 | LK Freyer Investments | Lee Freyer Kennedy | 1065 | $4,000.00 |
| 04/28/17 | LK Freyer Investments | Lee Freyer Kennedy | 1065 | $4,000.00 |
| **Total** | | | | **$20,500.00** |

1588.  LK Freyer Investments' 2017 transfers to Kennedy occurred in direct violation of the Louisiana Charging Order.

### 2.  Deposits into personal accounts

1589.  On several occasions in 2017 and 2018, Kennedy has deposited checks made payable to LK Freyer Investments directly into her personal accounts at JPMC. Kennedy converted nearly $4,000.00 in checks payable to LK Freyer Investments and deposited those checks into her personal accounts ending in 1065 and 8264 at JPMC. Kennedy also has deposited into LK Freyer Freyer's accounts checks made out personally to Kennedy.

### 3.  Regular transfers to and from business and personal accounts

1590.  From and after the date of the HCB Judgment, Kennedy repeatedly transferred money to Hungry Otter. From those transferred proceeds, Hungry Otter would pay many of Kennedy's personal expenses. In 2015, Kennedy transferred $25,000.00 from her account ending in 8264 at JPMC to Hungry Otter's account ending in 2835 at JPMC. Between November 2013 and August 2015, Kennedy transferred $35,160.00 from her account ending in 9320 at JPMC to Hungry Otter's account ending in 2835 at JPMC. Similarly, between March 2013 and June 2015,

Hungry Otter transferred $52,300.00 from its account ending in 2835 at JPMC to Kennedy personal account ending in 9320 at JPMC.

1591.   Since entry of the Original Judgment, Kennedy has transferred $75,664.54 from her personal accounts at JPMC into her business accounts at JPMC, as follows:

| Date | From | Account No. | To | Account No. | Amount |
|---|---|---|---|---|---|
| 02/27/15 | Lee F. Kennedy | 8264 | Hungry Otter Holdings | 2835 | $10,000.00 |
| 03/10/15 | Lee Freyer Kennedy | 9320 | Hungry Otter Holdings | 2835 | $350.00 |
| 03/26/15 | Lee Freyer Kennedy | 9320 | Hungry Otter Holdings | 2835 | $300.00 |
| 03/27/15 | Lee F. Kennedy | 8264 | Hungry Otter Holdings | 2835 | $15,000.00 |
| 04/02/15 | Lee Freyer Kennedy | 9320 | Hungry Otter Holdings | 2835 | $2,500.00 |
| 07/30/15 | Lee Freyer Kennedy | 9320 | Hungry Otter Holdings | 2835 | $20,000.00 |
| 09/08/15 | Lee F. Kennedy | 8264 | LK Freyer Investments | 7565 | $2,000.00 |
| 03/30/16 | Lee Freyer Kennedy | 1065 | Destin Holdings Trust | 9595 | $5,000.00 |
| 02/17/17 | Lee Freyer Kennedy | 9320 | LK Freyer Investments | 2702 | $20,000.00 |
| 10/10/17 | Lee Freyer Kennedy | 1065 | LK Freyer Investments | 2702 | $114.54 |
| 08/25/18 | Lee Freyer Kennedy | 9320 | Hungry Otter Holdings | 2835 | $400.00 |
| **Total** | | | | | **$75,664.54** |

1592.   In contrast, since entry of the Original Judgment, the Count 20 Defendants have transferred approximately **$725,000.00** into Kennedy's personal accounts at JPMC.

### 4.   Mercedes Benz

1593.   In April 2013, **one month after the District Court entered the Original Judgment**, Kennedy traveled to Phoenix, Arizona, to buy a Mercedes Benz. On April 13, 2013, Kennedy charged $1,000 to her American Express card ending in 1005 at Phoenix Motor Co. Both Kennedy and LK Freyer Investments made payments on Kennedy's American Express card ending in 1005 for the month of April 2013. Then, on April 25, 2013, Kennedy charged $4,000.00 to her American Express card ending in 2003 at Phoenix Motor Co. LK Freyer Investments paid the entire amount of charges on Kennedy's American Express card ending in 2003 for the month of April 2013. Kennedy financed the remainder of her purchase through Mercedes Benz Financial. LK Freyer Investments made monthly payments to Mercedes Benz Financial in the amount of $697.68 after Kennedy bought her vehicle, as shown on **Exhibit 278**

attached to this Complaint. On information and belief, LK Freyer Investments paid Mercedes Benz Financial a total of $26,511.84 from June 2013 through June 2016. LK Freyer Investments has never scheduled the vehicle as its own asset and has never depreciated the vehicle.

### 5.    Artwork

1594.    On January 12, 2014, **between her first and second post-judgment depositions**, Kennedy purchased art at Galerie D'Art Francais in New Orleans, Louisiana, and Kennedy charged $10,327.00 to her American Express account ending in 4009 for her art purchase. On March 10, 2014, and March 20, 2014, Kennedy paid $17,527.00 and $11,463.72 to American Express from LK Freyer Investments' account ending in 2702 at JPMC, to pay the balance of her American Express account ending in 4009, including Kennedy's January 12, 2014, purchase at Galerie D'Art Francais.

1595.    During her post-judgment deposition on May 1, 2014, Kennedy was purposely evasive and dishonest regarding artwork she owned:

> Q.    Do you have any artwork -- I don't want to miss this by us misconstruing. But, I mean, in a general sense of what artwork is, paintings, sculptures, statues, anything along those lines that -- any pieces that either you purchased -- that either had a purchase price by you or had a value greater than $2,000? . . .

> A.    Purchased by me?

> Q.    Yes, purchased -- yeah, that was purchased by you where the purchase price was either -- the purchase price was either $2,000 -- at least $2,000 or the worth of it is $2,000. I could re-ask that. Do you have any paintings in your house that you paid more than $2,000 for?

> A.    No. That I paid more than $2,000 for?

> Q.    No. Do you have any paintings in your house?

> A.    I mean, I don't -- I have stuff that my parents gave me or that were family. But I don't recall. I mean, I have stuff -- I have some paintings that were my ex-husband's. And but I don't know what – what – you know, I don't know.

Q.      Do you have any paintings or other artwork that you believe is worth -- that has a fair market value of $2,000 or more?

A.      I don't know.  I mean, you know, how do you sell art, on Craig's List?

*Kennedy*, *Vol. II*, 217:4-218:6.

1596.   From January 1, 2009, to December 31, 2016, LK Freyer Investments' Form 1065 tax returns reflected among its assets "Artwork" valued at $19,650. Since at least 2009, the value of LK Freyer Investments' "artwork" has not changed. On information and belief, Kennedy's art purchase on January 12, 2014, was for herself, and LK Freyer Investments paid for Kennedy's purchase.

### 6.      Porsche Austin

1597.   On or about August 15, 2016, Kennedy purchased an automobile from Porsche Austin. She paid for the automobile by writing check number 117 from LK Freyer Investments' account ending in 7565 at JPMC, made payable to Porsche Central Austin in the amount of $10,000.00. A true and correct copy of LK Freyer Investments' check no. 117 is attached to this Complaint as **Exhibit 279**. Kennedy financed the balance of the automobile purchase through BB&T Consumer Loans. LK Freyer Investments makes monthly payments of $805.71 to BB&T Consumer Loans on Kennedy's behalf for her vehicle, as shown on **Exhibit 280** attached to this Complaint. On information and belief, LK Freyer Investments paid BB&T Consumer Loans a total of $18,531.33 from September 2016 through July 2018. LK Freyer Investments has never scheduled the vehicle as its own asset and has never depreciated the vehicle.

1598.   Kennedy used Hungry Otter to pay for personal expenses for her home, including payments to utility companies such as the City of Austin and Loop 360 Water. Hungry Otter paid $22,812.58 to the City of Austin, Kennedy's electricity provider, from its account ending in 2835 at JPMC, for electricity service at Kennedy's home. Hungry Otter paid $1,950.31 to Loop 360

Water from its account ending in 2385 at JPMC for water and service at Kennedy's home. Hungry Otter paid $3,031.05 to Bill Gusman Lawn Service for lawn maintenance at Kennedy's home. Hungry Otter made each payment to Bill Gusman Lawn Service from its account ending in 2835 at JPMC.

### 7. Condominium association

1599. Kennedy's home is situated in the Cima Terre community, a horizontal condominium. From May 2013 through September 2015, Hungry Otter paid monthly assessments due and payable to the Cima Terre Condominium Community, in which Neil McPherson has been an officer since 2014. Hungry Otter paid the Cima Terre Condominium Community a total of $8,387.20 from 2013 through 2015. Hungry Otter made each payment to Cima Terre from its account ending in 2835 at JPMC.

### 8. Austin Country Club

1600. In addition to other personal expenses, Hungry Otter paid Kennedy's expenses associated with membership in Austin Country Club. Hungry Otter paid $36,401.00 to Austin Country Club. Each payment to Austin Country Club was made from Hungry Otter's account ending in 2835 at JPMC.

### 9. Legal fees

1601. LK Freyer Investments has paid $259,605.13 of Kennedy's personal legal bills. Hubbard, Mitchell, Williams & Strain has represented Kennedy in post-judgment discovery and collection defense with respect to the Amended Final Judgment. It also has represented Kennedy in the defense of Biel REO's claims in the Harrison County Case. Throughout those engagements, Kennedy never paid Hubbard, Mitchell, Williams & Strain directly from her personal accounts. Instead, Lee Kennedy Investments, LKF Investments-Texas, and LK Freyer

Investments paid Hubbard, Mitchell, Williams & Strain $174,993.00 for its work on behalf of Kennedy.

1602.   Attorney Taube represented Kennedy before the Fifth Circuit on appeal from the HCB Judgment. Attorney Taube also represented Kennedy and her entities as Kennedy defended against HCB's efforts to obtain the Texas Charging Orders. Throughout those engagements, Kennedy never paid Mr. Taube directly from her personal accounts. Instead, LK Freyer Investments and Hungry Otter paid Mr. Taube and his law firm more than $70,000.00 on Kennedy's behalf. LK Freyer Investments paid $57,400.00 and Hungry Otter paid $8,800.00 for Mr. Taube's representation of Kennedy.

1603.   On January 23, 2014, Hungry Otter paid Hopkins & Williams, PLLC, $2,571.00 from Hungry Otter's account ending in 2835 at JPMC.[98] Hungry Otter's January 23, 2014, payment to Hopkins & Williams, PLLC, included the reference, "Payment *for* Lee McPherson."

1604.   From time to time, Lee Kennedy Investments paid Kennedy's and Neil McPherson's legal fees. For example, on September 28, 2014, Kennedy wrote check No. 1033 from Lee Kennedy Investments' account ending in 7472 at JPMC (ABA routing number 111000614) to Neil McPherson in the amount of $3,800.00 for "legal fees."

1605.   Lee Kennedy Investments and Rockcliff Holdings also paid Kennedy's counsel in Canada, Miller Thomson, to defend Kennedy in the McPherson Bankruptcy Receivership Case, as follows:

| Date | From | Account No. | To | Amount |
|------|------|-------------|-----|--------|
| 06/15/15 | Lee Kennedy Investments | 7472 | Miller Thomson | $8,250.14 |
| 06/30/15 | Rockcliff Holdings | 7373 | Miller Thomson | $8,169.93 |
| 08/06/15 | Lee Kennedy Investments | 7472 | Miller Thomson | $3,875.67 |

---

[98] On February 25, 2015, Hungry Otter made a payment to Hopkins & Williams, PLLC, in the amount of $1,000.00, referencing "Payment for Hyperion," from Hungry Otter's account ending in 2835 at JPMC.

| | | | | |
|---|---|---|---|---|
| 07/16/15 | Lee Kennedy Investments | 7472 | Miller Thomson | $7,851.76 |
| **Total** | | | | **$22,900.00** |

1606.  Likewise, LK Freyer Investments and Hungry Otter paid Canadian law firm Snyder & Associates $672,034.61 to defend Kennedy and Neil McPherson and to preserve Neil McPherson's interest in his property in British Columbia, Canada, as follows:

| Date | From | Account No. | To | Amount |
|---|---|---|---|---|
| 06/18/13 | Hungry Otter | 2835 | Snyder & Associates | $3,000.00 |
| 09/03/13 | Hungry Otter | 2835 | Snyder & Associates | $4,034.61 |
| 11/06/13 | Hungry Otter | 2835 | Snyder & Associates | $10,000.00 |
| 11/18/13 | LK Freyer Investments | 7565 | Snyder & Associates | $200,000.00 |
| 01/22/14 | Hungry Otter | 2835 | Snyder & Associates | $5,000.00 |
| 02/24/14 | Hungry Otter | 2835 | Snyder & Associates | $200,000.00 |
| 02/25/14 | Hungry Otter | 2835 | Snyder & Associates | $200,000.00 |
| 02/26/14 | Hungry Otter | 2835 | Snyder & Associates | $50,000.00 |
| **Total** | | | | **$672,034.61** |

### 10.    2014 – Montana

1607.  On November 20, 2014, Lee Kennedy Investments paid $7,500.00 for Kennedy's accommodations during her 2014 vacation in Whitefish, Montana. Lee Kennedy Investments made such payment from its account ending in 7472 at JPMC (ABA routing number 114000776) in New York to Joanna King's account at Parkside Credit Union (ABA routing number 292978005) in Montana.

### 11.    2016 – Paris, France

1608.  From July 23, 2016, through August 4, 2016, Kennedy's son, CWK, spent two weeks in France, incurring nearly $2,000.00 in charges to Kennedy's American Express account ending in 5006. Kennedy paid the charges CWK incurred from her account ending in 1065 at JPMC. On August 4, 2016, Kennedy paid $4,028.95 on her American Express account ending in 5006 to pay such charges. Kennedy could not have made such payment without a prior transfer from LK Freyer Investments.

### 12.    2018 – London, England

1609.   From June 5, 2018, through June 12, 2018, Kennedy and her son CWK traveled to London, England. On March 17, 2018, Kennedy charged $2,759.70 to her American Express account ending in 6004, for CWK's airfare from Austin, Texas, to London, England. On May 13, 2018, Kennedy charged another $1,558.90 to her American Express account ending in 6004 for airfare for herself and CWK from London, England, to Austin, Texas. While in England, Kennedy charged $4,574.30 to her American Express account ending in 6004 at the Westbury Hotel in London. On July 6, 2018, Kennedy paid $5,907.40 to American Express from her personal account ending in 1065 at JPMC. Kennedy could not have made such payment without a transfer from LK Freyer Investments on June 29, 2018, and a transfer in the amount of $25,000.00 from PJ Adams Holdings on June 27, 2018.

### 13.    Mardi Gras with Beary

1610.   From 2015 to 2018, Kennedy charged $80,000.00 to her American Express card ending in 7002 for payments to Fat Bankers' Social Aid and Pleasure Club, L.L.C. ("**Fat Bankers**"), a "sub-group" of the Krewe of Tucks, a New Orleans Mardi Gras parade organization.

1611.   Beary organized Fat Bankers on February 28, 2003. He is one of the members and an officer of Fat Bankers. According to Fat Bankers Annual Report for the period ended February 28, 2017, Beary is one of only two members of Fat Bankers. Fat Bankers' telephone number is (504) 299-8724, which is the telephone number for Beary's law firm, Beary & Oakes, LLC. From its accounts ending in 7565 and 2702, LK Freyer Investments paid all of the charges to Kennedy's American Express account ending in 7002 related to Fat Bankers.

### 14.    Athletic Tickets

1612.   Since 2013, Kennedy has charged nearly $45,000.00 to her American Express cards for University of Texas athletics tickets, as follows:

| Date | For/To | AmEx Acct. No. | Amount |
|------|--------|----------------|--------|
| 04/17/13 | UT Mens Ath Tickets | 2003 | $2,910.00 |
| 09/09/13 | UT Mens Ath Tickets | 4009 | $200.50 |
| 09/09/13 | UT Mens Ath Tickets | 4009 | $304.50 |
| 04/21/14 | UT Mens Ath Tickets | 5006 | $3,040.00 |
| 04/06/15 | UT Mens Ath Tickets | 5006 | $9,080.00 |
| 05/28/15 | UT Mens Ath Tickets | 6004 | $195.00 |
| 07/09/15 | UT Mens Ath Tickets | 4009 | $500.00 |
| 03/08/16 | UT Mens Ath Tickets | 7002 | $9,080.00 |
| 01/07/17 | UT Mens Ath Tickets | 7002 | $8,530.00 |
| 04/12/17 | UT Mens Ath Tickets | 7002 | $540.00 |
| 02/13/18 | UT Mens Ath Tickets | 7002 | $8,550.00 |
| **Total** | | | **$42,930.00** |

1613.   In addition, on June 25, 2015, Kennedy charged $4,330.00 to her American Express account ending in 6004 for tickets for the World Golf Championships. LK Freyer Investments paid each of those charges.

1614.   On August 25, 2016, March 6, 2017, and August 31, 2017, Kennedy sold some of the athletics tickets she purchased. Instead of reimbursing LK Freyer Investments, Kennedy deposited the proceeds from those sales – $11,101.00 – into her personal checking and savings accounts in 1065 and 5963. She deposited $9,200.00 into her personal checking account ending in 1065 and $1,901.00 into her personal savings account ending 5963.

### 15.    Health insurance and life insurance

1615.   From April 12, 2013, through December 16, 2016, LK Freyer Investments paid Kennedy's Blue Cross premiums in the total amount of $58,450.00.

1616.   LK Freyer Investments and Lee Kennedy Investments paid Kennedy's life insurance premiums as follows:

| Date | From | Account No. | To | Amount |
|------|------|-------------|-----|--------|
| 09/20/13 | LK Freyer Investments | 7565 | Aviva Life & Annuity | $4,575.00 |
| 10/14/14 | LK Freyer Investments | 7565 | Athene | $4,575.00 |

| 11/09/15 | Lee Kennedy Investments | 7472 | Accordia Life and Annuity | $4,575.00 |
| 09/23/16 | Lee Kennedy Investments | 7472 | Accordia Life and Annuity | $4,600.00 |
| 10/01/16 | Lee Kennedy Investments | 7472 | Accordia Life and Annuity | $4,575.00 |
| **Total** | | | | **$22,900.00** |

### 16. Utilities and maintenance

1617. From time to time, Lee Kennedy Investments and Hungry Otter paid Kennedy's personal homeowner's or property association dues as well as Kennedy's personal utility services.

1618. Kennedy used Hungry Otter to pay for personal expenses for her home, including payments to utility companies such as the City of Austin and Loop 360 Water. Hungry Otter paid $22,812.58 to the City of Austin, Kennedy's electricity provider, from its account ending in 2835 at JPMC, for electricity service at Kennedy's home. Hungry Otter paid $1,950.31 to Loop 360 Water from its account ending in 2385 at JPMC for water and service at Kennedy's home. Hungry Otter paid $3,031.05 to Bill Gusman Lawn Service for lawn maintenance at Kennedy's home. Hungry Otter made each payment to Bill Gusman Lawn Service from its account ending in 2835 at JPMC.

### 17. Condominium association

1619. Kennedy's home is situated in the Cima Terre community, a horizontal condominium. From May 2013 through September 2015, Hungry Otter paid monthly assessments due and payable to the Cima Terre Condominium Community, in which Neil McPherson has been an officer since 2014. Hungry Otter paid the Cima Terre Condominium Community a total of $8,387.20 from 2013 through 2015. Hungry Otter made each payment to Cima Terre from its account ending in 2835 at JPMC.

18.     **Austin Country Club**

1620.  In addition to other personal expenses, Hungry Otter paid Kennedy's expenses associated with membership in Austin Country Club. Hungry Otter paid $36,401.00 to Austin Country Club. Each payment to Austin Country Club was made from Hungry Otter's account ending in 2835 at JPMC.

1621.  Overall, Kennedy has abused the corporate structure she utilizes to shield her assets.

**WHEREFORE,** HCB demands judgment against the Count 21 Defendants (1) determining there is such unity between Kennedy and the Count 21 Defendants that the separateness among Kennedy and the remaining Count 21 Defendants has ceased; holding only Kennedy liable for the HCB Judgment would be unjust and inequitable; and Kennedy and the Count 21 Defendants are alter egos; (2) imposing against the Count 21 Defendants any and all amounts Kennedy owes to HCB in an amount to be determined by a jury; (3) awarding attorney's fees and the costs of this action; and (4) granting any other relief to which HCB may be entitled.

## DEMAND FOR JURY TRIAL

HCB demands trial by jury on all issue so triable.

Dated: December 24, 2018                    Respectfully submitted,

                                            **ADAMS AND REESE LLP**


                                            */s/Robin B. Cheatham*
                                            Robin B. Cheatham LA Bar No. 4004
                                            Scott R. Cheatham, TX Bar No. 24050406
                                            Matthew Storey, TX Bar No. 24060669
                                            701 Poydras Street, Suite 4500
                                            New Orleans, Louisiana 70139
                                            Telephone: (504) 581-3234
                                            Facsimile: (504) 566-0210
                                            robin.cheatham@arlaw.com
                                            scott.cheatham@arlaw.com
                                            matthew.storey@arlaw.com

                                            AND

                                            Jason Michael Osborn (ASB4122A58O)[99]
                                            OSBORN GROUP, LLC
                                            61 St. Joseph St., Ste. 1301
                                            Mobile, Alabama 36602
                                            Telephone: (251) 929-5050
                                            Email: josborn@osborngroupllc.com

                                            Counsel for HCB Financial Corp.

---

[99] Seeking admission pro hac vice.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HCB FINANCIAL CORP

**(b)** County of Residence of First Listed Plaintiff   WALTON COUNTY, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robin B. Cheatham, Scott R. Cheatham, Robert Parrott, Adams and Reese LLP, 701 Poydras Street, Suite 4500, New Orleans, LA 70139, 504-581-3234

## DEFENDANTS

LEE K. MCPHERSON, et al

County of Residence of First Listed Defendant   TRAVIS COUNTY, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 1964
Brief description of cause:
Defendants engaged in scheme to defraud Plaintiff and others through a pattern of racketeering activities

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
12/24/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/Robin B. Cheatham

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.